E9ATCHA1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4            v.                            13 CR 290 (PAC)

 5   CHRISTINA CHAI and HI JONG
     LEE,
 6
                  Defendants.
 7
     ------------------------------x
 8

 9                                         September 10, 2014

10
     Before:
11
                       HON. PAUL A. CROTTY,
12
                                           District Judge
13

14                          APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  ELISHA KOBRE
17        DANIEL TEHRANI
          Assistant United States Attorneys
18
     BRAFMAN & ASSOCIATES, P.C.
19        Attorneys for Defendant Chai
     BY:  MARC A. AGNIFILO
20        JACOB KAPLAN

21   SERCARZ & RIOPELLE
          Attorneys for Defendant Lee
22   BY:  ROLAND G. RIOPELLE
          GIULIANA GRAHAM
23
     Also Present:  Robert Polimeno, DEA
24                  Nicholas Evert, Paralegal
                    ARIEN GREENE-PINTO, Korean Interpreter
25                  KYCONG SILK SONG, Korean Interpreter
```

E9ATCHA1

1              (In open court, jury not present)

2              THE COURT:  Mr. Riopelle, you had two matters you

3    wanted me to take up, and I'm happy to take them up.  Number

4    one was the interpreter.  And we've checked with the supervisor

5    of the interpreters.  This is one of our very best interpreters

6    in the Korean language.  There may have been problems which we

7    believe started because the jurors weren't always using the

8    microphone.

9              Mr. Lee, can you hear us

10             DEFENDANT LEE:  Yes.

11             THE COURT:  So I think that if all of us use the

12   microphones -- Mr. Agnifilo wasn't using the microphone in his

13   opening -- that feeds into the interpreters' earpieces, so

14   always be mindful of using the microphones, I think that this

15   ought to cure the problem.  If it doesn't, Mr. Riopelle, let us

16   know.

17             MR. RIOPELLE:  I will.

18             THE COURT:  And obviously Mr. Lee has to know what is

19   going on.

20             MR. RIOPELLE:  Understood, thank you, your Honor.

21             THE COURT:  Now with respect to your letter about

22   Mr. Catizone's testimony, I didn't get a response from the

23   government.  Does the government want to be heard?

24             MR. TEHRANI:  Yes, we are largely okay with the

25   instruction.  There is one --

E9ATCHA1

1              THE COURT:  Mr. Lee --

2              MR. RIOPELLE:  That may have been part of the problem

3      too, if you holds onto the --

4              THE COURT:  It covers -- up.

5              MR. RIOPELLE:  Exactly.

6              THE COURT:  -- his receptor.

7              MR. RIOPELLE:  That's exactly right, that may be part

8      of the problem, too.  We're all learning how to deal with the

9      technology.

10             THE COURT:  Mr. Tehrani.

11             MR. TEHRANI:  So we are largely okay with the

12     instruction.  We have one proposed instruction, one proposed

13     addition to the instruction, but before we get to that, we have

14     an issue that we would like to raise with your Honor that might

15     affect the instruction about the content of Mr. Catizone's

16     testimony.

17             We intend to ask Mr. Catizone during his testimony

18     about certain opinions that he has developed in reviewing

19     certain of the materials in this case.  And in addition to

20     asking him what his specific opinion is, we also intend to ask

21     him whether, in his view, a pharmacist operating in the usual

22     course of professional practice should have identified certain

23     prescriptions as invalid.  The defense counsel has objected.

24     Our view is that he is not testifying as to any defendant's

25     actual state of mind, he is testifying to standards of

E9ATCHA1

1    professional practice and what his opinion is with respect to a

2    pharmacist operating in the normal course of professional

3    practice.

4              THE COURT:  Mr. Riopelle?

5              MR. RIOPELLE:  Your Honor, effectively what the

6    government wants to do is have the expert testify that a

7    pharmacist looking at this prescription should have known that

8    it was bogus, and that is the equivalent of wrongful mental

9    state that is charged in the indictment.  They have asked for a

10   conscious avoidance instruction, and that is right down the

11   middle of the mental state, according to the conscious

12   avoidance instruction.  And I believe Rule 704(b) provides that

13   an expert's testimony on the mental state of a defendant, to

14   the extent that mental state is relevant in a case, is

15   improper.  So that testimony, that a pharmacist should have

16   known this prescription was bogus is, I submit, improper.

17             THE COURT:  All right.

18             MR. AGNIFILO:  Just to add to that, I think the

19   overlap is just too direct.  In other words, if the your Honor

20   gives the conscious avoidance instruction, you're going to

21   instruct the jury that if one of the defendants believed that

22   there was a strong probability that certain facts were true and

23   didn't do anything about it, that the jury could use that in

24   place of knowledge.  And I think that's in sum and substance

25   exactly what Mr. Catizone is going to be telling this jury.

E9ATCHA1

1    And so I think, especially because we have the conscious

2    avoidance instruction, he's getting -- he's violating the

3    provision against commenting on mental states.

4            THE COURT:  I'm going to allow him to express his

5    opinion on that issue.

6            With regard to Mr. Riopelle's charge on Mr. Catizone,

7    I'm going to give the charge or give the instruction pretty

8    much as proposed, except I'm going to reverse the order in

9    which I'm going to give it.

10           I would also like to limit this to Count One.

11           MR. RIOPELLE:  Okay, I think that's fair.

12           THE COURT:  Where it says the crimes charged in this

13   case, and say the crime charged in Count One, it's obviously

14   not Two and Three.

15           MR. RIOPELLE:  That makes sense.

16           THE COURT:  And then with respect to the credibility,

17   I'm going to say, you know, when I gave you the preliminary

18   instructions I told you an important task for every jury is to

19   determine the credibility of witnesses, and lead into that in

20   your language.

21           MR. RIOPELLE:  And your Honor, I would ask, in light

22   of your Honor's ruling this morning as to Mr. Catizone being

23   able to express an opinion to what a pharmacist should have

24   known seeing these prescriptions, I would ask that the Court

25   add to this instruction and advise the jury that it will be for

E9ATCHA1

1   them to determine ultimately whether any pharmacist in the case

2   knew that there was drug dealing going on, or something like

3   that, to make sure that they understand that it is ultimately

4   for them to decide that issue, whatever Mr. Catizone's opinion

5   may be.

6            THE COURT:  All right.

7            MR. TEHRANI:  Your Honor, we have no objection to

8   that.  We do have, I believe, an agreed-upon addition to the

9   paragraph that begins "Second."

10            THE COURT:  Yes.

11            MR. TEHRANI:  And so what we would propose is right

12   before the final sentence it says, "I will explain more about

13   that to you at the end of the case," our proposed language

14   would be something to the effect of:  That said, the failure to

15   comply with regulations is a factor you can consider in

16   determining whether either of the defendants knowingly

17   participated in unlawful distribution of oxycodone.

18            THE COURT:  That's agreed to?

19            MR. RIOPELLE:  Reluctantly.

20            THE COURT:  Give me the language again, that said.

21            MR. TEHRANI:  That said, the failure to comply --

22            THE COURT:  Wait a minute.  I know the on subway it

23   says if you can read this you can get a job.  I'm not that

24   good.  That said --

25            MR. TEHRANI:  That said, the failure to comply with

E9ATCHA1

1    regulations is a factor you can consider in determining whether

2    either of the defendants knowingly participated in the unlawful

3    distribution of oxycodone.

4          THE COURT:  That said, the failure to comply with

5    regulations is a factor you may consider -- you can consider in

6    determining whether either of the defendants knowingly

7    participated in the unlawful distribution of oxycodone.

8          MR. TEHRANI:  That's correct, your Honor.

9          THE COURT:  What was the language you wanted,

10   Mr. Riopelle, in light of my ruling?

11         MR. RIOPELLE:  In light of your ruling, I would ask

12   the Court insert, wherever it's appropriate in the instruction,

13   a reminder to the jury that although Mr. Catizone may express

14   an opinion as to what a pharmacist should have known when

15   examining the prescriptions in this case, it is for you, the

16   jury, to decide whether either of these defendants knowingly

17   participated in the unlawful distribution of oxycodone.

18         MR. AGNIFILO:  One more request, Judge.  Are you done

19   with Mr. Riopelle's request?

20         THE COURT:  Yes.

21         MR. AGNIFILO:  I think rather than failure in the

22   government's proposed language, it should be knowing failure.

23   And I say that because I think, as is apparent --

24         THE COURT:  Come on, this is day two of a 13-day trial

25   and you're squabbling over words.  I mean let's -- the word

E9ATCHA1

"knowingly" is picked up in Mr. Riopelle's instruction.

There's only so much they can absorb.

          MR. AGNIFILO:  All right, fine, Judge.

          THE COURT:  Mr. Riopelle, how much time do you want

for your opening?

          MR. RIOPELLE:  I think I would be approximately 20

minutes.

          THE COURT:  Does that mean more than 20 minutes or a

little less than 20 minutes?

          MR. RIOPELLE:  I think it will be around 20 minutes; a

little more, a little less.  I don't write them out and I don't

read them, so anything could happen, Judge.

          THE COURT:  We'll start with the opening statements

then.  Who is your first witness?

          MR. TEHRANI:  Your Honor, one procedural issue with

Mr. Catizone.  I raised this with defense counsel, they don't

object.  We also intend to ask Mr. Catizone to offer his

opinion on certain graphical exhibits that we intend to offer

through other witnesses later in the trial.  So we would like

to have the jury be able to see those graphs when Mr. Catizone

is testifying, so we'll offer them subject to connection.

          THE COURT:  You talked about this on Monday.

          MR. TEHRANI:  Yes, we wanted to alert you that it was

happening with this witness as well.

          THE COURT:  As soon as the jury gets here --

E9ATCHA1

1                What's the count?

2                DEPUTY CLERK:  It was 10.  I think I heard the door

3       opening.

4                THE COURT:  As soon as they get here, Mr. Riopelle --

5                MR. RIOPELLE:  I'll be ready.

6                Thank you, Judge.

7                THE COURT:  Incidentally, this is the procedure that I

8       like to follow rather than taking sidebars and interrupting the

9       jury.  Once they get here I like to have continuous testimony.

10      I'm happy to do it during the breaks, lunchtime and after -- at

11      the end of the day as well as at the beginning of the day.  I

12      really think that we ought to spend the time when the jury is

13      sitting in the box with the jury, not at the side bar.

14                MR. RIOPELLE:  Understood, your Honor, thank you.

15                (Recess taken).

16                MR. KAPLAN:  Is Kaplan.

17                THE COURT:  The jury is here, so Mr. Riopelle, we'll

18      start with you.

19                MR. RIOPELLE:  Thank you, Judge.

20                (Continued on next page)

21

22

23

24

25

E9ATCHA1                    Opening - Mr. Riopelle

1          (Jury present)

2          THE COURT:  As I told you on Monday, all of us have to

3   be here before any of us can get started, so I would appreciate

4   your trying to be as prompt as you possibly can.  I know

5   circumstances conspire against you, but try to be on time so we

6   can get started at 9:30.

7          We'll have Mr. Riopelle's opening on behalf of

8   Mr. Lee.

9          Mr. Riopelle.

10         MR. RIOPELLE:  Thank you, your Honor.

11         Good morning, ladies and gentlemen.  Welcome back.

12  I'm getting over a summer cold, so if my voice drops, throw a

13  pencil at me or something to remind me to speak up.

14         May please the Court, it is my duty and pleasure to

15  represent the defendant Hi Jong Lee, with my colleague,

16  Giuliana Graham, over at the end of the table.

17         Ladies and gentlemen, at the end of this case you'll

18  be asked to render a verdict.  And that verdict is a little

19  like a history of what you'll see in this courtroom, it will be

20  a history of what happened back in 2011 and 2012 as charged in

21  the indictment, it will be your job to tell us what the facts

22  are.  That's what a jury does.  It will be your job to tell us

23  what the facts are, what the history was in 2011 and 2012.

24         I want to remind you, though, that "History," as John

25  Gardner said, "doesn't look like history when you're living

E9ATCHA1                    Opening – Mr. Riopelle

1    it."  It's confusing.  The hurly-burly of daily events don't

2    look like the clean events of history as it is written after

3    the fact.  And it will be your job to sift through the facts,

4    decide which are significant, which are not, and decide what

5    actually happened back in 2011 and 2012.

6         And as you do so, I want you to keep in mind another

7    famous quotation, maybe the best opening line in all of

8    literature, because the facts will show this is true, what

9    Tolstoy said in Anna Karenina, "All happy families are alike,

10   every unhappy family is unhappy in its own way."  And the proof

11   will show that, ladies and gentlemen.

12        In this case, the history of this case takes place in

13   a certain place and in a certain time, and I want you to keep

14   that in mind.  You're going to hear a lot about the Stanley

15   Pharmacy.  There it is in downtown Yonkers, a busy urban area.

16   You can see all the foot traffic there.  And it's a certain

17   type of a business, you'll hear, it's a family business.

18        It's a family business, like so many others, begun by

19   an immigrant, my client, Mr. Lee.  Many, many years ago he

20   bought the pharmacy.  He operated it for many, many years.  And

21   it's kind of an immigrant story, because as you'll hear many

22   members of his family worked there, as is often true in these

23   small family businesses.  And you will hear from an expert

24   today that not every regulation applicable to pharmacies was

25   upheld in every respect.  Use your common sense.  You've been

1    told that by other counsel.  You run a small business, you do

2    the best you can.  Sometimes regulations are a little bit

3    violated, but at the end of the day you're not going to be

4    deciding whether regulations were violated, you'll be deciding

5    whether my client, Mr. Lee, was a dope dealer, and that's a

6    very different decision.

7              Urban environment.

8              Now let's talk about the family business, the whole

9    family worked there at one point or another.  You're going to

10   hear a lot about Mr. Lee's son, Ji Lee, who worked there as a

11   manager during the time that's relevant to your considerations,

12   2011 and 2012.  Indeed, he was really running the store at that

13   point.  He had taken it over.

14             You'll hear that Mr. Lee's daughter, Christine, worked

15   there from time to time as a cashier and as an intern, a person

16   studying to become a pharmacist.  You'll hear Ji Lee's wife

17   worked for the pharmacy as a sort of financial manager doing

18   the books and that sort of thing.  As you heard earlier, Ji

19   Lee's sister-in-law, Christina Chai, our co-defendant, worked

20   there as a supervising pharmacist in 2011 and 2012.

21             You'll hear that this was a busy urban pharmacy.

22   You'll see some videotapes of people coming in and out of there

23   all day.  It's a busy place.  It sold the stuff the pharmacy

24   sells, the drugs and all that, as well as things as simple as

25   shampoo, like a Duane Reed.  It's a mom and pop shop, but very

1    busy.

2           What was my client, Mr. Lee's role, in the pharmacy?

3    You'll hear that he bought the pharmacy many years ago, way

4    back in the 1980s.  He was a much, much younger man.  He worked

5    at the pharmacy very hard for many years.  He was a pharmacist

6    himself during the time that he owned the pharmacy.  It was a

7    real grind to work there, but he made a good living by devoting

8    himself to that pharmacy for so many years.

9           And his son, Ji Lee, worked with him at the pharmacy

10   from the time Ji was a small boy.  Like many small businesses,

11   the children come, they see their dad at work, they do a little

12   work as they grow up, they work as a cashier, they help dad.

13   My experience is usually they're screwing things up more than

14   helping, but that's how families are, they come to dad's work

15   to help him.

16          You'll hear that my client, as he aged and got older,

17   began slowing down years ago, years before the problems

18   happened at the pharmacy.  And we don't deny there were

19   problems at the pharmacy.  Years ago as my client aged, he

20   became tired.  He was injured in a car accident.  He ultimately

21   became ill with cancer.  And as that happened, he slowed down

22   significantly at the pharmacy.  You'll hear that by the time of

23   the events in this case he was only there a few hours a week.

24          Like most people who own a small business and work it

25   for so many years, he wasn't able to give it up entirely.  This

1    was his life.  So he came back during the week every week, a

2    few times for a few hours to do just a few things, but he was

3    effectively semi-retired by the time the problems began.  He

4    had turned the pharmacy over to his son Ji Lee to operate the

5    pharmacy years ago, long before the events that are key to this

6    case in 2011 and 2012.  And you'll hear from witness after

7    witness that it was Ji Lee who managed and operated the

8    pharmacy in 2011 and 2012.

9              My client, Mr. Lee, was not at the pharmacy every day.

10   He came in one, two, three times a week for a few hours, and on

11   Saturdays.  You'll hear that it was just a few hours a week he

12   was there.  You will hear from the witnesses that when he was

13   there, he spent most of his time downstairs in an office that

14   he had in the pharmacy for many years.  And you will see videos

15   of what was going on upstairs in the pharmacy.  You will not

16   see my client in very many of those videos, because that's not

17   the part of the pharmacy where he spent his time.

18             An even when he was upstairs, you'll hear that my

19   client rarely worked in the pharmacy area directly with the

20   customers.  He was not someone who dealt directly with the

21   customers and the regulars who you will hear from here in

22   court, the people involved in the oxycodone distribution

23   conspiracy charged in the indictment.  My client really didn't

24   deal with them.  Lots of reasons for that.  His English isn't

25   that great.  He's an immigrant.  He's a pharmacist.  He's a

1   technical guy.  He's a good business manager.  But in terms of

2   client relations, his son, who spoke English much better than

3   he did, the cashiers who spoke English much better than he did,

4   they were the people that dealt with the customers.  You'll

5   hear that Ji dealt with the customers over and over and over,

6   and that it was Ji Lee, Ji Lee, his son, who handled the money

7   that was taken in at the pharmacy.

8        And at the end of this case, ladies and gentlemen,

9   when you write your history, you will find that Mr. Lee, my

10  client, had no idea that oxycodone was being sold improperly at

11  the Stanley Pharmacy in 2011 and 2012.  The pharmacy that he

12  established and worked at, bought way back in the 1980s and

13  worked at so many years.  Remember, the problems really started

14  only at the very end after my client had begun to withdraw from

15  the pharmacy.

16       You'll hear that Ji Lee dealt with the drug

17  wholesalers, the people selling the oxycodone to the pharmacy

18  that was then distributed.  You'll hear that Ji ordered the

19  pills.  Ji handled any problems with the drug orders.  You'll

20  hear that Ji dealt directly with the retail customers, the

21  regulars, the guys who will come in and tell you they were dope

22  dealers and buying oxycodone at the Stanley Pharmacy, they

23  dealt with Ji Lee.  And most importantly, from my client's

24  perspective.  You will hear that 2003, his son, Ji Lee,

25  collected and handled the cash from the regulars who were

1    paying for their oxycodone in cash.

2           Now ladies and gentlemen, my client at this point in

3    time, 2011 and 2012, had worked with his son in that pharmacy

4    for will, many years.  He had come to trust his son.  He had

5    come to rely on his son.  He had no reason to believe that his

6    son would do the things that are charged in the indictment.

7           Now it is true, you will hear that Mr. Lee, my client,

8    made some of the bank deposits at issue in this case.  He made

9    them at the Bank of America branch just around the corner or

10   down the street in downtown Yonkers in Getty Square.  That's

11   where these deposits happened.  You'll hear that my client had

12   a sort of routine where he would come into the pharmacy two or

13   three days a week, go down to the basement, count the cash that

14   Ji Lee had gathered over the last day or so, take it to the

15   bank with the deposit slip and deposit it.  You'll hear that

16   the deposits my client made were often fairly large.  They

17   included both checks and cash in many cases.  You'll hear he

18   was not trying to hide the fact that he was depositing a lot of

19   money in the bank from time to time.  Some of the deposits were

20   pretty large.  And you will hear that my client made sure to

21   hand carry those deposits into the bank himself.  He made the

22   deposits in person.

23          Now as you hear and consider this evidence, I want you

24   to consider the fact that my client is charged with making

25   these deposits in an illegal way, either to launder the

E9ATCHA1                    Opening – Mr. Riopelle

1    proceeds of the narcotics crime or to engage in the crime of

2    structuring, about which I will have something to say in just a

3    moment or two.  Consider that fact when you consider the fact

4    that my client went into the bank in person every day that a

5    deposit was made at Getty Square with a deposit in his own

6    hand.  If he had really known that this was narcotics proceeds,

7    ask yourselves as you think about this evidence and you hear it

8    in court, would he have done that?  Would he really have done

9    that?  Doesn't make sense.

10         You'll hear the deposits were made a few days a week

11   with an ordinary deposit slip.  It looked just like that.  And

12   because my client didn't come to the pharmacy every day,

13   because the deposits he was making included the cash taken in

14   by the pharmacy over two or three days at a time, yes, those

15   deposits had a lot of cash in them, sometimes 7, 8, $9,000 at a

16   time.  Nothing unusual about that.  It was a busy pharmacy.

17         Where did the cash come from?  You'll hear that the

18   cash at the end of the day was put in a little basket like

19   that.  It's a pharmacy basket where the prescriptions are

20   passed back and forth to the pharmacist.  Ji Lee would put the

21   cash in that basket at the end of the day and leave it for his

22   dad to deposit when he got in.

23         Now ladies and gentlemen, nobody in this case is going

24   to suggest to you that Mr. Lee's son, Ji Lee, was not engaged

25   in improper distribution of oxycodone.  And it was Ji Lee who

1    left that cash in the basket for his dad to deposit when his

2    dad came into the pharmacy.  It was Ji Lee who left the 7, 8,

3    $9,000 amounts in that basket for dad to deposit.

4            So I submit to you that at the end of this case, when

5    you decide what the history was, it was Ji Lee who was actually

6    doing the structuring.  He was the guy making sure that not

7    more than $10,000 was deposited in cash at any time.  He was

8    leaving an amount for his dad that would not trigger the filing

9    of that currency transaction report.  His dad would simply come

10   in, count the cash, fill out a deposit slip, and show up at the

11   bank in person.  That's what happened here.

12           Now I want to also remind you that the way the

13   structuring count is charged in the indictment, it is charged

14   that my client did the structuring "while violating other laws

15   of the United States, and as part of a pattern of illegal

16   activity involving more than $100,000 in a twelve-month period

17   and in furtherance of the narcotics conspiracy."

18           So I suggest to you that if you find at the end of

19   this case that my client knew nothing about a narcotic

20   conspiracy, you will also find that he did not structure these

21   deposits to aid that narcotics conspiracy.

22           (Continued on next page)

23

24

25

E9azcha2                    Opening – Mr. Riopelle

1          MR. RIOPELLE:  Indeed, you will find that many of the

2     deposits at issue in this case were not even made by my client.

3     Because the proof will show that during 2012, as he got older,

4     as he got towards the end of his life, my client decided to

5     travel a lot.  He was travelling to venues that were important

6     to him; to Los Angeles where he had another son, Jay Lee, and

7     grandchildren.  He traveled there.  He was out of town in Los

8     Angeles when some of the deposits that the government claims

9     were structuring were made.  He was traveling to Seoul, Korea

10    where he's from, and to China on a religious mission.  You'll

11    hear that my client was a deeply religious man and went to

12    China for an extended period, on a religious mission, and many

13    of the deposits that the government charges as structuring were

14    made while my client was in China and in Korea.  As a religious

15    man, he went to Israel to the Holy Land at the end of his life,

16    he wanted to see it.  Many of the deposits were made then on

17    that trip.

18          He also went to the Dominican Republic and to Palm

19    Beach.  We'll be able to show you when he was there.  And

20    you'll see that some of the deposits the government claims were

21    structuring deposits were made then.

22          In fact, ladies and gentlemen, approximately 45 of the

23    deposits that the government claims were structuring worth

24    $275,000, those were made while he was out of town.

25          Now, some of the key documents in this case are the

1    prescriptions.  And you'll start hearing testimony about them

2    right today.  And I want to show you two of them which are very

3    important to Mr. Lee's case.  You'll see these during the

4    trial.

5            These are two prescriptions that the indictment

6    charges were filled by my client.  And I submit to you that by

7    the end of the trial, after you've heard all the evidence, you

8    will find that these were not filled by my client at all, and

9    that he had nothing to do with them.

10           Now, the reason the government charges that my client

11   had something to do with them is, you'll hear that a pharmacist

12   often writes a small entry on the front of the prescription --

13   and there it is -- and there is an initial H. on the front of

14   this prescription.  In addition to that, on the back of the

15   prescription there is a label that is the same label that goes

16   on the pill bottle that's generated by the computer that is in

17   the back where the pharmacist is.

18           Now, in this case there is an H. on the front.  And if

19   you look closely at that label, you will see that there are

20   initials on the label are T.C..  That's for Christina Chai.

21   She was actually the pharmacist who generated that label.  She

22   is in the back of the pharmacy not dealing with the customers.

23   Somebody is up front putting that H. there.  And the person up

24   front knows that the pharmacist is supposed to sign it.  But

25   you're not going to hear that my client dealt with the people

E9azcha2                    Opening - Mr. Riopelle

1    who handed this prescription in.  It was Ji Lee who did that.

2    He put in his own father's initial on the front of this

3    prescription, handed it back to Christina Chai who signed on

4    the computer as Christina Chai, T.C., and she puts her own

5    initials in there, because she has signed into the computer.

6           My client is not functioning as a pharmacist.  And the

7    same is true here with the second one, indictment paragraph 4G.

8    There is a H. on there, sure enough, but there is the back of

9    the prescription.  If you look at it closely, again you see

10   it's got the T.C. there.  And that is absolutely consistent

11   with the evidence you will hear from the dope dealers who came

12   into the pharmacy.  They will tell you that they dealt only

13   with Ji Lee.  He is the person taking the prescription.  He is

14   the person signing his father's initial on the front because he

15   knows you have to have a pharmacist sign it.  He is the person

16   who passes it back to Ms. Chai, who doesn't know what's really

17   happening up front, and she generates the label, because she is

18   the pharmacist working in the back.

19          Now, you'll hear some testimony about the home that my

20   client shared with his son.  He and his son Ji lived together

21   in that home, as is traditional for an Asian family.

22          You will hear that it was a house divided in some

23   respects, in two important respects.  First, it was physically

24   divided.  It's a sort of the equivalent of a two-family house,

25   where mom and dad live on one floor and the children live on

1    another floor.  We all are familiar with that.  In this case,

2    it was a large house spread out on one level, but mom and dad

3    lived in a little area off to the left, and Ji Lee and his wife

4    and children lived off to the right.  Separate living areas.

5    You'll hear that my client and his son didn't interact much at

6    home.  It was a house divided emotionally as well.  Didn't have

7    a close relationship.  They were a little bit estranged.

8           And you'll hear that cash was seized back at that end

9    of the house, the other end of the house from where my client

10   lived.  It was seized in an office that Ji Lee used.  It was

11   seized -- it was hidden there, hidden there where no one could

12   see it, until the DEA showed up with a search warrant.

13          I think you'll find I think the history will be at the

14   end of the case, that that was cash that my client's son was

15   hiding from him.  I believe that's what you'll find.

16          Ladies and gentlemen, at the end of the trial you'll

17   be asked to write the history of the Stanley Pharmacy in your

18   verdict.  There is some questions, ladies and gentlemen, that

19   the evidence just won't ultimately answer, I don't believe.

20   You won't get a complete answer to why Ji Lee did what he did,

21   why he betrayed his father and his sister-in-law; why he

22   engaged in that dope dealing.  Was he angry?  Did he feel

23   trapped working in his father's business?  Was it some kind of

24   rebellion?  I don't think you'll find that it was just about

25   the money.  Something more to it than that.  But we won't hear

1    from Ji Lee, and so I don't know that we'll ever be able to

2    answer that question.

3             But there are some questions you will be able to

4    answer, and those questions are whether my client ever dealt in

5    oxycodone and ever distributed oxycodone intending to be a dope

6    dealer.  I think you'll answer that question no.  I think

7    you'll be able to answer the question, whether he ever engaged

8    in a banking transaction for the purpose of laundering drug

9    money.  I think you'll find that he didn't know that the money

10   he was depositing in the bank was the proceeds of some drug

11   crime.  So he didn't do that.

12            And I think at the end of the case the proof will

13   show, and you will find, that my client did not knowingly

14   engage in a pattern of structuring deposits for the purpose of

15   concealing a drug dealing conspiracy.  And, therefore, ladies

16   and gentlemen, I believe your verdict, your history in this

17   case will be that my client, Hi Jong Lee, is not guilty.

18            Thank you for listening to me this morning.

19            THE COURT:  Thank you, Mr. Riopelle.

20            Call your first witness.

21            MR. TEHRANI:  Your Honor, the government calls Carmen

22   Catizone.

23    CARMEN CATIZONE,

24        called as a witness by the government,

25        having been duly sworn, testified as follows:

1    DIRECT EXAMINATION

2    BY MR. TEHRANI:

3             THE COURT:  Please sit down, Mr. Catizone.

4             THE WITNESS:  Thank you, sir.

5             THE COURT:  Pull yourself right up to the microphone.

6             Mr. Tehrani.

7             MR. TEHRANI:  Thank you, your Honor.

8    Q.  Mr. Catizone, how are you employed?

9    A.  I'm a pharmacist with the National Association of Boards of

10   Pharmacy.

11            THE COURT:  Is that on?  I don't know the microphone

12   is on.

13            THE DEPUTY CLERK:  Now it is.

14            THE COURT:  Speak right into the microphone.

15            THE WITNESS:  Testing, testing.

16            THE COURT:  That's better now.

17            THE WITNESS:  Thank you.

18   A.  I'm a pharmacist with the National Association of Boards of

19   Pharmacy.

20   Q.  And is that referred to sometimes as the NABP?

21   A.  Yes, sir.

22   Q.  What is your position with the NABP?

23   A.  I'm the Executive Director.

24   Q.  Can you please describe your educational background?

25   A.  I have a Bachelors of Science in Pharmacy that I earned

E9azcha2                           Catizone - direct

1   from the university of Illinois in 1983, and Masters in

2   Pharmacy Administration, which I earned in 1987.  And I'm

3   licensed as a pharmacist in Illinois, and earned that license

4   in 1983.

5   Q.  And how did you become licensed?

6   A.  I had to complete the Bachelor of Science program and pass

7   the National Pharmacy Exam, as well as the state law

8   examination.

9   Q.  Now prior to your work with the NABP, were you a practicing

10  pharmacist?

11  A.  Yes, sir.

12  Q.  For how long?

13  A.  14 years.

14  Q.  In what types of pharmacies?

15  A.  I worked in a community pharmacy, as well as a hospital

16  pharmacy.

17  Q.  And you may have said this already, but when did you join

18  the NABP?

19  A.  I joined in 1985.

20  Q.  When did you become the Executive Director?

21  A.  In 1988.

22  Q.  And how were you appointed to that position?

23  A.  There was a national search, and the committee then

24  selected me as the final candidate, and I was hired as the

25  Executive Director.

1    Q.   Now, when we've been talking about the National Association

2    of Boards of Pharmacy, could you explain what that is?

3    A.   It's a nonprofit organization whose members are the state

4    agencies that regulate pharmacies and pharmacists.   Pharmacists

5    do not belong to NABP.   Pharmaceutical companies do not belong

6    to NABP.   And the purpose of the association is to help states

7    protect patients and protect the public health.

8    Q.   And when was it founded?

9    A.   It was founded in 1904.

10   Q.   Could you describe what your duties and responsibilities

11   are as the Executive Director of the NABP?

12   A.   I oversee the operation of the association, and implement

13   the policies that the states determine for the association.

14   Q.   And what are some of the functions of the NABP?

15   A.   We prepare the national licensing exam that all states

16   require and use.

17         We also prepare state law examinations that 48 states

18   utilize, and then we do the background check and disciplinary

19   checks for pharmacists who want to transfer their license from

20   one state to the other.

21         We also have accreditation services, and which we

22   inspect pharmacies for the states, and then we assist the

23   states in legislation and model regulations.

24   Q.   And in your role as Executive Director, are you involved in

25   all those things?

1    A.  Yes, sir.

2    Q.  Focusing just for a minute on the licensing exams that you

3    were speaking about, what do those licensing exams entail?

4    A.  The national examination, which is called the NAPLEX,

5    N-a-p-l-e-x, examines three major areas of a pharmacist's

6    competence to practice.

7              The first is patient medication use and safety.

8              The second is the preparation of medications,

9    pharmacists that make compound products.

10             And the third is public education and wellness; how

11   the pharmacist communicates with patients and what they do to

12   assist patients and understanding public health issues and

13   wellness.

14             The law exams which we prepare consist of the

15   individual state laws and the federal laws that apply across

16   the board.  But the examination is such, and it's computerized,

17   so that when a pharmacist takes their individual state law

18   exam.  The questions are specifically geared to that state.  So

19   whatever the prevailing law is in that state, whether it's

20   state law or federal law, the questions in the computer

21   automatically selects those questions so the pharmacist has to

22   know what the laws are in that particular state.

23   Q.  Are both components required in every state?

24   A.  Yes.

25   Q.  And are pharmacists required to pass both components in

1    order to be a licensed pharmacist?

2    A.  Yes, sir.

3    Q.  Now, prior to being appointed as Executive Director, did

4    you serve in any other roles with the NABP?

5    A.  Yes.  I was a test and measurement director.

6    Q.  And what did you do in that role?

7    A.  I oversaw the examinations to make sure that the content

8    was accurate and appropriate, and also that the examination was

9    valid so that the questions asked what they were supposed to

10   ask, and that the questions weren't trick questions or

11   confusing questions, and that when a candidate was examined,

12   that that score was a valid score for their level of

13   competence.

14   Q.  Does the National Association of Boards of Pharmacy

15   maintain a data base of statutes and regulations for every

16   state?

17   A.  Yes, sir.

18   Q.  Do you have access to that data base?

19   A.  Yes, I do.

20   Q.  In connection with your role with the NABP, have you become

21   familiar with the standards of pharmacy practice?

22   A.  Yes, sir.

23   Q.  Including in New York?

24   A.  Yes, sir.

25   Q.  Have you published in the field of pharmacy practice?

1    A.   Yes, I have.

2    Q.   Approximately how many publications?

3    A.   Approximately a hundred publications.

4    Q.   And can you give just some general examples of some of the

5    things that you published?

6    A.   The presentations have focused on what state laws and

7    regulation are, and what the standards of practice may be.  So

8    I've published on competence of a pharmacist, published on what

9    some of the requirements are for pharmacist in individual

10   states, published on what some of the dangers of medication use

11   are and what fraud and abuse might be, and that the pharmacist

12   would be familiar with or identify.

13   Q.   In what types of publications have you published?

14   A.   They've been published in both professional journals that

15   are reviewed by peers.  They've also appeared in public domain,

16   Wall Street Journal, U.S.A. Today, local newspapers, any

17   information sources that people may rely upon.

18   Q.   Have you taught in the field of pharmacy practice?

19   A.   Yes, I have.

20   Q.   Where?

21   A.   During my graduate studies, I taught statistics as part of

22   the graduate program to pharmacy students at the University of

23   Illinois.

24        I also served as an adjunct faculty member once I was

25   graduated and licensed with the University of Illinois in the

1   area of pharmacy administration, and I served as an adjunct

2   faculty member for the DEA at the Quantico facilities in

3   Virginia where I teach DEA agents on drug diversion and

4   pharmacy issues.

5   Q.  You mentioned the term drug diversion.  We'll get to that

6   in a minute.

7          But would you just explain, since you mentioned it,

8   what drug diversion is?

9   A.  The term is used and defined when somebody obtains

10  medications inappropriately and then diverts or uses those

11  medications for other purposes; to sell those medications, to

12  abuse those medications, and not for the purpose that they're

13  intended for or they should be prescribed for.

14  Q.  Mr. Catizone, have you testified before any legislative

15  bodies on the subject of pharmacy practice?

16  A.  Yes, I have.

17  Q.  Which ones?

18  A.  I've testified before the Legislature or the Boards of

19  Pharmacy in every state but Alaska.

20  Q.  And what about the federal government?

21  A.  I've appeared before both the Senate and House Committee to

22  talk about issues involving pharmacy practice and pharmacy

23  regulation.

24  Q.  Have you testified in administrative proceedings in the

25  field of pharmacy practice?

1    A.  Yes, I have.

2    Q.  Have you testified in court proceedings as an expert in the

3    field of pharmacy practice?

4    A.  Yes, I have.

5    Q.  Approximately how many times?

6    A.  Approximately ten criminal cases at the federal level, and

7    probably about ten or so at the administrative hearings in both

8    the state and federal level.

9           MR. TEHRANI:  Your Honor, at this time we move to

10   qualify Mr. Catizone as an expert in the field of professional

11   standards relating to pharmacy practice?

12          THE COURT:  Any objection?

13          MR. AGNIFILO:  No, Judge.

14          MR. RIOPELLE:  No objection, Judge.

15          THE COURT:  He's recognized as an expert.

16   Q.  Now, Mr. Catizone, what city are you based?

17   A.  Chicago.

18   Q.  And who paid for your travel to New York and your

19   accommodations here?

20   A.  My expenses are being reimbursed by the U.S. Attorney's

21   Office.

22   Q.  Are you being compensated by the government in any other

23   way?

24   A.  No, sir.

25   Q.  So who pays for the time you devoted to your testimony?

1    A.  As part of my responsibilities and the purpose of the

2    association to help the states protect the public, part of my

3    salary is devoted to these activities.

4    Q.  Mr. Catizone, are pharmacies assist regulated?

5    A.  Yes, sir.

6    Q.  By whom?

7    A.  By the State Boards of Pharmacy, as well as by the Food and

8    Drug Administration and the Drug Enforcement Administration

9    with different laws that are enacted at the federal level.

10   Q.  What is a State Board of Pharmacy?

11   A.  A state board of pharmacy is a state agency that's been

12   created by the State Legislature to oversee the practice of

13   pharmacy, and to make sure that pharmacists are competent, and

14   that patients are protected by the oversight of that state

15   board of pharmacy.

16   Q.  And those are the entities that are members of the NABP?

17   A.  Yes, sir.

18   Q.  Now what is the source of the standards governing

19   pharmaceutical practice?

20   A.  Standards come from a number of different sources.  One is

21   professional practice and the standards that pharmacists and

22   prescribers and others deem important for the use and

23   prescribing dispensing medication.

24          Other standards come from the Legislature, when they

25   decide if there's something that's needed to protect patients.

1            And other standards come from standards setting

2    organizations that look at how medications are dispensed or

3    prescribed, and what some of those standards need to be.

4    Q.  Mr. Catizone, are you familiar with the term "controlled

5    substance"?

6    A.  Yes, I am.

7    Q.  Briefly, what is a controlled substance?

8    A.  A controlled substance is a subset of prescription drugs,

9    and it's a medication that has a high abuse for harm and

10   potential addiction.

11   Q.  And are controlled substances classified further in any

12   way?

13   A.  Yes, they are.

14   Q.  How so?

15   A.  They are subdivided into five categories.  And the first

16   category, schedule one, is reserved for drugs that have no

17   medical purpose.  Those are -- that's a drug like heroin.

18           Schedule two means that the drug has a medical

19   purpose, but the potential for harm to the patient and abuse or

20   addiction is extremely high.  That would be a product like

21   oxycodone or morphine.

22           Schedules three, four and five decrease in terms of

23   their potential for abuse and harm, and would include drugs

24   like Xanax or Ativan or Valium, that have a medical purpose,

25   but also have a potential for abuse or harm, but that potential

 1   is less than a product in the schedule two.

 2   Q.  Now, in order for a pharmacist to dispense a controlled

 3   substance, what, if anything, is required?

 4   A.  The prescriber, the doctor who writes that prescription has

 5   to be registered with the DEA and have a valid DEA number.

 6           Similarly, the pharmacy at which the pharmacist works,

 7   they must also be registered with the DEA.

 8   Q.  So the pharmacy has a DEA registration, not necessarily the

 9   pharmacist?

10   A.  Correct.

11   Q.  Now, you mentioned oxycodone a little bit ago.  What is

12   oxycodone?

13   A.  Oxycodone is a medication that's used to treat pain.

14   Q.  And you mentioned that it's schedule two?

15   A.  Yes, sir.

16   Q.  So again what does that mean about oxycodone?

17   A.  It means that it has the potential to cause harm to the

18   patient, and that some of the harm that's been documented as

19   part of the medication actually decreases the patient's

20   breathing muscles and breathing system.  So it could cause a

21   pain to have a significant reaction or serious injury.

22           It also is a medication that could be easily abused or

23   a patient also becomes addicted to, and there is a high

24   potential for that occurring.

25   Q.  Now what is it about oxycodone that makes it susceptible to

1    abuse?

2    A.   The product itself creates a euphoria or a high, and the

3    people who abuse that medication enjoy that or seek that

4    euphoria and that high from the medication.

5    Q.   Do you know whether or not people can get desensitized to

6    oxycodone?

7    A.   Yes.

8    Q.   And what does that mean?

9    A.   What that means is that by taking the medication over a

10   long period of time, your body builds a tolerance to that

11   medication so that you have to take more of it to achieve the

12   same results.  And that could happen for both legitimate uses

13   and for abuse uses.

14          So if you're taking it for pain and taking it for a

15   long period of time, the dose you have to take may have to be

16   increased over a long period of time.  And if you're taking it

17   for euphoria or abuse purposes, again, you'd have to take more

18   of it as your body builds up tolerance to it.

19   Q.   Now you discussed a little bit ago about what diversion is.

20   Can you just explain again what diversion is?

21   A.   Diversion takes many forms, but the best way to describe it

22   would be somebody obtains a prescription or uses a prescription

23   to obtain medicines that they shouldn't have, that there is no

24   medical purpose for.  And then they take that medication and

25   either abuse it themselves or they sell the medication, or they

1   do something with that medication that is not intended to be

2   used for or prescribed for.

3   Q.   Now, you referred to it from a perspective of a customer.

4   But can a pharmacy also be involved in diversion?

5   A.   Yes.

6   Q.   And a physician can also be involved in diversion?

7   A.   Yes.

8   Q.   Do you know whether or not oxycodone is a controlled

9   substance that is typically diverted?

10  A.   Yes.

11  Q.   And why is that?

12  A.   Again, the drug itself creates a high euphoria the people

13  seek, and oxycodone and hydrocodone, which is a derivative --

14  they're both derivatives of morphine -- are the two most abused

15  drugs in the entire United States.  And depending upon the

16  region, it's either oxycodone is the number one or hydrocodone

17  is number one.  And in the northeast region here oxycodone is

18  the number one abused drug.

19  Q.   Does oxycodone come in different dosages?

20  A.   Yes.

21  Q.   Could you explain what a dosage is?

22  A.   Sure.  Dosage is the strength of the medication that's

23  determined to be used for certain indication.

24  Q.   And how is that typically noted; how are dosages measured?

25  A.   With the particular product oxycodone, it really has -- it

E9azcha2                        Catizone - direct

can be broken down into really two primary categories.  There's

temporary severe pain, and then there's long term pain.

          So the temporary severe pain would be if you broke a

bone or had some surgery and you were going to be in severe

pain, but it was going to be for a limited amount of time, the

usual dose for that pain treatment is 10 to 15 milligrams every

four to six hours for a very limited time period; few days,

maybe a few weeks maximum.

          The other type of pain is the type of pain you see

with cancer patients, or patients that have back pain that

they've had for years and not able to treat.  That requires the

patient to be on oxycodone for a significant period of time.

And the doses for that treatment are much higher.  They're in

the 80-milligram range.  They're also the extended release or

sustained release tablets, which means when the patient takes

it the way the medication's formulated, it dissolves and works

throughout a long period of time so the patient doesn't have to

keep taking the medications.  Those patients have to be

carefully monitored, and the pain management therapy very

carefully adhered to so the patient's not harmed.

          The literature and the recommended dosing by the Food

and Drug Administration says that when you exceed a

30-milligram dose, it should be done with extreme caution, and

that also the maximum amount of oxycodone taken per day should

be about 100 milligrams.

E9azcha2                          Catizone - direct

1          So if you go back to the severe pain, which is the

2     category we're talking about a dose of 10 to 15 milligrams

3     every four to six hours, would mean that the patient shouldn't

4     really take any more than four or eight tablets per day

5     depending upon the strength.

6          The 30-milligram dose falls completely outside of both

7     of those areas of pain.  It's much stronger than the ten to 15.

8     It's not as strong as the 80 or sustained release.  And the

9     literature specifically says doses over 30 milligrams should be

10    measured and should be managed with extreme caution.

11         What's also been made available and known to

12    pharmacists through the Boards of Pharmacy and through the Drug

13    Enforcement Administration is that the 30-milligram dose is the

14    most abused form of oxycodone in the entire nation.

15    Q.  Mr. Catizone, I'd now like to ask you some questions about

16    pharmacy practice at a brick and mortar pharmacy.

17         At the outset, do you know what I mean by brick and

18    and mortar pharmacy

19    A.  Yes, sir.

20    Q.  And what does that generally mean?

21    A.  Typical pharmacy that you find on the corner in your

22    neighborhood, Duane Reade, CVS.  Those are brick and mortar

23    pharmacy.

24    Q.  Now, according to the professional standards of the

25    practice of pharmacy, what does a pharmacist need to do prior

1    to filling a prescription?

2    A.   All of the state practice acts and regulations require that

3    the pharmacist conduct an evaluation of that prescription.  And

4    terminology that's used across all states is that the

5    pharmacist conduct a drug use evaluation.  And what that means

6    is the pharmacist has to look at that prescription and

7    determine whether or not it's appropriate for that patient, and

8    appropriate for what the indication for that medication is the

9    prescriber wrote.

10           So if a patient comes in and they're suffering from

11   diabetes or high blood pressure, then that medication should be

12   for diabetes or high blood pressure.  It should also be the

13   appropriate strength.  It shouldn't be too strong or not as

14   strong as needed so that the patient doesn't receive the right

15   amount of medication.

16           And the quantity that's prescribed should also be for

17   the time period that patient needs.  With those non-controlled

18   substances, it's usually a 30 day period.  So looking at what

19   the directions are, what the strength is, the pharmacist should

20   make sure that it's the right quantity of medication.  They

21   should also look at the patient's allergies, other medications

22   they're taking to make sure there is no interactions.

23           Besides that evaluation, there's also the requirement

24   that the pharmacist make sure that it's a valid prescription;

25   that the prescriber is a valid prescriber; that they're writing

E9azcha2                        Catizone - direct

1    prescriptions within their scope of practice so that we don't

2    have doctors that treat children, pediatricians, writing

3    prescriptions for adults.  It would be outside of their scope

4    of practice.  Or you don't have prescribers that are writing

5    for medications that they have no authority to write because

6    they're not registered with the DEA, or they've not registered

7    with the state appropriately.

8            They must also determine if there is an appropriate

9    relationship between the patient and the prescriber.  And they

10   must look at other factors to see whether or not that

11   prescription's valid, and if it's not or they suspect that it

12   may be fraudulent or invalid, then they are legally responsible

13   to not fill the prescription and notify law enforcement.

14   Q.  Now, are these standards of practice for pharmacies, the

15   same throughout the United States?

16   A.  Yes, sir.

17   Q.  Do they govern the practice of every pharmacist practicing

18   in the United States?

19   A.  Yes, sir.

20   Q.  How do a pharmacist's responsibilities relate to those of a

21   physician with respect to the dispensing of prescribed

22   medication?

23   A.  The physician is responsible for the prescribing, but the

24   pharmacist has a corresponding responsibility that's spelled

25   out in federal law, and also spelled out in state law, that

1    says the pharmacist must authenticate and validate those

2    prescriptions are legitimate, and that there is not any fraud

3    or abuse or diversion occurring with those prescriptions.

4    Q.  Is a pharmacist required to fill every prescription that is

5    presented to him or her?

6    A.  No, sir.

7    Q.  So as a practical matter, how does a pharmacist fulfill

8    these obligations?

9    A.  If it's a non-controlled substance, and let's say the

10   prescription's written for medication that would harm the

11   patient and the pharmacist would fill that and the patient

12   would be harmed, that would be a problem for the pharmacist and

13   a violation, and action could be taken against that

14   pharmacist's license.

15          For controlled substance, the pharmacist has to verify

16   that the prescriber's legitimate, they have to verify their DEA

17   number, they have to verify that the medication exists and was

18   written because it was a legitimate relationship between the

19   doctor and the patient, and they also have to verify that the

20   patient is not abusing or diverting or selling that product for

21   other purposes.

22   Q.  And in order to do that, does a pharmacist need to be able

23   to observe a patient?

24   A.  Yes, sir.

25   Q.  And obtain background information about the patient?

E9azcha2                          Catizone - direct

1  A.  Yes, sir.

2  Q.  Are there requirements as far as what is required to be on

3  a prescription?

4  A.  Yes, sir.

5  Q.  And what are those?

6  A.  The patient's name, the patient's address, the name of the

7  drug, the direction for taking the drug, the number of refills,

8  the doctor's name and the doctor's address and phone number,

9  and if it's a controlled substance, the doctor must physically

10 sign that prescription.

11 Q.  Is a physician, I'm sorry, a pharmacist ever required to

12 call a physician about a prescription?

13 A.  Any time there is suspicion that the prescription may be

14 invalid or fraudulent, the pharmacist has responsibility to

15 call or verify, or whatever means possible, to authenticate

16 that the prescriber's legitimate and that the prescription is a

17 valid prescription.

18 Q.  And, in your experience, should a pharmacist call more

19 often for oxycodone prescriptions as opposed to other types of

20 prescriptions?

21 A.  Based on my experience and the literature, when you have

22 product that's a schedule two controlled substance with the

23 potential for harm and abuse, that certainly would require more

24 diligence than a prescription for high blood pressure or

25 diabetes.

E9azcha2                        Catizone - direct

1    Q.   Now, how, if at all, does the quantity of pills and

2    prescription relate to a pharmacist's duty to inquire of a

3    physician?

4    A.   The quantity is part of the information that the physician

5    or the doctor sends to the pharmacist, for the pharmacist then

6    to make a professional judgment and dispense the medication.

7    The quantity has to coincide with what the medication is and

8    what the course of therapy should be.

9              So, again, when we're dealing with pain medications,

10   we're looking at a short period of time.  And so when you see a

11   prescription that may be for 10 or 15 or 30 tablets and that

12   coincides with what the drug should be used for and for how

13   long, that would validate and justify that prescription and say

14   it's appropriately written and appropriately prescribed.

15             When you get totals that exceed that and exceed that

16   by significant number 100, 120, 180, those are red flags that

17   call into question that prescription, that therapy, and even

18   that prescriber.

19   Q.   So under the standards of professional pharmacy practice,

20   can a pharmacist just look at the face of a prescription, rely

21   on the information on the prescription and fill a prescription?

22   A.   No, sir.

23   Q.   Why not?

24   A.   The face of the prescription only tells part of or only

25   contains part of the information that the pharmacist may need.

1    There can be an error on that prescription; the doctor wrote

2    the wrong drug; the doctor wrote the wrong quantity, the wrong

3    strength, or there could be something on the face of that

4    prescription that suggests that there's something else going on

5    here or that the pharmacist needs to verify.

6            So just simply the relying on the prescription at face

7    value doesn't meet responsibilities the pharmacist has.

8    Q.  What is a pharmacist supposed to do if he or she cannot

9    verify a prescription?

10   A.  For a non-controlled substance, the pharmacist has to use

11   the professional judgment.  So if we're talking again about

12   diabetes or high blood pressure, the pharmacist may be able to

13   give that patient a few tablets so that the patient doesn't

14   suffer any serious injury.

15           But for a controlled substance, particularly a pain

16   medication, the pharmacist has first responsibility to make

17   sure that that medication isn't abused or diverted.  And so the

18   first option would be not to fill the prescription and help the

19   patient or direct the patient to an emergency room or some

20   other area where they could seek treatment and perhaps get the

21   medications filled there.

22   Q.  Is there an identification requirement to fill a controlled

23   substance prescription?

24   A.  Yes, sir.

25   Q.  And what does that mean?

1    A.  That means that the patient or care giver that's picking up

2    the medication, and even to dropping off the prescription, is

3    the person who they are supposed to be or the prescription

4    says.  And regulations in New York says that the pharmacist has

5    to make a reasonable effort to ascertain the identity of the

6    patient by looking at or examining some form of identification.

7    Q.  Can a customer fill prescriptions for controlled substances

8    for multiple people at the same time?

9    A.  They can't fill prescriptions for other people,

10   particularly in controlled substances.  And in some cases if

11   there is a care giver and that care giver has been documented

12   with the pharmacy, somebody taking care of their elderly

13   patients, their parents or maybe even children, that care giver

14   on record could pick up prescriptions or could drop off

15   prescriptions for those individuals.  But simply going into a

16   pharmacy and bringing in multiple prescriptions for multiple

17   patients or picking those up is not something that would be

18   allowed.

19   Q.  Is the pharmacist who fills a prescription required to be

20   documented in some way?

21   A.  The initials or identifying marks or name of the pharmacist

22   must appear in that prescription record.

23   Q.  Would you agree that a pharmacist's job is basically to

24   count pills?

25   A.  No, sir.

97

1    Q.   Why not?

2    A.   That goes beyond what I talked about earlier, that the

3    pharmacist has to conduct a drug use evaluation; that they have

4    to evaluate the prescription and make sure it's appropriate for

5    the patient; that it's safe, and that they also must look at

6    whether or not any fraud or abuse is occurring on that

7    prescription.

8    Q.   Mr. Catizone, how are pharmacists informed about these

9    standards or responsibilities?

10   A.   First of all, it's part of their formal education and

11   training.  There are law courses the pharmacists are required

12   to take in order to graduate.  And the law courses continue

13   throughout their degree program.

14           They're also informed by the State Board of Pharmacy

15   of the requirements or any changes.  And then the pharmacist

16   must maintain their license by completing continuing education

17   courses in the programs.

18   Q.   And starting at the beginning, can you explain the

19   educational process for pharmacists?

20   A.   The pharmacist undergoes a four or five year professional

21   program, and during that time they are educated on the medical

22   or clinical aspects of medications.  So they learn anatomy,

23   they learn biology, and then they learn how medications

24   actually work from the chemistry standpoint, as well as how

25   they work inside the body and how they interact with other

E9azcha2                              Catizone - direct

1    drugs.

2              From the beginning of their programs, through the very

3    end, pharmacy laws is a primary component of that instruction

4    as well.  So they learn about what's a legal prescription, they

5    learn what the requirements are, and they learn what they have

6    to do to be in compliance with both federal and state law

7    throughout their program.

8    Q.  And the potential for diversion is something that is taught

9    during the educational process?

10   A.  Yes.  There are specific courses and specific information

11   that the pharmacists take and engage in that teaches them about

12   diverted -- diversion and abuse.  It even talks about what

13   types of practitioners may be involved.  It talks about how

14   doctors can be duped by patients.  And it talks about the

15   warning signs that pharmacists should look for and should know

16   when presented with a fraudulent or possibly fraudulent

17   prescription.

18   Q.  And is a pharmacist's education all classroom based?

19   A.  No, it's not.  The majority of it is classroom based, but

20   then pharmacists engage in experiential education, which

21   actually puts them in real pharmacies.  It begins in the very

22   first year, and then by their last year it's very intense,

23   takes up most of that year and most of the time are spent in

24   the program.

25   Q.  And then after someone graduates from pharmacy school,

1    there is a licensing examination?

2    A.   Yes.   The examination that we prepare is required of all

3    pharmacists in all states.

4    Q.   Including in New York?

5    A.   Yes, sir.

6    Q.   And New Jersey?

7    A.   Yes, sir.

8    Q.   How long have there been licensing exams?

9    A.   The first exams started in about 1860.

10          Our examination has been used and required by the

11   state since 1979.

12   Q.   Now, I know you explained this before, but could you again

13   explain the components of the licensing examination?

14   A.   Sure.   There are three primary areas.

15          First is medication use and therapy, the second is the

16   actual preparation of medications, and then the third is public

17   education and counselling.

18   Q.   And it's broken down into two tests?

19   A.   That's the national examination.   And then there's a law

20   exam.   That's a separate exam that involves state practice act

21   and regulations.   It includes federal law and state law, and

22   talks about what the pharmacist must do or examination what the

23   pharmacist must do to be in compliance.   And it also examines

24   diversion and fraud and what the pharmacist needs to know to

25   detect and prevent and to address those issues.

1    Q.   So those diversion concepts are tested on the state law

2    exam?

3    A.   Yes, sir.

4    Q.   Is NABP involved in transferring licenses from one state to

5    another?

6    A.   Yes, sir.

7    Q.   And how does that process work?

8    A.   Any pharmacist that wants to move from one state to the

9    other submits an application to us.  We review the information

10   about that pharmacist, where they've been licensed, whether

11   there is any disciplinary action, what their educational

12   background is and what their test scores are, and we prepare

13   that information and send it to the state where the pharmacist

14   is seeking to transfer license or to practice.

15   Q.   And then in order to actually be licensed in more than one

16   state, is there -- are there additional examination

17   requirements?

18   A.   Yes.  They do not have to retake the national exam, but

19   they have to take the law exam for each of those states.

20   Q.   And so in order for a pharmacist to be registered in more

21   than one state, that pharmacist has to take the legal exam in

22   each state?

23   A.   Yes, sir.

24   Q.   And that's the component of the licensing exam and test on

25   diversion?

1    A.  Yes, sir.

2    Q.  Are there continuing educational requirements for

3    pharmacists?

4    A.  Yes, there are.

5    Q.  In New York?

6    A.  Yes, there is.

7    Q.  What about New Jersey?

8    A.  Same, yes.

9    Q.  And what are those requirements generally?

10   A.  Pharmacist has to complete 15 hours of continuing education

11   that's approved by each of those Boards, New Jersey, New York.

12   And in New Jersey a pharmacist's license is renewed every two

13   years, and so the pharmacist has to complete 15 hours per year

14   for a total of 30.

15           And in New York, pharmacist is licensed every three

16   years and the pharmacist has to earn 15 hours of continuing

17   education every year, so a total of 45 hours.

18   Q.  Are you familiar with the term "pharmacist in charge" or

19   "supervising pharmacist"?

20   A.  Yes, sir.

21   Q.  And are those terms the same?

22   A.  Yes, sir.

23   Q.  Which one is used in New York?

24   A.  Supervising pharmacist.

25   Q.  What is a supervising pharmacist?

A.   A supervising pharmacist is responsible for the overall

operations of the pharmacy to make sure it's in compliance with

federal and state laws.  And that pharmacist is also

responsible and held accountable for all the activities in that

pharmacy, including the activities of the other pharmacists and

the technicians that may assist in the practice of pharmacy.

Q.   Does every pharmacy have to have a supervising pharmacist?

A.   Yes.

Q.   Does being a supervising pharmacist require additional

training?

A.   Because of the added responsibilities of a supervising

pharmacist in terms of management and the supervision and the

responsibilities, it's not a legal requirement, but many

pharmacies and many companies require additional training.

Q.   Now what about the owner of a pharmacy, what

responsibilities does an owner have?

A.   The owner has the same overall responsibilities as a

supervising pharmacist.  And in New York in the practice act

regulations, the owners are specifically mentioned and noted to

have the same overall responsibilities as a supervising

pharmacist.

Q.   Now, you used the term previously a "tech."  Is that short

for pharmacy technician?

A.   The pharmacy technicians that assist the pharmacist, the

pharmacists in charge and the other pharmacists are accountable

E9azcha2                    Catizone - direct

```
 1    for those actions of that person.
 2    Q.  Just to step back.  A tech is shorthand for pharmacy
 3    technician?
 4    A.  Yes, sir.
 5    Q.  And just briefly, what is a pharmacy technician?
 6    A.  Pharmacy technician is somebody that helps the pharmacist.
 7    They can work the cash register, they can process insurance
 8    claims.  They may be able to take medications off the shelf and
 9    then fill the bottles.  But those medication and everything the
10    technician does must be checked and overseen directly by the
11    pharmacist.
12    Q.  Can a pharmacy technician count pills?
13    A.  Yes.
14    Q.  And is a pharmacy technician allowed to dispense
15    medication?
16    A.  Not without a pharmacist being present in the pharmacy.
17    Q.  Controlled substances?
18    A.  Again, not without a pharmacist there.  And requirements
19    and restrictions of technician access to controlled substances
20    are much different than medications that are not controlled.
21    Q.  Can a pharmacy dispense medication without a pharmacist
22    present?
23    A.  No.
24    Q.  Who is ultimately responsible for filled prescription?
25    A.  The pharmacist who has filled that prescription, as well as
```

1   the supervising pharmacist if it's a different person.

2   Q.  How does a pharmacist comply with his or her obligations

3   when the pharmacist is being assisted by a tech?

4   A.  The pharmacist is responsible for anything that happens in

5   that pharmacy or with that technician.  So everything the

6   technician does is ultimately the pharmacist's responsibility.

7   Q.  And as a practical matter, how does that responsibility

8   play out?

9   A.  The pharmacist has to be able to observe that technician at

10  all times.  They have to sign off on all of the activities that

11  the technician engages in, and nothing should leave that

12  pharmacy or should be entered into that patient's records

13  unless the pharmacist has checked and approved that record or

14  that action.

15  Q.  Now, do any of the corresponding responsibilities that

16  we've been talking about ever get transferred from the

17  pharmacist to any other pharmacy employee?

18  A.  No, sir.

19  Q.  What is a pharmacist supposed to do if the pharmacist does

20  disagrees with a pharmacy technician about whether to fill a

21  prescription?

22  A.  The pharmacist has the ultimate responsibility and

23  accountability.  And it's the pharmacist's decision

24  professional judgment.  And it wouldn't make sense for a

25  technician to overrule the pharmacist, unless the technician

E9azcha2                        Catizone – direct

1    noticed something that was violating the law or could injure

2    the patient.

3            But, again, it would fall back to the pharmacist, who

4    has the ultimate decision responsibility.

5    Q.   I'd like to switch gears now and talk a little bit about

6    indications of drug diversion.  And I think you previously

7    used --

8            THE COURT:  Mr. Tehrani, before we get into that, why

9    don't we take our Honor morning recess.

10           MR. TEHRANI:  Certainly, your Honor.

11           THE DEPUTY CLERK:  All rise.

12           THE COURT:  The jury can step out.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

E9azcha2                     Catizone - direct

1            (In open court; jury not present)

2            THE COURT:  Okay, we'll resume at 10:30 or 11:30,

3   excuse me.

4            When do you want the instruction?  I'm waiting for

5   somebody.

6            MR. RIOPELLE:  Somebody to stand up and say something,

7   yeah.  I think we're at the point now where it might be good to

8   do it.  It would be agreeable to me to do it right when we come

9   back from the break, Judge.  Because we're now getting to the

10  regulations and that sort of thing.

11           THE COURT:  Mr. Tehrani?

12           MR. TEHRANI:  No objection.

13           THE COURT:  Okay.  See you at 11:30.

14           MR. RIOPELLE:  Thank you, Judge.

15           (Recess)

16

17

18

19

20

21

22

23

24

25

E9azcha2                        Catizone – direct

1          (In open court; jury not present)

2          THE COURT:  Please sit down.

3          THE DEPUTY CLERK:  All rise.

4          (Jury entering)

5          THE COURT:  Please be seated.

6          Before we resume with Mr. Tehrani's examination of Mr.

7     Catizone, I'm going to allow Mr. Catizone to describe for you

8     various regulatory standards that apply to licensed pharmacists

9     here in New York.  And he'll be permitted to testify to his

10    opinion as to whether or not the Stanley Getty Pharmacy

11    violated those regulatory standards.

12         As you know, this is a criminal case, not a regulatory

13    case.  The failure to comply with regulations does not alone

14    provide the basis for concluding that either the defendants is

15    guilty of the crimes charged in count one.

16         Rather, count one has very specific elements, each of

17    which the government must prove beyond a reasonable doubt,

18    separate and apart from whatever regulations govern the

19    pharmacy's operation.

20         Now that said, the failure to comply with regulations

21    is a factor that you can consider in determining whether either

22    of the defendants knowingly participated in the unlawful

23    distribution of oxycodone.

24         Now, on Monday I told you about credibility and how

25    your assessment of credibility is very important.  It's up to

1    you to decide which witnesses to believe and which witnesses

2    not to believe, and how much of each or any witness' testimony

3    to accept or reject.  And that's true of Mr. Catizone's

4    testimony, even though he's testifying as an expert.

5         He'll be allowed to express his opinions as to what a

6    pharmacy should have known about examining the prescriptions in

7    this case.  But you are the judges of the facts, and you must

8    decide for yourself whether either the defendants knowingly

9    participated in the unlawful distribution of oxycodone.

10        All right, Mr. Tehrani.

11        MR. TEHRANI:  Thank you, your Honor.

12   BY MR. TEHRANI:

13   Q.  Mr. Catizone, before we broke we were just about to start

14   talk about indications of drug diversion, and I wanted to use

15   the word red flags.  Is that a term that's typically used?

16   A.  Yes, sir.

17   Q.  Now, what are some red flags that should alert a pharmacist

18   that customers are involved in diversion?

19   A.  Some of the immediate signs that a pharmacist would see is

20   if the patient comes in into the counter and are intoxicated,

21   or perhaps they look like they're high or they're disoriented.

22        Some other signs would include the actual prescription

23   itself as being presented, does it look like it's been altered?

24   Does it look like that prescription has not been issued by the

25   prescriber?

1          And then there is the other behaviors of the patient

2     that could serve as a red flag.  Is the patient using street

3     jargon and drug names for the medications they're seeking?  Are

4     they intimidating to the pharmacist?  Are they trying to

5     persuade or to threaten the pharmacist to fill the prescription

6     and to avoid doing any of the things the pharmacy is supposed

7     to do?

8     Q.   Now what about the frequency with which a customer is in a

9     pharmacy?

10    A.   There are other red flags that may not be immediately known

11    or may be immediately obvious.  But when you have chance to

12    review or you look at those red flags in combination with other

13    red flags, then they lead to the same conclusions, that there

14    is a problem or suspicion here.

15         And that could be for patients that come in all the

16    time very frequently for pain medications.  Because if the pain

17    medication's written appropriately, that patient should be in

18    the pharmacy a reasonable amount of time but not all the time.

19         If they're getting multiple prescriptions from

20    different doctors, that would be another red flag.

21         If they're bringing in groups of patients at the same

22    time, that would be another red flag that the pharmacist could

23    look at and reach some conclusions with.

24    Q.   Now, are there any red flags from the quantities or dosages

25    that are on prescriptions themselves?

E9azcha2                        Catizone - direct

A.  As I mentioned earlier, that quantity's very important to
determining whether or not the prescription is appropriate or
legitimate.  So if patients are coming in for large quantities
and you see one patient after the other, or patients are coming
in and they're getting the same quantity from different
prescribers or the same prescriber, and that's an excessive
quantity, that would be a red flag for the pharmacist as well.
Q.  Now, what are some indications that a customer is trying to
use a prescription from a stolen prescription pad?
A.  When you look at the prescription itself, there would be
some warning signs on there.

        One, the prescription would have information on there
that wouldn't normally be on a prescription.  So, for example,
doctors and pharmacists rely upon abbreviations.  So the letter
Q means every, and it's fairly common, fairly standard.  You
might see these prescriptions that contain the word every
written out.  And so the abbreviations are written out instead
of use.  I saw that on some of the prescriptions I reviewed.

        There is other markings on the prescription that
wouldn't appear.  They write out tablets, they write out
capsules, they write out quantities for refills that don't
coincide with the information and the dosing, or the doctor's
signature.  If it look like there is a problem, something
suspicious with the doctor's signature or information.
Q.  What about the numbering of the prescription?

E9azcha2                    Catizone - direct

A.   What's unique in New York is New York requires every

prescription, whether it's controlled or non-controlled, to be

issued on a state required prescription.  No other state

requires that.  So in other states the doctors have different

prescription pads that can be different colors, different

shapes, different information that may be included beyond the

required.

         In New York, every prescription has to be on the same

prescription pad, the same color.  And these prescriptions are

all numbered so that a doctor would have a prescription pad

issued by the state just like a checkbook that would run from

one to 100 or one to 1,000 whatever the sequence would be, and

those are sequential to the doctor, and the doctor would write

those prescriptions based on seeing patients.

Q.   And would there be anything about sequential prescriptions

that would be a red flag?

A.   What would normally happen in practice, based on my

experience, as doctors see different patients at different

times.  So when a pharmacy may have several prescriptions from

a doctor, but those numbers would be different and vary.  They

wouldn't be in order.

         When you see prescriptions from one doctor that run

consecutively like one to 50, that would indicate that those

prescription pads were either stolen or something else was

occurring.  Because the practice wouldn't happen that the same

1    50 patients would go to the doctor one after the other to be in

2    sequence for those prescriptions to be written, and those same

3    50 patients would be, would present to the same pharmacy.

4    Patients don't all go to the same pharmacy.  Some patients

5    don't even get the prescriptions filled.  So the likelihood of

6    that happening in practice doesn't exist, and it can only be

7    explained by that prescription pad was stolen or something else

8    happened in that prescription pad for that sequence to occur as

9    it did.

10   Q.  What about a doctor only prescribing a particular

11   medication?

12   A.  Again, in normal practice traditional practice that I've

13   experienced, even with non-controlled substance, if a patient

14   has diabetes or high blood pressure, the doctor's going to have

15   certain medications that they prescribe, and it's going to vary

16   from patient because different patients have different age,

17   different sex, different sizes, and it will be a different

18   reaction those patients have to medications.  And I'm not aware

19   of any doctor that prescribes just one medication for a disease

20   or a symptom for every patient.

21          On the pain management side, for a doctor just to

22   write one medication, the same medication for every patient,

23   the same dose, the same strength, the same quantity is not

24   something that occurs in practice.  It says that every patient

25   is the same and that every patient has the same disease or

E9azcha2                    Catizone - direct

 1    symptom and every patient has the same allergies, and are

 2    taking the same medications that would interact with that

 3    medication, and it simply is not the case.  It points to

 4    something else, fraud abuse or diversion that's occurring.

 5    Q.  Now, you mentioned a situation where a customer is in a

 6    pharmacy and has prescriptions from multiple doctors.  Is that

 7    referred to as doctor shopping?

 8    A.  Yes, sir.

 9    Q.  Why is doctor shopping a red flag?

10    A.  It's a red flag because it disguises or tries to hide the

11    behavior of the patient.  It means the patient then is going to

12    a number of different doctors, getting the same prescriptions

13    or pain medications or other medications that they're abusing

14    they've already filled, so that one doctor doesn't realize how

15    many prescriptions or how many medications that patient is

16    getting.  And it's a common technique that's used when someone

17    is diverting or abusing medications.

18    Q.  Can prescriptions be tampered with?

19    A.  Yes.

20    Q.  How so?

21    A.  There is very easy ways to tamper with them.  You can

22    change the quantity.  If the doctor's written for 10, you can

23    change it to 100 or the patient can.  You can change the number

24    of refills.  You can change the dosage.  There's various ways

25    that I've seen in my experience that prescriptions have been

1    altered.

2    Q.   What is a pharmacist supposed to do if he or she observes

3    indications of diversion?

4    A.   They're immediately supposed to investigate that, by

5    determining, contacting validating the prescriber, validating

6    the prescription.  And then if they can not verify or suspicion

7    exists, they have a responsibility not to fill that

8    prescription, and they must contact law enforcement.

9    Q.   Now, what are some red flags that a pharmacy is engaged in

10   diversion?

11   A.   What may happen as the pharmacist fills a prescription,

12   they may not notice some of these red flags until there is time

13   to step back and review them.  And in reviewing those

14   prescriptions, the total of those some things would come to

15   light.  Has the number of controlled substances or oxycodone

16   increased significantly?  Has the number of oxycodone

17   prescriptions that I buy or that I dispense far exceed what the

18   totals are for pharmacies in my area or comparable pharmacies?

19   And is there a change in the way people are paying for their

20   medications?  Are they paying more using cash instead of

21   insurance?  These would all be red flags that would indicate

22   something was going on with the pharmacy or red flags for the

23   pharmacy.

24   Q.   What percentage of prescriptions are typically paid for

25   with insurance as opposed to cash?

1    A.   It averages about 95 percent of prescriptions are paid for

2    by insurance.

3    Q.   And why would it would be a red flag diversion for a

4    pharmacy to be taking more cash as opposed to insurance?

5    A.   Based upon my experience, the reason the prescriptions are

6    paid for in cash is because if they're submitted to the

7    insurance company to be paid, the insurance company conducts

8    another review of those prescriptions, and they may contact the

9    prescriber.

10         They'll also have experts look at the prescription to

11   verify the treatment, the length of therapy and the quantity.

12         What else happens with many insurance programs is the

13   quantity and medications are restricted, so that a patient will

14   only be able to get a certain amount of medications and even

15   only get certain medications or dosages that the insurance will

16   pay for and cover.

17   Q.   Is there anything about the prices of medication that might

18   be a red flag of diversion?

19   A.   Since 95 or so percent of prescriptions are covered by

20   insurance, there should be a minimum cost to patient of their

21   out-of-pocket expenses.

22         When you see prescriptions and people paying cash for

23   those prescriptions, and prescriptions -- they're being charged

24   significantly more than what those products cost, or what other

25   pharmacies would charge, that would be a red flag.  Because you

1    have to ask yourself the question, why would somebody not

2    submit their prescriptions for payment.  And if they didn't

3    want to submit those for payment, perhaps they didn't want the

4    employer to know what medications they were taking.  Why would

5    they pay three or five or 10 times the amount if they could pay

6    another pharmacy that may be a block away or two blocks away,

7    there's something there that's a red flag the pharmacist should

8    look at.

9    Q.  Now, Mr. Catizone, you mentioned, I think in passing, that

10   you had reviewed some prescriptions in this case?

11   A.  Yes, sir.

12   Q.  Have you reviewed any other information provided to you by

13   the government?

14   A.  I reviewed some graphs and some charts and information

15   concerning how much oxycodone was purchased by the pharmacy, as

16   well as some comparative numbers about those purchases compared

17   to other pharmacies, as well as the percentage of prescriptions

18   that were paid for using cash or insurance coverage.

19   Q.  And you also reviewed prescriptions?

20   A.  Yes.

21   Q.  Now, based on your review of the schedule two prescriptions

22   from Stanley Pharmacy that you reviewed, have you developed any

23   opinions about the validity of any of those prescriptions?

24   A.  Yes, sir.

25   Q.  And what is your opinion?

E9azcha2                         Catizone - direct

1   A.   In my opinion, a significant number of those prescriptions

2   were fraudulent and invalid.

3   Q.   And what is that based on?

4   A.   It's based upon a number of factors.

5        First of all, the appearance of the actual

6   prescription.  As I mentioned earlier, every prescription in

7   New York has to be on a specially designated form.

8        When I looked at the prescriptions from the pharmacy,

9   a significant number of those prescriptions were discolored.

10  There was something different about the color of those

11  prescriptions that was immediately noticeable from what the

12  prescription blank form must be in the State of New York.

13       Second, there was something wrong and different with

14  the texture of the paper.  It didn't have the same consistency.

15  And it appeared to be in different parts of some of those

16  prescriptions, something that was removed or something else

17  done to alter the prescription.  And the way I was able to see

18  that is that the writing on the prescription at times bled

19  through the paper.  And it wasn't a bleeding from somebody

20  spilling a liquid on there, because it was no residue from any

21  liquid around there.  It was a bleeding as if there was

22  something different in the texture of that paper.  And it did

23  not look like a manufacture issue or problem with the paper,

24  because it appeared in different places on different

25  prescriptions.

E9azcha2                          Catizone - direct

1      And what was most noticeable on some of the

2    prescriptions, the bleeding could be seen all the way through

3    to the back of the paper.  And that would not happen and should

4    not happen on the prescription blanks that are issued by the

5    state and should be used by the pharmacist.

6    Q.  Did you make any observations about the dosages and

7    quantities on the prescriptions you reviewed?

8    A.  Yes.  Again, as I mentioned earlier, the pharmacist has a

9    responsibility to make sure that the prescriber's legitimate

10   and prescription is legitimate.  So they have to become

11   familiar with the doctor.

12      And they also have to become familiar with the types

13   of patients the doctor sees, and the types of prescriptions

14   that the doctor writes and the doctor's signature.

15      What I noticed with these prescriptions is that the

16   handwriting varied.  There were different colors of ink, there

17   were different directions.  And there were other different

18   differences in these prescriptions that were different from

19   what I normally see.

20      And what was also remarkable is that every patient

21   that I looked at received the same medication, the same dose

22   and the same quantity of prescriptions.

23      The other factor that indicates to me there was some

24   fraudulent behavior here is that usually there's a consistency

25   between the prescriber and how they write, what they write, and

E9azcha2                      Catizone - direct

1    how they sign their names.  The consistency that I noticed was

2    not within a prescriber where it had the same writing and the

3    same signature.  It was across multiple prescribers.  So it

4    looked as if a person or persons wrote the same directions in

5    the same medications and used different doctors' names and

6    different patients' names.

7              MR. RIOPELLE:  Objection, your Honor.

8              THE COURT:  Overruled.

9    A.  Rather than a physician writing consistently with their

10   group of patients.

11             What further substantiated that for me is that the

12   signatures of the doctors varied significantly.  And it wasn't

13   just a doctor's poor handwriting as people say.  Some of the

14   signatures actually looked like drawings, a drawing of a sunset

15   or squiggly lines, that had no resemblance to any of the other

16   signatures for that physician.

17             MR. RIOPELLE:  Again, objection, your Honor.

18             THE COURT:  Again, overruled.

19             (Continued on next page)

20

21

22

23

24

25

E9ATCHA3                        Catizone - direct

 1   BY MR. TEHRANI:

 2   Q.  Was there a particular dosage that you frequently saw among

 3   prescriptions?

 4   A.  I frequently saw the 30 milligrams of oxycodone.

 5   Q.  And again, what is your understanding of the 30-milligram

 6   oxycodone dosage?

 7   A.  Again, from two perspectives, it's one of the most abused

 8   medications in the United States, as well as its clinical

 9   significance or what it is prescribed or used for is very

10   limited and has to be very strictly managed.

11   Q.  Did you make any observations, based just on the

12   prescriptions you reviewed, about the form of payment for those

13   prescription?

14   A.  Yes.

15   Q.  What were those observations?

16   A.  The prescriptions that I looked at from 2011 was in line

17   with what was used in traditional pharmacies, and the majority

18   of prescriptions were paid for through insurance coverage.

19   When you looked at the back of the prescription, the amount

20   that the patient paid was either zero or one dollar, whatever

21   the co-pay was.

22          As I went through the prescriptions and saw an

23   increase in the oxycodone prescriptions, what the patient paid

24   and the percentage of what the insurance covered changed

25   dramatically.  The majority of prescriptions I reviewed were

E9ATCHA3                        Catizone - direct

1   cash, and the price for those prescriptions averaged a thousand

2   dollars.

3   Q.   Mr. Catizone, do you have an opinion about whether a

4   pharmacist operating in usual course of professional practice

5   should have identified those prescriptions as invalid?

6   A.   Yes.

7   Q.   Why?

8   A.   The information was there for the pharmacist, and the

9   pharmacist has been educated and trained to identify those red

10  flags and to act on those red flags.  The immediate signs that

11  the prescriptions had been altered, tampered or stolen through

12  the discoloration of the paper, the markings, the inappropriate

13  directions, the physician signatures.  Then there was the

14  abnormalities or the wrong things that occurred with how those

15  prescriptions were written in terms of the medication, the

16  quantity, and then there was again the abnormality that every

17  patient received the same medication, the same dose and the

18  same quantity.

19  Q.   Just to clarify, not every prescription was the same dose,

20  was it?

21  A.   Correct, within certain prescriptions the same patients

22  received the same dose, but every prescription wasn't for the

23  same dose.

24  Q.   Now when you reviewed the prescriptions in this case, they

25  had been organized by doctor?

E9ATCHA3                          Catizone – direct

1    A.  Yes, sir.

2    Q.  So you reviewed a stack of prescriptions for a particular

3    doctor?

4    A.  Yes, sir.

5    Q.  And that's not how prescriptions would typically be

6    reviewed as they come in by a pharmacist working in a pharmacy?

7    A.  Correct.

8    Q.  Do you believe that that would affect your opinion to

9    whether the prescriptions should have been identified by a

10   pharmacist as invalid?

11   A.  No, sir.

12   Q.  Why not?

13   A.  What happens in traditional practice is when a first

14   prescription or second prescription comes in you may not be

15   able to identify some of those red flags, but soon there's a

16   pattern that the pharmacist becomes aware of or should become

17   aware of, and that pattern then was identified as something

18   that came about upon review and something that a pharmacist

19   should know.

20   Q.  In your experience as a practicing pharmacist and as

21   executive director of the NABP, have you previously reviewed

22   prescriptions that you believe were tampered with?

23   A.  Yes, sir.

24   Q.  How did the prescriptions you reviewed in this case compare

25   with those other prescriptions?

E9ATCHA3                          Catizone - direct

1   A.  Of all the prescriptions I looked at, those were the worst

2   I have ever seen.

3           MR. TEHRANI:  Your Honor, may I approach?

4           THE COURT:  Yes, you may.

5   Q.  Taking a look at Government Exhibits 1002 and 1003, were

6   those some of the materials that you were asked to review in

7   this case?

8   A.  Yes, sir.

9           MR. TEHRANI:  Your Honor, the government offers

10  Government Exhibits 1002 and 1003 subject to connection.

11          MR. AGNIFILO:  We have no objection.  We would allow

12  them in subject to the connection with the witness that

13  actually made them.

14          THE COURT:  Do you agree, Mr. Riopelle?

15          MR. RIOPELLE:  Yes, Judge.

16          THE COURT:  1002 and 1003 are received in evidence.

17          (Government's Exhibits 1002 and 1003 received in

18  evidence)

19          MR. TEHRANI:  May we publish them to the jury?

20          THE COURT:  Yes, you may.

21  BY MR. TEHRANI:

22  Q.  And just briefly describe what Government

23  Exhibits Exhibit 1002 shows, just briefly describe in general

24  terms what it shows.

25  A.  Shows the actual purchases at the pharmacy of oxycodone.

E9ATCHA3                     Catizone - direct

1    Q.  And compare that to other.

2    A.  The first chart shows what the purchases were for that

3    individual pharmacy and how those purchases increased

4    significantly, so that the 413,000 purchases and dosage units

5    far exceeded any of the other totals and rose steadily

6    throughout that time.

7          The second chart shows how the purchases by that

8    pharmacy compared to other pharmacies in the same area and how

9    significant the purchases for this pharmacy exceeded any of the

10   other pharmacies in that entire zip code.

11   Q.  You may be looking at them in reverse order than the

12   screen.  To clarify, the graph with the red bar, that shows the

13   comparison of ordering oxycodone to other pharmacies?

14   A.  Yes, sir.

15   Q.  And the other graph shows the ordering of oxycodone by

16   Stanley Pharmacy over time?

17   A.  Yes, sir.

18   Q.  Did you develop my opinions based on your review of this

19   information?

20   A.  These graphs provided information indicating there was some

21   fraud or diversion occurring within this pharmacy because of

22   the significance, the quantity of the purchases, and how those

23   purchases increased over time, and how those purchases were so

24   much different and so much greater than any other pharmacy in

25   that zip code.

E9ATCHA3                        Catizone - direct

1   Q.  What are the possible explanations for that kind of pattern

2   of activity?

3   A.  There would be two explanations, one, that the pharmacy now

4   was a pain management pharmacy or affiliated with a pain

5   management facility.  I did not see anything in any of

6   materials I reviewed anything to indicate that.  The only other

7   explanation is that there was diversion occurring in this

8   pharmacy.

9   Q.  Now if you take a look at Government Exhibit 1005, is that

10  also one of the charts that you looked at in connection with

11  your testimony?

12  A.  Yes, sir.

13          MR. TEHRANI:  Your Honor, the government offers

14  Government Exhibits 1005 subject to connection.

15          MR. RIOPELLE:  No objection.

16          MR. AGNIFILO:  No objection.

17          THE COURT:  1005 is received in evidence.

18          (Government's Exhibit 1005 received in evidence)

19          MR. TEHRANI:  May we publish to the jury?

20          THE COURT:  Yes.

21  BY MR. TEHRANI:

22  Q.  For now looking at the chart that is on the left, what does

23  that chart generally show?

24  A.  The chart confirmed information that I mentioned earlier

25  that in 2011 the prescriptions paid for by insurance or cash

E9ATCHA3                          Catizone - direct

1   represented what you would see in a traditional pharmacy or

2   brick and mortar, the percentage of being paid for insurance

3   being significantly higher than those paid for cash.

4           When you get to the later years of 2012, you can see

5   how that changes significantly in the percentage of

6   prescriptions paid in cash for oxycodone far exceed what

7   happens in other brick and mortar pharmacies and becomes a red

8   flag that there's activity occurring here that probably

9   involves diversion.

10          MR. TEHRANI:  Your Honor, one moment.

11          THE COURT:  Yes.

12          (Pause)

13          MR. TEHRANI:  No further questions, your Honor.

14          THE COURT:  Any questions?

15          MR. AGNIFILO:  Yes, your Honor.

16   CROSS-EXAMINATION

17   BY MR. AGNIFILO:

18   Q.  Good morning, verging on afternoon.  How are you?

19   A.  Fine, thank you.

20   Q.  Mr. Catizone, my name is Marc Agnifilo.  I represent

21   Christina Chai.  We never met before, correct?

22   A.  Yes, sir.

23   Q.  I'm going to ask you a couple of questions.  If my question

24   to you is unclear, ask me to rephrase it and I'm happy to do

25   that.

E9ATCHA3                          Catizone - cross

1    A.  Thank you.

2    Q.  I want to start with what you were saying about the

3    specific nature of New York State written prescriptions.  You

4    said that New York State has something unique to New York State

5    that's different from every other state in the country.  Just

6    tell the jury exactly what that is.

7    A.  Sure.  Every prescription written in New York State has to

8    be on a state-approved or state-issued prescription form.

9    Q.  I'm not trying to test your memory.  Did that start in

10   about 2006?

11   A.  Yes.

12   Q.  And before 2006, how did New York State prescription -- how

13   did New York State handle their prescriptions?

14   A.  For schedule two prescriptions there was a specific form,

15   and for other controlled substances or non-controlled

16   substances prescription pads could vary based upon the

17   prescriber and based upon what their practice is.

18   Q.  So now that the procedure now in New York State is not just

19   schedule two prescriptions but all schedules, indeed all

20   prescriptions are handled in this same way?

21   A.  Yes.

22   Q.  And who issues the prescription pads?

23   A.  There are vendors that are approved by the state that

24   prescribers contact and purchase those prescriptions from.

25   Q.  And the prescription pads are given to only certain doctors

1   or medical professionals that are allowed to have these pads,

2   correct?

3   A.  Yes, sir, there's a secure procedure for securing and

4   accounting for those prescriptions.

5   Q.  And in your of experience and training, is it true that

6   doctors are supposed to safeguard these prescription pads?

7   A.  Yes, sir.

8   Q.  And is it your experience and training that if a doctor

9   knows that he or she lost one of these pads, that doctor should

10  report that back to the proper authority?

11          MR. TEHRANI:  Objection, your Honor.

12          THE COURT:  Overruled.

13  A.  Yes, sir.

14  Q.  And is that -- I listened to your direct testimony very

15  carefully, but here's my question, New York State handles it's

16  prescriptions the way it does because the prescription itself

17  is very important, is that fair to say?

18  A.  Yes, sir.

19  Q.  And it's the first step in the right medicine being given

20  to the right patient in the right dosage, is that a fair

21  statement?

22  A.  Yes, sir.

23  Q.  And the first person who makes the decision as to what

24  medicine and what dosage should be given to what patient is the

25  doctor, the medical professional, correct?

E9ATCHA3                        Catizone - cross

1    A.  Yes, sir.

2    Q.  And the doctor or medical professional writes a

3    prescription down on the New York State prescription pad and

4    gives it to the patient, and in a brick and mortar pharmacy

5    situation, the patient would bring that written prescription to

6    the pharmacy, correct?

7    A.  Yes, sir.

8    Q.  Now you went through a number of different guidelines as to

9    what the actual pharmacist and the pharmacy is supposed to do

10   when they get a certain prescription, correct?

11   A.  Yes, sir.

12   Q.  And here's my question, I'm going to go through the them

13   one by one, what I want to know is what stems from an actual

14   regulation and what stems from what your version of best

15   practice is, if I could make that distinction.

16   A.  Yes, sir.

17   Q.  Are you familiar with 21 CFR 1306?

18   A.  Yes, sir.

19   Q.  I'll lead you through it.  If I say something that's wrong

20   you'll correct me.  21 CFR 1306 is a federally-based rule,

21   correct?

22   A.  Yes, sir.

23   Q.  And it governs --

24          THE COURT:  For the jury's information, CFR stands for

25   Code of Federal Regulations.

E9ATCHA3                          Catizone - cross

1          MR. AGNIFILO:  Thank you, Judge.

2    Q.  And this particular Code of Federal Regulations has to do

3    with prescriptions, right?

4    A.  With controlled substances, sir.

5    Q.  Okay.  Prescriptions for controlled substances?

6    A.  Yes.

7    Q.  Any of the five schedules, correct?

8    A.  Yes, sir.

9    Q.  And so tell me if these are the different requirements that

10   are actually part of this regulation, first, that the

11   prescription be dated on the actual day that it was issued?

12   A.  Yes.

13   Q.  That it be signed by the medical professional on the day

14   that it was issued?

15   A.  Yes.

16   Q.  That the full name and address of the patient be on the

17   prescription?

18   A.  Yes.

19   Q.  That the drug name be on the prescription?

20   A.  Yes.

21   Q.  That the strength of the drug be on the prescription?

22   A.  Yes, sir.

23   Q.  That the dosage be on the prescription?

24   A.  Yes, sir.

25   Q.  That the quantity prescribed by on the prescription?

1   A.  Yes, sir.

2   Q.  Directions for use be on the prescription?

3   A.  Yes, sir.

4   Q.  The name of the doctor?

5   A.  Yes, sir.

6   Q.  The address of the doctor?

7   A.  Yes, sir.

8   Q.  And the DEA registration number of the doctor?

9   A.  Yes, sir.

10  Q.  And I'm not trying to trick you, so if you want to look at

11  it, feel free.

12  A.  The only information you didn't ask is refills have to also

13  be on there, the number of refills.

14  Q.  Correct me -- tell me if this is right, for schedule two

15  drugs, you can't get refills?

16  A.  Correct, sir.

17  Q.  So when we talk about refills, we're only talking about

18  three, four and five?

19  A.  Yes, sir.

20  Q.  And not that this is part of the case, but just to be

21  clear, schedule ones are illegal per se, so we're not -- a

22  doctor can't prescribe heroin for someone, for instance?

23  A.  Correct.

24  Q.  So to your knowledge -- and I can pull it up for if you

25  want to see it -- are there any other requirements that are

E9ATCHA3                    Catizone – cross

1    actually in the text of 21 CFR 1306.05 other than the ones that

2    I just laid out for you?

3    A.   I believe there's a requirement that the pharmacist has to

4    initial or somehow designate in a prescription record that they

5    dispensed that prescription, I'm not sure if that's in the CFR

6    or if that's a state requirement.

7    Q.   I'm trying to do this in the form of a question.  If you

8    want to look at the CFR I can show it to you.  Trust me I

9    didn't --

10              THE COURT:  What's your question?

11              MR. AGNIFILO:  I'm trying to ask it in a legal way.

12   Q.   We'll move on.  It's either in the CFR or in another place?

13   A.   Correct.

14   Q.   One other thing then we'll move off this topic.  Title 21,

15   United States Code, Section 829 relates to which prescriptions

16   must be in writing and which can be oral, is that fair to say?

17   A.   Yes, sir.

18   Q.   Which ones have to be in writing?

19   A.   The schedule twos.

20   Q.   And the other schedules can be oral, correct?

21   A.   Yes, even the schedule twos can be oral, but the physician

22   or prescriber has to follow up within a certain time period

23   with the actual written prescription.

24   Q.   Tell me how that works when an oral prescription is given

25   for a schedule two drug with the follow up with the written

E9ATCHA3                      Catizone - cross

1   prescription.

2   A.  Let's say you have an emergency situation and the doctor

3   can't get to write the prescription, they can phone the

4   prescription to the pharmacy, the pharmacy can fill it, but

5   within 72 hours that prescriber, that doctor had to make sure

6   that the pharmacist has in their hand the written prescription

7   for that patient.

8   Q.  You mentioned a number of state regulations in addition to

9   the federal regulations we covered, correct?

10  A.  Yes, sir.

11  Q.  Is there any state regulation that explicitly says that a

12  pharmacist has to do some type of face-to-face meeting with the

13  patient?

14  A.  There are DEA guidance documents that indicate for a

15  prescription to be valid that a pharmacist must conduct a

16  face-to-face evaluation.

17  Q.  Let me ask the question so I don't want to be confusing.

18  I'm talking about New York State regulations, is there any New

19  York State regulation that requires that a pharmacist have a

20  meeting or have a conversation with the patient?

21  A.  Yes.

22  Q.  And where is that?

23  A.  In 2004 the State of New York passed a requirement that for

24  all new prescriptions the pharmacist must counsel that patient

25  and must talk to the patient about what the medication is, what

1    it's used for, what the side effects are, how the medication is

2    stored, and what happens with the medication if a dosage is

3    missing.

4    Q.  Does the pharmacist him or herself have to do that?

5    A.  Yes, the pharmacists themselves.

6    Q.  You said the owner of a pharmacy has the same

7    responsibility as the pharmacist, correct?

8    A.  In terms of the oversight and compliance with the laws,

9    yes, sir.

10   Q.  So the pharmacist is -- the actual pharmacist on duty

11   doesn't have a greater degree of responsibility than does the

12   owner of the pharmacy, correct?

13   A.  Yes, sir.

14   Q.  Would it be fair to say in your experience that a pharmacy

15   in a busy, densely populated residential area could be involved

16   in between 2 and 300 prescriptions per day?

17   A.  Yes, sir.

18   Q.  And do you know -- and if it wasn't part of your review

19   today then say it wasn't part of your review today.  Did you

20   look at the number of controlled substance prescriptions that

21   were issued by the Stanley Pharmacy day to day or week to week

22   as part of your testimony today?

23   A.  No, sir.

24          THE COURT:  You say issued?

25          MR. AGNIFILO:  Yeah, prescriptions that were filled,

E9ATCHA3                              Catizone - cross

1   rather --

2   Q.  I used the wrong term, prescriptions filled by the Stanley

3   Pharmacy day to day, week to week, month to month.

4   A.  No, sir.

5   Q.  And I think you said on direct examination that when you

6   were given the written prescriptions you were given them broken

7   down doctor by doctor, correct?

8   A.  Yes, sir.

9   Q.  And I think that your testimony was that that is not the

10  way the pharmacist is going to get the prescriptions in

11  real-time, correct?

12  A.  Yes, sir.

13  Q.  And it's fair to say that in a pharmacy that might be

14  getting 2 or 300 prescriptions a day, that in all likelihood

15  there's going to be a different variety of doctors writing

16  those prescriptions, correct?

17  A.  Yes, sir.

18  Q.  And as part of your testimony today, did you review how

19  many doctors had written prescriptions that were filled at the

20  Stanley Pharmacy in total?

21  A.  Not the exact number, but I did look at whatever doctors

22  that were separated for those prescriptions.

23  Q.  And do you remember approximately -- I'm not trying to hold

24  you to a number -- how many doctors you reviewed their

25  prescriptions?

1   A.   Approximately somewhere between 20 and 30.

2   Q.   Do you have any reason believe that over the course of two

3   years over a thousand doctors had written prescriptions that

4   were filled at Stanley Pharmacy?

5   A.   That would be outside of my experience that any pharmacy

6   had a thousand doctors.

7   Q.   Now when was the last time you were -- I understand you're

8   a pharmacist, correct?

9   A.   Yes, sir.

10  Q.   When was the last time you were a practicing pharmacist?

11  By that I mean someone who actually filled a prescription and

12  handed a bottle to another person.

13  A.   That was probably about 15 years ago when I worked in a

14  community pharmacy where we filled 500 prescriptions a day.

15  Q.   Where was that, sir?

16  A.   That was on the south side of Chicago.

17  Q.   And how many pharmacists worked at your particular

18  pharmacy?

19  A.   There were two of us.

20  Q.   And so you and another pharmacist would fill 500

21  prescriptions a day?

22  A.   Yes, sir.

23  Q.   And it's 15 years ago, so you might not remember, do you

24  remember how long you would spend on each prescription?

25  A.   It would vary depending upon the prescriptions, so on

1    average if it was a refill, probably a few minutes; if it was a

2    new prescription, much longer than just a few minutes; if it

3    was a questionable prescription, it could take hours before we

4    would validate those prescriptions.

5    Q.  Now you're not a licensed pharmacist in the State of New

6    York, correct?

7    A.  No, sir.

8    Q.  And you are not a medical doctor?

9    A.  Correct.

10   Q.  And you're not an attorney?

11   A.  Sorry?

12   Q.  You're not an attorney?

13   A.  No, sir.

14   Q.  That was a wise move.

15          MR. AGNIFILO:  Couple of other questions, Judge.

16   Q.  Did you have any -- as part of your testimony here today,

17   did you review the percentage of controlled substance

18   prescriptions in Stanley Pharmacy in the context of all the

19   prescriptions filled in a given day or week?

20   A.  No, sir.

21   Q.  And in your experience, is it fair to say that on average

22   about 11 percent or so of the prescriptions filled by a

23   legitimate brick and mortar pharmacy would be controlled

24   substance prescriptions?

25   A.  Yes, sir.

E9ATCHA3                        Catizone - cross

1   Q.   So I'm trying to figure out from you where would the red

2   flag be in terms of the percentage.

3          Let me ask the question, so 11 percent would not be a

4   red flag because that's average?

5   A.   Not by itself, sir, no.

6   Q.   If you saw 15 percent, would you say that's a red flag?

7   A.   Yes.

8   Q.   So somewhere between 11 percent and 15 percent is where you

9   say the red flag would be in terms of percentage of controlled

10   substance prescriptions?

11   A.   No, I said once the percentage exceeds 11 percent it

12   becomes more than a red flag, but you look at it in the context

13   of other red flags, sir.

14   Q.   Understood.  You don't know who at the Stanley Pharmacy was

15   having the face-to-face contact with customers, correct?

16   A.   Not specifically, sir.

17   Q.   And you don't know -- I ask because you said that some of

18   the red flags that you would cite as some someone knowledgeable

19   in the pharmaceutical industry is how the person acted when

20   they came in, correct?

21   A.   Yes, sir.

22   Q.   If they used street talk, right?

23   A.   Yes, sir.

24   Q.   If they looked like more of a drug dealer than a person in

25   need of legitimate medication.  That wasn't your term.

E9ATCHA3                    Catizone - cross

1   A.   No, in terms of their behavior, how they were acting.

2   Q.   Now you said that the most abused drug in the country is

3   the 30-milligram variety of oxycodone?

4   A.   I said the two most were hydrocodone the oxycodone.   The

5   30-milligram was the most abused of the oxycodone.

6   Q.   And in the Northeast, that seems to be the drug that's most

7   abused?

8   A.   Oxycodone, yes, sir.

9   Q.   What are the companies that make oxycodone?

10  A.   I'm not sure of all the companies, but the primary

11  manufacturer of the brand name is Purdue Pharma.   Then there's

12  a generic company by the name of Watson, and I believe one

13  other generic company and I'm not sure of that company.

14  Q.   And is Purdue still producing the 30-milligram variety of

15  oxycodone?

16  A.   As far as I know, yes.

17  Q.   Fair to say that oxycodone was on the rise in this country

18  between 2009 and 2012?

19  A.   Yes, sir.

20  Q.   And describe what that rise is like in terms of however you

21  want to describe it in terms of percentages or volume or

22  however you have experienced it in your expertise.

23  A.   The best way to describe it, there was a theory in pain

24  management that the patient should receive as much pain

25  medication as they wanted or needed with no restriction on what

E9ATCHA3                          Catizone – cross

```
 1    the quantities would be, and there shouldn't be punitive
 2    measures against pharmacies that were dispensing large
 3    quantities, and oxycodone started rising from the top 200 drugs
 4    to the very top of the drugs that are dispensed and prescribed.
 5    Q.  You talking about nationwide, right?
 6    A.  Yes, sir.
 7    Q.  Do you know what year it became the number one drug
 8    prescribed?
 9    A.  I don't.
10    Q.  But fair to say between 2009 and 2012 there was a drastic
11    rise in oxycodone, correct?
12    A.  Correct, sir.
13    Q.  That's not unique to Stanley Pharmacy?
14    A.  Correct.
15            MR. AGNIFILO:  I have no other questions of this
16    witness.  Thank you, sir.
17            THE COURT:  Mr. Riopelle.
18            MR. RIOPELLE:  Yes, your Honor, thank you.
19    CROSS-EXAMINATION
20    BY MR. RIOPELLE:
21    Q.  Good afternoon, Mr. Catizone.
22    A.  Good afternoon, sir.
23    Q.  I think you testified, if I heard you correctly, that you
24    have testified in approximately ten criminal cases on previous
25    occasions, right?
```

E9ATCHA3                          Catizone - cross

1   A.  Yes, sir.

2   Q.  Am I right that in each case you have had your travel

3   expensed covered by the government, is that right?

4   A.  Yes, sir.

5   Q.  And you've testified in Cleveland, Ohio, for example?

6   A.  Yes, sir.

7   Q.  And gone as far west as San Francisco?

8   A.  Yes, sir.

9   Q.  As far north as Boston to testify, correct?

10  A.  Yes, sir.

11  Q.  And you've testified in Brooklyn across the river here

12  twice previously in criminal cases, am I right?

13  A.  Yes, sir.

14  Q.  And am I right that in each of those ten cases you were

15  called by the government, the Department of Justice?

16  A.  Yes, sir.

17  Q.  And you've never testified for a defendant in a criminal

18  case, is that right?

19  A.  Correct.

20  Q.  Now during your direct examination you expressed some

21  opinions about the handwriting that you saw on some of the

22  prescriptions that you reviewed.  Do you recall that?

23  A.  Yes, sir.

24  Q.  And I think we had it that the prescriptions were organized

25  when you examined them by doctor by doctor, correct?

1   A.  Yes, sir.

2   Q.  So when you noticed differences in the handwriting of the

3   prescriptions that you looked at for -- I'm going to use a

4   generic name, for a Dr. Smith, say -- say you looked at 20

5   prescriptions for Dr. Smith and saw a differences in than

6   handwriting, you were looking at a series of prescriptions that

7   purported to be issued by Dr. Smith, correct?

8   A.  Yes, sir.

9   Q.  And I think we had it previously as well that that is not

10  the way prescriptions typically come into a pharmacy though,

11  right?

12  A.  Yes, sir.

13  Q.  Dr. Smith's prescriptions don't come in all at one time,

14  correct?

15  A.  Yes, sir.

16  Q.  And it's true, is it not, that you have no formal training

17  by the way, as a handwriting expert, is that right?

18  A.  Correct.

19  Q.  Now I think you told us that the pharmacy you worked in on

20  the south side of Chicago issued as many as 500 prescriptions

21  in a day, is that right?

22  A.  Yes, sir.

23  Q.  And that is not necessarily unusual for a busy urban

24  pharmacy, is that right?

25  A.  Correct.

E9ATCHA3                          Catizone - cross

1    Q.  And I know you're from Chicago, you may not know Yonkers

2    that well.  Have you been to Yonkers?

3    A.  No, sir.

4    Q.  So you're not able to tell us whether the Stanley Pharmacy

5    is located in a busy urban location, is that correct?

6    A.  Correct, sir.

7    Q.  Now schedule two substances, as we have it, are those that

8    relate to pain medication, correct?

9    A.  Some of them.  There are other indications as well, sir.

10   Q.  And oxycodone, which is what this case is about, is a pain

11   medication, correct?

12   A.  Yes, sir.

13   Q.  And one thing that might affect the degree or the number of

14   prescriptions handled by a pharmacy for oxycodone would be its

15   proximity to doctors who would issue such prescriptions, is

16   that right?

17   A.  Yes, sir.

18   Q.  So for example, a pharmacy located near one or more

19   hospitals where surgery is performed might typically handle

20   more prescriptions for oxycodone than a pharmacy located in a

21   rural area, is that fair to say?

22   A.  Yes, sir.

23   Q.  And if a pharmacy is located near a surgical practice that

24   does outpatient surgery, that practice might issue oxycodone as

25   well, correct?

E9ATCHA3                    Catizone - cross

1   A.  Yes, sir.

2   Q.  Now are you aware or have you done any research to

3   determine how many hospitals were located near the Stanley

4   Pharmacy?

5   A.  No, sir.

6   Q.  So I take it you have no awareness that there is a hospital

7   called St. John's Riverside Hospital, which is just a short

8   distance from the Stanley Pharmacy, is that right?

9   A.  Correct.

10  Q.  And you do not know that there is a hospital in the

11  St. Joseph's Medical Center located in the same zip code as the

12  Stanley Pharmacy?

13  A.  Correct.

14  Q.  And you have no awareness there is a medical practice

15  called the Westchester Surgical Specialists located near the

16  Stanley Pharmacy?

17  A.  Correct.

18  Q.  Now am I right that it is not unusual for a patient to drop

19  a prescription off at the pharmacy and come back and pick it up

20  later?

21  A.  You're correct.

22  Q.  That happens all the time, correct?

23  A.  Yes, sir.

24  Q.  So on those occasions the same person would be seen in the

25  pharmacy at least twice a day, correct, or twice on the day

1   when he drops the prescription off and picks it up later,

2   correct?

3   A.  Could be, yes.

4   Q.  And I think we heard you say that a family member or a

5   caregiver may also drop off and pick up a prescription for a

6   family member or the person being cared for, is that right?

7   A.  Yes, sir.

8   Q.  And that is not unusual in the practice of pharmacy, am I

9   correct?

10  A.  Yes, sir.

11  Q.  Now we saw some charts while you were testifying that

12  indicated that the number of prescriptions for oxycodone that

13  were being paid for in cash increased dramatically in 2012, is

14  that right?

15  A.  Yes, sir.

16  Q.  And what those charts also demonstrated is that before that

17  time the number of oxycodone prescriptions being paid for in

18  cash was a more normal number, correct?

19  A.  Yes, sir.

20  Q.  And we also saw from those charts, did we not, that the

21  number of oxycodone prescriptions issued by the Stanley

22  Pharmacy increased dramatically in 1212, correct?

23  A.  I don't think the charts show that they were purchases.

24  Q.  Am I correct that the charts show in the year 2012 the

25  amount of oxycodone being dispensed by the Stanley Pharmacy

E9ATCHA3                         Catizone - cross

1   increased dramatically?

2   A.   Could I check the charts to make sure?

3   Q.   Certainly.

4   A.   I thought there were just purchases.

5   Q.   Certainly.

6   A.   The charts that I reviewed showed the amount of oxycodone

7   ordered and purchased but not the number of prescriptions

8   dispensed.

9   Q.   Let's go with ordered.  Is it fair to say the amount of

10  oxycodone ordered by the pharmacy increased dramatically in

11  2012?

12  A.   Yes, sir.

13  Q.   And is it also fair to say the charts show the amount of

14  oxycodone dispensed by the pharmacy increased dramatically in

15  2012?

16  A.   That would be an assumption that you could make.

17  Q.   Now am I -- do you recall whether the prescriptions

18  themselves that you examined and that in your opinion looked

19  strange to you or had red flags attached to them of various

20  kinds, do you remember whether those prescriptions were dated

21  in 2012?

22  A.   They were dated from 2012 across the spectrum from 2011 to

23  2013.

24  Q.   And I would like to ask you about what the New York

25  regulations provide with respect to the work that can be done

E9ATCHA3                        Catizone - cross

```
 1   in a pharmacy by pharmacy technicians or interns.  Am I
 2   correct, sir, that pharmacy technicians don't have the same
 3   certification that a pharmacist does?
 4   A.  Yes, sir.
 5   Q.  But they are permitted, are they not, by New York State
 6   regulation, at least, to do some functions associated with the
 7   dispensation of drugs?
 8   A.  Yes, non-judgmental tasks.
 9   Q.  And is that also true of a pharmacy intern?
10   A.  No, sir.
11   Q.  What can a pharmacy intern do?
12   A.  A pharmacy intern can engage in patient housing activities
13   and other patient care activities again under the supervision
14   of a pharmacist, because a pharmacy intern is someone that is
15   enrolled in a pharmacy program, a college pharmacy, and working
16   towards becoming licensed as a pharmacist.
17   Q.  So they can do everything that an intern can do more,
18   correct?
19            THE COURT:  You asked him about an intern.
20   Q.  You were focused right then on -- I'm sorry, I meant a
21   technician.  An intern can do what a technician can do and
22   more, correct?
23   A.  Yes.
24   Q.  And among the things that a technician can do is to
25   physically receive the written prescription from a patient, is
```

 1    that correct?

 2    A.  Yes, sir.

 3    Q.  And the technician can also type prescription labels, is

 4    that correct?

 5    A.  Yes, sir.

 6    Q.  And the technician can key the entries for the prescription

 7    into the pharmacy's computer system, is that right?

 8    A.  Yes, sir.

 9    Q.  And a technician is permitted by New York State regulation

10    to retrieve drugs from the pharmacy stock and return them to

11    the pharmacy stock, is that correct?

12    A.  Yes, sir.

13    Q.  And the technician is actually permitted to even count the

14    dosage units of drugs under the supervision of a pharmacist, of

15    course, correct?

16    A.  Yes, sir.

17    Q.  And the technician is permitted to place the dosage in a

18    bottle, correct?

19    A.  Yes, sir.

20    Q.  And the technician is permitted by New York State

21    regulation to put the prescription label on the bottle,

22    correct?

23    A.  Yes, sir.

24    Q.  And a technician is also permitted then ultimately to

25    deliver the filled prescription to the patient, correct?

E9ATCHA3                         Catizone - cross

1    A.   Under certain circumstances, yes.

2    Q.   Now when you were working in that busy pharmacy on the

3    south side of Chicago, am I correct that you had pharmacy

4    technicians who worked with you?

5    A.   Yes, sir.

6    Q.   And is it correct to say that you came to rely on those

7    pharmacy technicians?

8    A.   Yes, sir.

9    Q.   And you came to trust them over time as you continued to

10   work with them, correct?

11   A.   Yes, sir.

12   Q.   And in your experience as an expert in pharmacies, that's

13   not unusual, is it?

14   A.   No, sir.

15   Q.   Now am I correct that when a physician's prescription pad

16   is stolen, that physician is required to report that theft, is

17   that correct?

18   A.   Yes.

19   Q.   And am I correct that it is proper practice by a pharmacy

20   which becomes aware of stolen prescriptions to alert other

21   pharmacies in the neighborhood?

22   A.   That's sometimes a common practice, yes, sir.

23   Q.   And that's often done by email, is that right?

24   A.   Email, phone, various means.

25   Q.   In fact, you would expect a responsible pharmacist or a

1   responsible owner of a pharmacy to alert pharmacists and

2   pharmacist's technicians to the theft of prescription pads in

3   the neighborhood if he was aware of it?

4   A.  I think that's a fair statement, yes, sir.

5   Q.  And that's the correct thing to do, correct?

6   A.  Yes.

7   Q.  Now sir, are you aware that my client owned the Stanley

8   Pharmacy for more than 25 years by 2012?

9   A.  No, sir.

10   Q.  Are you aware that he owned the Stanley Pharmacy for some

11   period significantly before 2011 and 2012?

12   A.  No, sir.

13   Q.  Are you aware or has the government made you aware that my

14   client worked together with his son in the pharmacy?

15   A.  No, sir.

16          MR. RIOPELLE:  I have no further questions, your

17   Honor.

18          THE COURT:  Do you have anything, Mr. Tehrani?

19          MR. TEHRANI:  Your Honor, just a few questions.

20   REDIRECT EXAMINATION

21   BY MR. TEHRANI:

22   Q.  Mr. Catizone, you were asked some questions on

23   cross-examination about testifying on behalf of the government.

24   A.  Yes, sir.

25   Q.  Have you ever testified on behalf of a pharmacist?

E9ATCHA3                      Catizone - redirect

1   A.  Yes, I have.

2   Q.  In what capacity?

3   A.  When the pharmacist was denied licensure in a particular

4   state or the pharmacist was up for a disciplinary action that

5   was not fair, I testified in those cases on behalf of

6   pharmacist in those administrative hearings.

7   Q.  You were also asked some questions about whether you might

8   expect some higher levels of oxycodone being dispensed by a

9   pharmacy near hospitals.  Do you remember those questions?

10  A.  Yes, sir.

11  Q.  Would you expect a dramatic increase if a new hospital or

12  surgical center didn't open?

13  A.  No, sir.  If the pharmacy is located by those hospitals,

14  then the amount of oxycodone that's dispensed should remain

15  fairly consistent.  To see a significant increase without the

16  opening of a new hospital or something else significant

17  changing would not be explainable unless by some other reason.

18  Q.  Would you expect one pharmacy in a particular area where

19  there's a number of hospitals to have, say, doubled the amount

20  of oxycodone that it dispensed than any other?

21  A.  Again, if those pharmacies are located close to the

22  hospitals in the same zip code, there should be a comparable

23  rise in those prescriptions across time.  One pharmacy

24  shouldn't see a dramatic increase and the others not see an

25  increase.

E9ATCHA3                      Catizone - redirect

1   Q.  If the explanation for the increase in oxycodone were the

2   pharmacy's proximity to hospitals or surgical centers, would

3   you expect there to be a higher level of other schedule two

4   medications dispensed?

5   A.  There should be a high level of other pain medications,

6   because a hospital or clinic that is specialized or involved in

7   this type of practice wouldn't write for one drug, so there

8   should have been significant increases in other medications as

9   well.

10  Q.  You were also asked some questions about particular roles

11  that a pharmacy technician is allowed to perform.  Do you

12  remember those questions?

13  A.  Yes, sir.

14  Q.  Is there a requirement that the pharmacy technician be

15  supervised?

16  A.  Yes, everything the technician does, either taking

17  medications off the shelf and putting them in a bottle or

18  entering a prescription, that all has to be approved by the

19  pharmacist.  So before the prescription is filled, a pharmacist

20  has to sign off and check the prescription that was presented

21  with the information that was entered into the computer.

22  Q.  Does a pharmacist have to be present in order for a

23  medication to be dispensed by a pharmacy?

24  A.  Yes, sir.

25  Q.  You were also asked some questions on cross-examination

1   about your experience as a pharmacist in Chicago.

2   A.  Yes, sir.

3   Q.  You were asked questions about whether you worked with a

4   pharmacy tech and whether you ever came to rely on the pharmacy

5   tech.  Do you remember those questions?

6   A.  Yes, sir.

7   Q.  Did you ever let a pharmacy tech dispense medication

8   without your supervision?

9   A.  No, sir.

10          MR. TEHRANI:  No further questions, your Honor.

11          THE COURT:  Okay, you're excused.  Thank you very

12   much.

13          Next witness.

14          MR. TEHRANI:  Your Honor, the government calls Edward

15   Girdauskas.

16    EDWARD GIRDAUSKAS,

17        called as a witness by the Government,

18        having been duly sworn, testified as follows:

19   DIRECT EXAMINATION

20   BY MR. TEHRANI:

21   Q.  Mr. Girdauskas, how old are you?

22   A.  Forty-one.

23   Q.  Where were you born?

24   A.  Yonkers, New York.

25   Q.  How far did you go in school?

E9ATCHA3                              Girdauskas - direct

1    A.  Post-graduate year.

2    Q.  What jobs have you had since then?

3    A.  City of Yonkers Sanitation and security.

4    Q.  Where do you currently live?

5    A.  In jail.

6    Q.  How long have you been there?

7    A.  Five months.

8    Q.  Why?

9    A.  My bail was revoked.

10   Q.  Prior to that were you arrested?

11   A.  Yes.

12   Q.  Why were you arrested?

13   A.  Oxycodone conspiracy.

14   Q.  And where did you primarily get your oxycodone?

15   A.  Stanley Pharmacy.

16   Q.  And how did you get your from Stanley Pharmacy?

17   A.  Forged prescription, stolen prescription.

18   Q.  Sorry?

19   A.  Stolen and forged prescriptions.

20   Q.  Where is Stanley Pharmacy located?

21   A.  Yonkers, New York.

22   Q.  Now who in Stanley Pharmacy did you primarily interact

23   with?

24   A.  Ji.

25   Q.  And who is Ji?

E9ATCHA3                    Girdauskas – direct

1    A.  Owner.

2    Q.  And who else worked in the pharmacy?

3    A.  Two counterwomen, mulatto guy, pharmacist.

4    Q.  Did you ever see anyone else in the pharmacy, any other

5    males other than Ji or the mulatto guy?

6    A.  Older gentleman.

7    Q.  Did you understand who the older gentleman was?

8    A.  Ji's father.

9    Q.  Could you describe the pharmacist?

10   A.  Asian, she wore white lab coat.

11   Q.  What did she do?

12   A.  Put labels on bottles, filled bottles with pills.

13   Q.  How do you know that?

14   A.  I seen her.

15   Q.  Sorry?

16   A.  I saw her.

17   Q.  What did you do with the oxycodone after you got the

18   oxycodone from Stanley Pharmacy?

19   A.  Used it and sold it.

20   Q.  And you mentioned initially that the reason you're in jail

21   is because your bail was revoked?

22   A.  Yes.

23   Q.  Why was your bail revoked?

24   A.  Several dirty urines.

25   Q.  What do you mean by that?

E9ATCHA3                          Girdauskas - direct

1   A.  I was under a random drug testing program and I failed a

2   drug test for oxycodone.

3   Q.  So you were continuing to use narcotics?

4   A.  Yes.

5   Q.  Now other than oxycodone, have you used any other drugs?

6   A.  Yes.

7   Q.  Which ones?

8   A.  Oxycontin, I used Xanax, marijuana, Vicodin, Percocet.

9   Q.  Any others.  Ever used cocaine?

10  A.  Cocaine.

11  Q.  Heroin?

12  A.  Heroin, yes.

13  Q.  And other than oxycodone, have you sold any other kinds of

14  drugs?

15  A.  Yes.

16  Q.  Which ones?

17  A.  Marijuana, cocaine, heroin, Vicodin, Percocet, steroids,

18  Xanax, Valium.

19  Q.  And when generally did you sell those narcotics?

20  A.  Date?

21  Q.  Approximately, yeah?

22  A.  About 2005 to the present.

23  Q.  Now focusing on the pills that you sold, generally

24  speaking, how did you get the pills that you obtained and sold?

25  A.  Forging prescriptions, getting prescriptions from doctors,

E9ATCHA3                    Girdauskas - direct

1    buying stolen prescriptions.

2    Q.  And just to break that down, you got certain prescriptions

3    from doctors for the pills that you wanted?

4    A.  Yes.

5    Q.  And then another category was stolen prescriptions?

6    A.  Yes.

7    Q.  And then a third category was forged prescriptions?

8    A.  Yes.

9    Q.  Can you -- we'll talk about this more in depth, but can you

10   just sort of briefly explain how you forged prescriptions.

11   A.  You wash them, you submerge them in brake fluid, it removes

12   pen ink, you use a make-up wipe to remove the excess brake

13   fluid, place it in rubbing alcohol to remove the rest of the

14   brake fluid and dry it between paper towels.

15   Q.  So just in summary, you would get prescriptions for some

16   other thing?

17   A.  Asthma inhaler or antibiotic, something like that, or

18   referral to another doctor.

19   Q.  And you would remove the ink?

20   A.  Remove the ink and write it for oxycodone.

21   Q.  And that's called washing or cleaning prescriptions?

22   A.  Yes.

23   Q.  And certain of the prescriptions that you used came from

24   doctors after you went to visit the doctors?

25   A.  Yes.

E9ATCHA3                          Girdauskas - direct

1   Q.  And those weren't visits for legitimate medical conditions?

2   A.  No.

3   Q.  And the prescriptions that you got from those doctors

4   weren't for legitimate medical conditions?

5   A.  No.

6   Q.  How did you pay for those doctors' visits?

7   A.  Through my insurance, and doctors ran tests that I didn't

8   need, and another doctor I paid with pills.

9   Q.  And did you also pay for any of the prescriptions with

10  insurance?

11  A.  Yes.

12  Q.  Now you testified that you were arrested.  What happened to

13  those charges?

14  A.  I pled guilty.

15  Q.  And what charges did you plead guilty to?

16  A.  Narcotics conspiracy, and medical -- Medicaid fraud.

17  Q.  Did you plead guilty pursuant to a cooperation agreement?

18  A.  Yes.

19  Q.  Have you been sentenced yet?

20  A.  No.

21  Q.  As part of your cooperation, did you participate in

22  meetings with the government before getting your cooperation

23  agreement?

24  A.  Yes.

25  Q.  And as you sit here today, have you told the government

1    everything about your criminal past?

2    A.  Yes.

3    Q.  Now what is the highest sentence that you could receive as

4    you're sitting here today?

5    A.  110 years.

6    Q.  Sitting here today, what is the lowest sentence you that

7    you could possibly receive?

8    A.  Five years.

9    Q.  Was your cooperation agreement oral or was it written down?

10   A.  Written.

11   Q.  Now what is your understanding of what the government is

12   obligated to do for you if you live up to your end of

13   cooperation agreement?

14   A.  5K letter.

15   Q.  Could you briefly explain what a 5K letter is?

16   A.  It's given to the judge and helps me during sentencing.

17   Q.  Who writes a 5K letter?

18   A.  The government.

19   Q.  And if the government writes a 5K letter, is the judge

20   allowed to sentence you below the five year minimum that you

21   were talking about?

22   A.  Yes.

23   Q.  And what does your 5K letter -- what would a 5K letter say?

24   A.  That I lived up to my agreement.

25   Q.  And would it also talk about the crimes that you committed?

1   A.  Yes, everything.

2   Q.  And so if you get a 5K letter, what's the lowest sentence

3   that you could receive?

4   A.  Time served.

5   Q.  And even if you get a 5K letter, what is your maximum

6   sentence?

7   A.  110 years.

8   Q.  Have any promises been made to you at all about the

9   sentence you're going to receive?

10  A.  No, sir.

11  Q.  Who decides what your sentence is?

12  A.  The judge.

13  Q.  And does the government even recommend a particular

14  sentence to the judge?

15  A.  No, sir.

16  Q.  Does the result of this case here affect whether you get a

17  5K letter?

18  A.  No, sir.

19  Q.  What happens if you do not meet your obligations under the

20  cooperation agreement?

21  A.  Don't get the letter.

22  Q.  Do you get to take your plea back?

23  A.  No.

24  Q.  Have you committed any crimes that you have not been

25  charged for?

1    A.  Yes.

2    Q.  And what are those?

3    A.  I robbed Wal-Mart of doghouses and changed prices in the

4    supermarket.

5    Q.  How did you rob doghouses?

6    A.  Walked out, didn't pay for them.

7    Q.  What happened in the supermarket?

8    A.  Changed price tags.

9    Q.  So you would take a price tag off and put a lower price tag

10   on?

11   A.  Yes.

12   Q.  Approximately how many times did you do that?

13   A.  Couple hundred times.

14   Q.  Now turning back to your involvement with the oxycodone

15   distribution, when did you first start illegally obtaining

16   oxycodone?

17   A.  2005.

18   Q.  And did you eventually start using oxycodone as well?

19   A.  Yes.

20   Q.  When was that?

21   A.  2009.

22   Q.  And why?

23   A.  Injury.

24   Q.  And at that point, or at some point after that, did your

25   usage of oxycodone turn into an addiction?

E9ATCHA3                              Girdauskas – direct

1   A.  Yes.

2   Q.  So for some period of time you're obtaining legitimate

3   prescriptions for oxycodone because of your injury?

4   A.  Yes.

5   Q.  But at other times you were obtaining illegitimate

6   prescriptions?

7   A.  Yes.

8   Q.  Who did you primarily obtain prescriptions from?

9   A.  Doctors, doctors I went to.

10  Q.  And at least initially were there a doctor or doctors that

11  you went to more often than others?

12  A.  Yes.

13  Q.  Which doctors are those?

14  A.  Dr. Wijetilaka and Dr. El-Masry.

15  Q.  How many oxycodone prescriptions would you be able to get

16  from each of those doctors per month?

17  A.  One each from them plus others.

18  Q.  So you were also getting prescriptions for other pills from

19  those doctors?

20  A.  Yes.

21  Q.  What other pills?

22  A.  Percocet, Vicodin, Xanax.

23  Q.  And the prescriptions that you were getting from these two

24  doctors then were written in your name?

25  A.  Yes.

1    Q.  How did you pay to get those prescriptions?

2    A.  I used my insurance, and I was -- they were running tests

3    they weren't supposed to, and I paid in pills one of the

4    doctors.

5    Q.  Which doctor?

6    A.  Dr. El-Masry.

7    Q.  How would that work?

8    A.  I would give him 20 pills off the top of every script that

9    he wrote.

10   Q.  He would wrote you a prescription for oxycodone, you would

11   fill it, and you would give him 20 pills?

12   A.  Yes, sir.

13   Q.  Now did you also recruit others to get prescriptions?

14   A.  Yes.

15   Q.  From which doctors?

16   A.  El-Masry and Wijetilaka.

17   Q.  Whom did you recruit?

18   A.  My brother, Mike Girdauskas, Dan DiMase, Ant Sales, Joe

19   Fasce, and Doreen, Sales' wife.

20   Q.  What's your brother's name?

21   A.  Michael Girdauskas.

22   Q.  Why did you recruit them to get prescriptions?

23   A.  I needed the prescriptions.  They would give me half their

24   prescription.

25   Q.  Approximately how many people did you recruit in total?

E9ATCHA3                        Girdauskas – direct

1    A.  Ten.

2              THE COURT:  Mr. Tehrani, we're going to take our

3    afternoon break and we'll resume at 2 o'clock.

4              MR. TEHRANI:  Thank you, your Honor.

5              (Jury not present)

6              THE COURT:  We'll resume at 2 o'clock.  Let me make an

7    observation.  I found it very disconcerting that people are

8    moving around while you're conducting an examination.  It's

9    confusing to the jury.  I suggest you get in one place and stay

10   there and not be shuttling back and forth.  Whatever he needs,

11   give to him at one time, but don't be walking back and forth.

12             See you at 2 o'clock.

13             (Luncheon recess taken)

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1            A F T E R N O O N   S E S S I O N

2            2:00 p.m.

3            THE DEPUTY CLERK:  All rise.

4            (Jury entering)

5            THE COURT:  Please be seated.

6            All right, Mr. Tehrani.

7   BY MR. TEHRANI:

8   Q.  Mr. Girdauskas, before we broke for lunch I was asking you

9   some questions about the people that you recruited to go to

10  various doctors and get prescriptions, and you provided a list

11  of names.

12          Approximately, how many people in total did you

13  recruit?

14  A.  About ten people.

15  Q.  And why did you recruit them to get prescriptions?

16  A.  I was getting half of their prescriptions.

17  Q.  Can you explain how that worked?

18  A.  I would take them to the doctor, and if they got foot a

19  prescription for 180, they would have to give me 90.

20  Q.  So they would get the prescription, they would fill it, and

21  you would get --

22  A.  90.

23  Q.  -- approximately half?

24  A.  Yes.

25  Q.  Now, you had mentioned earlier in your testimony the

1  process of washing or cleaning prescriptions?

2  A.  Yes.

3  Q.  We talked about it generally, but can you again explain

4  what the process is for washing a prescription?

5  A.  Prescription is soaked in brake fluid, the pen ink comes

6  off.  It's wiped down with a swab like a makeup swab, put in

7  rubbing alcohol, and it's dried between two pieces of paper

8  towel.

9  Q.  And where did you get the prescriptions that you washed?

10 A.  Doctors, various doctors.

11 Q.  Those prescriptions were written for other things other

12 than oxycodone?

13 A.  Yes.

14 Q.  And when did you start, approximately, washing

15 prescriptions?

16 A.  2009.

17 Q.  So again the process, the brake fluid, what exactly does

18 brake fluid do to the prescription?

19 A.  Takes off the pen ink.

20 Q.  And then what does the rubbing alcohol do?

21 A.  It takes the brake fluid off the paper.

22 Q.  And then the process for drying, you mentioned that you put

23 it between two pieces of paper towels?

24 A.  Yes.

25 Q.  And how long does it take to dry if you're using paper

1  towels?

2  A.  15 minutes, ten minutes.

3  Q.  And if you wanted to speed that process up, what would you

4  do?

5  A.  You could blow dry it.

6  Q.  Were there any problems with using a blow dryer?

7  A.  Yes.  There is a little blue box on the bottom, that if you

8  blow dry, it disappears.

9  Q.  And how long would the entire process take?

10  A.  About a half-hour.

11  Q.  Where would you do it typically?

12  A.  My house, my brother's house.

13  Q.  And, again, what was the goal of washing these

14  prescriptions?

15  A.  To remove what they were written for, to rewrite them for

16  oxycodone.

17  Q.  And when you rewrote them, what names did you put on the

18  prescriptions?

19  A.  Just made up names.

20  Q.  Why not your own?

21  A.  I already had ones in my name.

22  Q.  And why couldn't you have additional ones in your name?

23  A.  You need ID to pick them up from the pharmacy if you had

24  your name on them, so use other names.

25  Q.  Now, what, if anything, would happen if you rewrote the

1    prescription before the paper had actually dried?

2    A.   The ink would run.

3    Q.   And would the ink run before the paper was dry?

4    A.   Yes.

5    Q.   And would anything happen if you left the brake fluid on

6    the prescription too long?

7    A.   It turns purple.

8    Q.   And you mentioned also that at one point during the process

9    you would scrub the prescription with some sort of pad?

10   A.   Yes.

11   Q.   And the process -- that was for what part of the process?

12   A.   To remove the excess ink that didn't come off with the

13   brake fluid.

14   Q.   And what would happen if you rubbed too hard?

15   A.   There is like a gray background on the prescription.  If

16   you rubbed too hard, the gray background comes off.

17   Q.   And when what would happen to the color of the

18   prescription?

19   A.   Turn white.

20   Q.   Now, in your experience, are all prescriptions from various

21   doctors the same color, at least initially?

22   A.   Yes.

23   Q.   And now who, again, were some of the people that you were

24   working with to obtain and fill prescriptions?

25   A.   Anthony Sales, Mike Penzo, my brother, Doreen, Joe Fasce,

1   Daniel DiMase.

2   Q.  Now, there is a number of photographs in front of you, and

3   I'm going to go through those in order.

4          Can you take a look at what's been marked as

5   government Exhibit 317?  Who is that?

6   A.  That's Anthony Sales.

7          MR. TEHRANI:  Your Honor, the government moves 317

8   into evidence?

9          MR. AGNIFILO:  No objection.

10         THE COURT:  317 is in evidence.

11         (Government's Exhibit 317 received in evidence)

12         MR. TEHRANI:  And could we publish to the jury?

13         THE COURT:  Yes.

14  Q.  What's his name again?

15  A.  Anthony Sales.

16  Q.  How do you know him?

17  A.  I know him for years.

18  Q.  Going back to when?

19  A.  He was friends with my brother Mike.

20  Q.  And what was his role as part of your group?

21  A.  He filled scripts, he stole scripts, he went to the doctor.

22  Q.  And what would he do with the prescriptions that you stole?

23  A.  He'd sell them.

24  Q.  Just to clarify, when you say the word "script," is that

25  just short for prescription?

E9AZCHA4                          Girdauskas – direct

1    A.  Yes.

2    Q.  Look at what's marked as government Exhibit 304?

3    A.  Uh-huh.

4    Q.  Who is that?

5    A.  It's his girlfriend Doreen.

6              MR. TEHRANI:  Your Honor, the government moves 304

7    into evidence?

8              MR. AGNIFILO:  No objection.

9              MR. RIOPELLE:  No objection, your Honor.

10             THE COURT:  304 is received in evidence.  You can

11   publish it.

12             (Government's Exhibit 304 received in evidence)

13   Q.  And what was her role?

14   A.  She stole prescriptions, she filled fake prescriptions,

15   sold prescriptions.

16   Q.  And how did you know her?

17   A.  Through Anthony.

18   Q.  Now looking at government Exhibit 305?

19   A.  It's Joseph Fasce.

20             MR. TEHRANI:  Government moves 305 into evidence?

21             MR. AGNIFILO:  No objection.

22             MR. RIOPELLE:  No objection.

23             THE COURT:  305 is in evidence.

24             (Government's Exhibit 305 received in evidence)

25             MR. TEHRANI:  May we publish?

E9AZCHA4                        Girdauskas – direct

```
 1                THE COURT:  Yes.
 2    Q.  What was his role?
 3    A.  He did fake scripts, sold scripts, sold pills.
 4    Q.  How did you know him?
 5    A.  He worked with my brother.
 6    Q.  Government Exhibit 316, who is that?
 7    A.  That's Michael Penzo.
 8                MR. TEHRANI:  Government moves 316 into evidence?
 9                MR. AGNIFILO:  No objection.
10                MR. RIOPELLE:  No objection.
11                THE COURT:  It's in evidence.  You can show it.
12                (Government's Exhibit 316 received in evidence)
13    Q.  And how did you know him?
14    A.  Through my brother.
15    Q.  And what was his role?
16    A.  He stole prescriptions, went to the doctor, sold pills,
17    sold scripts.
18    Q.  Government Exhibit 303, who is that?
19    A.  That's Daniel DiMase.
20                MR. TEHRANI:  Government moves 303 in evidence?
21                MR. AGNIFILO:  No objection.
22                THE COURT:  303 is in evidence.  You can show it.
23                (Government's Exhibit 303 received in evidence)
24    Q.  What was his role?
25    A.  He stole scripts, wrote scripts, sold pills, went to the
```

1    pharmacy with fake scripts.

2    Q.   Look at government exhibit 308, 308 and 306 together?

3    A.   Yeah.

4    Q.   Who are they?

5    A.   It's me and my brother.

6    Q.   308 is which one?

7    A.   Michael.

8              MR. TEHRANI:  Government moves 308 and 306 into

9    evidence?

10             MR. AGNIFILO:  No objection.

11             MR. RIOPELLE:  No objection.

12             THE COURT:  It's in evidence.  You can show it.

13             (Government's Exhibits 306 and 308 received in

14   evidence)

15   Q.   And what was your brother's role?

16   A.   He went into the pharmacy with fake scripts, sold pills,

17   full scripts.

18   Q.   Now, all the people that we just talked about in the

19   photographs that we've seen, are these all people who had

20   filled prescriptions at Stanley Pharmacy?

21   A.   Yes.

22   Q.   What was your arrangement with the others regarding the

23   filled prescriptions?

24   A.   If I wrote them, I would get half their script.

25   Q.   What do you mean, if you wrote them?

E9AZCHA4                          Girdauskas - direct

1  A.  If I cleaned the script and wrote it for them, I would get

2  half their prescriptions.

3  Q.  And who would actually go into the pharmacy and fill them?

4  A.  They would.

5  Q.  What did you do with all the oxycodone pills?

6  A.  Sold them, used them.

7  Q.  And how did you take the pills?

8  A.  I would crush the pills and sniff them.

9  Q.  When you first started taking oxycodone, how many pills

10  were you taking, approximately?

11  A.  About three.

12  Q.  That's per day?

13  A.  Yes.

14  Q.  Did that increase?

15  A.  Yes.

16  Q.  And at your peak, how many pills were you taking?

17  A.  100.

18  Q.  Is that per day?

19  A.  Yes.

20  Q.  Why did you need to keep taking more pills?

21  A.  You get sick if you don't have them.

22  Q.  Is that a withdrawal symptom?

23  A.  Yes.

24  Q.  And how long would it take for you to start feeling sick?

25  A.  About 12 hours.

E9AZCHA4                         Girdauskas - direct

1   Q.  12 hours after the last pill that you took?

2   A.  Uh-huh.

3   Q.  And for the pills that you sold, how much would you sell

    them for?

5   A.  Between 20 and $25.

6   Q.  And was that for a particular dosage?

7   A.  30-milligram oxycodone.

8   Q.  And so for a bottle of 180 oxycodone, approximately how

9   much would you be able to sell that for?

10  A.  3600.

11  Q.  And between you and the people you were working with,

12  approximately how many oxycodone pills were you getting a given

13  month?

14  A.  16,000.

15  Q.  And how much money were you making selling the pills?

16  A.  About 50,000 a month.

17  Q.  What would you do with the money?

18  A.  Spend it, drugs.

19  Q.  Is there a particular strength of oxycodone that you

20  preferred?

21  A.  30-milligram.

22  Q.  Why?

23  A.  Strongest, and tasted good, sniff it.

24  Q.  And what would do if the 30-milligram dosage wasn't

25  available?

E9AZCHA4                          Girdauskas - direct

1   A.  Get 20s, 15s, 10s first.

2   Q.  What do the pills do to you?

3   A.  Get me high.

4   Q.  And while you were taking those pills, did you continue to

5   work for Sanitation?

6   A.  Yes.

7   Q.  And did you drive a Sanitation truck while you're taking

8   pills?

9   A.  Yes.

10  Q.  Did you drive other times while on oxycodone?

11  A.  Yes.

12  Q.  When you first started with the oxycodone pills, where did

13  you fill the prescriptions?

14  A.  CVS, Walgreens.

15  Q.  And what, if anything, would you need to do at those

16  pharmacies to get prescriptions filled?

17  A.  You need ID with the name that's on the prescription, and

18  they called the doctor.

19  Q.  And so the prescriptions that you filled at those

20  pharmacies, were they in your name?

21  A.  Yes.

22  Q.  And how do you know that the other pharmacies would call

23  the doctor?

24  A.  They would tell you that they have to call the doctor

25  before I fill the controlled substance.

E9AZCHA4                          Girdauskas - direct

1   Q.  Now did there come a time when you started filling

2   oxycodone prescriptions at Stanley Pharmacy?

3   A.  Yes.

4   Q.  And approximately when was that?

5   A.  2009, late 2009.

6   Q.  How did you learn about Stanley?

7   A.  Joe Fasce.

8   Q.  What did he tell you?

9   A.  He said they had 30-milligram oxycodone in stock, and that

10  he'd fill anything.

11  Q.  And why was that important?

12  A.  We're using names that weren't -- wasn't my name.

13  Q.  Now just for reference, we're talking about the person in

14  government Exhibit 305?

15          MR. TEHRANI:  Could we publish that, Mr. Evert?

16  Q.  That's the person you're talking about?

17  A.  Yes.

18  Q.  Now, there should be in front of you what's been marked for

19  identification as government Exhibit 351?

20  A.  It's 311.

21          THE COURT:  What exhibit do you want?

22          MR. TEHRANI:  It's in the folder, 351.  May I approach

23  your Honor?

24          THE COURT:  Why don't you approach, yes.

25  Q.  Do you recognize that?

1   A.  Yes.

2   Q.  What is it?

3   A.  It's Stanley Pharmacy.

4   Q.  Photograph?

5   A.  Yes.

6           MR. TEHRANI:  Your Honor, the government offers

7   government Exhibit 351?

8           MR. RIOPELLE:  No objection, your Honor.

9           THE COURT:  351 is received in evidence.

10          (Government's Exhibit 351 received in evidence)

11          MR. TEHRANI:  May we publish?

12          THE COURT:  Yes, you may.

13  Q.  Now, we'll get back to this a little bit later, but can you

14  explain how many entrances there are into the pharmacy?

15  A.  There's two.

16  Q.  And is there one of the entrances that you typically

17  referred as to the main entrance?

18  A.  It's the one directly behind the bus stop.

19  Q.  So on the right-hand side of the photograph?

20  A.  Yes.

21  Q.  That would be the main entrance walking to the front of the

22  pharmacy?

23  A.  Yes.

24  Q.  Where is the other entrance?

25  A.  On the side.

E9AZCHA4                          Girdauskas - direct

1    Q.  That would be on the side of the cross street on the left?

2    A.  Yes.

3    Q.  Did you refer to that entrance as anything in particular?

4    A.  Side entrance, Main Street entrance.

5    Q.  So that's Main Street on the left-hand side?

6    A.  Yes.

7    Q.  Now, the first time that you went into Stanley Pharmacy,

8    what happened?

9    A.  I filled the prescription for oxycodone in my name.

10   Q.  And how did you pay for the prescription?

11   A.  With my insurance.

12   Q.  Who did you deal with?

13   A.  Ji.

14   Q.  Can you take a look at what's been marked as government

15   Exhibit 311?

16   A.  Yes.

17   Q.  Who is that?

18   A.  Ji.

19            MR. TEHRANI:  Your Honor, the government offers 311?

20            MR. RIOPELLE:  No objection.

21            MR. AGNIFILO:  No objection.

22            THE COURT:  311 is in evidence.  You can show it.

23            (Government's Exhibit 311 received in evidence)

24   Q.  And so again who is this individual?

25   A.  It's Ji.

E9AZCHA4                          Girdauskas - direct

1   Q.  Now, after the first time that you filled an oxycodone

2   prescription at Stanley Pharmacy, did you continue to fill

3   oxycodone prescriptions?

4   A.  Yes.

5   Q.  At Stanley Pharmacy?

6   A.  Yes.

7   Q.  And did you ever pay for your oxycodone prescription again

8   at Stanley Pharmacy with your insurance?

9   A.  No.

10  Q.  Why not?

11  A.  He didn't take insurance for oxycodone any more.

12  Q.  Who said that?

13  A.  Ji.

14  Q.  And so how did you pay?

15  A.  Cash.

16  Q.  Every time?

17  A.  Yes.

18  Q.  Did you use your insurance for any other purpose at Stanley

19  Pharmacy?

20  A.  Yes.

21  Q.  What?

22  A.  For my asthma medication.

23  Q.  Sorry?

24  A.  My asthma medication.

25  Q.  So you have asthma?

E9AZCHA4                        Girdauskas - direct

1   A.  Yes.

2   Q.  And you would fill your prescription for asthma medication

3   at Stanley Pharmacy?

4   A.  Yes.

5   Q.  And you would pay for that with insurance?

6   A.  Yes.

7   Q.  Did you pay for anything else with cash at Stanley

8   Pharmacy?

9   A.  No.

10  Q.  Just oxycodone?

11  A.  Yes.

12  Q.  How often did you go to Stanley Pharmacy?

13  A.  Every day.

14  Q.  How often did you go inside?

15  A.  Three times a week.

16  Q.  And if you did not go inside but you went to Stanley

17  Pharmacy, what would you do?

18  A.  Wait outside for my brother.

19  Q.  And why did he go instead of you?

20  A.  I probably wrote it, the prescription.  He went in.

21  Q.  So you would go there together, and your brother would go

22  in to fill the prescription?

23  A.  Yes.

24  Q.  And how often did your brother go inside Stanley Pharmacy?

25  A.  Every day.

1   Q.  How do you know?

2   A.  I was with him.

3   Q.  And how many oxycodone prescriptions, approximately, would

4   he fill every day?

5   A.  Four.

6   Q.  Do you know whether anyone else was at Stanley Pharmacy

7   that regularly?

8   A.  Yes.

9   Q.  Who?

10  A.  Joe Fasce, Anthony Sales, Mike Penzo, Dan DiMase.

11  Q.  How do you know?

12  A.  I seen them.

13  Q.  Were there ever occasions where you went into Stanley

14  Pharmacy and saw other guys from your group there you had not

15  gone to the pharmacy with?

16  A.  Yes.

17  Q.  What's the most number of your crew that you remember

18  seeing inside the pharmacy at one time?

19  A.  Three.

20  Q.  Now, when you went inside Stanley Pharmacy to fill

21  prescriptions, did you ever bring more than one prescription at

22  a time?

23  A.  Yes.

24  Q.  And, typically, how many would you bring in?

25  A.  Three, four.

E9AZCHA4                        Girdauskas - direct

1   Q.  And did you ever get more than one oxycodone prescription

2   filled at a given time?

3   A.  Yes.

4   Q.  What's, to the best your recollection, the most number of

5   oxycodone prescriptions you left the pharmacy with?

6   A.  Two.

7   Q.  Now, what was the most number of prescriptions that you

8   tried to fill at one time?

9   A.  28.

10  Q.  And what happened?

11  A.  He gave me dates to come back at a later time for them.

12  Q.  Can you explain that in a little bit more detail?  You walk

13  into the pharmacy and what happened?

14  A.  I handed him an envelope of prescriptions, and Ji handed

15  them back to me with dates written on post-its on each of the

16  scripts.

17  Q.  And what were you supposed to do with those dates?

18  A.  Come return to have them filled.

19  Q.  On those future dates?

20  A.  On the future dates.

21  Q.  And did you ever fill a prescription at Stanley Pharmacy,

22  and then return later that day to fill another prescription at

23  Stanley Pharmacy?

24  A.  Yes.

25  Q.  And what would happen?

E9AZCHA4                              Girdauskas - direct

1    A.  Fill it.

2    Q.  Were the prescriptions that you filled at Stanley Pharmacy,

3    in your name?

4    A.  No.

5    Q.  Whose names are on the prescription?

6    A.  Made up names.

7    Q.  Would you go into Stanley Pharmacy with multiple

8    prescriptions in multiple different names?

9    A.  Yes.

10   Q.  What would happen?

11   A.  Fill them.

12   Q.  Now, during this period of time were you also getting

13   prescriptions for oxycodone in your own name?

14   A.  Yes.

15   Q.  And where did you get those?

16   A.  Walgreens, CVS, Trust Pharmacy.

17   Q.  Why.

18   A.  Needed ID.

19   Q.  So why did you fill the prescriptions in your name at those

20   other pharmacies rather than at Stanley Pharmacy?

21   A.  You need ID at Stanley.

22   Q.  What was the method of payment that you used for the

23   prescriptions that were in your name that you filled at

24   Walgreens and --

25   A.  Insurance.

1   Q.   Now, you mentioned also that sometimes you would get stolen

2   prescriptions?

3   A.   Yes.

4   Q.   Who did you get those from?

5   A.   Anthony Sales.

6   Q.   Anyone else?

7   A.   Penzo.

8   Q.   Anyone else?

9   A.   Joe Fasce.

10  Q.   So we talked about washing prescriptions, and we talked

11  about what the problems that can arise with a washed

12  prescription.  Can you explain to the jury again what those

13  problems are?

14  A.   There is a safety feature, like a water mark on the back of

15  the script it's gray, if you scrub too hard that disappears;

16  too much heat, the blue box disappears.  And if you leave it in

17  brake fluid too long, it turns purpose purple, pinkish.

18  Q.   Anything about the ink?

19  A.   The ink could run.

20  Q.   And why again would the ink run?

21  A.   If you waited -- if you didn't wait long enough for it to

22  dry, it would run on, ink would run.

23  Q.   Now, did you ever try to fill washed prescriptions at

24  Stanley Pharmacy that you thought were badly washed?

25  A.   Yes.

E9AZCHA4                          Girdauskas - direct

1    Q.  In what ways were they badly washed?

2    A.  The ink was running, pink, no blue box, water mark was gone

3    on the background.

4    Q.  What happened?

5    A.  He filled them.

6    Q.  Was a washed prescription of yours ever rejected at Stanley

7    Pharmacy?

8    A.  In the beginning, yeah.

9    Q.  Approximately, how often would you get a prescription

10   rejected?

11   A.  Not very often.

12   Q.  Now, did Ji ever return a washed prescription to you that

13   had already been filled?

14   A.  Yes.

15   Q.  Can you explain what happened in that circumstance?

16   A.  He asked me and my brother to get him another script,

17   because this one didn't look too good.

18   Q.  And was that a prescription that you had previously brought

19   into the pharmacy?

20   A.  No.

21   Q.  And it had already been filled?

22   A.  Yes.

23   Q.  So what did you do?

24   A.  Brought him a prescription.

25   Q.  Why?

E9AZCHA4                              Girdauskas - direct

1    A.   Keep him happy.

2    Q.   Now, you said that you filled prescriptions at Stanley

3    Pharmacy using multiple names.  Were you ever required to show

4    identification?

5    A.   No.

6    Q.   Did you ever hear anyone at Stanley Pharmacy call the

7    doctor's office to verify a prescription?

8    A.   No.

9    Q.   Did you have to provide any information to fill a

10   prescription?

11   A.   Date of birth.

12   Q.   What date of birth did you use?

13   A.   Just made up one.

14   Q.   And did you use the same date of birth every time?

15   A.   No.

16   Q.   Now, you talked about a particular occasion where you went

17   into Stanley Pharmacy with 28 prescriptions and you were told

18   to return on future dates?

19   A.   Yes.

20   Q.   Were there other occasions where you dropped off a

21   prescription to be filled and were told to return to have the

22   prescription filled at a later time?

23   A.   Yes, yes.

24   Q.   And in those circumstances, were you given a prescription

25   paper back?

E9AZCHA4                         Girdauskas - direct

1   A.   Yes.

2   Q.   Do you know why that was?

3   A.   People were returning, stealing scripts from people that

4   brought them in saying the names they were using, he was giving

5   it to them instead of the person who really brought it in.

6   Q.   So, to give an example, you would go into Stanley Pharmacy

7   with a prescription in someone else's name --

8   A.   If someone found out that I had that name, they would get

9   there first and pick it up.

10  Q.   And so giving you the prescription back was a way --

11  A.   To prevent that.

12  Q.   Did that happen at other pharmacies where you filled

13  prescriptions?

14  A.   No.

15  Q.   Do you recall whether anyone you were working with was ever

16  given an oxycodone prescription, a filled oxycodone

17  prescription from Stanley Pharmacy without a prescription?

18  A.   Yes.

19  Q.   And what happened?

20  A.   My brother asked Ji if he could bring the script in the

21  next day.  Ji said yeah; filled it, gave him a script, 180

22  pills.

23  Q.   When you say he gave him a script, he gave him the pills?

24  A.   Bottle, yes.

25  Q.   Did your brother return the next day with the prescription?

E9AZCHA4                          Girdauskas – direct

1    A.   Yes.

2    Q.   Prescription paper?

3    A.   Paper.

4    Q.   I want to talk now about the process for filling

5    prescriptions at Stanley Pharmacy.

6          When you first started going to Stanley Pharmacy,

7    could you walk through the process for getting a prescription

8    filled?

9    A.   You walk up to the counter, you place your prescription in

10   a basket.  The woman would pass it back to Ji.  He would put

11   your pills in the basket.  She'd ring it up and you pay for it.

12   Q.   And was there anyone else in the back area that you could

13   see during this process?

14   A.   Pharmacist.

15   Q.   And how did you identify the pharmacist?

16   A.   White lab coat on.

17   Q.   Male or female?

18   A.   Female, Asian.

19   Q.   Now, did the process change over time?

20   A.   Yes.

21   Q.   How so?

22   A.   You'd have to walk in and place your money and the

23   prescription in a brown bag, and they would pass it back to Ji,

24   and he'd come around and hand you the pills.

25   Q.   Now when you say "they would hand it back to Ji," what

E9AZCHA4                         Girdauskas - direct

1    would happen, who would hand it back?

2    A.   The counter girls.

3    Q.   So you would walk in, you'd have -- you have cash -- did

4    you bring a bag yourself?

5    A.   No.

6    Q.   So you walk in with a prescription and cash?

7    A.   Cash.

8    Q.   And what would happen?

9    A.   You place it in a brown bag and they would pass it back to

10   Ji.

11   Q.   Did anything change with respect to the prices that you

12   were being charged?

13   A.   Yes.

14   Q.   And what was that change?

15   A.   Started at two something, and jumped up to 1,050 for 180

16   pills.

17   Q.   Of what dosage?

18   A.   30-milligram.

19   Q.   Did that change happen all at once or were there

20   incremental steps?

21   A.   No, it jumped -- it jumped from two something to seven,

22   then it jumped up to a thousand.

23   Q.   And so that's $1,000 for one 180 pill prescription of

24   30 milligrams oxycodone?

25   A.   Yes.

E9AZCHA4                          Girdauskas - direct

1    Q.  And how did you find out about the new prices?

2    A.  You just walk in, he'd tell you it's a thousand dollars;

3    you want it or not?

4    Q.  And what were the prices for the other dosages of oxycodone

5    you got at Stanley Pharmacy?

6    A.  The 20s were around 900, 15s were about 600, 10s I think

7    were 250, and if I was -- I don't really know the price of

8    them.  It wasn't much.

9    Q.  Did the pharmacy initially have 20-milligram oxycodone?

10   A.  No.

11   Q.  Did they eventually get them?

12   A.  Yes.

13   Q.  What happened?

14   A.  He said he was having trouble getting the 30s.  So I asked

15   him to get 20s.  And he said they didn't make them.  And I said

16   yeah, they make them.  And he had them, the next day he had

17   them.

18   Q.  And who is he?

19   A.  Ji.

20   Q.  How did you find out about the change in payment method

21   policy, the cash in the bag policy?

22   A.  Just walked in one day and that was the way I had to do it.

23   He gave us the bag and said put the money and the script in it.

24   Q.  Now, the thousand dollars that you were paying per

25   prescription of 30-milligram oxycodone, how did that price

E9AZCHA4                     Girdauskas - direct

1    compare to the same prescription at other pharmacies?

2    A.  Other pharmacy's about 200 bucks.

3    Q.  How do you know?

4    A.  I filled them before.

5    Q.  So why did you continue going to Stanley Pharmacy?

6    A.  I needed more pills.

7    Q.  Why didn't you just pay $200 at another pharmacy?

8    A.  You needed ID and they called the doctor.

9    Q.  So after you put the -- getting back to the process for

10   filling the prescriptions at Stanley.

11          After you put the cash in the bag and the cash in the

12   bag was handed back to Ji, how was the filled prescription

13   given back to you?

14   A.  Ji would hand it to us.  He'd come around the counter.

15   Q.  Now, was that always the case?

16   A.  No, not in the beginning.

17   Q.  What was the process in the beginning?

18   A.  You put your prescription in the basket, they hand it to

19   Ji, put your filled bottle in the basket, and you ring it up at

20   the counter.

21   Q.  And so the prescription, the filled prescription would be

22   given back to you by one of the cashiers?

23   A.  Yes.

24   Q.  And then the process ultimately changed and, your testimony

25   was that Ji handed it to you, personally?

1   A.  Yes.

2   Q.  Now where in the pharmacy would Ji personally hand you the

3   oxycodone prescriptions?

4   A.  The right-hand side or the left-hand side, like a little

5   area, seating area.

6   Q.  And you're talking about right-hand side, left-hand side

7   with respect to the main counter of the cashiers?

8   A.  Yes.

9   Q.  What did you do with the bottles of oxycodone once you

10  received them from Ji?

11  A.  Take the label off.

12  Q.  Why did you do that?

13  A.  You get caught with somebody else's name on the bottle, you

14  can get in more trouble if you have one without a name on it.

15  Q.  And where would you do that?

16  A.  At the lotto stand in the front of the store.

17  Q.  Inside the pharmacy?

18  A.  Yeah.

19  Q.  Did there come a time when Ji said anything to you about

20  the amount of oxycodone he was selling?

21  A.  He said he got a letter from the DEA and he could no longer

22  do four day, he could only do two.

23  Q.  So what happened?

24  A.  Start doing two, one in the morning, one in the afternoon.

25  Q.  And was that for a particular dosage?

E9AZCHA4                          Girdauskas - direct

1    A.  30-milligram.

2    Q.  Did that affect your ability to get other dosages of

3    oxycodone?

4    A.  No.

5    Q.  So the cutback was to go down to two 30-milligram

6    prescriptions per day?

7    A.  Yes.

8    Q.  And in addition to that, you could get prescriptions for

9    other dosages.

10   A.  Yes.

11   Q.  Did you ever speak with Ji on the phone?

12   A.  Yes.

13   Q.  Why?

14   A.  I told him I was going to be a little late, if he could

15   stay open; asked him if he had certain strengths of oxycodone.

16   Q.  Why did you do that?

17   A.  So I could write my prescription according to what

18   strengths he had in stock.

19   Q.  And did you ever go into the pharmacy with a prescription

20   for a dosage that the pharmacy didn't have in stock?

21   A.  Yes.

22   Q.  What happened?

23   A.  I went to the car and wrote another one that they had in

24   stock.

25   Q.  Another prescription for oxycodone in the dosage that the

1   pharmacy had in stock?

2          Now, again, who else worked at the pharmacy?

3   A.  Counter girls, the lotto guy, Ji, and the pharmacist.

4   Q.  And where did the pharmacist work?

5   A.  Ji's right-hand side.

6   Q.  In the back area of the pharmacy?

7   A.  Yes.

8   Q.  And what did she do?

9   A.  She filled bottles of pills and put labels on bottles.

10  Q.  And was she the only one to put bottles in pills, I mean

11  put pills in bottles?

12  A.  Ji did also.

13  Q.  And what was the pharmacist wearing?

14  A.  White lab coat.

15  Q.  Now, again, in relation to the cash register, where did Ji

16  work?

17  A.  Behind the wall that was -- there was like a little aisle

18  between the cash register, there is a wall.  Behind that he

19  worked.

20  Q.  And this wall, what was on this wall?

21  A.  Various products.

22  Q.  Was there also shelving?

23  A.  Shelving, yes.

24  Q.  And could you see through the wall?

25  A.  Yes.

E9AZCHA4                              Girdauskas - direct

1   Q.  How so?

2   A.  There was a cut out.

3   Q.  And where did the pharmacist work?

4   A.  Right next to Ji, right-hand side.

5   Q.  And you could see her?

6   A.  Yes.

7   Q.  From the front of the pharmacy?

8   A.  Yes.

9   Q.  Did you ever make eye contact with her?

10  A.  Once or twice.

11  Q.  Now take a look at what's in front of you as government

12  exhibit 1006.  What does that appear to you to be?

13  A.  It's a layout of Stanley Pharmacy.

14  Q.  And does it appear to you to be approximately a depiction

15  of the pharmacy during the period of time when -- where you

16  went in there?

17  A.  Yes.

18          MR. TEHRANI:  Your Honor, the government offers

19  government exhibit 1006?

20          MR. AGNIFILO:  No objection.

21          THE COURT:  1006 received in evidence.

22          You can display it.

23          (Government's Exhibit 1006 received in evidence)

24  Q.  Now, we talked previously about there being two entrances

25  to the pharmacy.

E9AZCHA4                         Girdauskas - direct

1            So there is a main entrance and side entrance.  Could

2      you describe where the main entrance is?

3      A.   The main entrance is on Palisade Avenue.

4      Q.   So it's the very top of the diagram?

5      A.   Yes.

6      Q.   And where is the lotto area?

7      A.   Lotto area is to the -- when you walk in, it's to the

8      right.

9      Q.   To the immediate -- if you were to turn right as soon as

10     you walked in, that would be --

11     A.   The lotto.

12     Q.   The lotto area.

13           Now what about the cash registers that you were

14     referring to?

15     A.   Straight ahead at the OTC counter, there's two.

16     Q.   Two cash registers?

17     A.   Yes.

18     Q.   One closest to the wall, and then one closer to the aisle

19     there?

20     A.   Yeah.

21     Q.   Now, where is the side entrance that you're referring to?

22     A.   Main Street.

23     Q.   And that's that dark area on -- where the dark sort of door

24     area on Main Street?

25     A.   Yes.

E9AZCHA4                          Girdauskas - direct

```
 1    Q.  And did you typically use one of the entrances as opposed
 2    to the other?
 3    A.  The side entrance.
 4    Q.  Now, where did Ji work?
 5    A.  Behind the RX counter.
 6    Q.  And the RX counter is long there.  We'll talk about exactly
 7    the same all the way across.
 8            But using the words RX and counter, where,
 9    approximately, did Ji work?
10    A.  Where the R and X is.
11    Q.  And where did the pharmacist work?
12    A.  Where the U and the N are in counter.
13    Q.  Now, this counter separating the front area -- let me step
14    back.
15            The employees who worked at the registers, they worked
16    behind the OTC counter?
17    A.  Yes.
18    Q.  And the area between where the register employees worked
19    and where Ji and the pharmacist worked, was that -- can you
20    describe again the separation between the front area and the
21    back area?
22    A.  It was a floor to ceiling wall with products with a cut
23    out, so you could see straight to the back.
24    Q.  Cut out in the middle of the wall?
25    A.  Middle, yes.
```

E9AZCHA4                          Girdauskas - direct

1    Q.   And was this, was the RX counter the same all the way

2    across?

3    A.   No.

4    Q.   Where was it different?

5    A.   To the left-hand side of the Main Street Entrance.  It was

6    a counter where you could speak to the pharmacist if you had

7    to.  It was about chest height.

8    Q.   So the wall with shelves and products ended before you got

9    to the side area?

10   A.   Ended at the end of the OTC counter, right about there.

11   Then it was like an area where storage, and they could come to

12   talk to you if they had to.

13   Q.   So that side area was just a counter?

14   A.   Yes.

15   Q.   And if you walked into the side entrance, what is

16   immediately in front of you?

17   A.   In the Main Street entrance?

18   Q.   The Main Street entrance, yeah?

19   A.   Or the front entrance?

20   Q.   Seating area?

21   A.   Yeah.  Seating area is right -- as soon as you walk in the

22   side entrance.

23   Q.   Now from that side entrance, could you see into the back

24   area of the pharmacy?

25   A.   Yes.

E9AZCHA4                         Girdauskas - direct

1    Q.   And could you see the pharmacist?

2    A.   Yes.

3    Q.   Could you see what she was doing from that area?

4    A.   Yes.

5    Q.   Now, where were the areas of the pharmacy where you would

6    speak to Ji or Ji would hand you the filled oxycodone bottles?

7    A.   It was to the left, left-hand side of RX counter and all

8    the way to the right.

9    Q.   So could you describe both of those areas?  All the way to

10   the left this, the counter didn't go all the way to the wall?

11   A.   No, it stopped.  There was a little area where you could

12   walk through.

13   Q.   And that's one of the areas where you would speak with Ji.

14   And the other area was where?

15   A.   When you walk in the Main Street entrance.

16   Q.   At that side counter?

17   A.   Little side counter, yes.

18   Q.   And that's the side area of the pharmacy closest where the

19   pharmacist works?

20   A.   Yes.

21        MR. TEHRANI:  Your Honor, I have now have a

22   stipulation to read.

23        THE COURT:  Yes, go ahead.

24        MR. TEHRANI:  It is hereby stipulated and agreed by

25   and between United States of America by Preet Bharara, United

1    States Attorney, Elisha Kobre and Daniel Tehrani, Assistant

2    United States Attorney of counsel, and Christina Chai and Hi

3    Jong Lee, the defendants by and through their attorneys Marc

4    Agnifilo, Esquire, and Roland Riopelle, Esquire that:

5           One, government exhibit 700 and C is a CD concerning

6    13 folders labeled government exhibits 714A through 714C, and

7    government exhibits 714E through 714N.  Each folder contains

8    clips of surveillance video recorded at Stanley Pharmacy in

9    Yonkers, New York referred to as Stanley Pharmacy.

10          The video files from which the clips were made were

11   stored on a video hard drive tower receiver at Stanley

12   Pharmacy.

13          The original video file names for the files from which

14   each of the clips were made are included in the names of the

15   respective folders on government exhibit 700 and C.  The file

16   names contain among other information the following:  The

17   particular camera that recorded the video, the date the video

18   was taken and the start time of the video.  For example, the

19   clips contained on government exhibit 714A were from the file

20   DVR 502012, 1203, underscore 122846 underscore 00015300.  That

21   file was recorded by camera number five on December 3rd, 2012,

22   starting at 12:28 p.m.  Within each folder are clips taken from

23   the recording listed in the folder names.  Clips are sub marked

24   with exhibit numbers.  For example, government exhibit 714A

25   contains five clips marked government exhibit 714A1 through

```
 1    714A2.

 2                It is further stimulated and agreed that this

 3    stipulation, which is government Exhibit 1,109 and government

 4    exhibits 700C, 714A through 714C, and 714E through 714N

 5    inclusive and all of the sub marked video clips contained on

 6    714 -- I'm sorry -- 700 and C, may be received in evidence as

 7    government exhibits at trial.

 8                THE COURT:  Received in evidence.

 9                (Government's Exhibits 1,109, 700C, 714-714C, and

10    714E-714N received in evidence)

11                MR. TEHRANI:  Thank you your Honor.  Could we look at

12    714A3, which is a video clip from a folder on December 3rd,

13    2012.  Now, we'll pause at the beginning of the clip here.

14    Q.  Mr. Girdauskas, can you explain where this surveillance

15    video is taken from?

16    A.  The Main Street entrance.

17    Q.  So this is the side entrance of the pharmacy?

18    A.  Yes.

19    Q.  Now what is immediately to the left?

20    A.  The counter.

21    Q.  That's the side counter you're talking about?

22    A.  Yes.

23    Q.  That's one of the areas where you would receive medications

24    from Ji?

25    A.  Yes.
```

1   Q.  And immediately in front of you is the seating area?

2   A.  Yes.

3   Q.  Now, on this video where does the pharmacist work?

4   A.  Behind the counter.

5          THE COURT:  Did you say behind the counter?

6          THE WITNESS:  Behind the counter, yes.

7   Q.  And is it behind the counter closest to the door?

8   A.  Yes.

9   Q.  And the shelving that you were describing previously,

10  that's sort of towards the back of the surveillance there?

11  A.  Yes.

12  Q.  And you can see from the front area through that shelving

13  into the back area?

14  A.  Yes.

15         MR. TEHRANI:  Now, if we can play the video and pause

16  it about 14 seconds.

17         (Video played)

18  Q.  Now, who is that behind the side counter?

19  A.  It's Ji.

20  Q.  And he's wearing appears to be a bluish shirt?

21  A.  Yes.

22  Q.  Who is the individual walking over towards Ji?

23  A.  It's my brother, Michael.

24         MR. TEHRANI:  Now can we play to --

25         MR. RIOPELLE:  I'm sorry, I didn't hear the last

1   answer.

2               THE WITNESS:  It's my brother, Michael.

3               MR. RIOPELLE:  Thank you.

4               MR. TEHRANI:  Now, could we play to 33 seconds?

5               (Video played)

6   Q.  What is your brother doing?

7   A.  He's speaking with Ji.

8   Q.  Could we pause it?

9               Where does the pharmacist work in connection to where

10  this conversation is taking place?

11  A.  Directly to the right of my brother.

12  Q.  To the left of Ji?

13  A.  Yeah.

14              MR. TEHRANI:  Continue playing, please?

15              (Video played)

16              MR. TEHRANI:  Pause that?

17  Q.  Who is the individual that's now walking behind the

18  counter?

19  A.  Pharmacist.

20  Q.  How do you know?

21  A.  Lab coat.

22  Q.  And what does she appear to be doing?

23  A.  Just walking back there.

24              THE COURT:  She's what?

25              THE WITNESS:  Walking.

 1            THE COURT:  Walking?

 2            MR. TEHRANI:  And can we play and then pause it about

 3   246?

 4   Q.  And so she walked back to the particular area behind the

 5   counter.  That's where she typically worked?

 6   A.  Yes.

 7            MR. TEHRANI:  Could we play and pause it three

 8   minutes?

 9   Q.  Again, what appears to be happening here?

10   A.  My brother's talking to Ji.

11            MR. TEHRANI:  Can we now play and pause at three

12   minutes and 11 seconds?

13            (Video resumed)

14   Q.  Who is that now on the screen?

15   A.  Pharmacist.

16   Q.  And walking behind who?

17   A.  Ji.

18   Q.  And who is she speaking with?

19   A.  My brother.

20            MR. TEHRANI:  Now could we play and pause at 325?

21            (Video resumed)

22   Q.  Where does she appear to go?

23   A.  Back to her station.

24   Q.  Now look at government exhibit 714A4.  This is a clip from

25   the same day.  What appears to be happening at the beginning of

1    this?

2    A.   My brother's walking over to the counter.

3              MR. TEHRANI:  And could we play and pause at a minute?

4              (Video played)

5              MR. TEHRANI:  Just a little bit further.  Pause it.

6    Q.   What appears to be happening right there?

7    A.   He gave my brother bottles of pills.

8    Q.   How many bottles does he appear to give your brother?

9    A.   Two.

10             MR. TEHRANI:  Play the remainder of the video.

11             (Video resumed)

12   Q.   Now, Mr. Girdauskas, going to show you what's been marked

13   as government exhibits 203, 206, 209, 210, 214, 216, 220 and

14   233.

15             MR. TEHRANI:  And, your Honor, I would move at this

16   time to offer those into evidence, subject to connection.

17             THE COURT:  Any objection?

18             MR. RIOPELLE:  No objection, your Honor.

19             MR. AGNIFILO:  No.

20             THE COURT:  They're received in evidence.

21             (Government's Exhibits 203, 206, 209, 210, 214, 216,

22   220 and 233 received in evidence)

23             MR. TEHRANI:  May I approach?

24             THE COURT:  Yes.

25   Q.   Now, Mr. Girdauskas, what are those?

E9AZCHA4                          Girdauskas - direct

```
1    A.  Prescriptions.

2    Q.  And have you previously reviewed certain of those

3    prescriptions?

4    A.  Yes.

5    Q.  How do you know?

6    A.  My initials and the date are on them.

7    Q.  So after the date where you reviewed them, your initials

8    and the date that you reviewed them were put on the subset that

9    you reviewed?

10   A.  Yes.

11   Q.  And what were the portions that you put your initials on

12   and reviewed meant to indicate?

13   A.  That I wrote the prescription.

14   Q.  So the portions that are separately clipped that have a

15   sticker with your initials and date, are all prescriptions that

16   you personally wrote?

17   A.  Yes.

18   Q.  Now, before we get to those, I want to show you what's been

19   marked as government Exhibit 234.

20          MR. TEHRANI:  Your Honor, the government also offers

21   this subject to connection?

22          MR. AGNIFILO:  No objection.

23          THE COURT:  Any objection?

24          MR. RIOPELLE:  No objection, your Honor.

25          THE COURT:  234 is received in evidence.
```

E9AZCHA4                          Girdauskas - direct

1       (Government's Exhibit 234 received in evidence)

2  Q.  Now, what does government Exhibit 234 appear to you to be?

3  A.  A prescription pad.

4  Q.  Does it appear to you to be unused?

5  A.  Unused.

6       MR. TEHRANI:  Now, can we put up 234?

7  Q.  Now, when you were washing prescriptions, what features of

8  the prescription did you attempt to preserve?

9  A.  The bottom, the pharmacist test area, the blue box.  Right

10 now it says void, but it's a water mark that's in the

11 background, try to preserve that too, and the writing doesn't

12 run, the bar code.

13 Q.  What do you mean you try to preserve the bar code?

14 A.  If you left it in the brake fluid too long, it would run

15 together and wouldn't be able to scan.

16 Q.  Okay.  So starting first with government Exhibit 214.

17      So looking at the set of prescriptions that are

18 specifically designated as the ones you previously reviewed?

19 A.  Yes.

20 Q.  Generally speaking, when you wrote prescriptions, what date

21 did you write on a prescription?

22 A.  The date that I was going into the pharmacy.

23 Q.  Why?

24 A.  You only have 30 days and the prescription is not valid any

25 more.  So you try to get there the date as soon as possible, if

1    you gave us a date too far away.

2    Q.  So you would date the prescription as late as you possibly

3    could?

4    A.  Yeah.

5    Q.  Which is always the date that you drop it off into the

6    pharmacy?

7    A.  Yes.

8    Q.  So looking at the first prescription?

9    A.  Yes.

10   Q.  What is it dated?

11   A.  10/17/12.

12   Q.  And so what does that mean?

13   A.  It's the date I brought it in.

14   Q.  And then turning it over to the back?

15   A.  Filled on 10/20/12.

16   Q.  And so what does that mean to you?

17   A.  Couple days before I filled it, gave -- told us to come

18   back.

19   Q.  Now looking at -- I'm going to refer to the prescriptions

20   by the serial number.  And what I'll do is I'll refer to the

21   last four.  So, for example, the one on the screen right now

22   would be referring referred to -- if my eyesight is good

23   enough -- WL 00.

24          With respect to the prescriptions in front of you,

25   would you please take a look at N768?

E9AZCHA4                        Girdauskas – direct

1    A.  Yes.

2               THE COURT:  Do you want to identify that by government

3    exhibit?

4               MR. TEHRANI:  I'm sorry?

5               THE COURT:  Why don't you identify it by government

6    exhibit, because that's what we keep track of.

7               MR. TEHRANI:  So they're all in government Exhibit

8    214.

9               THE COURT:  Okay.

10   Q.  And within 214, if we could look at N768?

11              Now, what do you notice about that prescription?

12   A.  Ink's running, the blue box is missing, the ink is running.

13   Q.  And?

14   A.  Ran through the back.

15   Q.  Could we look at the back of the prescription?  Could we

16   take a look at 9N73?

17   A.  It's purple in the corners, turned pink, the ink's running,

18   no blue box.

19   Q.  Now what about 3Y61?

20   A.  It's the water mark's running, it's really light, it's

21   white.

22   Q.  Again, what does it mean that it's white?

23   A.  Scrubbed too hard.

24   Q.  Looking at MC49?

25   A.  It's purple in the corners, the ink's running, ran through

E9AZCHA4                          Girdauskas – direct

1    the back a little bit.

2    Q.  Now looking at R791?

3    A.  The ink ran, no blue box, the water mark's rubbed off.  You

4    could still see a little bit of the writing underneath.

5    Q.  And could you turn it over?

6    A.  Bled through the back.

7    Q.  9N03?

8    A.  There is no blue box.  The ink is running.

9    Q.  QP18?

10   A.  The ink ran everywhere, through the back.

11   Q.  What about the bar code?

12   A.  Bar code's run together.

13   Q.  4189?

14   A.  It's really light, scrubbed hard.

15   Q.  TB28?

16   A.  It's turning purple up top, it's lighter on the bottom,

17   ink's running.

18   Q.  TB30?

19   A.  You could still see some of the writing underneath.

20   Q.  What do you mean by that?

21   A.  The writing, the original prescription, all the writing

22   didn't come off, try to write over and hide some of the ink

23   that's left over.

24   Q.  So again this was a prescription that was originally

25   written for something other than oxycodone?

1   A.  Yes.

2   Q.  And on the original that you're looking at right now, you

3   can still see some of that writing?

4   A.  Yes.

5   Q.  T752?

6   A.  The ink's running.  It's purple.

7   Q.  And again what would cause it to be purple?

8   A.  Leave it in the brake fluid too long, not take it all off.

9   Q.  QP78?

10  A.  76 I got.  I don't have 78.  Yeah, I got it.  Ink ran.

11  It's purple up top.

12  Q.  Could you turn it over?

13  A.  Ran through the back.

14  Q.  Do you notice anything about the refill box in this

15  prescription?

16  A.  Originally had five refills.  You could still see it

17  through the X.

18  Q.  Do you know whether you can get oxycodone prescriptions

19  with refills?

20  A.  You can't.

21  Q.  QP76.  You notice --

22  A.  I'm looking for it.  Ink ran.  You could still see the

23  writing underneath.  Doctor's signature is still underneath.

24  Q.  QQ90?

25  A.  It's purple up top, the ink's running, no -- it's lighter

E9AZCHA4                           Girdauskas - direct

1   on the bottom.  There is no blue box.

2   Q.  Does it appear to you that the writing on the top left is

3   running?

4   A.  Yeah.

5   Q.  Is that your handwriting?

6   A.  No.

7   Q.  So what does it mean to you that the writing at the top

8   left is running?

9   A.  It's written on when it was wet.

10  Q.  MC37?

11  A.  Ink's running, it's lighter in the middle, no blue box.

12  Q.  QZ79?

13  A.  You could still see the writing underneath.  The ink's

14  running, no blue box.

15  Q.  R127?

16  A.  It's really light, white almost, scrubbed hard.  Still see

17  some of the ink underneath, no blue box.

18              MR. TEHRANI:  Your Honor, with the Court's permission,

19  I'd like to hand out hand around the physical prescriptions?

20              THE COURT:  Yes.

21              MR. TEHRANI:  And I'd also like to hand around the

22  unused prescription pad?

23              THE COURT:  Yes.  It's 234?

24              MR. TEHRANI:  Yes, your Honor.

25              (Provided to the jury)

E9AZCHA4                        Girdauskas - direct

1          MR. TEHRANI:  Would you like me to continue, your

2    Honor?

3          THE COURT:  Yes, please.

4    Q.  Taking a look at government Exhibit 206?

5    A.  Yes.

6    Q.  Who is that a prescription pad for.

7    A.  It's a pediatrician.

8    Q.  What's his name?

9    A.  Dr. Dagli.

10   Q.  How do you know that Dr. Dagli is a pediatrician?

11   A.  My children went there.

12   Q.  How did you get the prescriptions that you wrote that are

13   part of government Exhibit 206?

14   A.  From my children, prescriptions they were written.

15   Q.  So those were prescriptions that Dr. Dagli wrote for your

16   children?

17   A.  Yes.

18   Q.  That you washed and turned into oxycodone prescriptions?

19   A.  Yes.

20   Q.  Now, do you recall who went into Stanley Pharmacy to fill

21   those, of those that you wrote?

22   A.  My brother.

23   Q.  How old is he?

24   A.  He's 37.

25   Q.  That means he's born in what year?

E9AZCHA4                          Girdauskas - direct

1    A.  '77.

2    Q.  Now when you were filling prescriptions at Stanley

3    Pharmacy, did you have to provide a date of birth?

4    A.  Yes.

5    Q.  And was that date of birth written on a prescription?

6    A.  Yes.

7    Q.  Where?

8    A.  Top right.

9    Q.  So if we're looking at the first, the first prescription

10   there that's on the screen, the 3/19/81 is the date of birth

11   that was given?

12   A.  Yes.

13   Q.  And then, for example, if we're to look at N914, what's the

14   date of birth?

15   A.  N914?  10/10/89.

16   Q.  So that's approximately how many years after your brother's

17   birthday?

18   A.  12 years.

19   Q.  Do you notice anything else about that prescription?

20   A.  It's really light.

21   Q.  Take a look at QJ58?  What's the date of birth on that

22   prescription?

23   A.  8/2/91.

24   Q.  Approximately how many years after your brother was born?

25   A.  13, 14 years.

1    Q.   Now look at W804.  What do you notice about that

2    prescription?

3    A.   No blue box, date of birth is 9/2/80.

4    Q.   What about W807?

5    A.   It's light, no blue box, the bar code is running, 10/15/79

6    is the date of birth.

7    Q.   Now look at Government Exhibit 203.  These are

8    prescriptions for which doctor?

9    A.   Judith Berger.

10   Q.   Do you recall prescriptions from Dr. Berger.

11   A.   Yes.

12   Q.   What do you recall about those?

13   A.   Stolen pads.

14   Q.   So where did you get them from?

15   A.   Anthony Sales and his wife Doreen.

16   Q.   How did you get them?

17   A.   Bought them.

18   Q.   Now looking at the prescription numbers in the bottom right

19   corner, notice anything?

20   A.   They're in order.

21   Q.   Why?

22   A.   That's how many I bought at one time.

23   Q.   Looking at the first five, what's the date written on

24   those?

25   A.   7/25/12, 7/25/12, 7/25/12, 7/25/12.

E9ATCHA5                          Girdauskas – direct

1    Q.  What does it mean they're all written with the same date?

2    A.  I bought them all at once.

3    Q.  Now looking at the back of those prescriptions, were they

4    all filled on the same date?

5    A.  7/28, 7/31, 7/28, 7/26, 7/27.

6    Q.  So the answer is no?

7    A.  No.

8    Q.  Now looking at J975 and J976, those are in sequential

9    order, right?

10   A.  Mm-hmm.

11   Q.  And were they both filled on the same date?

12   A.  8/3, yes.

13   Q.  Which date?

14   A.  8/3.

15   Q.  August 3rd, 2012?

16   A.  Yes.

17   Q.  Could you look at J988.

18   A.  Yes.

19   Q.  When was that filled?

20   A.  8/3.

21   Q.  Same date?

22   A.  Yes.

23   Q.  Could you look at Government Exhibit 220.

24   A.  Mm-hmm.

25   Q.  Who are those prescriptions from?

1   A.  Mike Penzo.

2   Q.  What doctor?

3   A.  Dr. Savino.

4   Q.  What kind of doctor is Dr. Savino?

5   A.  Pediatrician.

6   Q.  How do you know?

7   A.  Because I bought the paper, the books.

8   Q.  Who did you buy them from?

9   A.  Mike Penzo.

10  Q.  Look at B626.  Do you notice anything?

11  A.  Void all over it.

12  Q.  Now these were stolen prescriptions, right?

13  A.  Yes.

14  Q.  So they weren't washed?

15  A.  No.

16  Q.  Why would there be void all over it?

17  A.  It was placed next to another prescription that was wet or

18  some sort of brake fluid.  It's a safety feature.  The brake

19  fluid takes it off, but it stayed on, it says void.

20  Q.  But brake fluid wasn't specifically applied to this

21  prescription?

22  A.  No.

23  Q.  So where would the void come from?

24  A.  Another prescription was laid on top of it that was washed.

25  Q.  Look at Government Exhibit 216.  Which doctor are these

1    for?

2    A.   Cain Ranjan.

3    Q.   Look at 6970, notice anything?

4    A.   Some of the ink is running, no blue box, it's really light,

5    you can still see the pressure of the doctor signature.

6    Q.   6972.

7    A.   Ink is running, there's no blue box, it's really light.

8    Q.   4426.

9    A.   Ink's running, no blue box.

10   Q.   Does it appear to you that the ink is written in different

11   colors?

12   A.   Yep.

13   Q.   44?

14   A.   Ink's running, still see the doctor's signature underneath,

15   no blue box.

16   Q.   4680.

17   A.   The date is written in a different pen, purple on top,

18   purple on the bottom, no blue box.

19   Q.   4022?

20   A.   Ink's running, still void in the corner.

21   Q.   Up to this point in Dr. Ranjan's prescriptions, have those

22   been washed?

23   A.   Yes.

24   Q.   Those have been prescriptions from Dr. Ranjan that you

25   washed?

1   A.  Yes.

2   Q.  Was this prescription washed?

3   A.  No.

4   Q.  How do you know?

5   A.  I can feel it.  I can tell.  It has void on it.

6   Q.  So again, it's not washed, why does it say void?

7   A.  It was touching another prescription that was washed.

8   Q.  If we look at 4023.

9   A.  Void.

10  Q.  4024?

11  A.  Void.

12  Q.  4025?

13  A.  Same thing all over the whole thing, void.

14  Q.  And those four I just read are in sequential order?

15  A.  Yes.

16  Q.  Look at 3W12.

17  A.  Yes ink's running, it's purple, still see the writing

18  underneath.

19  Q.  3W13.

20  A.  Still see the doctor's writing underneath.

21  Q.  3W14?

22  A.  Pinkish on one side, top, too no blue box, ink's running in

23  the corner, you can still see the doctor writing.

24  Q.  Government Exhibit 209.  Which doctor are these from?

25  A.  Dr. Kandalaft.

1    Q.  What kind of doctor is Dr. Kandalaft?

2    A.  He's a psychiatrist.

3    Q.  On the top what does it say?

4    A.  Westchester Psychiatric Associates.

5    Q.  Were these prescriptions washed?

6    A.  Yes.

7    Q.  Why?

8    A.  Because I bought them.  They were already written out.

9    Q.  You purchased prescriptions that had been written by

10   Dr. Kandalaft to someone else?

11   A.  Yes.

12   Q.  And then you washed them?

13   A.  Yes.

14   Q.  Can you look at 1W41, please.  Do you notice anything?

15   A.  Blue box is put on in crayon.

16          MR. TEHRANI:  Zoom in on the box.

17   Q.  Who did that?

18   A.  I did.

19   Q.  Why?

20   A.  Blue box disappeared.

21   Q.  Notice anything else about the prescription?

22   A.  Ink's running.

23   Q.  9329.

24   A.  Ink's running.

25   Q.  FP76.

E9ATCHA5                           Girdauskas – direct

1    A.  It's light, ink's running.

2    Q.  FP78.

3    A.  It's light also, no blue box.

4    Q.  FX27.

5    A.  Ink's running, purple up top, no blue box, the bar code's

6    running.

7    Q.  G166.

8    A.  Ink's running, it's light, purple up top.

9            MR. TEHRANI:  Your Honor, what time do you intend to

10   take a break?

11           THE COURT:  We'll take our afternoon recess now.

12   We'll resume at 3:30.

13           (Jury not present)

14           THE COURT:  Mr. Tehrani, how much more do you have?

15           MR. TEHRANI:  I have about ten minutes, your Honor.

16           THE COURT:  Thank you.

17           See you at 3:30.

18           (Recess taken)

19           (Jury present)

20           THE COURT:  Mr. Tehrani.

21   BY MR. TEHRANI:

22   Q.  We just finished talking about Government Exhibit 209.

23   A.  Yes.

24   Q.  And the first prescription is the one that was colored in?

25   A.  Yes.

1                    MR. TEHRANI:  May I pass that one prescription around?

2                    THE COURT:  Yes, you may.

3    Q.  Looking now at Government Exhibit 210, which doctor are

4    those prescriptions for?

5    A.  Dr. Kharouba.

6    Q.  Look at J893.

7    A.  White, still see what the doctor wrote underneath it, ink's

8    running in the corner, it's lighter.

9    Q.  And what else again?

10   A.  You can see what the doctor wrote underneath.

11   Q.  W111.

12   A.  You can see what the doctor wrote underneath, it's light.

13   Q.  VZ99.

14   A.  You can see what the doctor wrote underneath, ink's running

15   a little bit, it's lighter.

16   Q.  2T86.

17   A.  See what the doctor wrote, it's light.

18   Q.  VZ97.

19   A.  It's light, you can see what is underneath.

20                   MR. TEHRANI:  May I pass this stack around to the

21   jury?

22                   THE COURT:  Yes, you may.

23   Q.  Government Exhibit 233.  Which doctor is this?

24   A.  Dr. Rabadi.

25   Q.  Look at CM39.

E9ATCHA5                        Girdauskas - direct

1   A.  The ink is running, it's light, no blue box.

2   Q.  Notice anything about the bar code?

3   A.  Bar code is running.

4   Q.  KZ11.

5   A.  It's light, watermark on the background is gone.

6   Q.  KZ08.

7   A.  It's light also.

8   Q.  D858.

9   A.  Light, no blue box.

10  Q.  Mr. Girdauskas, did there come a time when Stanley Pharmacy

11  shut down?

12  A.  Yes.

13  Q.  When was that?

14  A.  January 2013.

15  Q.  Where did you get oxycodone after that?

16  A.  I didn't.

17  Q.  What did you do?

18  A.  I just started using heroin.

19  Q.  Why?

20  A.  I needed it.

21          MR. TEHRANI:  No further questions, your Honor.

22          THE COURT:  Are you going to proceed now,

23  Mr. Agnifilo?

24          MR. AGNIFILO:  Yes, your Honor.

25  CROSS-EXAMINATION

E9ATCHA5                         Girdauskas – cross

1    BY MR. AGNIFILO:

2    Q.  Good afternoon, Mr. Girdauskas.

3    A.  Good afternoon.

4    Q.  We never before, have we?

5    A.  No.

6    Q.  I really only have a couple questions for you.  You said

7    you spoke on the phone with Ji from time to time, correct?

8    A.  Yes.

9    Q.  How would you reach him or how would he reach you?

10   A.  I called the pharmacist.

11   Q.  And you would speak to him?

12   A.  Yes.

13   Q.  And when you spoke to him, what sort of things did you

14   discuss during these phone calls?

15   A.  What prescriptions were in stock.  That's it.  If he would

16   stay open a little later if I would be late.

17   Q.  Ji would tell what you he had in stock and you might ask

18   from time to time to stay open a little later, correct?

19   A.  Yes.

20   Q.  On these times when he would stay open later, when you went

21   there, would he be the only one there?

22   A.  Yes.

23   Q.  When you went to Stanley Pharmacy and you had conversations

24   about these illegal prescriptions, it was with Ji every time,

25   correct?

1    A.  Yes.

2    Q.  Is it fair to say you have been in Stanley Pharmacy over a

3    hundred times?

4    A.  Yes.

5    Q.  Maybe even over 200 times?

6    A.  Possibly.

7    Q.  And you never spoke with the pharmacist that you said you

8    once made eye contact with, right?

9    A.  No, sir.

10   Q.  Never said two words to her?

11   A.  No, sir.

12   Q.  She never said two words to you?

13   A.  No.

14   Q.  Every conversation that you ever had about controlled

15   substances was with Ji and Ji alone, right?

16   A.  Yes.

17   Q.  Now when he would take you off to the side, did he take you

18   to the place where we saw your brother speaking to him on the

19   video?

20   A.  Yes.

21   Q.  That's same general area?

22   A.  Yes.

23   Q.  And if you remember from the video, I think your brother

24   was pretty tall guy sort of leaning in, right?

25   A.  Yes.

1  Q.  The conversations that you had with Ji in that same place

2  that we saw on the video, that was a private conversation

3  between you and Ji, right?

4  A.  Yes.

5  Q.  You weren't broadcasting, you weren't speaking loudly with

6  Ji when you were discussing controlled substances, right?

7  A.  No.

8  Q.  And Ji wasn't speaking loudly with you?

9  A.  No.

10  Q.  He was having a private conversation with you and you were

11  having a private conversation with him?

12  A.  Yes.

13  Q.  You didn't want anyone else to hear what you were saying,

14  right?

15  A.  Yeah.

16  Q.  You were talking to Ji?

17  A.  Yes.

18  Q.  And he was talking to you?

19  A.  Yes.

20  Q.  How many times, if you had to estimate -- let me ask it

21  this way, how many fraudulent prescriptions, stolen

22  prescriptions, whatever you want to call it, would you say you

23  got from Ji through the years?

24  A.  Hundreds.

25  Q.  And did you ever go in on weekends?

E9ATCHA5                          Girdauskas - cross

1   A.  Saturday.

2   Q.  And how often would you go in after hours?  Would it be

3   once a week, twice a week, once a month, if you had to

4   estimate?

5   A.  A few times a week.

6   Q.  A few times a week.  And was it always your suggestion that

7   you and Ji meet after hours?

8   A.  No, it was just if we were running late, we knew he closed

9   at six.

10  Q.  So you would ask him to stay open a little later?

11  A.  Yes.

12  Q.  Now I think you said on direct examination, I might have

13  said his name wrong, Joe Fasce?

14  A.  Fasce.

15  Q.  Joe Fasce is the one that told you about Ji, correct?

16  A.  Yes.

17  Q.  And what he told you is that Ji would essentially do

18  anything, right?

19  A.  Yes.

20  Q.  And do you know -- actually withdrawn.

21       Did Fasce have to introduce you to Ji?

22  A.  No.

23  Q.  And so when you went in and spoke to Ji the first time, do

24  you remember what you said to him?

25  A.  First time I filled my prescription in my name.

1   Q.   When was the first time you and Ji had a conversation about
2   illegal prescriptions?
3   A.   Maybe a couple of times after that.
4   Q.   And how did it come up?  Did you bring it up, did he bring
5   it up?  Tell us how the first time it came up.
6   A.   Just came up.
7   Q.   Do you remember if you brought it up?
8   A.   I didn't bring it up, no.
9   Q.   Would you call him on the phone often, once a week or twice
10  a week?
11  A.   Couple of times a week.
12  Q.   And if someone else at the pharmacy answered the phone,
13  would you ask to speak to Ji?
14  A.   Ji would answer the phone all the time.
15  Q.   So you never called the pharmacy and someone else answered
16  the phone?
17  A.   No.
18  Q.   You called the pharmacy and you spoke to Ji, correct?
19  A.   Yes.
20  Q.   And Ji from time to time would send prescriptions away,
21  right, say that he didn't want it for whatever reason, right?
22  A.   Yes.
23  Q.   And you said that was mostly in the beginning, right?
24  A.   Yes.
25  Q.   And when he would say this to you, did he give a reason?

E9ATCHA5                              Girdauskas - cross

1    Did you say what was wrong with the prescription?

2    A.  He would say if the ink was running or something, too bad,

3    he couldn't do it.

4    Q.  When you and he had that conversation, was that sort of the

5    conversation off to the side, the place on the side of the

6    counter?

7    A.  Yes.

8    Q.  Now at one point you said in the beginning you would put

9    the prescription in a basket, correct?

10   A.  Yes.

11   Q.  But then that changed, right?

12   A.  Yes.

13   Q.  How did it change exactly?

14   A.  You had to put the money and the prescription in a bag,

15   brown bag.

16   Q.  And you said that the counter people would then give that

17   to Ji, correct?

18   A.  Yes.

19   Q.  The counter people is not the pharmacist?

20   A.  No.

21   Q.  Bear with me one second?

22   A.  No problem.

23           (Pause)

24   Q.  I think you said at one point on direct testimony that you

25   thought that the pharmacist's writing had smudged, correct?

1    A.  Yes.

2    Q.  You don't know why that was, correct?

3    A.  Written on a wet piece of prescription.

4    Q.  Also could have been that her water bottle made

5    condensation and the prescription was in with the condensation

6    from the water bottle, right?

7    A.  Could have been.

8    Q.  You said you are looking at a maximum sentence of 110 years

9    for all of your offenses, correct?

10   A.  Yes.

11   Q.  And you're looking at a maximum 20 years on the oxycodone

12   conspiracy, right?

13   A.  Yes.

14   Q.  What are the other offenses?

15   A.  Three other drug conspiracies and medical fraud.

16   Q.  And it's within the realm of possibility that you get time

17   served, correct?

18   A.  Yes.

19   Q.  And you're hoping, are you not, that by testifying at the

20   trial here between this older gentleman and this woman you can

21   be back on the street as soon as possible?

22   A.  Yes.

23           MR. AGNIFILO:  I have nothing else.

24           THE COURT:  Mr. Riopelle.

25           MR. RIOPELLE:  Yes, thank you, your Honor, I have some

1    questions.

2    CROSS-EXAMINATION

3    BY MR. RIOPELLE:

4    Q.  Good afternoon, Mr. Girdauskas.

5    A.  Good afternoon.

6    Q.  Did I pronounce that correctly?

7    A.  Close enough.

8    Q.  We never met before either, have we?

9           Mr. Girdauskas, do you recall that earlier today you

10   testified under oath that you began filling the prescriptions

11   you have described at the Stanley Pharmacy in 2009?

12   A.  Yes, late 2009.

13   Q.  And am I correct that before you signed your plea

14   agreement, about which you just testified, you met with the

15   government on several occasions?

16   A.  Yes.

17   Q.  And on those occasions you met with them and described your

18   history in connection with the Stanley Pharmacy and other

19   matters, correct?

20   A.  Yes.

21   Q.  And am I correct that at the outset of the first of those

22   meetings, you signed another agreement which is called a

23   proffer agreement?

24   A.  Yes.

25   Q.  And that's also sometimes calls a queen for a day

E9ATCHA5                          Girdauskas - cross

1   agreement?  Did you hear it referred to like that?

2   A.  I never heard of that.  I don't know what you're talking

3   about.

4   Q.  In any event, you signed this other agreement, and that

5   agreement was explained to you, am I correct?

6   A.  Yes.

7   Q.  And it was explained to you by the assistant U.S. attorney

8   who was asking you the questions in that meeting, correct?

9   A.  Yes.

10  Q.  And that assistant U.S. attorney explained to you, among

11  other things, that the agreement would protect you for the

12  statements that you make in the meeting, correct?

13  A.  Yes.

14  Q.  But it would not protect you for a false statement made in

15  the meeting, would it?

16  A.  No.

17  Q.  In other words, if you were to make a false statement in

18  that meeting, that could be a separate crime, correct?

19  A.  Yes.

20  Q.  And that was explained to you in that first meeting, am I

21  right?

22  A.  Yes.

23  Q.  Now as you sat there in the meeting, you realized that it

24  was important that you get the facts right when you explained

25  them to the government, correct?

1   A.  Yes.

2   Q.  Because you were hoping as a result of that meeting to get

3   the cooperation agreement that you have now, right?

4   A.  Yes.

5   Q.  And you understood that if you were to lie in that meeting

6   you might not get the cooperation agreement that you have now,

7   correct?

8   A.  Yes.

9   Q.  And you understood that if you were to lie in that meeting

10  that could indeed be a separate crime, a false statement to a

11  federal officer, right?

12  A.  Yes.

13  Q.  Now in those meetings that you had before you got your

14  cooperation agreement, am I correct that Agent Polimeno was in

15  some of those meetings?

16  A.  Yes.

17  Q.  And you saw him taking notes, is that right?

18  A.  Yes.

19  Q.  And there were other agents present as well, correct?

20  A.  Yes.

21  Q.  And they took notes also, right?

22  A.  I never noticed.

23  Q.  You only noticed Agent Polimeno taking notes, right?

24  A.  Yes.

25  Q.  And do you recollect that in that important meeting where

E9ATCHA5                         Girdauskas - cross

1    you met with the government prior to your cooperation

2    agreement, do you remember that you told them that in fact you

3    began to fill prescriptions at the Stanley Pharmacy in 2011?

4    Do you remember telling them that?

5    A.  No.

6    Q.  Let me show you something, sir.  I'm going to show you

7    first what's been marked Government Exhibit 3501-6.

8               MR. RIOPELLE:  Judge, may I approach the witness?

9               THE COURT:  Yes, you may.

10   Q.  Mr. Girdauskas, I'm going to ask you to take a moment or

11   two to look at this document.

12              Does this appear to be notes of statements that you

13   made in a proffer session with the government, that meeting

14   that we discussed?

15              MR. TEHRANI:  Objection.

16              THE COURT:  Sustained.  Ask him if it refreshes his

17   recollection ask him a yes or no question.

18   Q.  Sir, I direct your attention about a third of the way down

19   page one.  You're welcome to look at the entire document, but

20   looking about a third of the way down that page, sir, does that

21   refresh your recollection that when you met with the government

22   you told them that you went to the Stanley Pharmacy in

23   approximately 2011?

24   A.  I don't even see it on here.

25   Q.  Isn't it a fact, sir, that you told the government in your

E9ATCHA5                          Girdauskas - cross

1    meeting with them that you began going to the Stanley Pharmacy

2    in about 2011?

3              Isn't that a fact?

4    A.  I don't see it on here.

5    Q.  Let me show you another document.

6              MR. RIOPELLE:  May I approach, your Honor?

7              THE COURT:  Yes, you may.

8    Q.  Let me show you this one.  You can give me the handwritten

9    one back.  Thank you, sir.

10             I'm showing you now what's been marked Government

11   Exhibit's 3501-11.  You have never seen that document before,

12   have you, sir?

13   A.  No.

14   Q.  Sir, you're welcome to look at the entire document, but I

15   will direct your attention to the first sentence under the bold

16   word "details."

17             Have you had a chance to read that?

18   A.  Yep.

19   Q.  Having read that sentence, sir, does it refresh your

20   recollection when you met with the government you told them

21   that you started going to the Stanley Pharmacy in approximately

22   2011 because your previous pharmacy was out of stock of

23   oxycodone?

24   A.  I don't remember that.  Possibly could have made a mistake.

25   Q.  Sir, do you deny making that statement to the government?

1           MR. TEHRANI:  Objection, your Honor.

2           THE COURT:  Sustained.

3    Q.  Isn't it a fact you made that statement to the government?

4           THE COURT:  Sustained.

5           MR. TEHRANI:  Objection.

6    A.  No.

7           THE COURT:  Strike the answer.  The objection is

8    sustained.

9           THE WITNESS:  Sorry about that.

10   Q.  Sir, did I hear you correctly that among the prescriptions

11   that you washed were prescriptions written to your children?

12   A.  Yes, sir.

13   Q.  What were those prescriptions originally written to your

14   children for?

15   A.  To visit other doctors.

16   Q.  And you used those prescriptions, among others, to get

17   oxycodone, is that right?

18   A.  Yes, sir.

19   Q.  Now if I understood you correctly, when you picked up

20   prescriptions, you picked them up from Ji Lee, correct?

21   A.  Yes.

22   Q.  And when you called the pharmacy, you spoke only to Ji Lee,

23   correct?

24   A.  Yes.

25   Q.  When you gave -- when you went to the pharmacy, you gave

E9ATCHA5                           Girdauskas - cross

```
1    the prescriptions either to the women who were working at the

2    cash register or directly to Mr. Ji Lee, correct?

3    A.  Yes.

4    Q.  And am I right that you would see Ji Lee enter information

5    into the computer at the pharmacy?

6    A.  Yes.

7    Q.  Am I correct that you would see Ji Lee put labels on

8    prescription bottles from time to time?

9    A.  Yes.

10   Q.  Am I correct that you would see Ji Lee make handwritten

11   notes on the prescriptions from time to time?

12   A.  Yes.

13   Q.  And it was Ji Lee who you saw write H on the prescriptions

14   from time to time, is that correct?

15   A.  I never seen that.

16   Q.  But you did see him making writings on the prescriptions?

17   A.  Yes.

18   Q.  Am I correct that you never dealt with my client, Hi Jong

19   Lee?

20   A.  No.

21   Q.  In other words, that is correct?

22   A.  That is correct.

23           THE COURT:  No, he never dealt.

24           MR. RIOPELLE:  Yes, I wanted to confirm that, Judge.

25           THE COURT:  All right.
```

1   Q.  Now am I right that when you went to the pharmacy, you

2   would try not to stay there too long at any given time,

3   correct?

4   A.  As long as it took to fill them.

5   Q.  But you wanted to be in and out, right?

6   A.  Basically, yeah.

7   Q.  Although you were never in there longer than you needed to

8   be, you did see that the pharmacy during business hours could

9   be a busy place, correct?

10  A.  Yes.

11  Q.  And you saw in some of the videos there were many people

12  coming in and out of the pharmacy in short periods of time,

13  correct?

14  A.  Yes.

15          MR. RIOPELLE:  If I may have just a moment, your

16  Honor.

17          (Pause)

18          MR. RIOPELLE:  I have no further questions at this

19  time.

20          THE COURT:  Thank you.

21          Mr. Tehrani?

22          MR. TEHRANI:  No further questions, your Honor.

23          THE COURT:  Mr. Girdauskas, you're excused.

24          Government call its next witness.

25          MR. TEHRANI:  The government calls Miriam Padilla.

1     MIRIAM PADILLA,

2          called as a witness by the Government,

3          having been duly sworn, testified as follows:

4     DIRECT EXAMINATION

5     BY MR. TEHRANI:

6     Q.  Ms. Padilla, where do you live?

7     A.  In the Bronx.

8     Q.  Where did you grow up?

9     A.  In the Bronx.

10    Q.  How far did you go in school?

11    A.  Eleventh grade.

12    Q.  Are you currently employed?

13    A.  No.

14    Q.  Were you recently employed?

15    A.  Yes.

16    Q.  Where did you work?

17    A.  In the Bronx in a pharmacy called Well Care.

18    Q.  And prior to that pharmacy, where did you work?

19    A.  Stanley Pharmacy.

20    Q.  Where is that?

21    A.  In Yonkers.

22    Q.  When did you work there?

23    A.  October 2010 to January 2013.

24    Q.  What was your job at Stanley Pharmacy?

25    A.  I was a cashier clerk there.

E9ATCHA5                        Padilla - direct

1    Q.  And prior to working at Stanley Pharmacy, had you ever

2    worked at a pharmacy before?

3    A.  No.

4    Q.  Did you receive any formal pharmacy education?

5    A.  No.

6    Q.  Any medical education?

7    A.  No.

8    Q.  What were your job responsibilities as a cashier at Stanley

9    Pharmacy?

10   A.  When the customer walked in they came in with a

11   prescription, they would come to us, and we would take their

12   prescription, ask for insurance, get information, date of

13   birth, address, write all that information, put it in a little

14   basket, pass it to the back, it would get filled, it would come

15   out.  When it was filled we would call the patient or customer

16   and have them sign for their medications.

17   Q.  Now how did you get your job at Stanley Pharmacy?

18   A.  Through Craigslist.

19   Q.  And what happened?

20   A.  I saw the ad and I sent my résumé and they called me and

21   told me to come in the next day.

22   Q.  When you say they called you, who specifically called you?

23   A.  Ji's wife.

24   Q.  Who is Ji?

25   A.  Ji was my boss there at Stanley.

1    Q.  Now other than that first conversation that you had with
2    Ji's wife, did you ever see Ji's wife in the pharmacy again?
3    A.  I saw her a few weeks after I was working there I met her
4    in person.
5    Q.  And then would you see her from time to time after that?
6    A.  Maybe a once a month.
7    Q.  What would she do?
8    A.  She would come in, clean the back, she would take the over
9    the counter products and get credit for the ones that were
10   expired.
11   Q.  When you first started working at Stanley Pharmacy, who
12   else worked there?
13   A.  It was me, it was Ixchel, Claudia, Oscar, Tina, and Ji.
14   Q.  And could you describe what those individuals' roles were
15   at the pharmacy?
16   A.  Tina was the pharmacist, Oscar was the level guy, me,
17   Ixchel and Claudia did the cashier clerk work.
18   Q.  Do you see Tina in the courtroom today?
19   A.  Yes.
20   Q.  Could you please identify her by an article of clothing?
21   A.  Black jacket or blouse.
22           MR. AGNIFILO:  She seemed to be identifying the
23   defendant.
24           THE COURT:  The record will reflect Ms. Padilla
25   identified Ms. Chai.

E9ATCHA5                     Padilla - direct

1   Q.  What was her role at the pharmacy?

2   A.  She was the pharmacist there.

3   Q.  How did you know that?

4   A.  She wore the white lab coat and gave consultation to the

5   customers that walked in with questions.

6   Q.  Did she do anything else at the pharmacy?

7   A.  She labeled bottles, she did counting of pills.

8   Q.  Did anyone else at the pharmacy ever wear a white lab coat,

9   as far as you know?

10  A.  No.

11  Q.  Now other than Ji and Oscar, were there any other males at

12  the pharmacy?

13  A.  Ji's father used to come in on Wednesdays.  He used to do

14  the payroll.

15  Q.  And how did you refer to Ji's father?

16  A.  As Mr. Lee.

17  Q.  Do you see Mr. Lee in the courtroom here today?

18          MR. RIOPELLE:  We'll stipulate she knows Mr. Lee, your

19  Honor.

20          THE COURT:  The record will reflect Ms. Padilla knows

21  Mr. Lee.

22  Q.  Could we put up Government Exhibit 311.

23          Who is that?

24  A.  That's Ji.

25  Q.  Ms. Padilla, are you testifying here today pursuant to any

1   kind of agreement?

2   A.  Yes.

3   Q.  And the agreement that you have, is that with the

4   government?

5   A.  Yes.

6   Q.  Is that referred to as a non-prosecution agreement?

7   A.  Yes.

8   Q.  And does the agreement that you have with the government

9   contain all the terms and conditions of your agreement with the

10  government?

11  A.  Yes.

12  Q.  And under the agreement, are you required to testify here

13  today?

14  A.  Yes.

15  Q.  And then also under the agreement the government has

16  provided for certain protections against prosecution against

17  you, is that right?

18  A.  Yes.

19  Q.  And that includes protection for prosecution for your

20  employment at Stanley Pharmacy?

21  A.  Yes.

22  Q.  Now Ms. Padilla, have you ever been arrested?

23  A.  Yes.

24          THE WITNESS:  Sorry.

25          THE COURT:  Would you like some water?

E9ATCHA5                        Padilla - direct

1              THE WITNESS:  Yes.

2              THE COURT:  Are you all right?

3              THE WITNESS:  Yes, thank you.

4              THE COURT:  Go ahead.

5    A.  Yes, I had been arrested once before, yes.

6    Q.  And when was that, approximately?

7    A.  1992.

8    Q.  What were the circumstances of that?

9    A.  I was -- I had just had a baby and I went to go visit my

10   husband at work, and I took him some lunch.  And then a few

11   minutes later a white van pulled up and some officers came out

12   and arrested me and my husband.

13   Q.  Were you charged with a crime?

14   A.  Yes.

15   Q.  What were you charged with?

16   A.  Selling of drugs.

17   Q.  Did you sell drugs?

18   A.  No, I did not.

19   Q.  But you pled guilty, is that right?

20   A.  Yes, I did.

21   Q.  Why did you do that?

22   A.  I was afraid my lawyer -- my lawyer told me if I went to

23   trial, I may not see my kids and go to prison.  So he

24   recommended that I take the guilty plea and get five years

25   probation, and that's what I did.

1    Q.  Did you get five years probation?

2    A.  Yes, I got five years, but I -- the judge closed it in

3    1995.

4    Q.  Now after your arrest, did you ever apply for any kind of

5    public assistance?

6    A.  I did.

7    Q.  And were you entirely truthful in those applications?

8    A.  I was not.

9    Q.  How not?

10   A.  On the part where they asked you have you ever been

11   arrested or committed a crime, I lied, I said no, because I was

12   afraid that if I said yes -- I was embarrassed to say yes, I

13   was arrested, and I also thought that they would deny me if I

14   said I was -- that I was arrested.

15   Q.  And does your agreement with the government also protect

16   you against prosecution for your statements in those

17   applications?

18   A.  Yes.

19   Q.  Before you signed the agreement, did you meet with the

20   government?

21   A.  Yes, I did.

22   Q.  Approximately how many times?

23   A.  Four times.

24   Q.  And that includes times after you signed the agreement?

25   A.  Yes, yes.

1    Q.  And what happened in those meetings?

2    A.  They prepared me for the trial, and I was -- I had to be

3    honest and truthful.

4    Q.  So generally speaking, you were asked questions and you

5    answered those questions?

6    A.  Yes.

7    Q.  Now getting back to your job at Stanley Pharmacy, what

8    hours did you work there?

9    A.  I worked from nine to six.

10   Q.  What days?

11   A.  Monday through Friday.

12   Q.  And was Ji at the pharmacy whenever you were there?

13   A.  Yes.

14   Q.  What about Tina?

15   A.  Yes.

16   Q.  So at least as far as you know, Tina worked Monday through

17   Friday, nine to six?

18   A.  Correct.

19   Q.  Focusing on the time period when you first started working

20   at Stanley Pharmacy, could you explain the process for filling

21   a prescription there?

22   A.  The patient or customer would come in with the

23   prescription, their insurance, if they had insurance, we would

24   ask for their information, date of birth, address, we would put

25   it in the basket, put it in the little window behind us, it

1    would get filled.  If they didn't wait, we would leave it in

2    the front; if they were there, we would call them and have them

3    sign for it.

4    Q.  Where would they sign for it?

5    A.  We had a book where they would sign for it.

6    Q.  And what information was provided with the filled

7    prescription with the customer?

8    A.  Sorry, can you say that again?

9    Q.  You may have said it.  Was there a receipt provided to the

10   customer?

11   A.  Yes, there was a receipt when they received the medication,

12   and on the receipt it stated name and address, phone number of

13   the pharmacy, the doctor's name, the patient's name, if it was

14   cash, the amount, if it was insurance, it would say which

15   insurance, and some other numbers, the address and some RX

16   numbers at the bottom.

17              MR. TEHRANI:  Your Honor, may I approach?

18              THE COURT:  Yes, you may.

19   Q.  Showing you what has been marked as Government Exhibit 12,

20   do you recognize that?

21   A.  Yes.

22   Q.  What is it?

23   A.  It's a receipt we give to the customers when we get their

24   medications.

25   Q.  And that's the orange receipt that you have just been

1    describing?

2    A.  Yes.

3              MR. TEHRANI:  Your Honor, the government offers

4    Government Exhibit 12.

5              MR. AGNIFILO:  No objection.

6              MR. RIOPELLE:  No objection, your Honor.

7              THE COURT:  12 is received in evidence.

8              (Government's Exhibit 12 received in evidence)

9              MR. TEHRANI:  May I publish to the jury?

10             THE COURT:  Yes, you may.

11   BY MR. TEHRANI:

12   Q.  So looking at the receipt, do you know what the form of

13   payment is?

14   A.  Where it says CA, that means cash, then right underneath

15   it, it says the amount.

16   Q.  So how much was paid for this prescription?

17   A.  $1,074.20.

18   Q.  And what is this a prescription for?

19   A.  Oxycodone, 30 milligrams.

20   Q.  Where does it say that?

21   A.  Right under the person's name on the left side of the

22   receipt.

23   Q.  And what is the person's name?

24   A.  Lori Mello.

25   Q.  And underneath the person's name is what information?

1    A.  The address.

2    Q.  And what's the doctor?

3    A.  The doctor is Dr. Greenidge.

4    Q.  That's written where?

5    A.  On top of the customer's name.

6    Q.  When was this prescription filled?

7    A.  September 21, 2012.

8    Q.  Where is that written?

9    A.  That's on the other side of where the doctor's name is.

10   Q.  Now when you were working at Stanley Pharmacy, again the

11   beginning of when you started working there, did you do

12   anything to verify the identity of the customers?

13   A.  We asked for ID.

14   Q.  For every prescription or just certain types of

15   prescriptions?

16   A.  No, if it was a controlled substance we would ask for ID.

17   Q.  Then if the payment was insurance, would you also get an

18   insurance card?

19   A.  Yes.

20   Q.  How did you know to ask for ID for controlled substances?

21   A.  When I first starred working there, one of the girls showed

22   me which ones are controlled substance, and she told me you

23   always have to ask for ID.  There was also some over-the-

24   counter medications that required ID, so she showed me which

25   ones I had to ask ID for.

E9ATCHA5                        Padilla - direct

1   Q.  And what would happen if a customer brought in a

2   prescription for a controlled substance and you didn't ask for

3   an ID?

4   A.  They wouldn't receive the prescription.

5   Q.  Were you told by anyone at the pharmacy on those particular

6   occasions that you needed to ask for an ID?

7   A.  No.

8   Q.  So there were never circumstances where you didn't ask for

9   an ID and someone who worked at the pharmacy asked you to ask

10  the customer for ID?

11  A.  Yes.

12  Q.  Who was that?

13  A.  Ji.

14  Q.  Again, when you first started working at the pharmacy, were

15  most of the prescriptions paid for by insurance, by cash, by

16  some other way?

17  A.  By insurance.

18  Q.  Now where did you work at the pharmacy?

19  A.  I worked in the second register, which was towards the

20  left-hand side when you are coming in the pharmacy in the

21  front.

22  Q.  Well, if you're facing towards the customers, are you on

23  the left-hand side or the right-hand side?

24  A.  I am on the left-hand side.

25  Q.  So the right side of a customer facing you?

1   A.  Yes.

2   Q.  And where did Ji work?

3   A.  I worked -- where did I work?

4   Q.  Where did Ji work?

5   A.  Ji worked behind me.

6   Q.  And where did Tina work?

7   A.  Tina worked behind me as well, on his right-hand side.

8   Q.  Now was there anything separating where you worked from

9   where Ji and Tina worked?

10  A.  Yes, there was like a semi wall from the waist down.  It

11  was shelves, and there was some bins behind us where we kept

12  patients' medication.  If they didn't come pick it up, it would

13  be in the back in the bins.  And then on the right-hand side

14  there was like a kind of like a peg wall and there was some

15  stuff that we sold, razors, headphones, and the shelves had

16  medications, pregnancy tests.

17  Q.  Now was it possible to see from the front area of the

18  pharmacy into the back area of the pharmacy?

19  A.  Yes.

20  Q.  How?

21  A.  It wasn't closed off, so if you were walking in the

22  pharmacy from the front you could see in the back.

23  Q.  Do you know whether anyone at the pharmacy verified

24  prescriptions at the doctor's offices before the prescription

25  was filled when you first started working at the Stanley

1    Pharmacy?

2    A.  Yes, if customers came in and they said the doctor had

3    faxed it, if he didn't get a fax, he would call, verify, then

4    they would wait for their medications.

5    Q.  Who would call?

6    A.  Ji.

7    Q.  How do you know?

8    A.  You could hear him on the phone to doctors.

9    Q.  So sitting where -- working where you were, you could hear

10   someone on the phone in an area behind you?

11   A.  Yes.

12   Q.  Now as far as filling prescriptions, what roles did Ji and

13   Tina play?

14   A.  When we handed the prescription to Ji, you could hear him

15   typing on the computer information, and they would fill it back

16   there, count pills, labeling the bottles.

17   Q.  Were there times you turned around and could see who was

18   doing what?

19   A.  Yes, sometimes, yes.

20   Q.  What would you see?

21   A.  Tina would be labeling bottles, sometimes she would count

22   pills.

23   Q.  Would you ever see Tina count pills?

24   A.  Sometimes.

25   Q.  Did you ever see anyone else put labels on bottles?

E9ATCHA5                          Padilla - direct

1   A.  No.

2   Q.  Other than Tina?

3   A.  No.

4   Q.  Approximately how far apart did Ji and Tina work?

5   A.  About arm's length.

6   Q.  Now if a customer had a question about medication, who

7   would speak to the customer?

8   A.  Tina would.

9   Q.  How often would that happen?

10  A.  Maybe once a week.  If somebody just happened to come in

11  the pharmacy and say they just got a cut, what can they get, or

12  they had something that they wanted to know if they could use

13  something but they think this medication or something, then we

14  would tell them to wait a few minutes or send them to Tina and

15  she would consult them on the side.

16         MR. TEHRANI:  Your Honor, may I approach?

17         THE COURT:  Yes, you may.

18  Q.  I'm showing you what is in evidence as Government

19  Exhibit 1006.

20         MR. TEHRANI:  May I publish it to the jury?

21         THE COURT:  Yes, you may.

22  Q.  Do you recognize that?

23  A.  Yes, this is what the pharmacy looked like.

24  Q.  And could you indicate where in the pharmacy you worked?

25  A.  On my left-hand side where it says OTC counter, I worked on

E9ATCHA5                         Padilla - direct

1   the second register there.

2   Q.   So you worked behind the area labeled OTC counter?

3   A.   Yes.

4   Q.   And with the diagram oriented the way it is, if you were

5   facing the customer area, you worked to the left?

6   A.   Yes.

7   Q.   Closest to the wall there?

8   A.   Yes.

9   Q.   And using the letters OTC, what does that stand for?

10  A.   It means over the counter.

11  Q.   And using the letters OTC, approximately where were you?

12  A.   Right behind towards the left of the letters OTC, I was

13  more closer to the wall.

14  Q.   And there was another register at that same counter?

15  A.   Yes.

16  Q.   And approximately, again, using the letters OTC counter,

17  where was that on the register?

18  A.   A little bit further from on the right-hand side from the

19  word "counter."

20  Q.   Sort of directly in front of the door?

21  A.   Yes.

22  Q.   And who typically worked there?

23  A.   Ixchel.  I don't know how to spell her name.

24  Q.   You also mentioned there was a Claudia that worked at the

25  pharmacy?

1   A.  Yes.

2   Q.  And were Claudia and Ixchel related in some way?

3   A.  Yes, they were sisters.

4   Q.  Now where did Claudia work?

5   A.  Claudia worked towards where the OTC counter is but where

6   the side entrance is.  There was a counter there, it was

7   another counter there, she worked there.  She did paperwork

8   with the prescriptions.

9   Q.  Would that be behind the RX counter all the way to the

10  right?

11  A.  Yes.

12  Q.  Now behind where you are working on this diagram -- or you

13  have a register sort of to the left of where it says OTC

14  counter, what's directly behind you?

15  A.  Behind me was some bins and some shelving with birth

16  control, baby -- little teething drops, we had Tylenol, Motrin,

17  headache pills and stuff on the shelves beneath.

18  Q.  That's the shelves you were describing before?

19  A.  Yes.

20  Q.  Where did Ji work?

21  A.  Ji worked behind the RX counter in between where it says

22  "RX" and "counter," in between those two words.

23  Q.  Now you testified earlier that part of the process for

24  filling prescriptions was getting information from customers

25  and then passing it back to behind the RX counter.  Where did

1    that happen?  Where did that pass through happen?

2    A.  Well, we would take it right there on the counter where we

3    worked, then we would pass it through a little window right

4    there between the "RX" and the "counter" words there was a

5    little open window there, kind of, and we would put the stuff

6    in the blue bin and then put it on the little shelf and they

7    would grab it from there.

8    Q.  Where did Tina work?

9    A.  Tina worked on the right-hand side of Ji, closer to where

10   the word "counter" is but where it says "RX," around there.

11   Q.  And it if you were to turn around from where you were

12   working, could you see what Ji and Tina were doing?

13   A.  No, I would have to be closer to the window to be able to

14   see.

15   Q.  Now there are two entrances to the pharmacy?

16   A.  Yes.

17   Q.  And there's an entrance on Palisade Avenue?

18   A.  Yes.

19   Q.  That's the main entrance?

20   A.  That's correct.

21   Q.  And then there's also an entrance on Main Street?

22   A.  Yes.

23   Q.  And was that referred to as a side entrance?

24   A.  Yeah, the side entrance.  We used to come in through there

25   in the morning and clock in through that entrance.

1    Q.   So if you came in through either of those entrances, how

2    would you get from the front area of the pharmacy to the back

3    area of the pharmacy?

4    A.   There was two little like -- on my side of where I worked,

5    there was like a little entrance, like a little step coming up,

6    but you could come down and exit through my side out to the

7    front.  Or where Ji worked on the other side, he could go

8    straight and pass Tina, and at the end of that other counter he

9    could exit through that as well.

10   Q.   And can you explain that a little bit, so part of the RX

11   counter to the side entrance?

12   A.   There was a counter there and kind of like a swing door or

13   something, and you could just open it and exit through there.

14   Q.   And what was behind the RX counter, again also towards the

15   side entrance?

16   A.   There was like baby Tylenol, children's Tylenol, like it

17   was being filled generic, it was on that side, and also a copy

18   machine back there, there was some stool softeners.

19   Q.   When you first started working at Stanley Pharmacy, did

20   anyone receive their medication at that side area?

21   A.   No.

22   Q.   Did anyone pay for medication at that side area?

23   A.   No.

24   Q.   Could you see into the back area of the pharmacy from that

25   side area?

1    A.  Yes.

2    Q.  And that back area is where Tina worked?

3    A.  Yes.

4    Q.  Ms. Padilla, did there come a time that things began to

5    change at Stanley Pharmacy?

6    A.  Yes, we started getting customers started coming in and

7    they were paying a certain amount of money for controlled

8    substance.

9    Q.  And approximately when was that?

10   A.  It had to be like a little over a year that I was there.

11   Q.  And you started when, again?

12   A.  In October.

13   Q.  Of what year?

14   A.  Of 2010.

15   Q.  So you noticed things changing in late 2011?

16   A.  Yes.

17   Q.  And specifically what did you observe?

18   A.  The guys that were coming in were paying cash and they had

19   these prescriptions and they would pay -- it started out like

20   with 700 something dollars for 30 milligrams of oxycodone.

21   Q.  And when you say "these guys," how many guys did you

22   notice?

23   A.  They had to be about six.

24   Q.  And did they come into the pharmacy on a regular basis?

25   A.  Yes.

```
1    Q.  How often?

2    A.  Maybe two or three times a day, two or three times a week.

3    Q.  And prior to this group of -- sorry, what was the number

4    again that was in this group?

5    A.  About six or seven.

6    Q.  So trying to -- this group of six customers who are in

7    every day multiple times per day, did you see any other

8    customers in the pharmacy with any kind of regularity?

9    A.  No.

10   Q.  Did you ever see customers that came in on a monthly basis?

11   A.  Yes.

12   Q.  What was that for?

13   A.  Like refills, or if they had to get a prescription for

14   their medication, they would come in monthly.

15   Q.  Would you typically see customers in the pharmacy more

16   frequently than that?

17   A.  Regular customers?

18   Q.  Not part of this group of six that were just --

19   A.  No, like once a month.

20   Q.  Now this group of six customers that you saw in the

21   pharmacy multiple times per day, were they buying anything in

22   particular?

23   A.  Just the oxycodone.

24   Q.  How do you know they were buying oxycodone?

25   A.  They would come in with the prescriptions and they would
```

E9ATCHA5                          Padilla – direct

1    pay cash for it.

2    Q.  And was there anything written on the receipts that were

3    handed back that indicated it was oxycodone?

4    A.  Yeah, on the prescription it would say oxycodone, it would

5    have doctor's name, address.

6    Q.  Did this group of six people use the same names every

7    single time they were in pharmacy?

8    A.  No.

9    Q.  Was that suspicious to you?

10   A.  Yes.

11   Q.  Why?

12   A.  Because after a while you have seen them there two or three

13   times a day and you know them as one name and they have

14   different names on the prescription, it didn't -- it seemed

15   weird.

16   Q.  And did you refer to this group by any particular name?

17   A.  Yeah, we called them the Italians.

18   Q.  Why?

19   A.  They had an accent, they had a way about them, and --

20   Q.  Did you think they were Italians?

21   A.  We thought they were Italians, yes.

22           MR. TEHRANI:  Your Honor, may I approach?

23           THE COURT:  Yes, you may.

24   Q.  Looking at what has been admitted into evidence as

25   Government Exhibit 308, do you recognize that person?

E9ATCHA5                         Padilla - direct

1    A.  Yes.

2    Q.  Who is it?

3    A.  He went by the name Mike.

4            MR. TEHRANI:  Could we publish it to the jury?

5            THE COURT:  Yes.

6    Q.  And what do you know about him?

7    A.  He used to come in and he used to come in two or three time

8    as a day, two or three times a week, sometimes he looked like

9    he was out of it, sometimes he looked normal.

10   Q.  He was one of this group of six people?

11   A.  Yes.

12   Q.  Taking a look at Government Exhibit 306, who is that?

13   A.  He also went by the name Mike.

14   Q.  And was he part of this group?

15   A.  Yes.

16   Q.  Take a look at Government Exhibit 305, who is that?

17   A.  He went by the name Joe.

18   Q.  Was he also part of this group of oxycodone customers?

19   A.  Yes.

20   Q.  And take a look at Government Exhibit 316, do you recognize

21   that person?

22   A.  Yes.

23   Q.  Was he part of the regular group?

24   A.  Yes.

25   Q.  How do you refer to him?

E9ATCHA5                              Padilla - direct

1    A.   We called him M and M.

2    Q.   Why?

3    A.   Because he look like the rapper M and M.

4    Q.   When this group of guys was filling oxycodone

5    prescriptions, how did they pay?

6    A.   They paid cash.

7    Q.   And you mentioned this initially, but -- you mentioned this

8    earlier, but initially how much did you observe that they were

9    paying in cash?

10   A.   At first they started paying like 700 something dollars.

11   Q.   That was for one bottle of oxycodone?

12   A.   One bottle?

13   Q.   And what was your reaction to being given approximately

14   $700 in cash?

15   A.   I just -- I thought wow, I mean $750 or 700 something

16   dollars for a bottle of pills, I just thought it was like a lot

17   of money for pills.

18   Q.   And how did you feel about handling that money?

19   A.   I was nervous.  I was afraid.  I was scared.  It was a lot

20   of money to count before we put it in the register, and there

21   was customers in the pharmacy.

22   Q.   Now in the beginning when this crew the first started

23   coming in, what was the process for them to get their

24   prescriptions filled?

25   A.   They would come in with the prescription, give it us, we

1    would ask for date of birth, if the name wasn't clear or the

2    address, we would write it down on the piece of paper, put it

3    in a basket and pass it back.

4    Q.  Then what would happen?

5    A.  It would get filled and we would bring it out, call the

6    name, and then they would sign for it and pay the cash.

7    Q.  And where would the cash go?

8    A.  In the register.

9    Q.  Did you ask any of these oxycodone regulars for any kind of

10   identification?

11   A.  No.

12   Q.  Why not?

13   A.  We just didn't.

14   Q.  Did you ever ask?

15   A.  No.

16   Q.  But you mentioned you asked them for date of birth?

17   A.  Yes.

18   Q.  Did you verify that information?

19   A.  No.

20   Q.  Did you notice whether the same person used the same date

21   of birth every time?

22   A.  No, it was always a different date of birth because we

23   always asked for a date of birth.

24   Q.  And I think that you testified earlier that the price of

25   the prescriptions for this crew changed over time.

E9ATCHA5                          Padilla – direct

1   A.   Yes.

2   Q.   What happened?

3   A.   It increased to 800 something dollars.

4   Q.   Did you say 800?

5   A.   800 or 8 something, I don't recall how much exactly.

6   Q.   Did it increase further from there?

7   A.   Yes.

8   Q.   To what?

9   A.   Then it increased to a thousand, I think it was 1,074.

10  Q.   That was for one bottle of oxycodone?

11  A.   Yes.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

E9AZCHA6                      Padilla - direct

1    BY MR. TEHRANI:

2    Q.  Did it increase further from a thousand?

3    A.  That's the last I remember it.

4    Q.  Why don't you know whether it increased further from there?

5    A.  After awhile it was a thousand and 74, we were, we were

6    asked not to put the money in the register any more.

7    Q.  Where would the money go?

8    A.  The money would go in a bag, a paper bag.

9    Q.  Where would the paper bags come from?

10   A.  From us, the cashier clerks.

11   Q.  Did any people bring in bags with them?

12   A.  One person did.  Joe would come in with the money already

13   wrapped in a bag and he would just say, give this to Ji.  And

14   then I would pass it to the back to him.

15   Q.  Now, did you notice whether the prices of other medications

16   went up that much during the same time period?

17   A.  No.

18   Q.  So you did not observe any other similar increases?

19   A.  I'm sorry?

20   Q.  You did not observe any other increases like that?

21   A.  No.

22   Q.  So during this period of time, when the money was placed in

23   the paper bag, did it go in the register?

24   A.  No, it did not.

25   Q.  Where did it go?

E9AZCHA6                          Padilla - direct

1   A.   We put it in a basket, and we would pass the basket to the

2   back and they would take it from there.

3   Q.   So the money in the bag went into the basket?

4   A.   Yes.

5   Q.   And before the system changed, when the cash was going into

6   the register, did you make any observations about the quantity

7   of cash that was in the register?

8   A.   Yeah.  There was a lot of cash in the register by the end

9   of the day.

10  Q.   And were there any difficulties with the operation of the

11  register?

12  A.   Yeah.  Sometimes the little handle that clamps down on the

13  money was a little, you know, kind of loose.  It was, it was

14  plastic.  So we had to like either press it down and then try

15  to close the register.

16  Q.   Were it part of your responsibility to count the money in

17  the register?

18  A.   Yes.

19  Q.   And when you first started working at Stanley Pharmacy, on

20  an average day how much money would there be in the register at

21  the end of the day?

22  A.   Maybe between 100, 200.  Depended on the day of the week.

23  Q.   And did that increase.

24  A.   Yes.

25  Q.   And when this oxycodone crew first started or started

E9AZCHA6                        Padilla – direct

1   coming, how much money was in the register at the end of the

2   day?

3   A.  Over a thousand, maybe over 1,500.

4   Q.  And did it go back down?

5   A.  No.

6           THE COURT:  Mr. Tehrani, would this be a convenient

7   place to take our recess?

8           MR. TEHRANI:  Certainly, your Honor.

9           THE COURT:  Ladies and gentlemen, we're going to

10  recess now.  We'll resume tomorrow morning at 9:30.

11          Remember my instruction, don't discuss the case, don't

12  do any independent research.  Keep open minds.

13          The jury room will be open at 9:00 o'clock, and we'll

14  resume trial at 9:30 tomorrow morning.  Thank you very much.

15          THE DEPUTY CLERK:  All rise.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

E9AZCHA6                              Padilla - direct

1              (In open court, jury not present)

2              THE COURT:  Ms. Padilla, you can step down.  We'll see

3     you tomorrow morning.

4              Okay, Mr. Riopelle.

5              MR. RIOPELLE:  Judge, I just received an e-mail

6     notifying me that Judge Koeltl has put on an arraignment in a

7     case of mine tomorrow at 4:30.  If you could please just ask

8     Mr. Ovalles to call Judge Koeltl's Deputy and tell him I'll be

9     ten minutes late?  Because I don't want to shorten the trial

10    day here.

11             THE COURT:  I'm glad you don't.

12             MR. RIOPELLE:  Yeah, I know better than to say that

13    it's going --

14             THE COURT:  All right.  We'll be in touch with Judge

15    Koeltl's.

16             MR. RIOPELLE:  I'll run down there as fast as I can

17    after the day.

18             THE COURT:  Anything else?

19             MR. RIOPELLE:  No, sir.

20             (Adjourned to September 11, 2014 at 9:30 a.m.)

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   CARMEN CATIZONE

 4    Direct By Mr. Tehrani . . . . . . . . . . . .75

 5   Cross By Mr. Agnifilo  . . . . . . . . . . 126

 6   Cross By Mr. Riopelle  . . . . . . . . . . 140

 7   Redirect By Mr. Tehrani  . . . . . . . . . 150

 8   EDWARD GIRDAUSKAS

 9   Direct By Mr. Tehrani  . . . . . . . . . . 153

10   Cross By Mr. Agnifilo  . . . . . . . . . . 224

11   Cross By Mr. Riopelle  . . . . . . . . . . 231

12   MIRIAM PADILLA

13   Direct By Mr. Tehrani  . . . . . . . . . . 239

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        GOVERNMENT EXHIBITS

 2    Exhibit No.                                    Received

 3    1002 and 1003  . . . . . . . . . . . . . . 123

 4    1005     . . . . . . . . . . . . . . . . . 125

 5    317  . . . . . . . . . . . . . . . . . . . 169

 6    304  . . . . . . . . . . . . . . . . . . . 170

 7    305  . . . . . . . . . . . . . . . . . . . 170

 8    316  . . . . . . . . . . . . . . . . . . . 171

 9    303  . . . . . . . . . . . . . . . . . . . 171

10    306 and 308  . . . . . . . . . . . . . . . 172

11    351  . . . . . . . . . . . . . . . . . . . 177

12    311  . . . . . . . . . . . . . . . . . . . 178

13    1006     . . . . . . . . . . . . . . . . . 195

14    1,109, 700C, 714-714C, and 714E-714N  . . . 201

15    203, 206, 209, 210, 214, 216, 220 and 233  . 205

16    234  . . . . . . . . . . . . . . . . . . . 207

17    12   . . . . . . . . . . . . . . . . . . . 248

18

19

20

21

22

23

24

25
```