E9JZCHA1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,                    New York, N.Y.

4                    v.                           13 CR 290 (PAC)

5    CHRISTINA CHAI and HI JONG
     LEE,
6
                      Defendants.
7
     ------------------------------x
8

9                                                September 19, 2014
                                                 9:00 a.m.
10
     Before:
11
                         HON. PAUL A. CROTTY,
12
                                                 District Judge
13

14                            APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  ELISHA KOBRE
17        DANIEL TEHRANI
          Assistant United States Attorneys
18
     BRAFMAN & ASSOCIATES, P.C.
19        Attorneys for Defendant Chai
     BY:  MARC A. AGNIFILO
20        JACOB KAPLAN

21   SERCARZ & RIOPELLE
          Attorneys for Defendant Lee
22   BY:  ROLAND G. RIOPELLE
          GIULIANA GRAHAM
23
     Also Present:  Robert Polimeno, DEA
24                  Nicholas Evert, Paralegal
                    ARIEN GREENE-PINTO, Korean Interpreter
25                  KYCONG SILK SONG, Korean Interpreter

E9JZCHA1

```
 1              (In open court; jury not present)
 2              THE DEPUTY CLERK:  All rise.
 3              THE COURT:  Good morning.
 4              MR. KOBRE:  Good morning.
 5              THE COURT:  Do we have the redacted indictment?
 6              MR. KOBRE:  Your Honor, we don't have it with us, but
 7    we will have it at the break.
 8              THE COURT:  Okay.  Because I want to put in, the page
 9    reference in the jury charge.
10              MR. KOBRE:  Yes, your Honor.
11              MR. TEHRANI:  Yes, your Honor.
12              THE COURT:  Are the interpreters here?
13              THE DEPUTY CLERK:  Not yet, your Honor.
14              THE COURT:  The jury's here, as soon as the
15    interpreters get here.
16              MR. AGNIFILO:  Your Honor?
17              THE COURT:  Yes.
18              MR. AGNIFILO:  After the government's summation, could
19    I have maybe five minutes just to set up?  I just need to get
20    some materials.  I don't know when you're planning on taking
21    the morning break.
22              THE COURT:  Well, I guess we can take -- how long are
23    you going to be, Mr. Tehrani?
24              MR. TEHRANI:  I haven't timed it.  I think --
25              THE COURT:  You haven't done it before?
```

E9JZCHA1

1          MR. TEHRANI:  I've don't it before, but I didn't time

2     it unfortunately.  I think an hour and a half is ballpark.

3     Probably under, though.

4          THE COURT:  Okay.  We'll take a break then.

5          MR. AGNIFILO:  Thank you, Judge.

6          MR. KOBRE:  And, Judge, just to follow up on that,

7     would it be possible to take literally one minute just to move

8     away some of the items to the extent for the rebuttal defense

9     after defense counsel's summations?

10          THE COURT:  Yes.

11          MR. KOBRE:  Thank you, Judge.

12          MR. RIOPELLE:  May we sit down, Judge?

13          THE COURT:  Yes, please.  Sit down.

14          MR. RIOPELLE:  Thank you, Judge.

15          THE COURT:  The interpreters thought -- didn't we say

16     we're going to start at 9:00 o'clock tomorrow?

17          MR. RIOPELLE:  You did say that, Judge.

18          (Interpreters present)

19          THE DEPUTY CLERK:  All rise.

20          (Jury entering)

21          THE COURT:  Good morning.  Please be seated.

22          We're going to have summations by the government and

23     the defendants, rebuttal by the government, then I'll charge

24     the jury.

25          Mr. Tehrani.

E9JZCHA1                    Summation - Mr. Tehrani

1              MR. TEHRANI:  Thank you, Judge.

2              Ladies and gentlemen, Christina Chai and Hi Jong Lee

3    are licensed pharmacists.  Because of their specialized

4    education and training, they're granted the privilege, the

5    privilege of dispensing medications to people who legitimately

6    need them.

7              As the evidence has shown, these defendants made a

8    mockery of that license, of that privilege.  They used their

9    licenses as nothing more than tools to deal drugs.  They sold

10   oxycodone hundreds of thousands of pills of oxycodone, not to

11   people who legitimately need it, but to addicts and other drug

12   dealers.

13             Now, to be sure, there was a veil of legitimacy that

14   made it seem like what they were doing was legitimate; white

15   lab coats, pill counters, shelves full of medicine, lotto

16   tickets, cashiers, prescriptions.  But as you've seen and as

17   you've learned, Christina Chai and Hi Jong Lee were filling

18   oxycodone prescriptions that were anything but legitimate, for

19   cash, and they knew it.

20             Ladies and gentlemen, this is the Government's

21   opportunity to walk through all the evidence that has been

22   presented in this case, to explain how all the evidence that

23   you've heard over the last two weeks shows beyond all

24   reasonable doubt that Christina Chai and Hi Jong Lee conspired

25   to unlawfully distribute oxycodone, and how Hi Jong Lee

E9JZCHA1                    Summation - Mr. Tehrani

1   conspired to launder the proceeds of that drug dealing, and how

2   he structured his cash deposits in order to evade detection.

3           Now, before we begin discussing the evidence that

4   shows the defendants' guilt, I just want to talk very briefly

5   about the law regarding the drug charges.  Because, as you

6   know, pharmacists are allowed to dispense medication.  In fact,

7   that's what they're supposed to do.  But for a pharmacist, what

8   separates the illegal distribution of drugs from the lawful

9   dispensing of medication is a prescription, a legitimate

10  prescription.  And as I expect Judge Crotty will explain to you

11  when he gives you the legal instructions, when a pharmacist

12  acts outside the usual course of professional conduct and fill

13  prescriptions that they know to be illegitimate, they become

14  drug dealers.  And that, ladies and gentlemen, is exactly what

15  the evidence has shown in this case; Christina Chai and Hi Jong

16  Lee filled oxycodone prescriptions that they knew were invalid.

17  In sum, they broke the law and they're guilty.

18          Now, Mr. Agnifilo mentioned in his opening statement

19  the government and the defense really agree on a lot in this

20  case; there's not very much that the parties disagree about.

21  So before we get to those contested issues, let me just talk,

22  very briefly, about the issues that are not seriously in

23  dispute.

24          First, Stanley Pharmacy is a pharmacy in Yonkers, New

25  York in the Southern District of New York.

1          Second, Christina Chai was a supervising pharmacist at

2    Stanley Pharmacy.  There is a registration notifying the

3    authorities that Christina Chai was the supervising pharmacist

4    from March 2010.

5          She worked Monday through Friday 9:00 a.m. to 6:00

6    p.m.

7          Hi Jong Lee was the owner of Stanley Pharmacy, and he

8    had owned the pharmacy for at least 30 years.  He was also the

9    Saturday pharmacist, the only Saturday pharmacist.

10          He was responsible for the banking activity at Stanley

11    Pharmacy.

12          What else is not in dispute?  Ji Lee was a pharmacy

13    technician, not a pharmacist.  A pharmacy technician.  He was

14    not legally allowed to dispense medication.  Now, he was also

15    the store manager of Stanley Pharmacy.  And to be clear, he was

16    the primary interface between the pharmacy and the oxycodone

17    customers.  There is no dispute about that.  You've seen it in

18    video after video, you've heard it from all the witnesses; Ji

19    Lee was the person who interacted with all of the oxycodone

20    customers.

21          What else is not in dispute?  There was a massive

22    quantity of oxycodone that was being distributed at Stanley

23    Pharmacy.  We're going to come back to these graphs later, but

24    they show unequivocally the massive and dramatic increase in

25    oxycodone distributed at Stanley Pharmacy in 2012.

E9JZCHA1                    Summation - Mr. Tehrani

1            You also know that this massive quantity of oxycodone

2      was being distributed pursuant to fraudulent prescriptions.

3      There is no dispute about that.  You heard about that from the

4      drug dealers.  Ed Girdauskas, Mike Girdauskas, Michael Penzo.

5      They told you they were using stolen prescription pads, and

6      they were washing or changing the prescriptions so they could

7      be rewritten for oxycodone.  They told you they were feeding

8      their addictions and they were selling pills.

9            You also heard from the doctors.  You heard from Dr.

10     Roston, a gastroenterologist, who told you he almost never

11     prescribes oxycodone.  You heard from Dr. Chacko, an internist,

12     who also told you that he very very rarely prescribes

13     oxycodone.  And you heard from Dr. Dagli, a pediatrician.  He

14     told you that he, in fact, has never in his career written a

15     prescription for oxycodone and it would be hard for him to

16     conceive of a situation when a pediatrician would write a

17     prescription for oxycodone.  And they reviewed the

18     prescriptions that were recovered from Stanley Pharmacy written

19     on their prescription pads, and they told you they were not

20     their prescriptions, not their handwriting, not their

21     signatures, not their patients.  And for Dr. Chacko, not his

22     DEA number.

23            So there's simply no dispute that the oxycodone that

24     was being distributed from Stanley Pharmacy was being issued,

25     distributed pursuant to invalid prescriptions.

1    The only real issue that is in dispute is whether the

2    defendants, Christina Chai, the supervising pharmacist, and Hi

3    Jong Lee, the owner of the pharmacy where all this was

4    happening, knowingly participated in a scheme to illegally

5    distribute a massive quantity of oxycodone for more than a

6    year.  And after two weeks of evidence, after dozens of

7    witnesses and countless exhibits, you know beyond a reasonable

8    doubt that they did it.  So let's walk through that evidence

9    together, the evidence that shows that Christina Chai and Hi

10   Jong Lee conspired to fill thousands of oxycodone prescriptions

11   that they knew were phony, and let's take the defendants in

12   turn starting with Christina Chai.

13       Let's begin with Mr. Catizone.  He was the first

14   witness you heard from, and an expert witness, the Executive

15   Director of the National Association of Boards of Pharmacy.  He

16   told you how prescriptions are supposed to get filled, and what

17   obligations a pharmacist has to ensure that a prescription a

18   pharmacist fills is a legitimate one.  He explained that first

19   a pharmacist is required to evaluate a prescription and

20   determine whether it's appropriate for a patient; the

21   medication is for the patient's actual condition; are the

22   dosage and quantity appropriate; does a patient have any

23   relevant allergies.  Second, a pharmacist has to determine

24   whether a prescription is valid.  Let me repeat that.  A

25   pharmacist has to determine whether a prescription is valid.

E9JZCHA1                        Summation - Mr. Tehrani

1   Is it written by someone who is allowed to write prescriptions?

2   Is it a prescription within the doctor's scope of practice?

3   And Mr. Catizone gave a specific example of that.  He said it

4   would not be within a pediatrician's scope of practice to write

5   a prescription for an adult, let alone an oxycodone

6   prescription for 180 pills of 30 milligrams of oxycodone for an

7   adult.  Finally, is there a real relationship between the

8   patient and doctor, or is a prescription a result of some theft

9   or fraud?  And he told you unequivocally that a pharmacist's

10  job is not basically to count pills, as Mr. Agnifilo suggested

11  in his opening.

12          He also told you about oxycodone.  It's a Schedule II

13  controlled substance, it's a pain medication.  Which means as a

14  Schedule II substance that the potential for harm to the

15  patient, there is -- that there is a potential harm for the

16  patient and potential for abuse and/or addiction and that

17  potential is an extremely high.  It one of the most diverted

18  drugs in the United States and the most abused drug in the

19  northeast.  He also explained 30-milligram dosages of

20  oxycodone, for which there is little medical need because it's

21  too strong for temporary needs and not strong enough for

22  serious chronic pain, is the single most abused dosage of

23  oxycodone in the United States.  And because of all those

24  concerns, pharmacists are required to do more before filling

25  oxycodone prescriptions, to make sure that the prescriptions

E9JZCHA1                         Summation - Mr. Tehrani

1    for this highly addictive frequently abused drug are

2    legitimate.

3            Then he explained to you what a supervising pharmacist

4    did.  Remember that's Christina Chai's position.  He explained

5    that a supervising pharmacist is responsible for the overall

6    operation of a pharmacy, and to make sure it's in compliance

7    with federal and state laws.

8            The owner too.  The owner is also responsible for what

9    goes on in the pharmacy.

10           Then he explained what a pharmacy technician does.

11   That's what Ji's job was.  He explained that a pharmacy

12   technician assists a pharmacist.  The technician gets

13   medication from shelves, counts pills, fills bottles, tasks

14   that require no actual judgment, and always under the direct

15   supervision of a pharmacist.

16           Then Mr. Catizone walked through the red flags, or the

17   signs oxycodone is being illegally sold by a pharmacy,

18   illegally bought by a customer; signs that patients are

19   bringing in fraudulent prescriptions and signs that a pharmacy

20   is engaged in an illegal sale of controlled substances.  He

21   listed a number of them.  Patients look high; prescriptions

22   look altered; the patients use street jargon like script, 30s,

23   20s; patients are at the pharmacy regularly trying to get pain

24   medication; patients bring in pain medication for multiple

25   doctors.  This is called doctor shopping, and it's a sign of

1    abuse because it's a way for patients to get multiple

2    prescriptions from multiple doctors without any of the doctors

3    knowing that another doctor is also prescribing pain

4    medication.

5         He mentioned groups of customers showing up at the

6    pharmacy together.  He mentioned the quantity of medication

7    prescribed to be a red flag, both because large quantities are

8    a sign of abuse, and because the same quantities of cross

9    prescriptions are a sign that the prescriptions are not valid.

10   They're not tailored to the specific patient.  He talked about

11   sequential numbering of prescriptions.  And he mentioned this

12   is unique in New York; in New York all prescriptions are

13   numbered.  They show the prescription pad, that's the first six

14   letter number combination, and then the number H pad from zero

15   to 99.  This is the 61st prescription in that pad.  100

16   prescriptions in a single pad.  And Mr. Catizone explained how

17   unlikely it is for all the prescriptions in a doctor's

18   prescription pad to be written for the same medication and

19   filled at the same pharmacy.  It just doesn't happen, unless

20   the prescription pad is stolen.

21        He also told you about seeing the same medication

22   prescribed by a doctor as being a red flag, because no doctor

23   writes the same prescription for the same medication for the

24   same quantity, the same dosage for every patient.

25        Then Mr. Catizone talked about the volume of oxycodone

E9JZCHA1                          Summation - Mr. Tehrani

1    dispensed, both over time at a single pharmacy and in

2    comparison to other pharmacies in the same area.  Because a

3    spike in oxycodone being ordered or dispensed by a pharmacy

4    shouldn't ordinarily happen.  And one pharmacy in a particular

5    area probably shouldn't be selling more oxycodone than all the

6    others -- particularly not twice as much.

7            Then he talked about the form of payment.  He

8    explained 95 percent of prescriptions are paid for with

9    insurance.  95 percent.  But not illegal prescriptions.  Why?

10   Because insurance creates a record.  Insurance creates another

11   level of review, and insurers will only pay for a certain

12   number of prescriptions for a certain drug within a specified

13   time period.  So illegal drugs, illegal deals are usually done

14   in cash.

15           And then finally he talked about the prices of

16   medication.  Pharmacy pricing is competitive.  So even if

17   someone needed to pay for a prescription in cash, that person

18   walked into a pharmacy and the pharmacy charged a price that

19   was too high, that person would just walk down the street and

20   go to a different pharmacy and pay the normal price, unless

21   it's an illegal prescription and the pharmacy knows, because

22   then the pharmacy can charge whatever it wants.  It's the only

23   game in town.  And as we'll go over, Stanley Pharmacy hit every

24   single one of these.  That is incredible.  That is not just

25   drug dealing, that is brazen reckless drug dealing, drug

E9JZCHA1                          Summation - Mr. Tehrani

1      dealing that the supervising pharmacist and owner would

2      certainly know about.

3              Mr. Catizone also told you about how pharmacists are

4      informed about their obligations and about these red flags,

5      about their responsibility to evaluate the validity of

6      prescriptions.  It's taught throughout pharmacy school, both in

7      class rooms and clinical or practical settings.  It's tested on

8      the licensing exams.  Diversion specifically is tested on the

9      licensing exams.  And the pharmacist has to pass an exam for

10     each state he or she wants to practice; one for New York, one

11     for New Jersey.

12             Pharmacists are also provided information by the State

13     Boards, and they also have continuing education requirements;

14     15 hours a year in New York.  So pharmacists are well aware of

15     what drug diversion is, how to detect it, how to prevent it,

16     how to avoid it.  They are trained.

17             Then Mr. Catizone told you that he reviewed the

18     prescriptions at Stanley Pharmacy.  He told you how obviously

19     tampered with they were and how uniform they were; the same

20     medication, the same dosages, the same quantities.  He told you

21     about the sequentially numbered prescriptions.  In short, he

22     told you unequivocally that in his experience they were the

23     worst prescriptions he had ever seen, the most obviously

24     tampered with, and that a pharmacist operating in a normal

25     course of professional conduct should have known that they were

E9JZCHA1                     Summation - Mr. Tehrani

1    bogus.

2              So we know when pharmacy is -- how a pharmacy is

3    supposed to operate, and we know what the signs of drug

4    diversion are.  So what was going on inside Stanley Pharmacy?

5    Drug dealing.  Plain and simple.  You heard from Ed Girdauskas,

6    he's at the pharmacy every day.  He's in the pharmacy multiple

7    times a week, sometimes more than once a day.  He told you

8    about his addiction, how he got prescriptions.  He went to

9    doctor after doctor.  Some of the doctors wrote prescriptions

10   for oxycodone, usually dirty doctors, doctors that he was

11   paying with actual pills.  Other doctors wrote prescriptions

12   for other things or referrals, and he told you he recruited

13   people to go to doctors to get more prescriptions.  He needed

14   as many prescription as he could get his hands on.

15             And you learned who was in his crew, the group of

16   people who were filling oxycodone prescriptions at Stanley

17   Pharmacy.  There's Ed Girdauskas and his brother Mike, Michael

18   Penzo, Joe Fasce, and Anthony Sales, Doreen Dugan, Daniel

19   DiMase, Neil Paulerico.  That was the crew.

20             He also told you about the other ways that he got

21   oxycodone prescriptions.  He told you he purchased stolen

22   prescription pads.  And he explained how he washed or cleaned

23   prescriptions.  He removed handwriting and rewrote them for

24   oxycodone.  He explained the process.  First, he dipped the

25   prescriptions in brake fluid to remove the ink.  Next, he

E9JZCHA1                    Summation - Mr. Tehrani

1   rubbed the face of the prescription to get any left over, then

2   he dipped the prescription in rubbing alcohol to remove the

3   brake fluid.  Then finally he dried the prescription, sometimes

4   between two pieces of paper towel, but if he was too impatient,

5   then with a hair dryer.  He also explained what some of the

6   problems were with washed prescriptions.  And to do that, he

7   talked about the prescriptions that he wrote.  And you can look

8   at the prescriptions that he wrote.  They're in evidence.

9   They're marked with his initials.  The sets of prescriptions

10  from each doctor that Ed Girdauskas personally wrote are marked

11  and identified with his initials.

12          He talked about the running ink, the blurring; it's

13  when you write a prescription that's still wet, before it fully

14  dries, the ink runs.  And here's an example.  Here's another

15  one.  Notice here Christina Chai's handwriting is blurred; the

16  information at the top, the date, the pharmacy number, the

17  initials CC, that's Christina Chai's handwriting.  That writing

18  is blurred.  That means that the prescription was still

19  physically wet when Christina Chai held it, filled it and wrote

20  on it.  And not just once.  Here's another example.  There's

21  more.  You can look at them on the actual exhibits.

22          Then there's ink that bleeds through straight to the

23  back.  Here's another one.  We're going to talk about Dr.

24  Berger.  These prescriptions are stolen, so there is no need to

25  wash them.  They're not tampered with.  They were just blank

1    pads that were stolen and rewritten for oxycodone.  That's the

2    back of a normal prescription, and here's the back of a washed

3    prescription.  And that's the back where Christina Chai

4    personally placed that label.  She admitted in her statement

5    that she put the label on the back of the prescription after

6    she wrote her initials on the front.

7           Then there's discoloration of the prescriptions,

8    sometimes faded, almost white, sometimes pink or purple.

9           Now, remember Investigator Dewey.  He was the

10   Investigator from the Bureau of Narcotic Enforcement.  He

11   explained to you the prescriptions in New York are uniform.

12   Every single handwritten prescription in New York looks exactly

13   the same; the same color, the same pattern, the same security

14   features, every one.  And here's a faded prescription.  Ed

15   Girdauskas told you what causes that; it's when you rub too

16   hard to remove the ink, that fades the background.  And here's

17   a pink or purple one.  And this is when you leave it in the

18   brake fluid too long, it turns the color darker pink or purple.

19          You also know the bar code in the corner, and that

20   sometimes that gets blurred by the process.  And here's an

21   example.

22          And Girdauskas told you that sometimes you could still

23   see the original writing on the prescription, despite their

24   best efforts; if the doctor wrote too hard on a prescription,

25   the imprint would stay on the prescription, and you could see

1    it underneath the rewritten oxycodone prescription.  Here's a

2    couple of these.  But it's actually hard to see on the scans.

3    So, please, look at them yourselves.  Look at them the same way

4    Christina Chai looked at them when she filled them.  Here's

5    another.  This one you can see the refill number on it.

6    Remember, you can't get refills for oxycodone prescriptions, so

7    this would have been written for something else.  Five refills

8    were authorized, and they had to remove that.  But you could

9    still see it underneath, and they wrote next to it.

10        Then there is the blue box, the pharmacist test area.

11   The pharmacist test area.  Investigator Dewey explained what

12   that was and how it worked.  It's designed to prevent

13   tampering.  It's heat sensitive so if you rub it it disappears,

14   but then it shows back up.  Look at these.  That's one with the

15   blue box, and here are the ones without the blue box, over and

16   over and over again, all filled by Christina Chai.

17        Ladies and gentlemen, these are not slight

18   differences.  This is a blue box that is completely gone from

19   the face of a prescription.

20        What else did Ed Girdauskas tell you?  He told you

21   that when he went into the pharmacy, sometimes he would bring

22   in three to four prescriptions at a time, all in different

23   names, and that he would leave with more than one at a time.

24   He even told you that one time he brought in almost 30

25   prescriptions at once in different names, 30.  There was

E9JZCHA1                    Summation - Mr. Tehrani

nothing suttle about this, ladies and gentlemen.  There was no

effort to hide what was going on.  He brought in nearly 30

prescriptions, and he was given post-it notes telling him when

to come back to fill those oxycodone prescriptions.  He also

told you how he paid; cash, wads of cash every time.  He wasn't

allowed to use his insurance.  In fact, when he had a

prescription in his own name, he took it to another pharmacy

because he could use his insurance for the prescription in his

own name, and he could pay normal price.

He also told you about the way that payment method

changed; how they were told to put money in a bag.  They were

literally given a bag at the pharmacy and told to put cash in

the bag.  The bag was then passed to the back.  And who worked

in the back?  Ji Lee and Christina Chai.

Then he told you about the prices for oxycodone at

Stanley Pharmacy.  Started off at a normal price, around $200

for 180 pills of oxycodone 30 milligrams, but that increased.

First to about $700, then to over a thousand, over $1,000 for

one bottle of oxycodone, five times the price of when it first

started.  Five times the price of what other pharmacies were

charging.

And you know how Christina Chai knew about these

prices too?  First, the pricing payment method is on the orange

receipt.  This was one for $1,074.20 paid for in cash to CA

they're also on the labels, the labels that Christina Chai put

E9JZCHA1                    Summation - Mr. Tehrani

on the back of the prescriptions after she initialed it.  And here the price increases.  $325 in October 2011; $540 in November 2011; up to $750 by January 2012, just a couple months later; then over $1,000 by October 2012, just one year later. That's absolutely crazy.  That's over a 200 percent increase in one year.

          And as Ms. Chai told the agents in her interview, she put these stickers on the back of the prescriptions and she noticed these prices.

          Ed Girdauskas also told you about the pharmacist, the one wearing a white lab coat.  You know that's Christina Chai. He told you didn't talk with her, but he saw her in the pharmacy.  He could see what she was doing and where she worked; right behind the counter, right next to Ji, right next to the side counter.  He told you about his interactions with Ji, how he met with him on the sides of the pharmacy, either to the right next to Miriam Padilla, or to the left right next to Christina Chai.  And then he told you about, despite the fact that he was at the pharmacy multiple times per week, despite the fact that his brother and others were in the pharmacy every day, multiple times per day, no one ever verified a prescription, no ID, no call to a doctor, ever, not when they filled oxycodone prescriptions from a pediatrician or psychiatrists, not when they used the wrong DEA number, the prescriptions, not when they filled oxycodone prescriptions

1   after oxycodone prescription every day for over a year using

2   multiple names and multiple dates of birth for over a year.

3   One call would have ended this scheme, one call.  One call to

4   Dr. Roston, one call to Dr. Berger, one call, but no one ever

5   did.  That's why they kept coming.  That's why they're willing

6   to pay over $1,000 per prescription of oxycodone, because the

7   other pharmacies called.  The other pharmacies asked for ID.

8   The other pharmacies wouldn't deal them drugs.  And how do you

9   know that?  Because when Stanley Pharmacy shut down, Ed

10  Girdauskas turned to heroin.  No one else would fill his

11  prescriptions.

12          You also heard from Ed's brother, Mike Girdauskas.  He

13  told you the same things.  He told you that he in the pharmacy

14  every day, multiple times per day.  He told you he brought in

15  multiple prescriptions at a time.  He left with multiple filled

16  prescriptions at a time.  In fact, you saw a video of him being

17  given two bottle of oxycodone.  That's government Exhibit 714

18  A4 from December 3rd, 2012.  That was two bottles of oxycodone.

19          What else do we know about that sale?  Christina Chai

20  was right there, standing right next to them.  In fact, she

21  walked past them when they were talking.  There's nothing

22  suttle about this, nothing hidden.

23          He told you about the process for filling

24  prescriptions at Stanley, the cash in the bag, the prices, the

25  price increases.  Now, to be sure, Mike Girdauskas cannot tell

E9JZCHA1                    Summation - Mr. Tehrani

1    the difference between Christina Chai and Ji Lee's sister
2    Christine Lee.  But here's the thing.  It doesn't matter.
3    There is no dispute that Christina Chai was a supervising
4    pharmacist at Stanley Pharmacy; that she was there Monday
5    through Friday 9:00 a.m. to 6:00 p.m., that she initialed the
6    prescriptions that she filled, and that Mike Girdauskas was in
7    the pharmacy over and over and over and over and over and over
8    and over and over and over.  Ladies and gentlemen, that is one
9    week, January 7th, 2013 to January 11th, 2013.  Mike Girdauskas
10   is in the pharmacy every day, multiple times per day, standing
11   right next to Christina Chai.

12        You also heard from Michael Penzo.  He told you the
13   same exact things.  He also told you about the controlled buys
14   that he did, the ones at the time direction of law enforcement.
15   He told you about buys where he literally wrote the dosage on
16   the prescription while he was in the pharmacy.  He told you
17   about one time when he was told to get a new prescription, he
18   came back with a prescription from a doctor in less than 20
19   minutes, a doctor in the Bronx, a trip, a round trip trip that
20   easily would have taken well over an hour.  And you saw the
21   videos of those purchases, because Mr. Penzo was wearing a
22   recording device.  You saw the cash in the bag, you heard his
23   conversations.  Now, again, his interactions with undoubtedly
24   with Ji Lee.  There is no dispute, again, that Ji Lee was the
25   person who primarily dealt with the customers.  But you know

1    that Christina Chai was right there with him.  You saw her

2    working in the back.  You saw Ji pass her the pharmacy

3    medicine.  She was literally at Ji's right hand.

4           And he told you that on a few occasions he dealt

5    directly with the woman in the white lab coat.  He literally

6    handed her cash.  Again, there was nothing suttle about this.

7    No one was in the dark about what was happening.

8           You heard from Miriam Padilla and Ixchel Campos, two

9    of the cashiers at the pharmacy.  Neither of them had any

10   pharmacy training.  Neither of them ever worked at a pharmacy.

11   Ms. Campos is 19 years old.  She wasn't even old enough to vote

12   when this was going on.  They told you what they observed.

13   They told you about the regular customers that started coming

14   in in late 2011.  They recognized them.  They were in the

15   pharmacy all the time every day, multiple times per day; mike,

16   Joe, Eminem.  They recognized all of them they told you about

17   the cash in the bag policy and how it seemed strange.  Ms.

18   Campos told you she heard about it directly from Ji and spread

19   the word.  She was told to spread the word -- not to keep it a

20   secret, but to tell others.

21           They told you about the prices for oxycodone, over

22   $1,000 per bottle.  And they told you about the meetings

23   between Ji and the customers at the side of the pharmacy.  Ms.

24   Padilla told you that the meetings made her feel so

25   uncomfortable, that she walked away.  They told you that the

E9JZCHA1                    Summation - Mr. Tehrani

1    whole situation made them feel suspicious; the customers seemed
2    high, but never in pain, never in pain.  They were in the
3    pharmacy day after day getting oxycodone prescription after
4    oxycodone prescriptions, a powerful pain killer.  They looked
5    high, but never in pain.  And you saw them too.  Did they seem
6    in pain to you?  You saw them the same way Ms. Campos saw them,
7    the same way Ms. Padilla saw them, the same way Ms. Chai saw
8    them.

9              They told you the prescriptions felt strange to them.
10   They aren't pharmacists, they're not even pharmacy technicians,
11   and they noticed that the prescriptions felt strange.  They
12   couldn't say exactly what, just they just felt off.  They were
13   smudged.  They knew because they handled prescriptions every
14   day just like Christina Chai.  Despite all this, despite the
15   fact that Stanley Pharmacy basically became an oxycodone free
16   for all, Christina Chai, the supervising pharmacist, would have
17   you believe that she just didn't know.  She was there Monday
18   through Friday 9:00 a.m. to 6:00 p.m. 45 hours a week, but she
19   didn't realize what was going on.  That's nonsense.  Christina
20   Chai knew exactly what was going on.  And you know that for a
21   number of reasons.

22             First, common sense tells you that she knew.  How
23   could she not?  You don't need to go to pharmacy school or pass
24   the license exam to know that this was not legitimate; to know
25   that the same handful of people coming in every single day to

E9JZCHA1                    Summation - Mr. Tehrani

1    buy oxycodone, that is not legitimate.  And not just once per

2    days, multiple times per day using different names.  There is

3    simply no way not to know.

4          This was not one person in the pharmacy one or two

5    times over the course of a week or two.  This was the same

6    group of guys for over a year, for over a year.  They were

7    there so often, that they kept bumping into one another.  Mike

8    and Ed Girdauskas told you about that.  They go into the

9    pharmacy and they'd see someone else there.  In fact, you saw a

10   video where Mike Girdauskas and Anthony Sales are there at the

11   same time.  That's government Exhibit 714 I1.  You saw another

12   video where Michael Penzo and Anthony Sales are both waiting by

13   the side counter.  That's government Exhibit 714 N2.  And who

14   was at that side counter?  Christina Chai.  This is not

15   happening in the back alley.  This is not happening at the

16   lotto stand.  This is happening right next to Christina Chai.

17   She is filling these prescription day after day.  And every

18   time Ji goes over there -- remember, he only goes over there

19   for the oxycodone customers.  Every time he walks right behind

20   Ms. Chai, and stands right next to Ms. Chai.  And you saw

21   videos of Ji and Mike Penzo talking to each other from across

22   that side area, government Exhibit 714 A1.

23         That's Ji right by Ms. Chai.  Penzo in the corner, and

24   they're talking to each other across the pharmacy.  This is not

25   discrete, this is not a secret.  Of course she knows what's

E9JZCHA1                    Summation - Mr. Tehrani

1    going on.  It would literally be impossible not to.

2           Again, it was obvious to Ms. Padilla and Ms. Campos.

3    Neither of them had any pharmacy training whatsoever, never

4    worked in a pharmacy before.  They were suspicious; seeing

5    payment, wads of cash, the cash in the bag, funny

6    prescriptions.  Ladies and gentlemen, these are pharmacy

7    employees with zero pharmacy experience, zero pharmacy

8    training, zero pharmacy education, and they knew that these

9    prescriptions were not right.  Why?  Because these

10   prescriptions were washed, they were dipped in brake fluid,

11   they were scrubbed, they were dipped in rubbing alcohol, they

12   were dried, sometimes with a blow dryer.  Of course they felt

13   weird.

14          But Christina Chai is no novice.  She's no 17-year-old

15   high school student.  She is a trained pharmacist.  She went to

16   years of pharmacy school and graduated.  She's licensed to be a

17   pharmacist in two states, New York and New Jersey.  And as Mr.

18   Catizone explained, in order to get your license transferred

19   into a new state, you have to take the law exam in that state.

20   So Ms. Chai took the New Jersey legal exam and the New York

21   legal exam.  That's the test, the part of the exam that tests

22   on legal issues and diversion concepts.  Ms. Chai took it twice

23   and passed it twice.  This wasn't her first job.  Mr. Catizone

24   explained part of a pharmacist's education occurs in pharmacy

25   settings.  And before Stanley, she worked at a real pharmacy,

1    Stop&Shop, a chain pharmacy in New Jersey.  Ms. Chai knew what

2    diversion looked like, knew what legitimate prescriptions

3    looked like, and she knew that what was going on at Stanley

4    Pharmacy was illegal.

5            And, again, just look at what happened.  You heard

6    from Investigator Whitmore, who explained what ARCOS is and

7    what these graphs show.  It's the volume of Schedule II

8    controlled substances sold to the pharmacies, and as reported

9    by the distributors.  Look at how quickly and drastically the

10   volume of oxycodone increased even from 2010, when Christina

11   Chai start, first started working at Stanley Pharmacy.  That's

12   five times more oxycodone in 2012 than in 2010.  And it wasn't

13   as if this was just a growing pharmacy.  Look at the other

14   Schedule II medications they were ordering.  Almost none.  And

15   then look at everyone else in the area.  No one even close.

16           You also heard about BNE, that's Bureau of Narcotic

17   Enforcement Data.  That's prescription by prescription

18   information reported by the pharmacist.  Look at how quickly

19   this grew; from 77 oxycodone prescriptions in June 2011 to 250

20   in November 2012.  That's more than eight oxycodone

21   prescriptions per day in November 2012, and it's almost all in

22   cash.  70 percent, 80 percent cash.  Again, you heard from Mr.

23   Catizone, 95 percent of prescriptions are paid for by

24   insurance.  80 percent of these are in cash, cash in a bag.

25           And the money.  We already discussed this, but look at

1  this increase.  From $300 to over $1,000 per bottle, and it's
2  written on the labels that Ms. Chai personally placed on the
3  back of each prescription.  That is five times the cost of an
4  oxycodone prescription at other pharmacies.  Again Ed
5  Girdauskas, told you that.  He told you why he was willing to
6  pay the 400 percent premium, because no one else would fill his
7  ridiculous prescriptions.  No one else would give him 180 pills
8  of oxycodone day after day using different names.  If they
9  would have, don't you think he would have bought them for $200?
10 There is simply no innocent explanation for these prices.  They
11 could demand a premium because they were the only business in
12 town.  They were the only pharmacy willing to just deal
13 oxycodone.
14         You also heard about calls from one of the
15 distributors, Bellco.  You heard from Roseanne Joset.  She told
16 you about the records of her calls with Stanley.  They were
17 calls because Stanley was ordering too much oxycodone.  They
18 were over their limit.  There were a few calls from Stanley, a
19 couple of them.  On a couple of them Ms. Joset spoke directly
20 with Ms. Chai, the supervising pharmacist, and on one, in
21 October 2011, Ms. Chai provided her explanations for that
22 increase; it was because of increase in Medicaid customers.
23 We're going to come back to that, ladies and gentlemen, but you
24 know that is false.  You know that that is not the reason.
25         Then, according to the records, Ji Lee gets on the

E9JZCHA1                    Summation - Mr. Tehrani

phone and tells Bellco a different reason; that they're not --
they're ordering more because there is an oxycodone shortage.
Again, you know that that is not the reason.  And it's a
totally different explanation, presumably given right in front
of Ms. Chai.  They worked at the same pharmacy counter.

          What's the real reason?  Because they're dealing
oxycodone to the oxy crew.  Then there's another call, July
2012.  Again Ms. Joset spoke directly with Ms. Chai, the
pharmacist in charge; not Ji, Ms. Chai.  Again, the call was
about the volume of oxycodone.  In fact, Bellco was so
suspicious about what was going on, they asked the pharmacy to
resubmit a questionnaire, and you saw that response, sent back
the next day, government exhibit 401.

          Then there are prescriptions themselves.

          Now, we've already talked about washed prescriptions,
prescriptions that were written for some other medication or
for referral, and they're washed and rewritten for oxycodone.
We went through what washing does to prescriptions.  Remember
these are uniform prescriptions, uniform in color, uniform in
texture, uniform anti-tampering features.  Each contains a
serial number, a bar code.  They're supposed to look exactly
the same.  And Christina Chai has been working at Stanley
Pharmacy since March 2010, over a year and a half before this
all started.  A year and a half of seeing the same uniform
prescription after the same uniform prescription.

1         We've gone through a lot of these, but please take a

2    look at them yourselves.  The scans don't do them justice.

3    Blurred ink, ink bleeding through, blurred into Ms. Chai

4    herself wrote was wet she wrote it; faded prescriptions, purple

5    prescriptions, blurred serial numbers, missing blue boxes, the

6    initials CC are on each and every one of these.  She filled

7    every one.  Here are just a few more.  Handwriting underneath,

8    blurred ink. more blurred ink, handwriting underneath, ink that

9    bleeds through the back.

10        But about these blue boxes.  The oxy crew knew this

11   was a big deal.  They knew that prescriptions just didn't look

12   right without the blue box.  So what did they do?  Ed

13   Girdauskas colored this one in with a crayon.  Michael Penzo

14   pasted on a blue box.  But those weren't the only ones.  Here's

15   two more; pasted on blue boxes.  Ladies and gentlemen, this is

16   arts and crafts posing as serious medicine.  No one, I mean no

17   one could actually believe that these are real prescriptions.

18        What else do you know about this prescription with the

19   crayon that Ed Girdauskas colored in from Dr. Kandalaft, a

20   psychiatrist?  It's clear from the face of the prescription

21   Westchester Psychiatric Associates, and there's almost 40

22   prescriptions from Dr. Kandalaft, all for oxycodone, powerful

23   pain medication, from a psychiatrist.

24        Now, again, Mr. Catizone told you that in his opinion,

25   a pharmacist should have known that these were bogus

E9JZCHA1                    Summation - Mr. Tehrani

1    prescriptions; that they were the worst tampered prescriptions

2    that he had ever seen.  But you do not need to be an expert to

3    know that, and frankly, you don't need to be a pharmacist to

4    know that.  There is absolutely nothing suttle about these.

5    Look at the prescriptions yourselves, the ones that the

6    witnesses talked about are flagged, but look through all of

7    them.  Look at the color, the ink, look at the erased writing,

8    the blue boxes, or at least the boxes that are supposed to be

9    blue.  Feel them.  Compare them to the legitimate prescription.

10   That's government Exhibit 234.  That's the prescription pad

11   from Dr. Chacko.

12          Now, Mr. Agnifilo suggested in his opening that a

13   pharmacist is too busy to really study any given prescription.

14   Let's talk about that.

15          But first, as you've heard, the government bears the

16   burden of proof in this case, and it's a burden we wear with

17   pride.  The defense has no obligation to prove anything or to

18   say anything.  But if the defense does make arguments, as they

19   did in this case, it is perfectly appropriate for the

20   government to comment on them, and for you to scrutinize them.

21          So how do you know that Christina Chai was not too

22   busy to really look at these prescriptions?  First, even if

23   that were true, with respect to any given prescription, this

24   wasn't one prescription.  This was hundreds of prescriptions,

25   day after day, multiple times per day for over a year.

1           Second, these prescriptions are absurd.  Ed Girdauskas

2      told you that he could not get them filled anywhere else.  He

3      was willing to pay five times the price at Stanley because no

4      one else would fill them.  He moved to heroin after Stanley

5      Pharmacy closed, because no one else would fill these

6      prescriptions.  These are obviously fakes, but Mr. Agnifilo

7      made a big deal about how little time Ms. Chai was able to

8      spend with any given prescriptions; two hours and 40 seconds he

9      said.  Take a look at these prescriptions.  How long does it

10     take you to realize that these are fakes?

11          These are just the tampered with prescriptions.

12          You also heard about the stolen prescription pads.

13     They weren't washed.  They're blank pads that were stolen and

14     then written for oxycodone.  And huge portions of entire

15     prescription pads are written for oxycodone and filled at

16     Stanley Pharmacy, prescription after prescription in sequential

17     order.  Mr. Catizone told you there's no explanation for that,

18     other than the prescriptions come from stolen prescription

19     pads.

20          You heard from Dr. Roston.  He told you that his pad

21     was stolen.  And go through and look at the sequential number

22     on the prescriptions that come from Stanley Pharmacy.

23          And Dr. Savino.  Ed Girdauskas told you that these

24     were stolen prescriptions from a pediatrician.  Take a look.

25          Prescription after prescription for oxycodone; 180

E9JZCHA1                    Summation - Mr. Tehrani

1    pills each from a pediatrician

2              (Continued on next page)

1          MR. TEHRANI:  Now Dr. Berger.  These were stolen, too.

2     Edward Girdauskas told us that Andy Sales and Doreen Dugard

3     stole them and purchased them every one, day after day for

4     oxycodone.

5          Now you have the BNE data in evidence, Government

6     Exhibits 502 and 503, and they show you every prescription for

7     a controlled substance that was filled in Stanley Pharmacy from

8     June 2008 until the end of 2012.  And if you look at that data,

9     you will find that from June 2008 until July 25th, 2012, there

10    was not a single prescription for any controlled substance from

11    Dr. Berger filled at Stanley Pharmacy.  Not one.  To be clear,

12    it's not just that there were no prescriptions for oxycodone

13    filled at Stanley Pharmacy, there were no prescriptions for any

14    controlled substances from Dr. Berger filled at Stanley

15    Pharmacy.

16         Then starting on July 25, 2012, 139 prescriptions of

17    Dr. Berger come in, all of them for oxycodone, every single

18    one, day after day.  It's almost every preparation from one

19    prescription pad from number 23 to 99, 74 prescriptions out of

20    100 prescriptions from that pad.  Then 27 out of 32 from

21    another and 38 out 41 from a third.

22         Take look summary charts 1053A and 1053B.  Three

23    Dr. Berger prescriptions filled on July 26, two on July 27,

24    three July 28, one on July 30, three on July 31st, three on

25    August 1st, three more on August 2nd, four on August 3rd, on

E9JTCHA2                    Summation - Mr. Tehrani

and on and on.  All of the sudden, and nearly all of them, at

least in the beginning, filled by Christina Chai.

        And this wasn't one new patient, some new Berger

patient who found his way from the Bronx to Stanley Pharmacy in

Yonkers, because remember Dr. Berger, is in the Bronx.  This

was a new patient name after new patient name, day after day,

all of them are showing up just after July 25th, 2012, all of

them filling oxycodone prescriptions.  Patrick Moon, Adam

Velestri, Ralph Scoops, William Douglas, Ivan Duchivo, Anthony

Mitch, Brian Pacies, Chris Tuck.  All of them paying cash, all

of them getting oxycodone, all of the sudden.

        Think about that.  Since at least 2008, there had not

been a Dr. Berger prescription for a controlled substance

filled at Stanley Pharmacy.  Then starting July 25, 2012, a

flood of oxycodone prescriptions comes in.  There is simply no

way not to notice.  139 prescriptions, $114,000 in cash in four

months.  Dr. Berger wasn't the only one.  There are summary

charts for all 22 of the examined documents.  Karen Andolino,

Government Exhibit 1051, 135 cash oxycodone prescriptions in

three months, 75 percent of them filled by Christina Chai.

Ladies and gentlemen, Christina Chai knew these were bogus.

There is simply no other explanation.

        How else do you know that Christina Chai knew what was

going on?  She said as much.  You heard about the interview by

Special Agent Polimeno.  What did she say?  She explained the

1  procedure for filling oxycodone prescriptions, it was a special

2  procedure, one specifically designed for oxycodone.  She would

3  count the pills, she would review and initial the

4  prescriptions, and put the label on the bottle and on the back

5  of the prescription.

6          Then she explained the suspicious activity she

7  observed starting in the summer of 2012.  She called it shady,

8  and she rattled off a list of her observations, sometime even

9  referring to them as illegal.  There was an increase in overall

10  oxycodone dispensed, particularly 15, 20, 30 milligrams.  She

11  said that oxycodone increased in the summer of 2012 then

12  decreased and picked back up again.  Ladies and gentlemen, that

13  is a specific awareness of exactly what was going on in the

14  pharmacy.  She said that she knew about the abnormally high

15  pricing.  Again she saw the stickers, she saw the receipts.

16          She saw the same faces once or twice a week, once or

17  twice a week, picking up oxycodone.  Now that's an

18  understatement, but it's still remarkable.  Who are the people

19  she recognized?  Joe Fasce, Michael Penzo, Ed Girdauskas.

20  Michael Penzo and Ed Girdauskas testified here and told you

21  Fasce.  She said that she recognized about the faces about half

22  of the oxycodone customers.  And that's important and that's

23  interesting, because it means that she knows there's a group of

24  people.  She doesn't recognize all of them, but she knows it's

25  a group, the same people buying oxycodone over and over again.

1   She also told you that the oxycodone customers would meet with

2   Ji off to the side of the store.  Ji would also hand filled

3   oxycodone prescription at the side of the store, that's the

4   side counter right by where she works.  She knows he's

5   personally selling oxycodone, oxycodone prescriptions that she

6   just filled, at a side counter right next to her.

7        And then are the calls from the distributors.  She

8   told the agents about three calls.  The first call occurred

9   April 2012, distributor asked why the pharmacy was ordering so

10  much oxycodone and who did the ordering.  Ms. Chai told the

11  agents she transferred the call to Ji.  Second call took place

12  a few months later.  She answered it.  The representative asked

13  who was in charge of ordering.  She gave the phone to Ji.

14  Finally, there was a third call about a week before the

15  interview, January 2013.  In that one she overheard Ji argue

16  with the representative about oxycodone ordering limits.

17        Now let me talk a little bit more about the calls in a

18  minute, but she never had a conversation with the distributor,

19  she passed the phone to Ji.  But she knew why they were

20  calling.  They were calling about the volume of oxycodone the

21  pharmacy was ordering.  So she's not the only person who is

22  suspicious about the oxycodone.  She knows others are as well.

23  What does she do?  She keeps on filling oxycodone prescriptions

24  over and over and over again to the same people again and

25  again.

E9JTCHA2                    Summation - Mr. Tehrani

1          Ladies and gentlemen, every single person who had

2     anything to do with this pharmacy knew what was going on.  The

3     distributor knew what was going on.  Ms. Campos, a 17-year-old,

4     knew what was going.  Miriam Padilla knew what was going on.

5     In fact, apparently the only two people who did not know what

6     was going on at Stanley Pharmacy were Christina Chai, the

7     supervising pharmacist, and Hi Jong Lee, the owner.  The only

8     who people were who were actually responsible for knowing what

9     was going on in the pharmacy were the only two people who had

10    no idea.  You know that is not true.  Christina Chai knew how

11    much oxycodone of being distributed.  She knew what kind of

12    oxycodone was being distributed.  She knew who they being

13    distributed to.  She knew they were in the pharmacy multiple

14    times a week.  She saw the prescriptions from a small group of

15    people but with different names every time.  She filled the

16    prescriptions the same way Ms. Campos did, the same way

17    Ms. Padilla did.  But according her, she was just suspicious.

18    She was suspicious, but she didn't know.  Ladies and gentlemen,

19    that's just impossible.

20         But what if Ms. Chai, the supervising pharmacist, just

21    closed her eyes to what was going on.  She saw something

22    suspicious, didn't want to know more, so asked no questions.

23    She put her head in the sand and just kept filling

24    prescriptions, didn't call a doctor, didn't talk to the

25    customers, didn't say anything to Ji, didn't talk to law

E9JTCHA2                      Summation - Mr. Tehrani

1    enforcement.

2            Aside from making her a remarkably irresponsible

3    pharmacist, it also makes her guilty.  As I expect Judge Crotty

4    will instruct you, closing her eyes to avoid learning the truth

5    is called conscious avoidance in legal terms.  It's the same

6    thing as actual knowledge.  You don't avoid criminal liability

7    by closing your eyes and holding your nose and pretending that

8    it doesn't stink.  And you know at a bare minimum that's what

9    she did.  She told law enforcement what she saw.  She told them

10   she was suspicious.  But she did nothing about her concerns.

11   She deliberately avoided knowing the truth.  That, ladies and

12   gentlemen, is conscious avoidance.

13           Now Mr. Chai also claimed in her statement there were

14   certain things that lessened her suspicions, that despite

15   everything she saw, all the warning signs, all her suspicions,

16   he was comforted by the fact that she saw Ji reject a couple of

17   prescriptions, and that drowned out her suspicions.  Ladies and

18   gentlemen, that's just not believable.  She was the supervising

19   pharmacist.  She went to years of pharmacy school.  She took a

20   licensing exam to become a registered pharmacist in New Jersey.

21   She took another licensing exam to become a registered

22   pharmacist in New York.  She did clinical work to become a

23   pharmacist in school.  She worked in a real pharmacy, Stop &

24   Shop, in New Jersey.  She was not comforted by seeing Ji Lee

25   reject a couple of prescriptions.

1           And her story doesn't even make sense.  She was

2   comforted because she saw him reject a couple of prescriptions,

3   a few prescriptions?  Really?  What happened to those people?

4   You heard about examples from Ms. Padilla, from Michael Penzo

5   and the Girdauskases.  They just came back with new

6   prescriptions and came back again and again, day after day,

7   with different names for over a year.  There is nothing about

8   that, nothing, that is remotely legal.

9           Now let's get back to the calls from the distributor

10  because I want to focus on the first one, Government

11  Exhibit 404.  The distributor calls from October 2011, called

12  the pharmacy because she hit their limit for oxycodone,

13  30 milligrams, and she called to ask about that.  And she spoke

14  with the pharmacist Christina.  Christina's explanation was

15  that it was due to Medicaid customers and Medicaid customers

16  were coming in with oxycodone prescriptions.  She only then

17  spoke to the store manager Lee who she had she was told there

18  was a shortage of oxycodone and he was stocking up.

19          Now Christina Chai only told the agents that she

20  passed the phone to Ji.  She never told the agents that she

21  provided any kind of information to the distributor or had any

22  conversation whatsoever.  You know this explanation is entirely

23  untrue.  There was no increase in Medicaid customers in

24  October 2011.  Look at the BNE data, Government Exhibit 1005.

25  The number of oxycodone prescriptions certainly increased from

E9JTCHA2                    Summation - Mr. Tehrani

1    September to October when the call occurred by over 40 percent,

2    that's a 40 percent increase in one month.  But the number of

3    oxycodone prescriptions paid for by insurance actually dropped.

4    Look at the percentage paid for in cash.  It doubled from

5    September to October.  This had absolutely nothing to do with

6    Medicaid, nothing to do with insurance.  Why was Stanley

7    Pharmacy ordering so much oxycodone?  Because a bunch of drug

8    addicts and drug dealers were paying cash to trade bogus

9    prescriptions for pills.

10        Ladies and gentlemen, Christina Chai knew exactly what

11   was going, and she was filling all the prescriptions.  When she

12   was confronted about it, she told a story that couldn't be

13   further from the truth.  This had nothing to do with Medicaid,

14   it had everything to do with Ed and Mike Girdauskas and Michael

15   Penzo.

16        Now despite all this evidence, despite prescription

17   after prescription, drug deal after drug deal occurred every

18   day for over a year, red flag after red flag, and Ms. Chai's

19   own admissions, Mr. Agnifilo told you during his opening that

20   she was not involved.  Involved means involved is what he said.

21   Exactly.  Except that he suggested being involved means only

22   having conversations with the oxycodone customers, and because

23   Ji was the one who met with the customers, he was the only one

24   who was involved.  That, of course, is not true.

25        Here's an example:  Imagine you go out for dinner.

E9JTCHA2                    Summation - Mr. Tehrani

You walk into a restaurant and you talk to the host, the
hostess, and give your name, and there's a wait.  So maybe you
go to the bar and have a drink.  Then at some point the host or
hostess comes over to you and shows you to the table and you
sit down and someone brings some water, maybe some bread.
Eventually the waiter comes over and tells you about the
specials, then you order.  At some point your meal comes.  You
eat.  The waiter comes over and takes away your plates, then
you order dessert, maybe have some coffee.  Eventually the
waiter comes over and gives you the check and you pay.  You get
up.  At no point did you say word one to the chef.  You didn't
even see the chef.  In what world was the chef not involved in
preparing your meal?  In fact, imagine a dinner where there was
no chef involved in preparing your meal.  You would leave
pretty hungry.

          Of course Ms. Chai was involved.  This scheme doesn't
work without a pharmacist who is involved, a pharmacist willing
to fill bogus prescription after bogus prescription of
oxycodone, and that's exactly what Ms. Chai did.

          Ladies and gentlemen, Christina Chai is not standing
trial here because she's a bad pharmacist.  She's not standing
trial because she wanted to make her family happy.  Christina
Chai is guilty of a crime.  She knowingly gave oxycodone to
customers with bogus prescriptions and she's guilty.

          Now let's talk about Hi Jong Lee.  He's charged with

E9JTCHA2                    Summation - Mr. Tehrani

three crimes:  First, the same narcotics conspiracy as

Christina Chai; second, he is charged with conspiring to

launder the proceeds of illegal narcotic distribution; and

finally, he's charged structuring or engaging in past

transactions to avoid the requiring filing of a currently

transaction report or CTR.

        Let's talk about the narcotics conspiracy.  How do you

know that Hi Jong Lee, the owner of the pharmacy, knew what was

going on, that he knew that the pharmacy was selling oxycodone

pursuant to illegitimate prescriptions, that he participated in

this conspiracy?

        First of all, you know that he was at the pharmacy.

He came in during the week to do payroll.  Ms. Padilla told you

that.  And he admitted it.  He did the banking for the

pharmacy, bookkeeping.  He admitted that, too.  He also

admitted that he was the only pharmacist on Saturdays.  You

know that from Ms. Campos as well.  Just Hi Jong.  He's there

with his son Ji and his daughter Christine, neither of whom

were pharmacists.

        Here are some of the oxycodone prescriptions with the

Hs written on them.  We'll get back to these in a minute.

        He's not new at this.  He's been the owner of Stanley

Pharmacy for 30 years.  He knows exactly what he's doing, how a

pharmacy should be run.  He knows how this pharmacy should be

run, how much money this pharmacy makes, how much cash this

E9JTCHA2                         Summation - Mr. Tehrani

1   pharmacy takes in.

2           Now let's go back to these H prescriptions, the H

3   initials for a minute.  Mr. Osborn, the defense's handwriting

4   expert, opined the handwriting with the Hs probably aren't Hi

5   Jong's, that someone else wrote on prescriptions.  But he also

6   said a couple of other things.  First, he had no idea whether

7   one person wrote the information and Hi Jong Lee wrote the H.

8   But much more importantly, he has nothing at all to say about

9   whether Hi Jong Lee authorized anyone at the pharmacy to fill

10  prescriptions and write his initials.  But you know he did.

11  You know that he left the pharmacy completely unattended by a

12  pharmacist on Saturdays.  You know that he knew there were

13  patients on Saturdays.  You saw video of him on one occasion on

14  the pharmacy floor.  But he disappeared into the basement or

15  was out to lunch for most of the day.  So of course he

16  authorized his children to fill prescriptions and sign his

17  name.

18          Another point on that, that's something he didn't

19  mention in his statement to law enforcement.  Remember, he told

20  them that he was the only pharmacist on Saturdays.  But he

21  didn't mention that that really meant that there was no

22  pharmacist on Saturdays.  Because with Hi Jong Lee in the

23  basement, there was no one at the pharmacy who was legally

24  authorized to dispense medication.  And Hi Jong Lee knows that.

25  He didn't forget that his son was not a pharmacist.  He didn't

E9JTCHA2                         Summation - Mr. Tehrani

forget that his daughter was not a pharmacist.  Hi Jong Lee is
agreeing with his children, people who are not authorized by
law to distribute any controlled substance, to do just that.
Ladies and gentlemen, that is a conspiracy to distribute
controlled substances whether or not he knew that the
prescriptions were bogus.

         As I expect Judge Crotty will instruct you, when a
pharmacist agrees with someone who is not allowed to dispense
controlled substances to dispensed controlled substances
without any pharmacist supervision, that is an unlawful
conspiracy to distribute drugs.  And that, at a minimum, is
what happened here.

         You also know that Hi Jong Lee knows exactly what is
going on at the pharmacy.  How?  Well, you know that these
oxycodone deals happened right while Hi Jong Lee was literally
at the side counter.  Look at Government Exhibit 714E2
January 5, 2013, a Saturday.  That's Michael Penzo sitting at
the side counter, Hi Jong Lee also sitting at the side counter,
behind the side counter.  What happens?

         (Video recording played).

         MR. TEHRANI:  Ji Lee comes over and gives Michael
Penzo the oxycodone right next to his father.  Ji didn't tell
Penzo to go to the other side of the pharmacy where he also
handed out oxycodone.  He didn't tell him to come back at a
later date.  He didn't tell him they didn't have any oxycodone.

E9JTCHA2                         Summation - Mr. Tehrani

1   He gave the oxycodone to Michael Penzo literally right next to

2   Hi Jong.  Is that what you expect if this was a secret business

3   that only Ji knew about if Ji was doing everything that he

4   could to keep the illegal oxycodone dealing from his father?

5   Of course not.  This was obvious.  This was open.  Hi Jong Lee

6   knew.

7            Then the ledgers.  Government Exhibit 40.  Special

8   Agent Soo Hoo talked about these.  They were found in the

9   basement office of the pharmacy where, as you know, Hi Jong Lee

10  spent most of his Saturdays, and usually a couple times -- once

11  or twice during the week doing payroll and doing banking.

12           What else was in that office?  There are bank

13  statements with Hi Jong Lee's name on them and also payroll

14  records.  And you heard no testimony, no testimony whatsoever

15  that Ji Lee ever worked in that office, that he spent any time

16  in that office.

17           What does this ledger show?  Banking records.  Special

18  Agent Soo Hoo explains columns one through three correspond to

19  banking transaction with the Stanley Pharmacy bank account at

20  Bank of America, wire deposits.  In this month, January 2012,

21  column two correspond with the bank deposits.  Column four

22  shows the number of prescriptions filled that day.  Sometimes

23  off by one or two, but usually exactly right.  They match up

24  with the daily audit reports Government Exhibit 45.  And the

25  final column, that corresponds to the daily revenue from

E9JTCHA2                    Summation - Mr. Tehrani

insurance payments.  Not all revenue, just insurance.  And
again, that's from the daily audit reports, Government
Exhibit 45.  Ladies and gentlemen, this is a very specific and
detail accounting of exactly what was going in the pharmacy on
a daily basis, which at a minimum was in open view in the
defendant's office, an office that you know he used.

          How else do you know that Hi Jong Lee knew exactly
what was going on?  He's more than just a pharmacist, he's the
owner.  He's the one who stands to profit most from the scheme.
Look at the cash that just started pouring in in 2011.  He's
the owner of the pharmacy for 30 years and all the sudden cash
starts pouring in.

          This is the bank account for the store, the name is on
the account, Government Exhibit 602.  He and his wife are the
only authorized signers.  Not Ji Lee, no one else.  Look at the
balance, it's the blue line.  It just keeps increasing and
increasing, this Government Exhibit 1009, from about $200,000
to about $800,000.

          Look at Government Exhibit 1008.  These are the total
monthly cash deposits.  At no point prior to January 2012 was
there ever a month where the total deposits were more than
$100,000.  Never.  In July 2011, the total cash deposits were
only $22,000.  Then after January 2012 there's over $100,000 in
cash deposits in every month.  Every month.  That's Hi Jong
Lee's bank account.  That's not something that happens by

E9JTCHA2                    Summation - Mr. Tehrani

1    accident.  That's not something that goes unnoticed.  Think

2    about that.  You don't not notice $100,000 in your own bank

3    account.

4            What's also increasing?  The oxycodone dispensed at

5    the pharmacy, that's the middle one.  Let's focus on the period

6    from July 2011 to December 2012, a year and a half.  Oxycodone

7    out, cash in.

8            And you heard from Special Agent Polimeno exactly how

9    much money the pharmacy took in from the oxycodone

10   prescriptions.  That's Government Exhibit 1086.  That's just

11   the cash oxycodone from specified doctors.  There's more

12   prescriptions, this is just from 22 doctors.  $1.3 million.

13   You don't just miss $1.3 million.  It's a little over a year.

14   It's not a rounding error.  And the vast majority of that is

15   going straight into Hi Jong Lee's bank account.  It's not even

16   possible that he didn't notice.  Not even possible that he

17   didn't know what was going on.  He owned that store for 30

18   years, now from late 2011 through 2012 he is getting $1.3

19   million in cash.  And he doesn't know?  Of course he does.  Of

20   course he does.

21           By the way, who is paying for that oxycodone?  He is.

22   The Amerisource records, the Bank of America records in

23   Government Exhibit 1102, that's a stipulation, they make clear

24   that the oxycodone is being paid for from that bank account, Hi

25   Jong Lee's bank account.  As you heard, he's the one who does

1    the banking.  It's not as if he doesn't know about that.  He's

2    the one making the transactions.  He's depositing the money.

3    You heard that he said that to law enforcement.

4           You heard from a Bank of America Getty Square branch

5    manager.  She told you he was in the branch multiple times per

6    week and was not aware of anyone else who ever did any

7    transactions on behalf of Stanley Pharmacy.  You also heard

8    that from Kadene Gayle, the teller supervisor who worked in the

9    same Getty Square branch in 2011.  She told you she saw

10   Mr. Lee, an elderly Asian male, make deposits, and did not know

11   of anyone else that made any transactions on behalf of Stanley

12   Pharmacy.

13          Now I want to talk about these deposits for a moment.

14   They're important for a couple of reasons.  First, they show

15   beyond a reasonable doubt that the defendant engaged in

16   financial structuring and is guilty of Count Three.  As

17   Ms. Gayle and Ms. Maia explained, and I expect you'll hear from

18   Judge Crotty, a bank is required to file a Currency Transaction

19   Report or CTR for all cash transactions of $10,000 or more.

20          To be clear, there is nothing illegal about making a

21   cash transaction of $10,000 or more.  It just means that a

22   report will be filed.  What is illegal is structuring

23   transactions so as to not trigger that CTR requirement, that

24   reporting requirement, like a $9,900 deposit or an $8,000

25   deposit followed by a $3,000 deposit, holding off to make a

1    deposit to avoid a deposit greater than $10,000, anything done

2    with the intent to avoid a CTR.

3           Which brings us back to Kadene Gayle.  She used to be

4    a teller at the Getty Square Bank of America.  That's the

5    branch right next door to Stanley Pharmacy where the pharmacy

6    has a business account.  She told you Mr. Lee did most if not

7    all the transactions on behalf of Stanley Pharmacy.  You know

8    from her description of who that is, that's Hi Jong Lee.

9    Ms. Gayle told you that she knew that Mr. Lee was routinely

10   making transactions close to $10,000 but never $10,000.  Here's

11   her testimony:

12   "Q. Did you recall, other than Mr. Lee, anyone else either

13   making transactions on behalf of Stanley Pharmacy?

14   "A. No.

15   "Q. Did you make any observations about the types of

16   transactions that Mr. Lee engaged in?

17   "A. Yes.

18   "Q. What did you observe?

19   "A. They would never be 10,000, they would always be like

20   9,700, but they would never be over."

21          Now I want to talk about that for a second, because

22   Mr. Riopelle has suggested that these transactions might have

23   been drops by some unknown person and not Hi Jong Lee.  But

24   Ms. Gayle's testimony make clear that is simply is not the

25   case.  It was not some unknown person making the night drops of

E9JTCHA2                    Summation - Mr. Tehrani

1    $9,000 in cash, it was Hi Jong Lee, the owner of Stanley

2    Pharmacy, the person responsible for pharmacy's banking, who

3    made these $9,000 deposits in person over and over again.

4           Then Ms. Gayle told you about one transaction, about

5    the time that the defendant came into the bank to make a cash

6    deposit, and at first he gave Ms. Gayle approximately $9,000.

7    Then he gave her a $2,000 deposit, a total of over $11,000.

8    Because Ms. Gayle viewed that as one transaction, she asked

9    Mr. Lee for his ID because she was going to write a CTR.  What

10   did Mr. Lee do?  Did he give her his ID?  No, he pulled back

11   the $2,000 deposit.  Why?  Because he didn't want the bank to

12   file a CTR.

13          Here's the transcript:

14   "A. He came in to make a deposit with cash, and it was about

15   $9,000.  Once the deposit slip was completed he handed me

16   another deposit for about $2,000.  I then asked him for his ID,

17   he asked to see the deposit, and he took it back."

18          Ladies and gentlemen, that testimony standing alone

19   makes the defendant guilty of Count Three.

20          Just a couple words about that, because Mr. Riopelle

21   suggested to you in his opening that if you don't find that Hi

22   Jong Lee engaged in structuring or committing other crimes or

23   was part of pattern involving over $100,000 in a twelve-month

24   period, then he's not guilty of a crime.  As I mentioned, Judge

25   Crotty will explain the law to you, and you should of course

E9JTCHA2                    Summation - Mr. Tehrani

1    listen to his instructions, but what I expect he'll tell you is

2    that it's not necessary to find either of those things in order

3    to find the defendant guilty of Count Three.

4          Now as I will get to, the structuring certainly did

5    occur during the course of the unlawful oxycodone distribution,

6    and of course was for more than $100,000 in 2012 alone.  But if

7    you find that Hi Jong Lee structured a single cash transaction

8    on one occasion with a purpose of evading a CTR without any

9    knowledge of the source of that money, he is guilty of Count

10   Three.  Full stop.  What Ms. Gayle told you Hi Jong Lee did is

11   the crime of structuring.

12         Let's look at more of some of Hi Jong Lee's deposit.

13   Government Exhibit 1007, that's it the chart of cash deposits.

14   Let's start with November 2011, seven transactions.  Now as

15   Special Agent Soo Hoo explained, the vast majority of the New

16   Jersey deposits while Hi Jong Lee was not in the country, so

17   let's ignore those.

18         Five transactions, each transaction $9,000 or over,

19   every one.  Look at June 2012, 20 transactions, 15 days, all at

20   Getty Square.  Five transactions over $9,000, another five days

21   where the total transactions are over 9,500.  Ladies and

22   gentlemen, that's over $95,000 right there.  If you're willing

23   to assume that the only structured transactions are the ones

24   over $9,000, that's $95,000 in a single month.  These two

25   months alone are way over $100,000, let alone the rest of the

1  year.  Again, just look at the monthly deposits, every single

2  month in 2012, there are cash deposits over $100,000.  What do

3  you not see on any of these charts?  Ever?  Not a single cash

4  deposit over $10,000.  Not one.  Almost 300 transactions and

5  deposit after deposit after deposit over $9,000 but not a

6  single transaction ever over $10,000.  That's simply not a

7  coincidence, that's intentional, that is structuring.

8       And how else do you know that he's structuring?

9  Special Agent Soo Hoo walked through the analysis of the held

10  back deposits.  These are deposits purposefully not deposited

11  until the total deposit on a given day is less than $10,000.

12  Government Exhibit 1010.  I want to point out one thing about

13  this chart.  We walked through a December 2011 transaction.

14  That is actually a typo.  The Friday, December 2nd, 2011

15  handwritten date is actually Friday, December 21st.  So this is

16  not an example of the held back transactions, but there are

17  plenty more.

18       Take a look at February 2012.  Handwritten deposit

19  February 10, 2012, deposited on February 16, 2012.  There is

20  the actual deposit slip, February 10, $6,810.  And there's the

21  electronic deposit for that deposit, electronic record for that

22  deposit, $6,810 deposited February 16, six days later.

23       That February 10 deposit wasn't deposited until

24  February 16, 2012, even though he was at the bank numerous

25  times between the 10th and the 16th.  It wasn't deposited on

E9JTCHA2                          Summation - Mr. Tehrani

1    the 13th, it wasn't deposited on the 14th, it wasn't deposited

2    on the 15th, even though on the 15th he actually made two

3    transactions, two cash deposits.  Why not?  Because depositing

4    an additional $6,000 on any one of those days would have pushed

5    the total way over $10,000, so he held it back.  He waited for

6    a day when there was no other transaction to make, no other

7    deposit that would have pushed the total over $10,000, and this

8    is what happened again and again and again, each time

9    highlighted in yellow.  That is structuring.

10          Another point about these what charts show is they

11   were not nightly deposits.  Take a look at the May and June

12   page.  How did you know these Saturday deposits were not

13   deposited in the nightly mail drop, that a $9,000 deposit

14   wasn't put in a nightly mail drop?  Because they're deposited

15   on Monday at the same time as a deposit, the deposit slip dated

16   on Monday, or were deposited on Tuesday with a deposit slip

17   dated on Tuesday.  Look at what times these occurred, the vast

18   majority of them, 9 o'clock in the morning, 9:20, 9:39.  You

19   know those money deposits are done in person.

20          Ladies and gentlemen, these are Hi Jong Lee's

21   deposits.  The evidence is simply overwhelming that the

22   defendant is guilty of Count Three, that he structured

23   transactions to avoid the filing of CTRs and he structured well

24   over $100,000 just in 2012.

25          Now the defense suggested Mr. Lee is an

E9JTCHA2                        Summation - Mr. Tehrani

1    unsophisticated dupe who trusted his son and was tricked into

2    drug dealing and structuring cash deposits.  You know that's

3    not the case.  You have seen Mr. Lee's financial records.  He

4    knew what he was doing.  He has a sophisticated diversified

5    portfolio over numerous banks.  He's not stupid.  You know he's

6    involved in the operation of the pharmacy.  He's in charge of

7    payroll and also responsible for banking and bookkeeping.  He

8    admitted that.  He's owned the pharmacy for 30 years.  It's his

9    business.  He's not the son's pawn.

10          And frankly, Ms. Gayle's testimony puts the lie to

11   this entire argument.  Hi Jong Lee went into the bank with two

12   deposits.  Hi Jong Lee thought he could divide the $11,000 into

13   two to avoid the CTR.  Hi Jong Lee decided to pull back money

14   when Ms. Gayle asked him for his ID.  Hi Jong Lee is guilty of

15   Count Three.

16          And what else does the structuring of the cash deposit

17   tell you?  It is powerful evidence that the defendant knew

18   exactly what the source of that money was.  Remember, there's

19   nothing illegal about making $10,000 transactions.  But if you

20   know that that money is the proceeds of something illegal, if

21   you know it's drug money, you don't want reports about it.  You

22   don't want any attention at all.  So what did Hi Jong Lee do to

23   avoid scrutiny?  He structured his deposits so that Bank of

24   America would not file the CTRs.

25          So of course Hi Jong Lee knew exactly what was going

E9JTCHA2                        Summation - Mr. Tehrani

1    on at the pharmacy.  He knew how the pharmacy was supposed to

2    operate.  He's the one who profits most from the drug dealing.

3    He knows he has more cash than he knows what to do with, and

4    he's structuring his cash transactions so no one is asking

5    where he got that much cash.  He is guilty of Count One.

6         I want to talk about another defense offered by

7    Mr. Lee.  The defense has painted two very different pictures

8    of Hi Jong Lee's relationship with his son.  First, he tried to

9    make it seem like he didn't have any idea what was happening at

10   the pharmacy.  He turned everything over to the son, he trusted

11   him, relied on him.  But then to explain why he was totally in

12   the dark about everything happening in the pharmacy and

13   everything happening in his own house, then it's a house

14   divided.  Then they're estranged.  He and his wife spend all of

15   their time in their bedroom, a five-bedroom home that Mr. Lee

16   turned over almost completely to his estranged son.  You don't

17   turn over your business, your pharmacy, your home to your

18   estranged son.  You don't bring lunch for your estranged son.

19   You don't run banking errands for your estranged son.  You

20   don't leave all your finances to your estranged son.  You don't

21   leave a pharmacy completely unattended by a pharmacist with

22   your estranged son in charge.

23         Ask yourselves why, ask yourself why these two

24   conflicts exists.  It's because the defendant doesn't want you

25   to believe he knew what was going on in the pharmacy because he

E9JTCHA2                        Summation - Mr. Tehrani

1    trusts his son, and he needs you to believe that he doesn't

2    know what is going on in his own house because he's estranged

3    from his own son.  Ladies and gentlemen, you know what the

4    truth is, you know whatever relationship Hi Jong Lee has with

5    his son, he knew what was going on in the pharmacy with his

6    money, with his deposits.  He's guilty.

7         Now turning to the final count, the money laundering

8    conspiracy.  As Judge Crotty will explain to you, the defendant

9    is charged with conspiring to commit two very different kinds

10   of money laundering.  First, he's charged with conspiring to

11   launder money to conceal where he was getting the money from.

12   Second, he's charged with conspiring to launder money to

13   promote the illegal ends.

14        First, you know that he knew that the source of the

15   money was laundered, because the source of money that he was

16   laundering was cash for the oxycodone.  He knew that it was

17   illegal for all the reasons that I explained, the cash, the

18   oxycodone, bogus prescriptions, the structuring, he knew that

19   the source of the money was illegal.

20        Second, you know that the source of money was in fact

21   from the illegal distribution of oxycodone.  There's no dispute

22   about it.  You know that from Penzo and from the Girdauskas

23   brothers, the doctors, these were bogus prescriptions used by

24   drug addicts to buy oxycodone.

25        You know the transactions affected interstate

E9JTCHA2                    Summation - Mr. Tehrani

1   commerce.  There's a stipulation to that effect.  The oxycodone

2   was shipped from Pennsylvania to New York.  That's enough.

3          Now how did the defendant agree to engage in financial

4   transactions to conceal the illegal activity?  Well, he knew

5   that the cash that came in for the oxycodone did not go into

6   the register, it went straight to Ji.  The reason that the

7   money skipped the register is because it was the proceeds of

8   illegal activity.  Hi Jong Lee and Ji Lee did not want it to go

9   into the pharmacy books.  Their actions were clearly designed

10  to disguise the source and nature of the money.

11         Finally, how did the defendant engage in financial

12  transactions and promote the illegal activity?  Simple.  He

13  bought more oxycodone.  You saw that from the Amerisource

14  records and from the stipulation, Government Exhibit 1103,

15  money coming from the bank account to Amerisource, money to pay

16  for more oxycodone, all to promote the illegal distribution of

17  oxycodone from Stanley Pharmacy.

18         Ultimately, ladies and gentlemen, what this trial has

19  shown is that Stanley Pharmacy was not a pharmacy, it was an

20  oxycodone mill, and that Christina Chai, the pharmacist, and Hi

21  Jong Lee, the owner, were not dispensing medication, they were

22  dealing drugs openly, brazenly, repeatedly.

23         Pharmacists serve an integral function in our system

24  of medicine.  They're the last medical professionals between

25  the medications that they are trained to dispense and patients

E9JTCHA2                    Summation - Mr. Tehrani

 1    who need them.  They're entrusted with a tremendous

 2    responsibility, to serve the public health.  But the only thing

 3    these defendants served were their customers' addictions, and

 4    they are guilty.  Thank you.

 5              THE COURT:  Ladies and gentlemen, we'll take our

 6    morning recess now, and resume in about ten minutes.

 7              (Jury not present)

 8              THE COURT:  You're going next?

 9              MR. AGNIFILO:  I am.  Could I not use the podium?  I

10    will speak loud, I promise.

11              THE COURT:  I'm all right with that.  Don't roam too

12    much.

13              MR. AGNIFILO:  I pace a little, but I'll try and

14    constrain myself.

15              (Recess taken)

16              (Jury present)

17              THE COURT:  Mr. Agnifilo.

18              MR. AGNIFILO:  Thank you, your Honor.

19              Good morning, your Honor, colleagues with the

20    government, ladies and gentlemen.

21              So you go to a restaurant and you go in, you sit down,

22    the waiter comes over, and the waiter looks vaguely familiar,

23    and he gives you sort of a long, hard look and you look back at

24    the waiter, and it seems that you know him from somewhat but

25    you don't know.  What you don't know but the waiter knows is

E9JTCHA2                        Summation - Mr. Agnifilo

1    that way back in high school you dated his girlfriend, so he's
2    going to get even.  You order a burrito, you like burritos, the
3    chef makes you a nice big burrito with rice and beans and
4    salsa, nice big burrito, and the chef makes it, it's the
5    special one for the day.  The waiter takes a little something,
6    puts it in the burrito to make sure that you'll be spending the
7    next few hours in the men's room.

8          Was the chef involved?  Of course not.  The chef made
9    the burrito.  The waiter committed the crime.  The chef didn't
10   commit the crime by making the burrito.  The waiter used the
11   burrito.  The waiter took what the chef made and he made it
12   into something different.  He made it into a way of him getting
13   something that he wanted to to do.  What did the chef want to
14   do?  The chef wanted to make you a burrito.  The chef came to
15   work that day to be a chef.  The chef came to work that day to
16   prepare food.  The chef came to work that day to do what chefs
17   do day in and day out, which is to make food in a restaurant at
18   that particular time with that particular waiter -- sorry with
19   that particular customer.  The waiter and the waiter alone did
20   something wrong.  And just because the waiter and the waiter
21   alone did something wrong does not make the chef criminally
22   involved.  Is the chef involved in making your dinner?  Yeah,
23   he's involved in making your dinner.  That's not the crime.
24   He's not involved in putting something in your food.  That's
25   the waiter.

E9jzcha3                    Summation - Mr. Agnifilo

1              MR. AGNIFILO:  Now, what do we have in this case?  If

2      you boiled this case down to its bear essence, what you have in

3      this case is this:  A bunch of -- and I don't mean to be

4      judgmental -- a bunch of pretty bad guys.  I don't know if

5      they're bad in some religious sense, but they're criminals.  A

6      bunch of criminals conspired together to do things with

7      prescriptions for their own reasons, because they're addicted

8      and because they want to sell it and make money.  And so they

9      did things like using brake fluid and rubbing alcohol and all

10     these outlandish things for their own reasons.

11             And at the end of the day why is Christina Chai here?

12     Because she didn't catch them.  That's it.

13             My colleague, who is a very talented lawyer, who gave

14     a very good summation, he didn't talk about two really critical

15     things that I'm going to talk about; intent, intent, criminal

16     intent.  This is not a knowledge test.  The only issue in this

17     case is not knowledge.  The Judge is going to give you

18     instructions on the law.  And he's going to tell you that a

19     conspiracy, a criminal conspiracy is an agreement between

20     different people.  It has to be the specific intent of the

21     person to be guilty, to further that criminal agreement.

22     That's what this is about.  There was not a word in the

23     Government's summation about intent, not a word, nothing.  And

24     do you know why?  Because there is no, and I mean no, there is

25     no evidence of criminal intent on Christina Chai's part at all.

E9jzcha3                    Summation - Mr. Agnifilo

Nothing.  Not a single thing.  They have to prove intent beyond
a reasonable doubt.  They can't profit at all.  There's nothing
to suggest intent, much less proof beyond a reasonable doubt.

What did Christina Chai do?  Christina Chai was the
chef.  She came to work every day to be a pharmacist.  That's
what she wanted to do.  She's no different than Miriam Padilla,
she's no different than Ixchel Campos.  She came to the
pharmacy to do her job, to be a pharmacist, to be a pharmacy
employee.  That's what she did, day in day out.

There's nothing in the case that suggests anything
other than that.  She wanted to be a pharmacist.  She gave you
a little bit of background why.  She told the Special Agent her
mother wanted her to be a pharmacist, it was a dream of her
mother's and she became a pharmacist; first somewhere else, and
then at the Stanley Pharmacy.  So she's going to work every day
to be a pharmacist, not to be a criminal, not to be a drug
dealer.  To be a pharmacist.  But there's a problem.  It's not
a problem she created, it's not a problem she caused, and it's
not a problem she's responsible for.  The problem is that Ji
Lee transformed a perfectly good pharmacy with perfectly good
and honest and law abiding pharmacy employees, and for his own
reasons, reasons related to money, money, he transformed the
Stanley Pharmacy into a place where he, he and he alone,
distributed illegal drugs, and for which he and he alone got
money.  The evidence in this case is clear, Christina Chai went

E9jzcha3                    Summation - Mr. Agnifilo

1    there and she made a salary.  She made the same salary day in

2    and day out.  She didn't get extra.  They didn't give her

3    anything under the table for being involved in the conspiracy.

4    She went there to be a salaried employee, just like the

5    cashiers.

6            So who is getting something out of this?  Only one

7    person that you heard about, and it's Ji Lee.  Ji Lee is

8    getting something out of this.  He's selling oxycodone

9    illegally, he and he alone.  He is getting the money from

10   selling oxycodone illegally, he and he alone.

11           One thing now -- when we're all down with our

12   summations, his Honor is going to give you jury instructions.

13   I'm going to read a part of what he's going to read you, but

14   keep in mind he's going to give you the whole instruction, I'm

15   going to give you a little bit.  Why am I going to give you a

16   little bit?  Because I want to show you how the facts interface

17   with the law because that at the end of the day is really what

18   your job is going to be about.  So I'm going to give you one

19   quick little blurb on a jury instruction.

20           "In sum, in order to be a knowing and intentional

21   participant in the unlawful agreement that is to say, a

22   conspirator, Ms. Chai and Mr. Lee, with an understanding of the

23   unlawful character of the conspiracy, must have intentionally

24   engaged, advised, or assisted in the conspiracy --" ready --

25   "for the purpose of furthering an illegal undertaking."  It has

E9jzcha3                    Summation - Mr. Agnifilo

1    to be her purpose.  She has to have the specific objective of

2    breaking the law, not of being a pharmacist.  That has to be

3    what she wants, to be guilty of the conspiracy.  This has to be

4    what she wants to bring about, and there's no evidence of that.

5           And I suggest to you the evidence that you've heard in

6    the last two weeks suggests the exact opposite.  And I'll tell

7    you why.  Ji Lee went to great lengths to conceal his illegal

8    activity, to conceal it.  He didn't want Christina to know it,

9    he wanted to conceal it from her.

10          There's nine reasons, I want to give you nine

11   different ways that Ji Lee concealed his illegal activity.

12          Reason one.  He had conversations in private with the

13   regulars; conversations in private.  Now, the government kind

14   of suggests, and it's with all due respect it's a little bit

15   illogical, and it doesn't make a lot of sense, that the mere

16   fact that these suspicious conversations are going on in

17   private that Ms. Chai was not involved in, is somehow proof of

18   involvement; that because she's not involved in the

19   conversation, there is an illegal drug dealing in the pharmacy

20   in which she's involved.  That doesn't make any sense, and let

21   me show you why.

22          You guys are very much involved in this trial.  You're

23   key components to this trial.  Every once in awhile something

24   happens in this courtroom that you're not involved in, and you

25   know you're not involved in it.  You know why you're not

E9jzcha3                    Summation - Mr. Agnifilo

1    involved in it?  Because we come over here and we talk without

2    you.  We go to the side.  We go to the side, because every once

3    in awhile you're not a participant in certain aspects of the

4    proceedings that we are having here.  You're not involved.

5            Now, is it somehow evidence of involvement that we're

6    off to the side?  No.  It's the exact opposite.  It shows to

7    you that this part, when we're off to the side, doesn't concern

8    you; it's none of your business.  It's what we're doing.  And

9    in that particular thing, you don't have to worry about it,

10   because you're not involved in it.

11           It's the same thing at the pharmacy.  If she was

12   involved, if Christina was involved, Ji would be having this

13   conversations with her.  That's what coconspirators do.  But

14   she's not involved.  So Ji has them without her.  So that's the

15   first way you know.

16           Second way.  There is a lot of oxy being sold when

17   Christina's not there -- not exclusively.  There is a lot of

18   oxy being sold when she's there too, but I'm going to show you

19   in a minute there is a disproportionately high amount, a

20   disproportionate percentage of oxy that's sold when she is not

21   there.  There's oxy sold before the pharmacy opens.  I think

22   Special Agent when he testified said that on at least two

23   occasions he saw customers go in and come out before 9:00

24   o'clock before Christina got there.

25           There is a lot of oxy being sold after she leaves at

E9jzcha3                    Summation - Mr. Agnifilo

1   6:00 o'clock.  So Ji is doing this without her, to a very large

2   extent, because he's doing it times when she's not there.

3          Ji holds prescriptions.  We heard testimony about

4   this.  The regulars, some of them testified they would come in

5   with 30, 20, a lot of prescriptions all at one time and Ji

6   wouldn't put them all through at once.  He would hold them, and

7   he sort of give out a few at a time, a few at a time, few at a

8   time.  Why?  Why is he doing that?  Because otherwise Christina

9   would know for sure.

10         Now, listen, I'm kind of jumping a little.  She said

11  she was suspicious, and she was suspicious, but Ji doesn't want

12  to put it in her face.  Ji doesn't want her to know, so he sort

13  of manipulates it.  Ji is, um, the gatekeeper.  When it comes

14  to the prescriptions, Ji gets them and he dishes them out, you

15  know, little by little, so that no real real screening red

16  flags go out.  There is a lot of oxy, there is a lot of oxy,

17  and I'll get to that in a minute.  But he's not going to send

18  30 out at once.  Why not?  What's he afraid of?  He's afraid

19  that it's just going to be too blatant.  He's not going to be

20  that blatant.  So Ji, it's another way of Ji trying to conceal

21  from Christina what Ji and Ji alone is doing.

22         Number four.  Ji, himself, counts the oxy pills.  Why?

23  why would he do that?  He has a pill counter.  Christina's a

24  pill counter.  That's what she does day in and day out.  She

25  sits there with a little pad.  She counts pills, she counts

E9jzcha3                    Summation - Mr. Agnifilo

1    pills.  She puts them in the thing, she puts them in the box

2    she counts pills, she counts pills, she counts pills.  Why is

3    Ji counting oxy?  Because it's a fair amount, and if Christina

4    was counting it she would he have a clearer idea of what he is

5    doing, so he counts the oxy himself.  There is no other reason

6    for him to count the oxy himself, but he counts the oxy

7    himself.

8            Number five, related to number four.  He comes up with

9    a reason that he's counting the oxy himself.  Because by itself

10   would be suspicious.  Listen, Christina, you're going to do the

11   percocet, you're going to do all the other schedule twos,

12   you're going to do everything, in fact, but I'm going to do the

13   oxy.  Why?  What's the reason?  He gives a reason; because

14   there have been mistakes in the past.  That's Ji's reason,

15   there's been mistakes in the past with the pill counting.  So

16   I'm just going to count the oxy myself.  So he counts the oxy

17   and he comes up with a reason.  Because he's keeping it from

18   her.

19           Ji ordered all the prescriptions.  This is very

20   important, because those ARCOS charts where the line for

21   Stanley Getty is through the roof, Christina has no role in

22   that.  She's not ordering the stuff.  Ji's ordering the stuff.

23   Ji orders all the pharmaceuticals.  The evidence is very clear

24   on that.  Christina's not doing it.  So when you see all of the

25   oxy being ordered, yeah, a lot of at oxy is being ordered; Ji's

E9jzcha3                    Summation - Mr. Agnifilo

1   doing the ordering.

2        Number seven this disproportionately high number of

3   false prescriptions with the H on them rather than the CC.  And

4   for this we're going to look -- I'm not going to pull up any

5   exhibits this is -- go in the back.  It's government exhibit

6   1087.  And what government Exhibit 1087 is -- and you remember

7   seeing it, you saw a lot of charts -- there are two doctors on

8   a chart.  And what the DEA did is they basically tried to

9   segregate what the problematic prescriptions were from the non-

10  problematic preparations, and then they broke it up even

11  further by doctor.  So this is the chart.  It looks like --

12  well nothing really written on it.  It looks like this, and

13  basically it's just a list of doctors.  So let just point to a

14  few.  Dr. Kramer.  There are 56 fraudulent oxycodone

15  prescriptions that are paid with cash.  That's one of the

16  things on the chart.  Of the 56, 51 have an H; 51 have an H out

17  of 56.  Now, keep something in mind.  Christina works 45 hours

18  a week.  She works nine hours a day, five days a week.  The

19  pharmacy's also open on Saturdays.  So she's working at least

20  five sixth of the times.  So you would expect if there was a

21  natural distribution of the selling of the oxy, you would

22  expect that she put the CC on 87 percent of all the oxy,

23  because that would be a natural distribution five days out of

24  six day week -- although I'm not sure that on Saturdays they

25  worked as late, but let's just say five sixth, 87 percent.

E9jzcha3                    Summation - Mr. Agnifilo

1    What's the actual percentage?  It's actually far less.  It's

2    59.9 percent, so 59.9 percent of the time there's a CC and

3    38.5 percent of the time there's an H.  Natural progression, it

4    should be 13 percent of the time that there is an H.  What does

5    it mean?  It means Ji isn't certainly -- is doing it while

6    she's there, no doubt, because 59 percent of the prescriptions

7    have the CC, so she's there.  But considering that she's there

8    45 hours a week, nine hours a day, five days a week, you would

9    expect it to be more.  So what Ji's doing, he's doing more when

10   she's not around in terms of a proportional sense.

11        So Ji, again, he's doing a lot of it on his own time.

12   He's doing a lot of it either while -- he's putting Hs on the

13   prescription pads either while Christina's in the store or

14   after hours during the week.  Because one of the things you see

15   in the Government's Exhibit 1087, at least for Dr. Kramer, 56

16   total prescriptions, 44 out of 56 are approved by H on a week

17   day, approved by H on a weekday.  Now there is no indication

18   that Mr. Hi Jong Lee works on weekend.  So how are you getting

19   all those Hs on weekdays?  It's a lot.  It's an unusually high

20   percentage, and across the board it's always a higher

21   percentage.

22        Number eight.  One of the more important, I suggest,

23   pieces of evidence is Government's exhibit 57.  It's a daily

24   audit report specifically for oxycodone.  A lot of daily audit

25   reports are for the day, you know, what the pharmacy did on

E9jzcha3                    Summation - Mr. Agnifilo

August 3rd or August 10th or whatever.  But this is one

specific for oxycodone.  And where is it?  It's at Ji's house.

It's at Ji's house.  So, again, this isn't something that's out

in the pharmacy that he wants Christina to see.  It's at his

house.

          And the final thing, and it seems like a little thing,

reason number nine, but I suggest that it means something.

He's putting cash in the bag.  Why is he putting it in a bag?

Think about who is he concealing it from?  The cashiers know

that it's cash.  They're the ones who took it from Mike

Girdauskas or Ed Girdauskas or Michael Penzo or whomever is

bringing in the cash.  So he's not concealing it from the

cashiers because they took the cash from the customer.  It's

Ji's cash.  He knows it's coming.  So the cashier knows it's

cash.  Ji knows its cash.  Who doesn't know it's cash?  She

doesn't know it's cash.  She doesn't know it's cash so he puts

it in a bag, so as not to just put cash into the little basket

that goes in the back.  Why put it in a bag?  Put a rubber band

around just, put it in the bag without -- put it in the basket

without a bag.  He's concealing it from Christina.  And in

conjunction with the other eight things, what you are seeing is

that Ji doesn't want Christina to know.  It's affirmative

evidence of a non-conspiracy.  It's a affirmative evidence that

there is no agreement.  It's affirmative evidence that he's

doing this on his own, he's trying to keep it from her.  He

E9jzcha3                    Summation - Mr. Agnifilo

1    doesn't want her to know.  And she's certainly not involved.

2    She would be the worst conspirator in the history of

3    conspiracies.  Some way to treat your partner, some way to

4    treat your team mate, some way to treat your coconspirator;

5    keep her in the dark like that.  Shame on Ji.  It's ridiculous.

6    She's not involved.  This is Ji.  This is Ji and Ji alone.  He

7    doesn't want her to know.

8         What's very apparent here is that Ji used this

9    business.  He used the apparatus of the business.  He used the

10   personnel of the business.  He used the cashiers just like he

11   used Christina Chai.  It's the same thing.  Ixchel Campos and

12   Miriam Padilla don't want to come to work every day and have to

13   take cash from these knuckle heads.  Really?  That's -- I get a

14   job at a pharmacy and I have to deal with these guys?  They

15   don't want that.  She doesn't want it either.  This is Ji.

16   He's doing it to all of them.  They're all in the same boat.

17   They don't want to have to deal with that.  They want to get a

18   job at a pharmacy.  They don't want to have to deal with Eminem

19   coming in, although he might have been the best of them; with

20   Mike Girdauskas coming in high out of his mind?

21        Remember what Ed Girdauskas said?  Actually, I'm not

22   sure it was Ed or Penzo.  It was one of them.  I think the

23   question was how do you feel after you have taken oxy for eight

24   hours?  And the answer was I get diarrhea, I vomit, and I'm in

25   terrible physical pain.  Who wants these guys in the store?

1    Who would want this?  Nobody wants this.

2          You really -- you saw Mike Girdauskas on the stand.  I

3    don't know if you saw it.  And maybe you saw it, you saw it,

4    maybe you.  Did you see him glaring at me?  You saw it.  You

5    saw him glaring at me.  Mike Girdauskas right here when the

6    whole thing happened; you misidentified Christina Chai, you

7    picked out Christine Lee.  And I put a picture up, he sat here.

8    If looks could kill, if looks could kill I would need medicine

9    a lot stronger than oxycodone.  He is not a nice person, and

10   he's probably extra not nice what he's whacked out of his mind

11   because he just ground up 12 oxycodone pills and snorted them

12   through his nose.  Nobody wants this in the pharmacy.  She

13   doesn't want -- really?  She wants this?  She wants this?

14   Really?  She wants to go -- she wants to go every day and deal

15   with this?  Really?  Look at her.  That's what she wants?  Of

16   course not.  Use your common sense.  Of course she doesn't want

17   it.  There's only one who wants it.  Ji wants it because he's

18   laughing all the way to the bank.  That's why he wants it.  No

19   one else is getting anything out of this.  She doesn't want

20   that.  She wants to be a pharmacist.

21          It's hard to show non-involvement.  It's just a hard

22   thing to do.  How do you show that two people aren't involved?

23   It's hard, just difficult.  It's not an easy thing to do.  I

24   suggest to you, though, in this case the videotapes show non-

25   involvement, and let me tell you what I mean.

E9jzcha3                    Summation - Mr. Agnifilo

1           DEA does a search.  They get a month's worth of
2    surveillance video, a month.  And the DEA, being good and
3    responsible agents, they go through every single minute of it,
4    every single minute for a month, day in day out, nine hours a
5    days, a month's worth of surveillance.  What does the U.S.
6    Attorney's Office play?  They can play the best, whatever.  The
7    can cherry pick.  They're going to have the whole tree of a
8    month's worth of DEA surveillance and they're going to pick the
9    best stuff that there is.  What's the best stuff that there is?
10   And we saw it ten times.  We saw, it's like the computer film
11   of this case.  We saw it ten times.  It's Ji dealing with one
12   of the regulars, and Christina doing this.  Ji's' here,
13   regulars there, Christina.  That's it.  That's the best they
14   have, in a month, in a month.  How many hours are in a month?
15   How many nine hour days are in a month?  That's a lot of
16   footage, that's a lot of footage, and that's the most guilty
17   thing she did.  She walked.  She walked from one place to
18   another.  Wouldn't you expect if she was Ji's coconspirator, if
19   they were in a conspiracy, if they were joined at the hip
20   working side by side to sell oxycodone to these guys who would
21   come in, there would be something, there would be something --
22   I don't know what it would be -- but it would more than that.
23   It would be, hey, are Ji's talking to the regular?  Christina
24   walks up right next to Ji, has a conversation.  Isn't this a
25   different case if that happened?  I mean just think for a

E9jzcha3                    Summation - Mr. Agnifilo

1    minute.  If that evidence was in this case, wouldn't that be a

2    different case?  It would be a different case.  If you had

3    video footage one time, one time, of Christina Chai rather than

4    walking by, going like this, it's a different case.  It's a

5    different ball game.  Why?  Because my good colleagues here

6    would say that's powerful evidence of involvement.

7         The opposite is true too.  The fact that that never

8    happened over a course of a month, day in and day out, is

9    powerful evidence of non-involvement.  It's the only way you

10   can prove non-involvement, and we proved it.  We proved it.

11   She is not involved.  Because there is no evidence of

12   involvement, and they certainly had enough time to try and show

13   that.

14        The Penzo videos.  Penzo went in, I don't know, ten,

15   8, 10.  And keep in mind, Penzo -- I think he has a camera on

16   his hat because certain points we saw him sort of like putting

17   his hat on, then looking straight ahead.  And he has a

18   microphone some place in his upper torso, button or somewhere.

19   So the microphone is very close to his mouth, 8 inches away,

20   6 inches away, and it's a microphone.  It's specifically

21   designed to capture everything that he says.  And so you hear

22   him sort of clearly.  You barely here Ji, I suggest to you.

23   But those are very quick cryptic conversations.  This isn't --

24   they're not long.  They're not anywhere near the level of

25   talking in a public place.  And it's also it's the kind of

E9jzcha3                    Summation - Mr. Agnifilo

1   tone, if you listen to him, it's like this, it's like ahh --

2   it's designed to be heard only by the person he's talking to.

3   He's not, he's not speaking in a social sense in an outward

4   sense to someone in the pharmacy.  It's meant specifically and

5   exclusively for Ji.  And Christina is nowhere to be seen.

6   Remember in all the videos, I think we stopped at it every time

7   we saw Christina.  What did we see?  I think we saw her arm one

8   time.  We saw her arm, one time.  So what that means is that in

9   ten times of Penzo going into the pharmacy, Christina -- there

10  is no indication Christina ever would have seen him, because we

11  never see her face.  I mean, arms are nice, but arms don't have

12  eyes.  So if we see her arm Penzo sees her arm.  That doesn't

13  mean Christina is seeing Penzo.  So for ten times Penzo's in

14  the pharmacy ten times, and it doesn't appear that Christina

15  saw him once.  So if he's in the pharmacy ten times without

16  Christina seeing him once, he could be in the pharmacy 20

17  times, 30 times, 50 times without Christina seeing him once.

18  Now we know, though, that a couple of times at least Christina

19  did see him, because she pointed out his photograph to the DEA

20  when they -- during her statement.  But in terms of just raw

21  amount of times that Christina would have seen these guys,

22  she's seeing them far far less than the cashiers.  The cashiers

23  are up front, up here, Christina's in the back I think we saw

24  some video and some photographs of what it's like.  There's

25  some shelves, but there is a lot of stuff on the shelves, and

E9jzcha3                    Summation - Mr. Agnifilo

1    specifically a lot of stuff on the shelves where Christina is

2    where she's counting her pills.  So while Ixchel Campos and Ms.

3    Padilla might have seen these guys three times a days, she just

4    didn't see him that much.

5            Okay.  There are lot of different summations one could

6    give in this case, and there is certainly a summation that one

7    could give in this case where I go on for five hours about the

8    fact that they made deals, deals to give people less time like

9    Ed Girdauskas and Mike Girdauskas and Mike Penzo.  And I

10   certainly could go on and on and on, whoa is me and our country

11   that this would happen.  But time is precious and I'm not going

12   to get into all of that because you remember it, you remember

13   it.  What does it mean, what does it mean for the case for the

14   circumstances of this trial?  I suggest to you there are times

15   when there just -- they're trying too hard.  They're trying --

16   make no mistake, they're trying very hard, using all of their

17   power, using all of their skills and all of their might and all

18   of their witnesses and they're making deals with witnesses to

19   try to convict this young woman.  And part of what they're

20   doing is they're making deals with Ed Girdauskas and Mike

21   Girdauskas and Penzo, and paying Penzo money, $25,000.  They're

22   looking the other way as official corruption is being

23   committed.  Penzo's cases are disappearing in Westchester

24   County, but that's okay, because at the end of the day we are

25   going to get Christina Chai, and that is -- that's okay.  If we

E9jzcha3                    Summation - Mr. Agnifilo

1    make a deal with Ed Girdauskas and Micke Girdauskas for washing

2    prescriptions and committing crimes throughout their entire

3    adult and probably late childhood lives to get someone who has

4    never been in trouble before, who didn't catch them -- shame on

5    you, you should've known.  You should have stopped them.  So

6    now we're going to give them deals and have them testify

7    against you.

8           So where does the government go in light of these

9    facts?  They talk at length she knew, she knew, she knew, she

10   knew, she had to know, how could you not know.  They put

11   Catizone on the stand.  Now keep in mind, Catizone is here for

12   a reason.  Catizone is flown here, given prescriptions, saying

13   people have been arrested and these prescriptions are the

14   prescriptions that we recovered, tell us how bogus they all

15   look.  And he gives an opinion.  He gives an opinion, you know,

16   that she should have known.  The thing at the end of the day is

17   no one here is saying that she wasn't suspicious.  She was

18   suspicious.  We start with that.  We embrace that.  She was

19   suspicious.  Did she know for sure?  She didn't know for sure.

20   She didn't know for sure.  And she didn't know for sure because

21   Ji didn't want her to know for sure.  One of the things that

22   really is kind of galling in this case if you think about it,

23   everybody's trying to fool her.  Everybody's trying to fool

24   her.  You have Mike Girdauskas and Ed Girdauskas and Penzo and

25   the cast of thugs from Yonkers, washing prescriptions in brake

E9jzcha3                    Summation - Mr. Agnifilo

1    fluid.  She took, she went to pharmacy school.  I don't think

2    there is a brake fluid class.  She's not learning that people

3    are going to take brake fluid, brake fluid -- where do they

4    think of this -- and they're going to take a prescription and

5    give it a bath in brake fluid, and then to take off the brake

6    fluid they're going to give it a bath in rubbing alcohol, and

7    then they're going to dry it or use a hair dryer.  She's

8    supposed to know this?  How is she supposed to know this?  She

9    doesn't know this.  She's not ready for this.  She's so over

10   her head, it's amazing.  So they're all trying to fool her.

11   They're trying to give her prescriptions that look kind of,

12   good they're trying to make them as good as possible, and Ji is

13   trying to fool her too.  Because maybe if the prescription is

14   really egregious, Ji sends it back.  I don't know which one he

15   sent back, but he sent some back.  So he tries to send it back.

16   But some of them get through.  And she didn't catch it.  That's

17   really why she's on trial.  She didn't catch it.  They fooled

18   her, the guys washing the brake fluid fooled her, and so she's

19   on trial.  Not because she got a dime, not because she wanted

20   it.  Because she didn't catch it.

21         Her second job.  She graduates pharmacy school.  She

22   works at Stop&Shop, she works at Stanley Pharmacy, and she

23   didn't catch the thugs using the brake fluid, so we're going to

24   have a trial in a federal courthouse.

25         There are certain things that made her suspicious, and

1    she told the truth to the agent about them.  Why?  She wasn't

2    afraid to.  She wasn't afraid to.  I'll tell you everything you

3    want to know.  I didn't do it.  Ji did it.  So she tells the

4    agent the truth about what she knows.  And we have to go

5    through some of them because some of them the government

6    commented on.

7            She noticed that there were more oxy 20 milligram,

8    30-milligram prescriptions than percocet.  Now percocet,

9    sometimes you see oxy 10/325, that's percocet, okay.  So there

10   is more oxy than percocet after while.  Percocet was dying

11   down, oxy was picking up and that made her suspicious, okay.

12   Now, what she told the agents -- and I submit to you what she

13   also told the Bellco people -- is that that is because

14   customers were complaining to her that the percocet upset their

15   stomach, and there were issues with payment on the percocet.

16   This is what she heard from the customers.  This is what she

17   told the agent, okay.  And she said -- keep in mind, she said

18   that according to the notes -- and we'll get into the notes in

19   a minute, the notes have problems and I'll go through them in a

20   minute -- but at the end of the day let's say that she had that

21   conversation with the Bellco woman who testified, in October of

22   2011, okay, October 2011.  Even by the Government's evidence,

23   this whole -- the real oxycodone problem is just starting.

24   It's early.  You know, so the super duper red flag that

25   happened in 2012 haven't happened yet.  So I suggest to you

E9jzcha3                    Summation - Mr. Agnifilo

1     that's a truthful answer.  She's giving truthful information to

2     the Bellco lady.  And there is no suggestion that she's not.

3            Second, if this was a conspiracy, really, if this was

4     a real conspiracy between her and Ji, wouldn't they say the

5     same thing?  I mean, if they were really conspiring, wouldn't

6     they say the same thing to the Bellco lady?  She thinks that

7     oxy is on the rise because of this special feature with

8     percocet.  It's upsetting people's stomach and Medicare and

9     Medicaid isn't paying for it.  That's not what Ji said.  He

10    side, according to the notes, that he's afraid there would be a

11    shortage.  If they were shoulder to shoulder, part of the team,

12    two members of the same conspiracy, couldn't they get their act

13    together?  It's actually evidence that there is no conspiracy,

14    because she's saying what she thinks and Ji is saying things

15    for whatever reason Ji wants to say it.  I don't know if Ji's

16    telling the truth or not.  I have no idea, and it doesn't

17    really matter.  You know, Ji could just be saying that as an

18    excuse, or Ji could be saying that because it's true.

19           Here's what we do know.  Ji dealt with Bellco.  Ji

20    dealt with Bellco except for one other time, okay.  And if you

21    look at, it's Exhibit 404, and you'll have it in the back,

22    there is one time when Ji doesn't deal with Bellco, and that is

23    August 3rd, 2012, and there is an issue.  There is an issue

24    with the oxycodone and Bellco's calling up saying, you know,

25    you guys are ordering a lot.  And who does Bellco speak to

E9jzcha3                    Summation - Mr. Agnifilo

according to the notes?  Sunni, Sunni Lee, Christina's older

sister, Ji's' wife.  What does that mean to you?  When there is

really a tricky issue, Ji doesn't have Christina deal with it.

He has a pharmacist.  If Christina as a pharmacist was really

Ji's coconspirator, she would have fielded that conversation.

She didn't field that conversation.  Because why?  His wife

fielded that conversation because now there is sort of an

issue.  So he's not going have her deal with it.  Maybe in his

view, it's over her head.  Maybe she doesn't have the

sophistication or the experience level to deal with it, or he

just doesn't want to have a red flag.  He doesn't want her to

know that there is an issue with Bellco, so he doesn't want to

put her on the phone, because Ji can control what Ji says to

Christina.  Ji can't control what Bellco says to Christina.

And so the difference between what's going on in 2011 when she

did take the call and what's going on in August of 2012 when

Sunni took the call, is by summer of 2012 this whole thing is

in high gear.  This whole thing is in high gear, that the oxy

is ramped, up the oxy is flowing.  And if I'm Ji, I don't know

what Bellco is going to say on the phone.  I'm not putting her

on the phone.  Bellco might say the wrong thing and scare her

away, so I'm going to have Sunni do it.  And it's in the

record, its Exhibit 404.  What's the records show is that times

Christina spoke to Bellco, two times we talked about, here's

what's interesting, and I asked the witness from Bellco on

E9jzcha3                    Summation - Mr. Agnifilo

1    cross-examination.  And go back and take a look at these

2    records yourself; every entry is in reverse chronological

3    order, starting with January 23rd, 2013.  It goes January 23rd,

4    2013; January 18th, 2013, except for two, the two up top that

5    Christina Chai is in.  Those are the only two in the entire

6    report that aren't in date order, the first one, the top one --

7    and here's what I'm saying.  The first date is July 9th, 2012,

8    the second date is October 20th, 2011.  Both of those have to

9    do with Christina Chai.  After that, everything is in reverse

10   chronological order, starting with January 23rd, 2013, and

11   going backwards in time.  Why are the two Chai ones out of

12   order?  She didn't know.  She had no idea, I said, did you take

13   these -- did you speak to Christina Chai?  Yes.  That was her

14   answer on direct examination.  On cross, what's up with the

15   dates?  How come these two dates are out of order?  I don't

16   know.  Someone else might have spoken to her.  My supervisor

17   might have spoken to her.  Well which is it?  Which is it?  Who

18   spoke to her?  And why are the dates out of order?  Why are the

19   two things that the government focused on, the only two entries

20   that are out of order?  Why?  You know why?  An answer to that

21   question, there is no answer because there is no answer to the

22   question because the witness testified she had no idea.  But

23   what's incontrovertible is that the two entries with Christina

24   Chai up here are out of order.  There is one other entry and

25   that relates to when the questionnaire, they wanted a

E9jzcha3                    Summation - Mr. Agnifilo

1    questionaire done so they sent a questionnaire.  That's not a

2    particular contentious situation.  They just wanted a

3    questionnaire.  Christine apparently got the questionnaire and

4    it was filled out and returned, at least that's what the

5    evidence tends to show.

6          So she says also, one of the things that made her

7    suspicious, she did see more oxycodone; saw more oxycodone as

8    time went on.  Well, what did Catizone say about that?

9    Catizone said that there was a change in philosophy in pain

10   management between 2009 and 2012, and what doctors were doing

11   was giving a lot of pain medicine, giving a lot of pain

12   medicine, trying to treat pain with aggressive treatments of

13   pain medicine.  And what he said is that oxycodone went from

14   being sort of an undistinguished drug in terms of how much it

15   was prescribed -- I think he said to being the number one drug

16   in the country, at least one of the top prescribed drugs in the

17   country.

18         So we're talking about a dynamic that's nationwide,

19   okay.  So I'm not saying that Stanley Pharmacy didn't go

20   through the roof.  They clearly went through the roof, and they

21   clearly went through the roof in the drugs that they order, and

22   amount of drugs that were distributed.  But it's not, by

23   itself, going to set off the same red flags, because oxycodone

24   is on the rise nationwide.  So, yes, it might make her

25   suspicious, and she said it made her suspicious.  But it

E9jzcha3                    Summation - Mr. Agnifilo

1   doesn't make her know.  It doesn't make her know.  She said

2   that the high markups were significant to her, and she really

3   didn't understand.  She wasn't sure if the customers were

4   paying that, but she saw the markups.  Now keep in mind she's

5   not seeing the cash, she's seeing the label.  She's seen that

6   orange receipt.  Now is the customer really paying $1,074?  She

7   doesn't know, because she doesn't see the cash.  So is it

8   something else?  It's not her thing.  It made her suspicious,

9   but it doesn't make her know.

10          Now, the last three things I submit to you are things

11  that the cashiers would have seen more clearly and had a better

12  idea of than would Christine Chai.  What she said to the DEA

13  she saw the same faces one or two times a week.  What she said

14  to the DEA that Ji would have the private conversation like we

15  discussed.  And what she said to the DEA is that Ji handed the

16  bottle over on the side, which made her suspicious.

17          Now, if I remember right, Ixchel Campos when she

18  testified, I asked her were you concerned that you're doing

19  something wrong when you went to the store?  And she said no.

20  She said I went there to do my job.  She said I thought Ji was

21  doing something suspicious, but I didn't know exactly what he

22  was doing.  She didn't know exactly what he was doing.

23          Now, if you remember the redirect on that, was that,

24  you are not a trained pharmacist, you're not a trained

25  pharmacist.  But here's what I have to say to that.  And she's

E9jzcha3                    Summation - Mr. Agnifilo

1    a very sweet girl, and I think there is no reason to think

2    she's breaking the law.  If you're taking bags and bags and

3    bags of cash from some of this crew, you don't need to go to

4    school.  You don't need to go to school to know that

5    something's wrong, okay.  But she didn't know that she was

6    committing oxycodone distribution, conspiracy with Ji.  You

7    know why?  Because she wasn't, she wasn't.  Did she intend to

8    do this?  Of course she didn't.  She was in the same boat as

9    Christina.  And, if anything, the cashiers had a better view,

10   had a better view of the most incriminating facts --

11   incriminating to Ji, not to them -- better than Christina did,

12   because Christina was behind that that obstructed area.

13            Now, Christina had a limiting role in the pharmacy.

14   She didn't do all the things she did when she was at Stop&Shop.

15   She basically -- and she said this to the DEA -- the DEA was

16   asking what she did.  She said, basically, I counted pills and

17   they used my license.  That's it.  She didn't do the drug

18   ordering.  She didn't do all those things.  Testimony wasn't

19   that long ago.  I'm sure you remember it.  All the things she

20   did at Stop&Shop, she didn't do here.  Now why is that?  And

21   it's hard to really know because we don't exactly know who Ji

22   is, but it's either Ji's business model or his personality that

23   it's his pharmacy.  It's in his family, and it doesn't matter

24   his rank.  It doesn't matter that he's a pharmacy tech.  This

25   is his pharmacy.  This is his family's pharmacy period.  He's

E9jzcha3                        Summation - Mr. Agnifilo

1   older.  He's been doing this for 20 years.  She's been doing it

2   at the time for three or four.  It's his pharmacy, it's his

3   business.  She is going to do whatever he tells her to do.  And

4   we know that there are times when she just signed things

5   because she was supposed to sign them.

6        When, I think it was Agent Soo Hoo who was testifying,

7   we pointed out three times that Christina signed those daily

8   activity reports, CC on a Saturday.  She didn't work Saturdays.

9   She doesn't exactly know what was sold on a Saturday because

10  she's not there.  How can she confirm the daily activity report

11  was what was sold on a Saturday.  You know what happened, you

12  know the different personalities here.  Ji said sign this and

13  she signed it.  That's it.  They needed her signature because

14  she's the pharmacist and Ji's' not.  She has no discretion.

15       Now one thing I think you have to watch out for, but I

16  think it's an issue that's been clarified.  The direct

17  examination of Agent Polimeno.  It was very clear that the

18  evidence before you after direct was that Christina Chai

19  approved prescriptions.  That's important.  Let me tell you why

20  it's so important.  Because what the government lacks in this

21  case and what it lacked in its summation is meaningful

22  purposeful intentional involvement.  That's what they don't

23  have.  And that's what they need for conspiracy.  So they try

24  to kind of plug up the gap by saying she said she approved.

25  But it end up getting sorted out, because approved is nowhere

E9jzcha3                    Summation - Mr. Agnifilo

1    in the notes, because approved is nowhere in the DEA-6.  So

2    although the direct examination -- there was no

3    cross-examination, you would all be thinking she approved those

4    prescriptions, that was -- that's what you're all thinking.

5    And guess what, that wouldn't be true.  So we straightened it

6    out.  But why did it happen to begin with?  Because they don't

7    have that.  They're desperate to try to get it, because they

8    need it.  They need her to do something.  They need her to

9    further the venture.  It's not enough to know that Ji's

10   committing a crime.  Ji committing a crime, whether she knows

11   it, whether she doesn't know it, it is not enough.  You don't

12   get charged and convicted with a conspiracy because you know

13   this guy's committing a crime.  That's not a conspiracy.  You

14   have to help, and you have to help on purpose.  That has to be

15   your goal.  That has to be your objective.  You have to want to

16   help him.  And if that's not there, if they can't prove that

17   beyond a reasonable doubt, there is only one verdict, and that

18   verdict is not guilty.

19           Now in terms of the numbers, this is a daily activity

20   report.  Take me a second, but I'm going to do it this way.

21   Well polished top to there is going to make this fall off, so

22   I'm going to use that.  Bear with me, everybody.  This is the

23   daily activity report.  You have been hearing about oxycodone,

24   oxycodone, oxycodone, oxycodone, Schedule II, controlled

25   substance.  Ready?  Here the schedules twos.  Here are the

E9jzcha3                        Summation - Mr. Agnifilo

1    schedule twos.  All the oxycodone, here are the Schedule II.

2    We have ten schedule twos.  Four of them, four of these ten are

3    bogus prescriptions.  All of this, this is all non-schedule,

4    all this, none-schedule.  So what this whole trial has been

5    about is this 4 inches of this 15 feet of prescriptions, okay.

6    Because they made a big deal out of charts, the charts, the

7    charts, the charts looked at all this stuff.  Here's the

8    problem with the statistics in this case.  Since the DEA didn't

9    take this, this, all these prescriptions, never left the

10   pharmacy because they're not schedule.  All of this stayed in

11   the pharmacy.  So all these charts -- oh, my God, all the oxy,

12   the high percentages, the blah blah blah, is this.  Not this.

13   Put in a different way, and as a New York sports fan I suffer,

14   I'm a Yankee fan.  I was born in the Bronx, huge Yankee fan.

15   When the Yankees lose, I hurt.  What I've decided to do I've

16   decide to disregard the top 90 percent of the American League,

17   and under my analysis, the Yankees are now in first place by

18   ten games.  They are shoe ins to win the American League East,

19   because they're in first place by ten games, because I'm going

20   to ignore -- I'm going to ignore 90 percent of the teams in the

21   American League.  And so the Yankees will, without a doubt, win

22   the World Series sees because they're the best team in

23   baseball.

24          Same thing, statistics are funny.  You can ignore

25   things.  You can ignore 90 percent of data, but that's not how

E9jzcha3                    Summation - Mr. Agnifilo

1    Christina Chai did her job.  That's not how the prescriptions
2    came in.  All of these came in, all of them, all of them, all
3    of them, day in day out, minute in, minute out.  And at the end
4    of it there's four of them that are bad, four out of all of
5    this.  Because they're just ignoring the vast majority of it.
6    So when she says she was suspicious, but she didn't know, and
7    my colleagues with the government said with the vast amount of
8    oxycodone, four.  She had to know?  She didn't have to know.
9    She didn't have to know.  If you're doing 350 prescriptions a
10   day, and I think this is a -- this is not an unusual day.  I
11   think this is a 324 prescription day -- 332 and there are many
12   many of these.  This is a typical day.  Four out of 332 are
13   bad.  I want to show you something else.  These are
14   prescriptions for percocet.  They're paid with insurance.  They
15   look different.  Here's one with a really really faded blue box
16   okay, faded blue box; percocet paid with insurance, okay.
17   Faded blue box.  Percocet, paid with insurance.  Not so faded.
18   How is this possible?  This must be washed, right?  This must
19   have brake fluid on it, right?  No.  They're just not all the
20   same.  I don't know if it's fits environmental factors, I don't
21   know if someone dropped lemon aid on it, I don't know if it was
22   out in the sun, I have no idea, but they look awfully much
23   alike.  And then you have one that's kind of in the middle.
24   Now here, legitimate, totally legitimate prescriptions;
25   percocet paid with insurance.  They look different.  How could

1    she not know?  How could she not know?  It's easy.  It's easy

2    not to know.  And it's really easy not to know when you weren't

3    told and not to know when Ji's trying to keep this from her.

4         Bellco keeps sending oxycodone.  They never stooped.

5    Call up every once in awhile.  There is some issues.  Bellco is

6    very happy to keep sending oxycodone.  I think the government

7    in summation said that Bellco knew what was up.  They didn't

8    know what was up.  They kept sending oxycodone.  If they know

9    what was up, I might have another client.  But they didn't know

10   what was up.  They keep sending oxy.  She knows they keep

11   sending oxycodone.

12        Also there is reference to an audit.  There is

13   reference to an audit.  She mentioned in her statement.  She

14   said there was state auditors in here.  And Special Agent

15   Polimeno, being diligent agent, followed up, spoke to the

16   auditor.  There was an auditor in there.  And the auditor was

17   concerned with prescriptions that had expired.  Now, I agree

18   wholeheartedly with what my colleagues at the government said

19   about the importance of pharmacists.  What pharmacists are

20   supposed to do.  They're not law enforcement officials.

21   They're supposed to make sure that if you come into the

22   pharmacy to get percocet, you walk out with percocet.  If you

23   come in to get birth control, you don't walk out with Viagra;

24   whatever is supposed to not happen, they're supposed to make

25   sure it doesn't happen.  They're not here to try and figure out

E9jzcha3                    Summation - Mr. Agnifilo

the crazy machinations of these guys who come into fool them.
They're foolable, they're foolable.  These guys are good at
what they do,

All right.  The government talked about conscious
avoidance, and I want to talk about that for a second.  Now
there is two things, more than two -- listen to Judge's
instruction, two things I want to focus on that you have to
find beyond a reasonable doubt before you convict Christina
Chai of conspiracy.  You have to find knowledge beyond a
reasonable doubt and you have to find something else, intent.
You have to find them both.  They're different, they're
independent.  You have to find each one beyond a reasonable
doubt.  Conscious avoidance is part of knowledge.

Under the law, as the Judge is going to explain it to
you is, there's two ways that the law presumes that someone
knows something.  You can know it because of actual knowledge,
I actually know this, and there's something called conscious
avoidance, which basically I didn't actually know it, but I
consciously avoided it.  And I'm going to give you an example,
and it's my example, and I'm not the Judge and that is this
very important.  Anything to do with the law, only one Judge in
this courtroom and it's Judge Crotty, so I'm going to gave you
an example that I submit to you could be helpful.  You're on
vacation in Mexico -- doesn't involve a restaurant -- you're on
vacation in Mexico, and you're at a bar and someone comes up to

E9jzcha3                    Summation - Mr. Agnifilo

1    you and says I have a white van outside, I'll give you $20,000

2    if you drive that white van to Texas.  And you say, um, do I

3    want to know what's in it?  You don't want to know what's in

4    it.  You want $20,000, right?  Yeah I want $20,000.  Get in the

5    van, you take the $20,000, you drive the van to Texas, stopped

6    at the border by Agent Polimeno who is now working on the

7    border.  And guess what he's going to say, do you know what was

8    in the van?  Well, not exactly I didn't know what it was in the

9    van, but I didn't really want to know, I wanted the $20,000.

10   Guess what?  The law is not going to let you get out of that,

11   because you didn't actually know.  Okay.  The law is basically

12   going to say listen, buddy, you didn't want to know and so

13   we're not going to give an out because you didn't want to know

14   and you didn't know that there was coke in the van or heroin in

15   the van or pills in the van whatever you're getting $20,000

16   for.  That's conscious avoidance, okay.  When you know high

17   probability that something exists but don't want to know  and

18   you don't want to ask.  And because you don't want to know, you

19   don't want to ask because you want the venture to work, okay.

20   And the Judge is going to instruct you on that.

21           Now, put yourself in Christina Chai's position for a

22   second.  First of all, I think it's a lot to ask, I think it is

23   a lot to ask that you expect -- and I'm not saying you do --

24   someone to give up a family member to the law on suspicion,

25   okay.  It's not reasonable.  It's just not what's going to

E9jzcha3                    Summation - Mr. Agnifilo

1   happen.  But I submit that her problem is not so much the law

2   as much as it's her family.  What is she doing going to do?

3   She's going to go to Ji?  I submit to you this is just not her

4   personality; listen, dude, I think you're selling oxycodone

5   illegally.  What happens then?  The family is in ruins.  The

6   family stops being the family that maybe it was destined to be.

7   I'm not saying her and Ji are that close, but her and her

8   sister are that close.  You heard a little bit about her about

9   her family upbringing, very little, but it's all you need.  She

10  grew up without a father, you heard.  She has two older

11  siblings, half brother and sister Sunni, and the man who

12  testified, Sunni is the eldest of the family.  She's her older

13  sister.  And there is sort of a name that Sunni is called,

14  which is JJ.  And JJ is like the respected older sister.  How

15  is she going to do that?  How is -- Christina Chai is not a

16  worldly sophisticated person.  She's really going to go to her

17  sister say listen, JJ, I think your husband is dealing

18  oxycodone?  She just, she doesn't have that amount of gumption.

19  Maybe she should.  Maybe that's why she's here.  I mean, I

20  always think that something that goes this far has to happen

21  for a reason, something had to have happened, right?  I mean it

22  can't just be completely crazy off the wall, right, so she must

23  have some personality flaw.  Maybe not, but maybe.  If she has

24  a personality flaw that caused her to be here, she lacks

25  gumption.  She's afraid, she's timid.  She's meek.  That's what

E9jzcha3                    Summation - Mr. Agnifilo

1    she is.  She's not a criminal, she's not a criminal.  She

2    didn't have the guts to say that to her sister.  Why?  She

3    didn't know for sure.  And there's explanations for it and Ji's

4    good at giving explanations.  If Ji could fool Bellco, Ji could

5    fool Christina.  Bellco kept sending it, because Ji talked them

6    into sending it.  If Bellco doesn't know, and they have -- they

7    had entire units, diversion units.  I mean the woman who

8    testified, that's what she does.  She looks at the red flags

9    she cuts them off when the law's getting broken.  Guess what?

10   Never got cut off, oxy kept flowing, kept continuing.  He

11   talked his way out of it.  She doesn't snow.

12           THE COURT:  Mr. Agnifilo, are you getting close to the

13   end there?

14           MR. AGNIFILO:  I am, your Honor.

15           THE COURT:  Thank you.

16           MR. AGNIFILO:  Maybe another ten minutes, then I'll

17   sit down.

18           THE COURT:  You said 45 minutes.

19           MR. AGNIFILO:  I'll be quick.

20           okay I want to talk about her statement for a second.

21   If she had a guilty heart, if she had intended to break the

22   law, if she was a coconspirator, if she intended to further a

23   criminal objective and a criminal purpose, would she have run

24   right over to the DEA and told them the truth about everything?

25   And there's really no dispute about that.  Special Agent

E9jzcha3                    Summation - Mr. Agnifilo

1    Polimeno -- and I commend him -- I think was very frank and

2    forthright on the stand, when he said was that his estimation

3    Christina Chai told him the truth, she told him the truth.  She

4    has nothing to hide.  She has nothing to hide because she

5    didn't do anything wrong.  She was forthcoming.  She was full,

6    she was complete.  She spoke to them openly.  If she was a

7    coconspirator, I submit to you she would have lied to them or

8    she wouldn't have spoken to him at all, but she spoke to them.

9    She spoke to him without a lawyer.  I don't think in a million

10   years she thought she was going to get charged, but she did.

11            (Continued on next page)

E9JTCHA4                    Summation - Mr. Agnifilo

1              MR. AGNIFILO:  She spoke to them in good faith and she
2       spoke to them because Ji was guilty, but she was not, and
3       that's why she spoke to them.
4              One of the things that she said during the statement,
5       and I think it's interesting, she said I'm not happy in my job,
6       I'm not happy.  I don't want to just be a pill counter.  They
7       just use me for my license.  It's sad.  It's sad to not to be
8       happy in your job.  It's sad to be counting pills and having no
9       real responsibility, working for a man that you don't seem to
10      like and not a lot of people seemed to like, a man that was
11      brought into your life because she married your sister.  It's
12      sad.
13             You know what's more sad?  It's more sad is to sit
14      here in a federal courtroom listening to your lawyer try to
15      convince a jury that you're not involved in a conspiracy with
16      the man that you never wanted to be with in the first place,
17      that you never wanted to work with, that you never wanted to be
18      there.
19             In an exchange that I had with Agent Polimeno on the
20      stand, I asked him:  Didn't she talk to you about wanting to be
21      a baker?  Right?  And he smiled, he sort of opened up.  He said
22      yeah, I remember that now.  Don't you get the feeling she could
23      have snapped her fingers and made the whole thing go away and
24      she didn't have to work in the pharmacy?  She wanted to be a
25      baker.  That's what she wants to do.  She doesn't want any of

E9JTCHA4                          Summation - Mr. Agnifilo

1    this.  She doesn't want any of this.

2           She went to work at the pharmacy and she worked

3    alongside Ji because it was is expected of her.  Because her JJ

4    wanted her to do it, and that's her role as the little sister.

5    She doesn't have guidance, except for her JJ, and that ends up

6    being part of the problem.  So she goes.  And she doesn't like

7    it.  And she's unhappy.  But she has no way to get away.  She

8    has nowhere else to go.  She works there because she has to

9    work there because that's expected of her.

10          But then one day she gets arrested and she runs to the

11   DEA and she tells them everything.  She tells them everything

12   that he did.  And in a horrible twist of fate, the DEA and the

13   government link them together in a conspiracy.  She goes there

14   to say this is what I went through.  This is what Ji did.  This

15   is what I saw.  What does she get?  Now you are going to be

16   with him forever.  You'll be with him forever?  Yes, now

17   there's an indictment saying that you and he are

18   co-conspirators, and you can live with the consequences of that

19   for the rest of your life.

20          Is that right?  Does she deserve that?  Does she

21   deserve that fate?  She doesn't deserve that fate.  She does

22   not deserve to suffer the consequences of Ji Lee's crimes.  And

23   there was no one to take her away.  Her family wouldn't take

24   her away because he's family, too.  The DEA didn't take her

25   away.  Well, not in that way.  Because they said oh, now you

E9JTCHA4                    Summation – Mr. Agnifilo

1   confessed, now you're even linked up more.

2           You know who can break that bond?  You know who can

3   take her away from Ji Lee?  You.  You can.  When you got the

4   jury summons a month ago, six weeks ago, you were getting

5   something more powerful than you ever knew, because you're

6   getting a license.  Our society, the United States, is giving

7   you a license to come here and to listen to the evidence in

8   this case, and it is giving you the power to be the one to

9   finally take her away from Ji Lee.  She doesn't deserve to be

10  with him.  She doesn't deserve to be linked to him in any way,

11  shape or form, not in the form of a criminal conspiracy and not

12  in any other fashion.  She deserves to be away from him, and

13  she has only you to count on.  You can do this.  And I am

14  asking you from the bottom of my heart to finally do this.  She

15  doesn't deserve to be with him, she never wanted it.  She never

16  wanted this.  Your verdict can set her free.  And I'm asking

17  you to do that.  Let her get away from him and live her life in

18  peace.

19          I thank you for your time.

20          THE COURT:  Mr. Agnifilo, do you want to --

21          MR. AGNIFILO:  I'll clean up.

22          THE COURT:  Mr. Riopelle.

23          MR. RIOPELLE:  Thank you, Judge, and I will use the

24  podium.

25          Good afternoon, ladies and gentlemen.  I would like to

E9JTCHA4                    Summation - Mr. Riopelle

1    start where Mr. Agnifilo left off by thanking you for your

2    attention over the last couple of weeks.  We all noticed how

3    carefully you have paid attention to the evidence, and it is

4    such a wonderful and important thing that jurors do to give up

5    their time to this very important duty, and we all thank you

6    for that.

7         Now when I go home at night after a long day in court,

8    every night my wife has one of those legal shows on where

9    lawyers sum up the case in two minutes.  And it drives me nuts

10   because, first of all, their objections are terrible, and that

11   makes me angry, and secondly, I have never been able to sum up

12   a case in three minutes.  And I'm sorry about that, I wish I

13   could in this case, but we've been here for two weeks and we

14   heard a good deal.  So I'm going to take a little time now and

15   try to guide you through the evidence that I think you'll find

16   that demonstrates that my client is innocent.

17        As we do this, I want you to keep in mind certain

18   bedrock principles that are the principles that apply in any

19   criminal case in any courthouse in our country.  They are --

20   and the judge is going to tell you about these when he gives

21   you the charge.

22        The government has the burden at all times to prove

23   each defendant's guilt beyond a reasonable doubt, the highest

24   burden of proof in the law.  That burden never shifts to

25   Mr. Lee or Ms. Chai.  They have no burden to prove they're

E9JTCHA4                    Summation - Mr. Riopelle

innocent.  The government must prove their guilt.

            The judge will tell that you each of these defendants
starts with a clean slate.  They are presumed innocent in this
case.

            The government must prove that they're guilty beyond a
reasonable doubt, and that means proof of such a clear and
convincing character that a reasonable person would not
hesitate to the act upon it in an important matter of your own
personal affairs.  That's a little bit of a vague statement.
Think of it as betting the rent check, betting the mortgage
payment.  That's an important thing do you in your life.
That's the type of important thing you do.  You have to act
with a certainty that you have in a case like that.

            And the last thing is the most important one in this
particular case.  The case against each one of these defendants
stands and falls on the proof as to them alone, not the proof
as to anyone else.  In our society defendants are judged
individually.  That is, of all these bedrock principles, the
most ancient one of all.  It comes to us ultimately from the
book of Genesis and the story of Sodom and Gomorrah, you may
remember it, where Father Abraham disputes with God as to
whether God should wipe out all of Sodom and Gomorrah, where
there was a lot of bad going on, like there was a lot of bad
going on at the Stanley Pharmacy, and we don't dispute that.
God was going to wipe out everybody in Sodom and Gomorrah, and

E9JTCHA4                    Summation - Mr. Riopelle

1   Abraham stood up to God and said:  What if there is one or two

2   or just a few good people?  You can't wipe out the whole city.

3   And ultimately God agreed.  And that's how old that principle

4   is, and it applies here.

5          Now the judge is going to tell you about the evidence.

6   We're going to deal with the evidence.  But the first thing we

7   want to know is what is not evidence.  The indictment is not

8   evidence.  The fact that these two defendants and my client has

9   been charged with a crime is not evidence in this case.  You

10  cannot consider it.

11         What the lawyers say is not evidence.  That applies to

12  me, it applies to my colleagues at the front table, it applies

13  to Mr. Agnifilo.

14         THE COURT:  Also applies to me.

15         MR. RIOPELLE:  We're getting there.  And the judge

16  will tell you himself that what he says is not evidence.  He's

17  going to give you the law, that's his job, but not the

18  evidence.

19         And even your notes of what you saw and heard here in

20  the courtroom are not in evidence.

21         Ladies and gentlemen, only the testimony and the

22  exhibits are the evidence.  And if you have any concern about

23  what the evidence is as you deliberate, you should ask for it.

24  You can ask for readbacks of the testimony.  You will have the

25  physical exhibits that were admitted.

E9JTCHA4                         Summation - Mr. Riopelle

1              And when you look at that evidence, when you consider

2      the testimony and the physical exhibits, I submit that you will

3      find that Mr. Lee never knew about the oxycodone conspiracy at

4      the Stanley Pharmacy involving his son Ji Lee and the

5      Girdauskas brothers and the others.

6              What was the testimony?  The testimony about Mr. Lee

7      is that he never dealt with the drug dealers.  We saw all kinds

8      of videos here in court.  Not one time did we see Mr. Lee hand

9      a pill bottle or even speak to any of the drug dealers.  He did

10     not.  The one video that the government showed in its summation

11     showed my client, Mr. Lee, sitting a few feet away as his son

12     Ji Lee passed pill bottles to one of the dope dealers.  The

13     whole thing took about three seconds.  That is the one time he

14     was ever even in the presence of the conspiracy charged in the

15     indictment.

16             You heard that he rarely worked at the pharmacy

17     counter.  By this point in time, late 2011, early 2012, he was

18     sort of semi retired coming in a few hours a week and on

19     Saturdays.  But he rarely worked right at the pharmacy counter,

20     he rarely dealt right with the customers.  He was only at the

21     pharmacy a few hours each week.  And you also heard that Ji Lee

22     closed the pharmacy at night.  He is the one that collected the

23     cash, he is the one that opened the pharmacy in the morning,

24     and he is the one that closed it down at night.

25             And what about the documents we saw?  These are really

E9JTCHA4                    Summation - Mr. Riopelle

1    key to finding out about the case and figuring it out.  We're

2    going to take a look in some detail at the prescriptions.  You

3    saw many of them during the trial.  We're going to talk about

4    those.  The banking records are also critical to Mr. Lee's

5    case, and we'll talk about some of those as well.

6          Now the testimony about these prescriptions was this:

7    You didn't hear -- and the absence of testimony is important

8    for you to consider, too.  You didn't hear a single witness

9    testify that he or she saw Mr. Lee fill out -- fill or write on

10   a prescription connected to the improper dispensation of

11   oxycodone.  Nobody told you:  Mr. Lee gave me the prescription.

12   Nobody told you:  I saw Mr. Lee write on the prescription.  Not

13   one witness.  Not even the witnesses who were on commission in

14   this case, the people who had something to gain by their

15   testimony.  Not even somebody like Michael Penzo, who was paid

16   $25,000 the week before he testified, not even he told you that

17   he saw Mr. Lee or could connect Mr. Lee in any way to the

18   prescriptions in this case.

19         And we called an expert, a handwriting expert,

20   Mr. Osborn, and you heard him testify just yesterday that it

21   was highly probable that Mr. Lee did not write on about 9,000

22   or 88 percent of the prescriptions at issue in this case, and

23   that it was probable that he didn't write on any others.  So

24   the expert, the scientist told you that there is no connection

25   between Mr. Lee and these prescriptions.

E9JTCHA4                    Summation - Mr. Riopelle

1          He also told you that there were at least three

2   different persons who were putting the letter H on

3   prescriptions.  A relief pharmacist perhaps?  Who knows?

4   Somebody else, two others, but they were not Mr. Lee.  Who was

5   one of these individuals that we know for certain who that was?

6   His son Ji Lee was putting that H on those prescriptions,

7   because Ji Lee knew he was not a pharmacist and he couldn't put

8   his own initials on there, so he would put his dad's initials

9   on there without his father knowing.

10          Now we looked at these in my opening statement.  These

11   are the two prescriptions that the government describes in its

12   indictment as having been issued by Mr. Lee.  The handwriting

13   on these, on the face of them, we're now told is not his.  It

14   is at least probably not his.  That's what our handwriting

15   analysis tell us.  And we know from the back of the

16   prescription that the pharmacist, whose initials are on the

17   sticker that goes on the back of the prescription, was TC, Tina

18   Chai, Christina Chai.

19          So it appears that what happened here for both of

20   these is that Ji Lee, who was out front dealing with the

21   customers, is putting an H on the front of the prescription

22   while Tina's initials are coming on the label -- are put on the

23   label that sticks on the back of the prescription and goes on

24   the bottle itself.

25          These very documents, the ones referred to in the

E9JTCHA4                    Summation - Mr. Riopelle

government's indictment, demonstrate that my client had nothing
to do with issuing these prescriptions.  You don't need two
pharmacists to issue a prescription.  The H is on the front.
For whatever reason, Ji Lee decided to put it there.  It was
Tina who was working as a pharmacist on the day those
prescriptions were issued, Tina who didn't know what Ji was up
to out in front.

        The summary charts of the doctor's prescriptions which
we heard about in the government's summation, they showed one
or two of them, one I think relating to Dr. Judith Berger, for
example, those also demonstrate that someone other than my
client was writing the H on the prescriptions.  You'll recall
that during the cross-examination of Agent Polimeno, we
compared those charts to the document on the right, the exhibit
that shows when my client was traveling out of town, places
like China on a religious mission, that's when Hs were put on
the prescriptions when my client wasn't even in New York.  So
the government's own documents, the government's own summary
prescriptions, tell you that someone other than my client was
putting his H on those prescriptions.

        And what about the bank records?  Do they really show
that Mr. Lee knew about the drug conspiracy?  Is that what they
show?  The answer, ladies and gentlemen, is in the details.
Let's take a look at some of those records now.

        First of all, the records show that not all the

E9JTCHA4                    Summation - Mr. Riopelle

1    deposits were made by Mr. Lee.  You'll recall that the records

2    show that many of the deposits were made while Mr. Lee was out

3    of town.  Now what does that tell you?  That tells you that he

4    didn't really control the money.  If he was in complete control

5    of the money, he would be making deposits when he got back.

6    Nobody else would have access to that money.  But in fact,

7    there were many, many deposits that were made while Mr. Lee was

8    out of town, and we went over some of that in cross-examination

9    of the government's witnesses.

10           You'll recall that many deposits, a great many of

11   them, appear to have been made at night, long after Mr. Lee

12   left the pharmacy.  You'll recall that during some of the

13   cross-examinations of the bank employees, we looked at deposits

14   that were dated on a Monday and deposited the next day at about

15   9 o'clock, and the bank witnesses told you that that was

16   typical of a night deposit where you put it in the night

17   depository.  The bank opens it the next day and credits it to

18   the account typically in the morning, but it could be later.

19   And there were an awful lot of deposit slips that looked like

20   that, and we went over some of them with the bank employees.

21           Now during his summation, you may recall that

22   Mr. Tehrani suggested that the bank employees never said they

23   saw anybody put anything in the night depository, and

24   therefore, this is a specious argument by Mr. Riopelle.

25           Well, let's think with about it.  Let's use our common

E9JTCHA4                    Summation - Mr. Riopelle

1    sense.  We don't check that at the door like a coat before you

2    sit in the jury box.  The bank employees are like most people,

3    like the people who worked in pharmacy who told you I gave the

4    money to Ji, I didn't see what he did with it, I went home for

5    the day.  When the bank employees finish their day at five,

6    they do the same, they go home.  It's not surprising that they

7    don't see Ji Lee show up at 7:00 p.m. to put the money in the

8    night depository.  Of course they don't, they don't see anybody

9    put the money in the night depository.  They go home at that

10   point, as they should, they worked a full day.

11          We learned by looking at the details of the documents

12   that a great many of the deposits made in New Jersey, far away

13   from Yonkers, they were made by Sunni Lee, Ji Lee's wife.

14   You'll recall that we compared the phone number on some of

15   those slips to the phone number that she had written on a

16   letter she sent, and you could see that was her cell phone

17   number.  So many of those deposits in New Jersey, the deposits

18   in New Jersey were made by Ji Lee's wife, and that shows us

19   that he was in control of the money, not Mr. Lee.

20          And what about the bank records?  Remember these

21   exhibits?  The government had several of them, schedules of the

22   records of the bank deposits.  Here is a page from Government

23   Exhibit 1010, for example, which shows the series of bank

24   deposits made in 2011.  And you will recall that when we

25   started to look at the details of these, what you find out is

E9JTCHA4                      Summation - Mr. Riopelle

1    that an awful lot of the deposits don't have anything to do

2    with Mr. Lee.  For example, those ones that I just blacked out,

3    if you compare it to the document -- the chart that shows when

4    he was traveling, he was out of town when those were made.

5          How about these?  Turns out those look like they are

6    night deposits, if you look at the times.  More travel.

7    Another night deposit.  And by the time you exclude the

8    deposits that don't appear to have anything to do with Mr. Lee,

9    it doesn't look like much of a guilty pattern or anything

10   suspicious at all.  And that's the kind of detail, that's the

11   kind of hard work that the presumption of innocence and the

12   burden of proof require you to make.

13         And you will recall that there's been a lot of talk

14   about oh, two deposits at a time, sometimes they add up to

15   close to $9,000.  Here are a couple of deposits made on Monday,

16   July 11, that add up to about $5,000.  And you learned as the

17   trial went on there's a reason, a number of reasons why Mr. Lee

18   might have shown up at the bank with two deposits at a time.

19   There's a second business that he and his wife own called Photo

20   Arts just down the street.  They may have a deposit on the same

21   day that the pharmacy does, so he carries both of them, because

22   they're going into the same account, the Stanley Getty account.

23   You heard Mr. Lee collected rents from tenants he had in that

24   neighborhood in cash.  That's another explanation for why there

25   might be a second deposit.  And there's another example of two

E9JTCHA4                    Summation - Mr. Riopelle

1     deposits.

2              Now when Mr. Kobre responds to these points in his

3     rebuttal, and I'm sure that he will, I would expect him to

4     point out that oh, Mr. Riopelle is not being fair, he's looking

5     at the records or schedule for early 2011, the whole thing

6     wasn't in full swing by then, so he's kind of gilding the lily,

7     he's not looking at one of the hard ones to show you.

8              Let's look at one of the hard ones then in October of

9     2012 and November 2012.  That's when the oxycodone conspiracy

10    was at its absolute peak.  So let's look at one of the hard

11    ones and see what was happening then.  Well, look what happens

12    when you compare all of these.  Those deposits are all made in

13    New Jersey.  Mr. Lee didn't have anything to do with the New

14    Jersey deposits, that was Sunni Lee, or they were made at

15    night, if you look at the deposit slips carefully.  That one

16    was made while Mr. Lee was away.  The same is true of those.

17             And you know what?  Here's an interesting fact.  If

18    you look very closely at this deposit slip, which is deposited

19    on Tuesday, November 13, 2012 after Mr. Lee has returned, you

20    will see that the deposit slip was made out on Monday,

21    November 12.  That's the day Mr. Lee was out of town.  So that

22    tells you that somebody other than Mr. Lee is making out those

23    deposit slips.  He's just carrying them to the bank.  And then

24    there are a couple more that appear to be night deposits.  And

25    yes, here's one where he carries two deposits into the bank at

E9JTCHA4                          Summation - Mr. Riopelle

1    the same time.

2              But if you really look at the details of this

3    evidence, ladies and gentlemen, if you compare the evidence to

4    itself, you will see that Mr. Lee is not engaged in some kind

5    of pattern of activity to hide what he's doing.  These charts

6    look bad until you compare them to what else you know in the

7    case, and then they don't really do much for the government at

8    all.

9              When you really consider the proof, the proof of his

10   travel, that's Government Exhibit 1014, the proof of the night

11   deposits, that's one of the deposits that we put in evidence so

12   you can see it individually, you'll have all of them back

13   there, there are hundreds of deposit slips, you can look at

14   every one of them.  And when you look at the deposits in New

15   Jersey, when you do all this, the pattern of deposits that were

16   actually made by Mr. Lee, not the pattern of deposits as a

17   whole, that pattern, the ones he did, doesn't look very

18   suspicious at all.

19             And it did not seem suspicious to Mr. Lee.  Because

20   what you realize when you look at these deposits and you

21   realize that someone else was making out the deposit slips,

22   that one where he took it on the date he came back after

23   someone had written it out on a day he was away, and you

24   realize that, you realize that it's someone else who is really

25   doing the structuring.  Mr. Lee is just carrying it down to the

E9JTCHA4                    Summation - Mr. Riopelle

bank.  He's not thinking about it.  He's not intentionally

structuring the deposits.  It's the person making out the

deposit slips, the person who collects the money at the end of

the day, the person who puts it downstairs sorts it out and

gives it to his dad to take to the bank.  It's Ji Lee.

          In fact, the way in which Mr. Lee did the banking

tends to prove he really knew nothing about Ji Lee's drug

dealing.  Ask yourself these questions when you think about the

way this case worked and the way Mr. Lee did the banking:  If

you were a dope dealer, if you were involved in a drug

conspiracy, would you do this?  Would you show up at a bank

where you had been doing your banking for 30 years and show

your face and bring in a big cash deposit for everybody in that

bank, like Ms. Maia, who has known you for years, to see that?

Would you show up like that with a big bunch of cash money?  Is

that the way a dope dealer ought to do his business?  Or

wouldn't you do something different?

          If you were involved in a drug conspiracy, you don't

do these kinds of things yourself.  You give somebody else the

deposit and ask them to go to the bank.  You drop off the money

in the night depository so nobody sees you.  Or you make your

deposits in an unfamiliar bank far from the scene of the crime.

You might go to someplace as far away as New Jersey to deposit

your cash so that the government wouldn't find it.

          So there's no evidence, I submit to you, that Mr. Lee

1   knew about the wholesale oxycodone orders, the one from Bellco

2   and the like, and the fact that more oxycodone was being

3   ordered by the pharmacy during these last years is not

4   something that was suspicious to Mr. Lee.

5          Now you heard that many pharmacies ordered more

6   oxycodone than Stanley Pharmacy over a long period of time and

7   many increased their orders over time.  Now this is a chart

8   that the government prepared but didn't ask its witness to put

9   on during the trial.  We had to do that.  We wanted you to get

10  the whole story, not half of the story, not a chart that shows

11  only what the Stanley Pharmacy was ordering, but a chart that

12  shows what every pharmacy was ordering in that zip code where

13  the Stanley Pharmacy was located.

14         If you look at it -- the Stanley Pharmacy by the way,

15  is -- here's their last year, the blue line on the far side.

16  This is 2006.  You can see that they're the blue line all the

17  way to the left.  They are ordering very little oxycodone at

18  that point.  Another pharmacy, I think the Robert Jackson or

19  Robert Jacobson, is ordering ten times as much oxycodone as the

20  Stanley Pharmacy during that year.  And look at this, that's

21  2011, that's the year 2011, that's the year that this

22  conspiracy supposedly all got started.  And the Robert Jackson

23  pharmacy is ordering twice as much oxycodone, and nobody

24  contends that the Robert Jackson or Robert Jacobson, whoever

25  they are, is a bad pharmacy or dirty pharmacy or anything like

1    that.

2              You heard a whole lot of argument and thumping about

3    during 2012 Stanley Pharmacy had twice as much oxycodone as

4    anybody else, they must be guilty.  Well, look, 2011, the

5    Robert Jacobson or Robert Jackson pharmacy had twice as much as

6    the Stanley Pharmacy, and they had more in 2011 than the

7    Stanley Pharmacy had in 2012, and nobody suggests that they are

8    bad or dirty.

9              And remember that the trend -- you can see it in the

10   bar graph -- the trend for many pharmacies in oxycodone sales

11   over time was up everybody's sales were going up.  And indeed,

12   you should consider Mr. Catizone's testimony, that was the

13   government's pharmacy expert, he told you that legitimate

14   prescriptions for oxycodone increased dramatically,

15   dramatically during the years prior to the indictment and

16   during the period of the indictment.

17             So to the extent more oxycodone was being ordered by

18   Stanley Pharmacy, to the extent you could infer that my client

19   was semi-retired and even knew something about that, to the

20   extent -- and you can't because nobody has told you he knew

21   about that.  But even if you were inclined to do that, this

22   testimony tells you that there's nothing suspicious or no alarm

23   bell to go off for my client about the fact that more oxycodone

24   was being ordered at the Stanley Pharmacy because that was the

25   way of the world during this period, orders for oxycodone

E9JTCHA4                    Summation - Mr. Riopelle

1    generally were going up.

2          Now you heard a little bit of discussion of the

3    concept of willful blindness and putting your head in the sand

4    and conscious avoidance, and the judge is going to give you

5    very specific instructions on this.  And by the way, when I

6    used the gavel there, that's a representative of the judge and

7    what he's going to tell you during his charge.

8          THE COURT:  Even though I don't have a gavel.

9          MR. RIOPELLE:  No, I didn't want to put a picture of a

10   judge up there, though, that might cause a lot of dispute at

11   the side bar, so we're going to stick with gavel.  It's

12   probably good he doesn't have a gavel.  He might throw it at me

13   for that last remark.  So there we go.

14         The judge is going to tell you if a person

15   deliberately closes his eyes to what would have otherwise been

16   obvious, that could be a substitute for actual knowledge of a

17   crime.

18         But what do we know about Mr. Lee?  First we know that

19   when he went to the pharmacy, he typically spent his time

20   downstairs in that little office area.  So he was not upstairs

21   to see the wrongdoing that was going on when these dope dealers

22   were coming in and picking up oxycodone.  He was not like the

23   cashiers who had an all-day view of these miscreants coming

24   into the pharmacy.  Remember, we saw one video where one of the

25   miscreants got a bottle of pills from Ji Lee and they took it

E9JTCHA4                    Summation – Mr. Riopelle

1   in three seconds, one time we saw Mr. Lee was in the presence

2   of it.

3            He saw no documents that would make him suspicious.

4   The increase in oxycodone ordering.  We know now was not a

5   suspicious thing.  The prescriptions themselves we know now he

6   didn't put his own initials on any of those.  No pharmacy

7   employee told Mr. Lee of their suspicions, right?  We didn't

8   hear Miriam Padilla or Ixchel Campos tell us that they told

9   Mr. Lee of their suspicions.

10           Remember, they told you that they were suspicious, and

11   indeed Ms. Chai told the DEA agents at one point that she

12   became a little worried about what was going on in the

13   pharmacy, but we have no evidence from anyone that they ever

14   raised a suspicion with Mr. Lee.  And that makes sense.  That

15   make sense, ladies and gentlemen, because by the time this

16   conspiracy was going on, Ji Lee was in entire control of the

17   pharmacy.  He was the manager.  He was the president.  He was

18   the guy running the place, and the employees there were

19   terrified that they would be fired if they raised their

20   suspicions.  If they raised them with Ji Lee or if Ji Lee got

21   wind, if they raised them with my client, they would be fired,

22   so they didn't say anything to anyone.  Mr. Lee never knew.

23           And ladies and gentlemen, let's keep in mind that

24   Mr. Lee had every reason to trust Ji Lee as the manager of this

25   pharmacy.  They had worked together in that pharmacy for many

E9JTCHA4                    Summation - Mr. Riopelle

years before things went wrong.  They had been this that

pharmacy for years and nothing bad was happening.  So in 2011,

late 2011 and 2012 when the bad things started to happen, my

client had no reason to believe that his son was up to

something wrong.  All of the evidence, all of the evidence

shows that Ji Lee had taken over the management of the pharmacy

by the time period charged in the indictment.  You heard Ixchel

Campos tell you she was hired by Ji Lee.  For example, Mr. Lee

trusted his son to run the pharmacy legitimately.  He had seen

him do that for years prior.  Why on earth should he believe he

was doing anything wrong?  They worked together there for years

before Ji Lee began involving himself in the oxycodone

conspiracy.

        And you know what?  The testimony of everyone was

entirely consistent on that point.  Consider the testimony of

Ms. Padilla and Ms. Campos.  Ji Lee was their boss.  He could

hire and fire them.  Consider the testimony of the government's

cooperating witnesses.  They dealt with Ji.  They thought he

was the pharmacist.  He was running the place.  Consider the

testimony of the government's agents when they surveilled the

pharmacy.  Who closed it down at night?  Who opened it up in

the morning?  It was Ji Lee.  He was running things there.

        And consider the testimony of other witnesses,

including Jae Lee, Andrew Chong, and particularly Roseanne

Joset.  You will recall that Mr. Lee's other son Jae told you

E9JTCHA4                         Summation - Mr. Riopelle

1    five or six years ago Mr. Lee began to slow down and his son Ji

2    Lee became the primary manager of the pharmacy.  You will

3    recall that Andrew Chong told you the same thing.  That was

4    Mr. Lee's accountant.  He said I used to represent him for

5    years and I used to go in there he would be there right in the

6    pharmacy.  As time went on I had to call him to meet him

7    because he wasn't there every day.

8           And most importantly, consider the testimony of

9    Roseanne Joset.  That was the nice woman who worked in Long

10   Island in Amityville for the drug wholesaler, I think it was

11   Bellco.  We had a great moment in this trial, ladies and

12   gentlemen, when we looked at some signature, Government

13   Exhibit 401.  That was a document submitted to Bellco.

14          And that's Government Exhibit 401.  You will recall

15   that government made a great point of the fact that my client's

16   name, Hi Jong Lee, appears here on the document.  He's

17   described as the president.  And they made a big point of that

18   because this document is dated 2012, and they were desperate to

19   show that he was in control.  And ladies and gentlemen, there

20   is his signature on the document in 2012.  Do you remember how

21   excited government was about all that?

22          You have to look at all the evidence, not just some.

23   And if you look at this document, which we put in evidence,

24   that is a document that Mr. Lee signed in the presence of Agent

25   Polimeno and other DEA agents at the time -- on the date of his

E9JTCHA4                    Summation - Mr. Riopelle

son's arrest.  And there is his true signature.  It doesn't

look a thing like the signature on the document that Bellco

got.  Somebody else signed his signature on that document as

president.  He didn't do that.  The government didn't realize

it.  They made a mistake when they made a fuss about this in

court.

            And ladies and gentlemen, in every trial there's a

little moment like that that really encapsulates all you need

to know.  It's possible to make a mistake.  It's possible not

to know.  Think about that.  They said that's Hi Jong Lee's

signature.  They had a dozen agents working on this case, they

had hundreds of documents to look at, they had a document that

my client signed right in front of them and they made a

mistake.  I'm not accusing anyone of doing anything wrong, they

just made a mistake.  They didn't pay enough attention to know

the facts.  In that respect, they're a little bit like my

client, Mr. Lee.  He didn't pay enough attention.  He wasn't

enough involved.

            What about the other records?  Well, here's one,

HLSG3, signed by Ji Lee, where he says he is the principal of

Stanley Pharmacy.  Here's another retail pharmacy questionnaire

form, HLSG4, where Ji Lee in 2008 signs as general manager and

president.  By 2008 he is already in control.  And here is

another one, signed I believe in 2007, it's a little faint

there on the copy, in which Ji Lee describes himself as the

E9JTCHA4                        Summation - Mr. Riopelle

1   principal of the Stanley Pharmacy.  He is in control.   The

2   records show that he was the manager of the pharmacy and in

3   control of it long before the drug dealing began.

4           And the evidence shows quite clearly that Mr. Lee did

5   not know about Ji Lee's drug dealing.  And if that's true, he

6   was not, not a knowing and voluntary participant in either the

7   narcotics conspiracy or the money laundering conspiracy.   He

8   has to know that there is drug dealing going on or he is not

9   guilty of conspiring with somebody else.

10          And the judge -- there's the judge, right there --

11  will tell you that when he gives you his charge.  He will tell

12  you that the mere presence of a defendant at a place where a

13  crime is committed or his or her mere association with another

14  person who has committed a crime is not sufficient to support a

15  conviction.  Mere knowledge or acquiescence, without

16  participation, in the unlawful plan is not sufficient.

17  Moreover, the fact that the acts of a defendant, without

18  knowledge, merely happen to further the purposes or the

19  objectives of the conspiracy, does not make that defendant a

20  member.  If you carry a bank deposit put together by your son

21  down to the bank without knowing that that is drug money, you

22  are not involved in a conspiracy.  That's what that sentence

23  means.

24          What is necessary is that the defendant must have

25  participated with knowledge of at least some of the purposes or

E9JTCHA4                    Summation - Mr. Riopelle

1    objectives of the conspiracy and the intention of aiding in the

2    accomplishment of those unlawful ends.  That's what the judge

3    will tell you the law requires.  And in this case, the proof

4    fails to show it.

5         An act is done knowingly and intentionally if it is

6    done deliberately and purposefully.  It can't be the product of

7    mistake, accident or negligence.

8         In order to be a knowing and intentional participant,

9    you have to act with an understanding of the unlawful character

10   of the conspiracy.  You have to know that a crime is being

11   committed, and you have to know that when you're acting.

12        And that's true for the money laundering conspiracy as

13   well.  He's got to act with knowledge that the transaction

14   involved the proceeds of some form of unlawful activity.  In

15   this case, it's drug dealing.  When he goes to the bank, you

16   can't convict him of the money laundering conspiracy unless he

17   knows that the cash he's carrying is the proceeds of narcotics

18   transaction.  And he's got to do it with the intention to carry

19   on the narcotics dealing.  He's got to know that the

20   transaction at the bank is designed to conceal the narcotics

21   dealing and it's unlawful nature.

22        So that's what the judge is going to tell you.  I'm

23   going to ask you, when you consider the facts in this case, to

24   focus on knowledge, the words promote, conceal.  Did Mr. Lee

25   know that the funds that he took to the bank were drug money?

E9JTCHA4                    Summation - Mr. Riopelle

1    Ask yourself that question.  Did he know he was promoting Ji

2    Lee's drug selling conspiracy?  Ask yourselves that question.

3    If he did, what was he doing showing up at the bank with people

4    that he knows all his life?  Did Mr. Lee do anything to conceal

5    what he was up to?  Certainly not.  Did he do anything to

6    conceal Mr. Lee's drug dealing?  No, he showed up with cash,

7    sometimes it was pretty close to $9,000.  He made those

8    deposits, no question about it.  Was he just taking the

9    deposits to the bank without knowing where the money really

10   came from?  I submit to you the answer to that last question is

11   yes.

12            And what about the structuring count?  Here's what the

13   judge will tell you about that.  First --

14            THE COURT:  I'm going to give the charge to the jury,

15   and you will have to take the law from me.  Mr. Riopelle has a

16   copy of the charge, we have given them out in advance so he can

17   make factual arguments not legal arguments.

18            MR. RIOPELLE:  That's absolutely correct.  The judge

19   gives us the law, and only the judge, I'm merely quoting to you

20   from what I believe he will tell you when he charges you on

21   what the law is.  You must follow his instructions on the law.

22   I am not a judge.  If the trial has proved anything, it has

23   proved that, I think.

24            He will tell you that the government must prove beyond

25   a reasonable doubt that this defendant, Mr. Lee, acted

E9JTCHA4                         Summation - Mr. Riopelle

1    deliberately and purposefully and had a conscious objective to

2    structure rather than a product of mistake or accident.  So if

3    he was simply carrying to the bank deposits made out by his

4    son, he is innocent of structuring because he is not choosing

5    what deposits to make.

6         Let's consider the evidence.  Consider the testimony

7    of all the witnesses, all of whom said Ji handled the money and

8    collected it at the end of the day.  That was Miriam Padilla

9    and Ixchel Campos.

10        Consider the evidence that Ji controlled the deposits,

11   the deposits were made when Mr. Lee was out of town, and the

12   night deposits and the deposits made by Ji Lee's wife in New

13   Jersey.  That shows Ji Lee's control.

14        And consider the fact, ladies and gentlemen, that it

15   was Ji Lee who had the cash horde that was discovered by the

16   DEA at the time of Ji's arrest.  It was him.  This is an

17   exhibit that came in right at the end of the trial.  You will

18   recall there was testimony about the fact that Ji Lee had a

19   separate business called Jacob's Ladder, and he kept that

20   business in the office at the other end of the house from where

21   my client spent his time and did his living.  And when the DEA

22   searched that room, as they searched every room in the house,

23   they found concealed in that room a lot of cash hidden away in

24   those bins related to Ji Lee's business.  That's where the cash

25   was seized from.  Remember there was stuff about herbs and

E9JTCHA4                    Summation - Mr. Riopelle

herbal stuff, stickers on those bins, because they related to
his individual business.  And the witnesses told you that my
client didn't typically go in that room.  That was Ji Lee's
cash that he was hiding, hiding not just from the DEA, hiding
from his own father.

         These are some of the proceeds of the drug conspiracy
that he is hiding from his own father.  He is stealing it for
himself, that is what the search tells you, because he was
keeping that money away from his dad in a place where his dad
didn't go and hidden away.

         And ladies and gentlemen, there was no pattern of
illegal activity.  Again, this is one of the pages from
Government Exhibit 1010.  When you look at it, when you look at
these carefully and compare them to the times when Mr. Lee was
out of town, the night deposits were made, you will see that
there was no pattern of illegal activity, there were just bank
deposits.

         And you heard -- yes, you did hear on a single
occasion Mr. Lee did not deposit more than $10,000 when the
teller warned him about the CTR form.  But that's not a
pattern.  One time doesn't make a pattern.  A pattern means
more than once.  And it shows -- what's really important about
that testimony, it shows that Mr. Lee wasn't paying close
attention to the deposits he was carrying to the bank.  If he
was really a money launderer, if he was really involved in a

E9JTCHA4                    Summation - Mr. Riopelle

 1    dope dealing conspiracy, if he was really worried about not

 2    depositing more than 10,000 at a time, he wouldn't have shown

 3    up with all that.  What this shows, what this shows is that

 4    somebody else was making out the deposits.  And you will recall

 5    the testimony was that he showed up with two deposits, a

 6    smaller one of about $2,000 and one about $9,000 that added up

 7    to more than ten.  He showed up with the bank with those

 8    because it never occurred to him to worry about it.  He just

 9    carried deposits to the bank.  He wasn't thinking about.  It,

10    somebody else put the money together.

11         The 9,000, I submit to you, the proof would tend to

12    show that was Ji Lee gave his dad a deposit of 9,000.  What Ji

13    Lee didn't think about was the fact Mr. Lee walked down to the

14    Photo Arts store down the block and picked up another deposit

15    for them and showed up with the two deposits because he didn't

16    think about it.  Other people were making the deposits out for

17    him and he just didn't worry about this issue.  And that's the

18    fact.  That's the fact.

19         There was no violation of another wrong because

20    Mr. Lee had no idea that his son was selling oxycodone

21    illegally.  You'll be asked to decide whether there was a

22    violation of another law at the time Mr. Lee made his deposits

23    in the bank.  He has to know there's a violation.  And I submit

24    to you that the proof shows overwhelmingly he did not know

25    that.

1          Now when I opened to you, ladies and gentlemen, a

2     couple weeks ago, I described 285 Mountain Road -- that's my

3     client's house.  I think it's actually South Mountain Road, but

4     last night in the middle of the night I left out the "south,"

5     forgive me -- as a house divided.  You heard several witnesses

6     tell you about how my client and his wife lived in a sort of

7     smaller almost separate apartment area off to the left of the

8     house and then Ji Lee lived with his children and his wife in

9     the larger part of the house, and that is the office over there

10    where all that cash was found.

11         Ladies and gentlemen, you have heard from a number of

12    witnesses in a number of ways about the conflict between my

13    client and his son.  That they were not getting along very

14    well.  I want you to consider the testimony of Ms. Soon Back,

15    his sister-in-law, who testified just a couple of days ago.

16    She told you about how Mr. Lee is from a different generation

17    than his son.  He's kind of old world.  He eats different food,

18    has different attitudes, different viewpoints than his son.

19    His son, who is Americanized, is a very different person, and

20    the son and the father had disputes and didn't get along.  She

21    also told you, by the way, that she worked at the Photo Arts

22    store, and she told you about collecting the cash rents on

23    behalf of Mr. Lee.  So she told you about a source of some of

24    cash that has nothing to do with drug dealing.

25         You also heard from Jae Lee, Mr. Lee's son.  You heard

E9JTCHA4                          Summation - Mr. Riopelle

1     from him that his brother and his dad didn't get along.

2     Indeed, I think you saw when I asked him that question

3     directly, he choked up a little bit, it was difficult for him

4     to answer.  It's difficult when families are unhappy.  It's

5     difficult when you can't get along.

6              He told you also, I thought, very interesting, that

7     when his dad has a problem with the computer, he doesn't go to

8     Ji Lee, who lives in the house, he calls his son Jae in

9     California 3,000 miles away for help on his computer.  He would

10    rather talk to Jae than Ji.  The same thing with his travel

11    arrangements.  Jae told you about that, too.  He helped his dad

12    make travel arrangements because his dad didn't like to deal

13    with Ji when he could avoid it.

14             And consider also the testimony of Andrew Chong and

15    Reverend Shim who testified just yesterday, Mr. Chong a couple

16    days ago.  They told you about Mr. Lee's character.  Andrew

17    Chong handled Mr. Lee's tax returns and matters relating to his

18    business for more than 20 years.  He told you that he's honest

19    and law abiding with his business.  Reverend Shim has known

20    Mr. Lee for almost 25 yours.  He told you Mr. Lee is an elder

21    in his church, respected by all who know him, and is known as

22    an honest and good man.

23             And this is called character testimony, and the judge

24    will give you the law.  The law is that you got to consider

25    that testimony about a defendant's character with all the other

E9JTCHA4                    Summation - Mr. Riopelle

1   evidence you consider in the case.  And evidence of good

2   character, the evidence you heard from Mr. Chong and Reverend

3   Shim can itself create a reasonable doubt in a criminal case

4   even where, without such evidence, there would be no such

5   doubt.

6          And ladies and gentlemen, the truth is at the end of

7   the day you really are being asked to judge someone's character

8   in a criminal case.  That's what this case is about in some

9   ways.  What is the character of Mr. Lee?  I'm going to ask you

10  to consider that character evidence very carefully when you

11  deliberate.

12         In a few moments I'm going to sit down, and soon

13  indeed I and all the other participants in this trial will,

14  like the characters in a play, melt into thin air in your

15  minds, and this insubstantial pageant you have watched over the

16  last couple of weeks shall dissolve as all your memory of all

17  that happened here begins to fade and you go back to your lives

18  and your routines, your jobs, and your families and all that's

19  dear to you.  You won't be asked to think any more about

20  Mr. Lee or the evidence in this case or my arguments or the

21  law.  You won't have to think about that any more, and I, and

22  all the other lawyers here and the judge, will all go on to our

23  next case.  Maybe we'll have it together, I don't know, but

24  we'll all go on to our next case and we'll start to focus on

25  that and we'll forget about this one, too.

E9JTCHA4                        Summation - Mr. Riopelle

1              Unfortunately, the same will never be true for

2     Mr. Lee.  The loss of his son to an ugly and terrible crime,

3     the damage to his good reputation, the loss of the business

4     that he spent his life building for many, many years, the

5     remorse and the pain he feels over the events in this case,

6     these are things that are permanent for him.  They won't ever

7     fade.  They will stay with him until the day he dies.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. RIOPELLE:  For the rest of his life, the pain and

2     the sorrow that this case has caused him to bear, he will carry

3     those with him.  The wounds he suffered in January of 2013 when

4     his son was arrested, they won't ever completely heal.  But,

5     ladies and gentlemen, he can be spared a felony conviction here

6     based on the evidence we've discussed.  I ask you to spare him

7     that after a careful and searching review of the evidence.

8          The truth is, ladies and gentlemen, that justice,

9     justice is done by an acquittal just as much as it is done by a

10    conviction.  That too is a ancient principle.  If you're ever

11    in London, I'd encourage you go watch a trial in London.  I've

12    taken a few busman's holidays there myself.  It is the oldest

13    continuously functioning criminal court in the English speaking

14    world.  On the wall as you enter that wonderful place is

15    inscribed a statement, in this hallowed place of justice, the

16    crown never loses.  Not because they win every case, not

17    because the government always wins, because justice is done by

18    an acquittal.  And when that happens, the government wins.

19    Acquittal here is a win for the government because justice will

20    have been done to Mr. Lee.

21          As I prepare to sit down, I want you to recall

22    carefully the wonderful arguments of Mr. Agnifilo.  If you find

23    that any of those arguments apply with equal force to Mr. Lee,

24    I ask you to consider them for him.  I'm only one person, and I

25    certainly can't think of everything.  I make my share of

E9jzcha5                       Mr. Riopelle - Summation

1   mistakes and forget things, and you've probably seen that a
2   couple of times during this trial.  I hope you'll forgive me
3   for that and I hope you won't hold against Mr. Lee any of my
4   faux pau or peccadillos.  I also ask you to listen very closely
5   to what I'm sure will be the very able arguments of Mr. Kobre
6   when he makes them.  I won't get a chance to stand up and
7   address them directly, as I was able to address the very fine
8   arguments of my colleague Mr. Tehrani.  But, ladies and
9   gentlemen, if the presumption of innocence is to mean anything
10  at all, it must mean that when you consider Mr. Kobre's
11  arguments in rebuttal, you must ask yourself what would Mr.
12  Riopelle say about that.  Wait a minute, what does the other
13  evidence demonstrate?  And what is the counter argument for Mr.
14  Lee.  Your oath as jurors is to follow the Judge's instruction
15  on the presumption of innocence which stays with Mr. Lee
16  throughout Mr. Kobre's argument.  It requires you to do this,
17  think of the counter arguments, think of the other evidence.
18  And, now ladies and gentlemen, I give Mr. Lee to you, with only
19  that presumption of innocence and the evidence in this trial
20  protecting him.  I cannot do more for him than I have done.
21  And in a paraphrase of Mr. Lincoln, our 16th president who was
22  a pretty darn good trial lawyer before he made a mistake and
23  went into politics, I ask you to keep on with the work you've
24  done so well and without prejudice, with malice toward none and
25  with charity for all, the charity that the presumption of

E9jzcha5                          Mr. Riopelle - Summation

1    innocence requires.  I ask you to keep on and strive in this

2    work we are doing to reach a good and just result.  And in this

3    case, ladies and gentlemen, I submit to you that that result is

4    a not guilty verdict for Mr. Lee.  Thank you for listening to

5    me.

6               THE COURT:  We're going to take our luncheon recess

7    now.  We'll resume with the Government's argument and rebuttal

8    to the jury.

9               THE DEPUTY CLERK:  All rise.

10              (In open court; jury not present)

11              THE COURT:  Please be seated.  Mr. Kobre.  Yes?

12              MR. AGNIFILO:  I'm sorry, I thought --

13              THE COURT:  Did you want to say something?

14              MR. AGNIFILO:  No, I thought you were saying

15   something.  I apologize.

16              THE COURT:  I was going to ask Mr. Kobre how much

17   longer, how much --

18              MR. KOBRE:  Not more than half an hour.

19              THE COURT:  All right.

20              MR. KOBRE:  Is that --

21              THE COURT:  I got to take a plea now, so everybody

22   enjoy their lunch.

23              MR. RIOPELLE:  Thank you, Judge.

24              (Luncheon recess)

25              A F T E R N O O N   S E S S I O N

E9jzcha5                          Rebuttal - Mr. Kobre

1          2:00 p.m.

2          THE COURT:  Call the jury in.

3          THE DEPUTY CLERK:  Yes, sir.

4          All rise.

5          (Jury entering)

6          THE COURT:  Please be seated.

7          You'll now hear argument from the government.

8          Mr. Kobre.

9          MR. KOBRE:  Thank you, Judge.

10         Ladies and gentlemen, I want to thank you for your

11    close attention to this case.  I'm just going to ask a few more

12    minutes of your time to respond to some of what you just heard.

13         THE COURT:  Mr. Kobre, is your microphone on?

14         MR. KOBRE:  Here we are.

15         I'm just going to take few more minutes of your time

16    to respond to some of what you just heard.

17         Now, as you know, the government has the burden of

18    proof in this case, and as in every criminal case, and we

19    embrace that burden and we have met that burden in this case.

20         Now the defendants do not have any responsibility to

21    do anything in this case.  But when defense counsel make

22    arguments on behalf of their clients, it's appropriate for the

23    government to respond to those arguments.

24         Mr. Riopelle and Mr. Agnifilo are very good lawyers,

25    and they've made many arguments, and I don't have time to

respond to all of them, but I'm going to respond to some of

them.  And I'm going to rely on your own common sense and your

own recollection of the evidence to respond to the other

arguments that they made.

        In short, what Mr. Riopelle and what Mr. Agnifilo have

done is try to distract you from what is really the evidence in

this case.  Because when you consider the evidence that you

heard from the witnesses testifying from the witness stand, and

the exhibits you saw in that case, you will see that the

defendants are guilty.

        Now, let me turn first to some of the arguments that

were made by Mr. Agnifilo.

        You heard Mr. Agnifilo say that the oxycodone

conspiracy at Stanley Pharmacy was essentially a one man job;

it was Ji Lee, Ji Lee, Ji Lee.  Now, ladies and gentlemen, a

conspiracy, like many undertakings, often involves several

different people who play all different types of roles.

Conspiracy to rob a bank involved a person who goes into the

bank, involve the person who drives the getaway car.  It

involves even a person who does an act, any act no matter how

small, in furtherance of the conspiracy.  And all of those

different people play different roles.  It's not necessary for

the different members of the conspiracy to not even like each

other or be on the same team, if they're acting in furtherance

of the conspiracy.

E9jzcha5                          Rebuttal - Mr. Kobre

1           Now, ladies and gentlemen, the evidence in this case

2    has shown that the defendant, Ms. Chai, was a crucial part of

3    this conspiracy.  Why was she a crucial part of this

4    conspiracy?  Because the important thing to remember is without

5    Ms. Chai's participation, Stanley Pharmacy could not have gone

6    onto distribute oxycodone, could not have distributed enormous

7    amounts of oxycodone in exchange for the fake prescriptions

8    that Ms. Chai knew were being brought in day after day after

9    day.

10          Ladies and gentlemen, you know that in any business,

11   one of the most important aspects of that business is the

12   source of supply.  You can have, may have customers, you may

13   have a store front, you may have a phone number, but without

14   the supply you don't have a business at all.  And that is what

15   Ms. Chai provided.  Because without her pharmacy license,

16   without her being the pharmacist at Stanley Pharmacy, without

17   her knowing participation, Stanley Pharmacy couldn't have

18   gotten the oxycodone that they bought.  So Ms. Chai was a

19   crucial part of this conspiracy.

20          You heard Mr. Agnifilo talk about whether Ms. Chai

21   approved prescriptions.  And I submit to you, ladies and

22   gentlemen, that that's a distraction.  You know exactly what

23   Ms. Chai did.  You heard it from not only from her own

24   statement, but you heard it from the drug addicts and the

25   cooperators who were here who testified.  You heard it from the

E9jzcha5                          Rebuttal - Mr. Kobre

cashiers.  She wrote, she approved of every one of those

prescriptions by -- what did she do?  She put her initials on

it, she handled the prescription.  She took the label and she

put it on the back, she took the label, she put it on the

bottle, she handled it to Ji.  It's a matter of semantics,

ladies and gentlemen.  Of course she approved it that's what

approving is, when you put -- you handle the prescription and

you're the pharmacist and you put your initials on it, and you

put the date on it, and you put the label on the bottle, that's

what you're doing.  That is participation.  And each and

everyone of her signatures on each and every one of the

prescriptions was her personal endorsement on another drug

deal.  That was happening just feet away from her.

          What did Mr. Agnifilo try to distract you is by saying

blame the drug addict, the drug dealers who were going into

Stanley Pharmacy to get the drugs.  It's a distraction.  Those

people were not -- those people were not pharmacists.  Those

people were not dealing out dealing the drugs that were coming

straight in from the distributor.  Those people didn't have

pharmacy licenses.  And, ladies and gentlemen, those people,

each pled guilty to a conspiracy involving obtaining oxycodone

for Stanley Pharmacy.

          Mr. Agnifilo tells you, well, look at Ixchel Campos,

look at Miriam Padilla.  Ladies and gentlemen, it's a

distraction.  Those people are not pharmacists.  They don't

1    have the education.  They didn't take exams in New York and New

2    Jersey law exams, specifically involving diversion.  Those

3    cashiers were not signing the prescriptions.  Those cashiers

4    were not putting labels on bottle.  Ixchel Campos, 17 year old

5    high school student who worked at the pharmacy was able to tell

6    felt the paper of those prescriptions was table to tell they

7    felt funny.  And Mr. Agnifilo is asking you to compare

8    Ms. Chai, a licensed pharmacist who went to school for years

9    for that, and worked at pharmacies, not only at this pharmacy,

10   but at a prior pharmacy for years, and he wants you to compare

11   her to Ixchel Campos.  Ladies and gentlemen, Mr. Agnifilo wants

12   you to -- says that somehow Ms. Chai is simply being held

13   responsible for not catching what other people did.  Ladies and

14   gentlemen, it has nothing to do with Ms. Chai catching someone.

15   It has to do with Ms. Chai day after day after day coming in

16   and putting her endorsement and her stamp on drug deals that

17   were happening in that store.

18          Another distraction.  Mr. Agnifilo wants -- says,

19   well, Ji Lee sometimes did this when Ms. Chai wasn't working

20   there.  Ms. Chai took days off, or this happened at other

21   times, or there are Hs on a lot of prescriptions.  Ladies and

22   gentlemen, it's a distraction.  He wants to refocus you from

23   what Ms. Chai did, which was sign thousands, thousands of these

24   prescriptions, and fill thousands of these prescriptions,

25   because sometimes Ji Lee did this when she was not there.  It a

E9jzcha5                        Rebuttal - Mr. Kobre

1    distraction.

2              What's another distraction?  Mr. Agnifilo wants you to

3    focus on why, why the defendant Ms. Chai continued to do this.

4    But, ladies and gentlemen, why she continued to do this is not

5    relevant.  And I expect that Judge Crotty will instruct you on

6    the law, which is that motive immaterial; that motive is

7    immaterial, and that whether Ms. Chai was doing this to make

8    her sister happy, it's still a drug conspiracy.  Whether

9    Ms. Chai was doing this because she didn't want to make waives,

10   she still participated in the drug conspiracy.  Whether it's

11   just not her personality to make waives, she still participated

12   in that drug conspiracy.  It's a distraction.  And I expect

13   Judge Crotty will instruct you that motive is not material.

14   Why she did it is not material.

15             Now, Mr. Agnifilo also suggested to you that, well,

16   look despite the fact that Ms. Chai admitted that she was

17   suspicious, despite all the other evidence that you saw that

18   this was happening all around her, despite the prescriptions

19   that looked washed, despite the drug dealers who were coming in

20   day after day, whose faces Ms. Chai recognized, despite all of

21   these things, despite Ji meeting with the drug dealers on the

22   sides of the pharmacy off to the side regularly and handing

23   them bottles of pills, despite all of that, Ms. Chai was

24   suspicious, she was suspicious, but she didn't know.  And,

25   ladies and gentlemen, my colleague, Mr. Tehrani, talked to you

E9jzcha5                          Rebuttal - Mr. Kobre

1    about conscious avoidance.  But for a moment I want you to

2    focus on the fact that I think we've been stretching the

3    meaning of the use of the word suspicious really beyond what it

4    could be used by.  It's simply, there comes a point where when

5    you make observations and you see things that are going on day

6    after day and you're actually participating in those things,

7    they become at some point no longer suspicious.  You know what

8    they become, ladies and gentlemen?  They become a crime in

9    progress that you are personally observing and participating in

10   every day.  And that is exactly what happened here.  Because

11   bottom line is if the defendant admitted and the evidence shows

12   that she saw the high prices that were over $1,000 per

13   prescription, she saw Ji Lee meeting with the drug dealers on

14   the sides.  She saw the same drug dealers coming in.  And this

15   didn't happen once.  If you say it happened once, maybe it was

16   a mistake.  It happened day after day after day, month after

17   month starting from early -- starting from by defendant's own

18   statement, early December 2012 until the pharmacy finally

19   closed down in January 2013, more than six months by

20   defendant's own statement.

21            And Mr. Agnifilo touched on this, but I think rather

22   briefly.  The call that came in from Bellco was important,

23   ladies and gentlemen.  That call's important because what is

24   clear from the evidence is that the defendant lied when that

25   call came in.  What is clear from the evidence is that

E9jzcha5                         Rebuttal - Mr. Kobre

1    Christina Chai, the defendant, told the Bellco representative

2    when asked why the pharmacy was ordering so much oxycodone,

3    that it was because of an increase in Medicaid customers coming

4    in.  Ladies and gentlemen, not only do you know that that could

5    not be further from the truth, that in fact the oxycodone

6    prescriptions were being paid for almost enormously

7    overwhelmingly with cash, but the defendant knew that.  She

8    knew it because she was the one putting the labels on the back

9    that actually indicated that they were being paid for in cash.

10   She knew it because she saw the price was over, was over $1,000

11   per prescription.  Medicaid wasn't paying over $1,000 for

12   prescription, which is five times what other pharmacist were

13   charging.  She knew it, ladies and gentlemen, because she was

14   right there back with Ji when those paper bags and plastic bags

15   of cash were being handed back there.  So she knew it was a

16   lie.

17           Just to address briefly something Mr. Agnifilo said

18   about the statement, I think it's about defendant's statement.

19   I think it important.  In her statement the defendant said that

20   she never saw one of those daily audit reports, she never saw

21   one of those daily audit reports of the type Mr. Agnifilo

22   spread out here.  But today we find out, today we find out that

23   not only did the defendant see them, she actually signed them.

24   And not only did she actually sign them with her initials CC,

25   but she didn't only sign them for the days she was actually

E9jzcha5                          Rebuttal - Mr. Kobre

present at the pharmacy, she signed them even for other days,

when they were presented to her by Ji Lee.  I think that's

significant, ladies and gentlemen, because it shows

consciousness of guilt.  It shows that when she made her

statement she was not entirely truthful.

        Another point along the same line.  Mr. Agnifilo wants

you to believe, he cites Dr. Catizone's testimony that

increases in trends in pain management, rather, led to an

increase in oxycodone distribution generally across the country

and therefore and, therefore, Ms. Chai didn't question the

enormous increases in oxycodone being dispensed at Stanley

Pharmacy.  Well, ladies and gentlemen, consider this.  Mr.

Agnifilo wants you to believe that she knew, that the defendant

knew that the trends in oxycodone distribution, but she didn't

know that when you see regulars coming in day after day after

day with oxycodone prescriptions, when you see prescriptions

that look as if they were part of an arts and crafts project

day after day; that when you see Ji Lee going to the side

having conversations and handing pill bottles to others, that

when you see an enormous price increases that, that the

defendant didn't realize.  But trends in pain management across

the country, that much the defendant knew about is, it's simply

incredible, ladies and gentlemen.

        Now, ladies and gentlemen, Mr. Agnifilo said that in

some ways this case is a sad case.  And it's true, in some ways

1   it is.  It's sad when you don't like your job.  It's sad when

2   family's involved, and it's sad when otherwise good people get

3   involved in crimes.  But, ladies and gentlemen, that does not

4   detract in one bit from the seriousness of the crime that was

5   committed here by this defendant when she came in to work every

6   single day and put her personal endorsement on drug deal after

7   drug deal after drug deal.

8           I just want to turn to the defendant Hi Jong Lee.

9   Now, in a minute I want to discuss why Mr. Riopelle's arguments

10  are entirely inconsistent with each other, and with the

11  evidence that you saw and heard in this case.  But first let's

12  talk about what Hi Jong knew about what was happening at

13  Stanley Pharmacy in 2011 and 2012.  Because I submit to you

14  that Hi Jong knew or at the very least was aware of a very high

15  probability that oxycodone was unlawfully being distributed at

16  Stanley Pharmacy.  Now, Mr. Riopelle said that Hi Jong had

17  turned the pharmacy over to his son before the drug conspiracy

18  began.  That simply is not consistent with the evidence in this

19  case.  You heard that Hi Jong was and always remained the

20  president and owner of Stanley Pharmacy.  You heard that he

21  himself, you heard the statement, his statement to the agents

22  he, himself, does the banking and paperwork at the pharmacy.

23  You heard it.  He told the agents, and you heard it also from

24  Miriam Padilla, Hi Jong does the payroll at the pharmacy.  You

25  know from the Bank of America employees who came in here and

E9jzcha5                          Rebuttal - Mr. Kobre

1   Providence Maia, that Hi Jong is the one who makes the cash

2   deposits, Hi Jong is the one who makes the cash deposits at the

3   Bank of America.  You know from the bank certificate of

4   authority for the bank for the pharmacy bank account that it's

5   Hi Jong who is the authorized signer on that account, not Ji

6   Lee.  Hi Jong controls that account.  And you know that Hi Jong

7   was not unsophisticated.  You heard during this trial that he

8   owned another business, that he owned other properties.  He's

9   not an unsophisticated person.  So the evidence is quite clear

10  that Hi Jong had not turned over the pharmacy to his son, when

11  this conspiracy began.  So what did Hi Jong know about what was

12  going on at Stanley Pharmacy?  Well, you know that he knew that

13  there was a massive explosion in cash being taken into the

14  pharmacy.  He, himself, was depositing that cash, personally,

15  thousands of dollars, just under $10,000 at a time, again and

16  again, day after day, month after month suddenly starting in

17  2011 and going until 2013 when the pharmacy was closed down.

18  He knew that the pharmacy's bank account, his bank account, the

19  bank account which he was authorized signer on, that the

20  balance of that bank account had exploded from just about 200

21  to almost $800,000 at the time the pharmacy closed down.  He

22  knew that.  You don't -- that's something you don't miss when

23  your bank account goes triples or quadruples.  You know that it

24  happened.  You know it's happening.  And where was Bellco, the

25  oxycodone supplier being paid from?  From that very same bank

E9jzcha5                         Rebuttal - Mr. Kobre

1  account, ladies and gentlemen.  So what did Hi Jong do, having
2  this knowledge?  What did Hi Jong do?  Well, he took steps to
3  hide the massive cash increase.  What were those steps?  He
4  structured, he arranged his deposits at the bank so that the
5  bank would not file the CTR reports.  And the evidence is quite
6  clear on that.  I'm going to come back to it in a little bit.
7  And what else does he do, ladies and gentlemen, aside from
8  structuring his deposits, so as to hide them?  The other thing
9  he did, ladies and gentlemen, was when he was the pharmacist,
10 by his own admission, he was the Saturday pharmacist, okay, so
11 he was the only other pharmacist in that pharmacy on Saturdays.
12 And where did he go when he came in?  When he came into that
13 pharmacy, he said he spent some time upstairs.  But as you
14 heard from Ixchel Campos that was the cashier who works on
15 Saturdays, he went down to the basement knowing, knowing,
16 ladies and gentlemen that his son, who is not a pharmacist, and
17 his daughter who is also not a pharmacist, were upstairs
18 dispensing controlled substances.  So Hi Jong both hid the fact
19 that all this cash was coming in by making structured deposits
20 in the bank and then he deliberately hid himself in the
21 basement while his son and daughter were upstairs distributing
22 controlled substances without a pharmacist present.  And Mr.
23 Tehrani made the point, I think it's important to reiterate,
24 and I think you'll hear from Judge Crotty when he instructs you
25 on the law, that it is a conspiracy, it is a narcotics

E9jzcha5                        Rebuttal - Mr. Kobre

1    conspiracy for a practitioner like the defendant Hi Jong to

2    conspire with a non-practitioner like Ji Lee to unlawfully

3    distribute controlled substances, and that is precisely what

4    happened in this case.  When Hi Jong came in on Saturdays and

5    went knowing, knowing that there was no one else present at the

6    pharmacy, no other pharmacist present at the pharmacy, and

7    leaving Ji Lee and his daughter, both non-pharmacists upstairs

8    to distribute controlled substances.

9            Now let me just talk briefly about the structuring.

10   Because I submit to you, ladies and gentlemen, that Mr.

11   Riopelle has basically taken a shot gun approach to just

12   throwing out whatever might stick in terms of defenses to the

13   structuring.  So first we hear, and I'm going to run through

14   these very quickly.  First we hear, well, maybe the deposits

15   went into the night depository.  Another time we hear that

16   maybe the deposits came from a different business, that the

17   defendant ran.  Then we hear that, well, maybe it was Ji Lee

18   who prepared the money and just packaged up the money and left

19   it for Hi Jong to walk it over to the bank a half a block away.

20   We hear, well, maybe it's just coincidental, it just works out

21   that way that over 300 deposits, over 300 deposits in two

22   years, and none of them are, none of them are greater than

23   $10,000, but many of them just almost approach that amount.

24   Let's turn to some of these.  First, the notion that he didn't

25   deposit the cash was put into the overnight drop box.  Ladies

E9jzcha5                      Rebuttal - Mr. Kobre

1    and gentlemen, the problem with that is that you heard from the

2    bank employees, Providence Maia, who works at the bank, the

3    only person she dealt with him on a regular basis with the

4    defendant, who is the defendant personally came to make many of

5    these deposits, you heard from Kadene Gayle.  She remembers Mr.

6    Lee, even though she worked at the bank in 2011, she remembers

7    him as a person who came in with all the deposits that were

8    just below, $10,000. ladies  and gentlemen, people generally

9    don't deposit large amounts of cash bordering on $10,000 in an

10   overnight drop box.  You want to make the deposits personally.

11            MR. RIOPELLE:  Objection.

12            THE COURT:  Overruled.  It's argument.

13            MR. KOBRE:  And, ladies and gentlemen, these are --

14   I'm not just saying this.  This is Mr. Riopelle's own words in

15   his opening, I'm going to quote them to you.  Some of the

16   deposits were pretty large, and you'll hear that my client made

17   sure to hand carry those deposits into the bank himself.  He

18   made the deposits in person.

19            And, ladies and gentlemen, that makes sense.  You have

20   almost $10,000, you want to make sure it gets to where it's

21   going.  You want to get the deposit slip, you know, so that you

22   can assure yourself that you have a record that deposit was

23   made

24            (continued on next page)

25            MR. KOBRE:  Hi Jong Lee wants you to believe that

E9JTCHA6                    Summation - Mr. Kobre

 1   somebody else was making the deposits.  Well, if that's the
 2   case -- and again, the defendant doesn't have any burden, the
 3   defendant doesn't have to do anything, but the defendant put on
 4   a handwriting expert, and the handwriting expert looked at
 5   thousands of prescriptions, some of which weren't relevant to
 6   his case.  The handwriting expert reviewed thousands of
 7   prescriptions with CCs on them.  How come you didn't hear a
 8   word from the handwriting expert about the handwriting that was
 9   on the deposit slips?  That's because it was the defendant who
10   wrote those deposit slips and it was the defendant who brought
11   those deposits personally into the bank.
12               MR. RIOPELLE:  Objection.
13               THE COURT:  Overruled.
14               MR. KOBRE:  Then the defendant tries to argue well,
15   maybe the deposits are all coincidental, maybe it worked out
16   that way, just worked out that way that the deposits were never
17   over 10,000.  But ladies and gentlemen, that's just common
18   sense.  Look at all the deposits.  They are in amount 7, 8,
19   9,000, 9,700, never reaching 10,000.
20               Mr. Riopelle pointed out some examples where, well,
21   maybe it was on a Saturday and the slip was written on Saturday
22   but it came in Monday morning.  But ladies and gentlemen, you
23   know many of those Monday morning deposits were in-person
24   deposits because, as Mr. Tehrani pointed out, many OF those
25   deposits came with a Monday morning handwritten deposit slip.

E9JTCHA6                          Summation - Mr. Kobre

1    So you know that those deposits, which were made earlier in the

2    morning, and the 9 and 10 o'clock hour, were made in person.

3    And ladies and gentlemen, they were made in person by the

4    defendant.

5            And Mr. Tehrani also showed you an example of this,

6    but you know the defendant was structuring.  You know this was

7    on purpose.  You know that not only because Kadene Gayle told

8    you about a specific instance where the defendant actually took

9    back $2,000 because it would have bumped him up above the

10   $10,000 limit, he took it back when he was asked for ID.  You

11   know that not only because of that, but you know it because the

12   examples where the defendant purposely held back the cash

13   deposit, purposely held back the cash deposit for several days

14   when he was making other deposits because on any one of those

15   subsequent days it would have driven the amount deposited over

16   $10,000.  So ladies and gentlemen, you know that this wasn't

17   coincidental.

18           Then the defendant takes the third proffered reason,

19   that the defendant had another business.  But ladies and

20   gentlemen, you heard from Detective Cassino that that business

21   closed down about a year before Stanley Pharmacy closed down.

22   So the deposits were not coming from the Photo Arts business in

23   2012.

24           And ladies and gentlemen, you know the defendant's

25   other reason, in which, according the defendant it was Ji Lee

E9JTCHA6                    Summation – Mr. Kobre

1   who sort of packaged the money up and carried it over the bank.

2   Does it make any sense to you?  It's preposterous, the notion

3   that the defendant is coming from New City -- the defendant, by

4   the way, who rarely, we're told, leaves his bedroom, travels

5   from New City, New York, to Yonkers not to actually do any

6   counting of money or banking, but simply to walk over a

7   preprepared package of cash that is already prepared for him

8   half a block to a bank a half a block away.  Ladies and

9   gentlemen, it's simply not credible.

10          Ladies and gentlemen, the defendant Hi Jong's position

11   is simply inconsistent.  On the one hand he wants you to

12   believe that he turned over his entire business to his son Ji

13   Lee, that he trusted him enough to do that, but he didn't trust

14   him enough to ask him to help him with his computer problems or

15   to ask him for help making travel plans.  Simply not credible.

16   He wants you to believe that he was so uninvolved in the

17   pharmacy, but nevertheless, he was the one who maintained

18   authority over the bank account, he was the one who made the

19   cash deposits.

20          Ladies and gentlemen, defense counsel has suggested

21   somehow this case is about character.  Ladies and gentlemen,

22   it's not about character, it's about facts, it's about

23   evidence, it's about the witnesses, it's about the crime that

24   was committed.

25          Now as you know from the trial, the evidence in this

E9JTCHA6                    Summation - Mr. Kobre

1    case is overwhelming.  You have the prescriptions themselves to

2    look at, you have the bank accounts, and the charts that

3    describe the bank transactions and the bank deposits, you have

4    seen the videos of the Defendant Chai walking right by drug

5    dealing, and the bank employees, and the cashiers, you heard

6    all that testimony.  When you consider all that testimony,

7    ladies and gentlemen, when you go back to the jury room, I ask

8    that you come back with only verdict that is consistent with

9    the evidence in this case, and that is that the defendants

10   Christina Chai and Hi Jong Lee are guilty.  Thank you.

11            THE COURT:  Would you like a brief recess?

12            All right.  I'm going begin my charge now, and a lot

13   of it will seem familiar to you because just two weeks ago I

14   asked you a lot of questions about whether or not you would be

15   able to follow my instructions.  I gave you preliminary

16   instructions on how to consider the evidence and credibility,

17   and we'll go over those same principles.

18            I told you at the beginning how important your service

19   is to our country and our system of justice.  You have been

20   most conscientious in your attendance, your punctuality, and

21   the complete attention you have given during the trial.

22            I'm going read my instructions to you, but I want you

23   to know that I'm going send the instructions into the jury room

24   so you don't have to take notes as you listen.  Put your pens

25   down and relax, try to concentrate on what I'm saying.

1          Do not single out any particular instruction as alone

2     stating the law, but you should instead consider my

3     instructions as a whole.

4          We are now approaching the most important part of the

5     case, your deliberations.  You have heard all the evidence as

6     well as the final arguments of the lawyers for the parties.

7     Before you retire to deliberate, it's my duty to instruct you

8     as to the law that will govern during your deliberations.  As I

9     told you at the start of the case, and as you agreed, it is

10    your duty to accept my instructions of law and to apply them to

11    the facts as you determine them.

12         Regardless of any opinion that you may have as to what

13    the law may be or ought to be, it's your sworn duty to follow

14    the law as I give it to you.  Also, if any attorney or other

15    person has stated a legal principle different from any that I

16    state to you in my instructions, it is my instructions that you

17    have to follow.

18         Your duty is to decide the factual issues of the case

19    and arrive at a verdict.  You, the members of jury, are the

20    sole and exclusive judges of the facts.  You decide the weight

21    of the evidence; you determine the credibility of witnesses;

22    you resolve such conflicts as there may be in testimony; and

23    draw whatever reasonable inferences you decide to draw from the

24    facts as you determine them.

25         In determining the facts, you must rely upon your own

E9JTCHA6                         Charge

1    recollection of the evidence.  None of what the lawyers have

2    said in their opening statements, their closing arguments,

3    their questions or objections is evidence.  They're not sworn

4    as witnesses.  They do not testify.  They make arguments about

5    what conclusions you should draw from the evidence or lack of

6    evidence.  But as I said, argumentation is not evidence.  And

7    the same is true of me.  Anything I may have said is not

8    evidence.  I have allowed you to take notes, but as I said

9    earlier when I permitted you to take notes, your notes are not

10   evidence either.

11          The evidence consists of two things, the testimony

12   given by the witnesses that was received in evidence and the

13   exhibits that were received in evidence, including the

14   stipulation of the parties.

15          Testimony consists of the answers that were given by

16   the witnesses to the questions that were permitted.  The

17   questions themselves are not evidence.  It is the answers to

18   the questions that count.  Remember, you may not consider any

19   answer that I directed you to disregard or that I directed be

20   stricken from the record.  Also, as I instructed you at the

21   beginning of the case, and I'm sure you complied with these

22   instructions, anything you may have seen or heard about this

23   case outside the courtroom is not evidence and must be entirely

24   disregarded.

25          It is the duty of the attorney for each party to

E9JTCHA6                          Charge

1    object when the other party offers testimony or other evidence

2    that the attorney believes is not properly admissible.  Counsel

3    also have the right and the duty to ask for the Court to make

4    rulings of law and to request conferences out of the hearing of

5    the jury.  All such questions of law have to be decided by me.

6    You should not show any prejudice against any attorney or party

7    because the attorney objected to the admissibility of evidence

8    or asked for a conference out of your hearing or asked me for a

9    ruling on the law.

10          I instruct you now that the testimony and documents

11   that have been admitted into evidence are appropriate for your

12   consideration.  You may consider all the evidence that has been

13   admitted.

14          I also ask you to draw no inference from my rulings or

15   from the fact that upon occasion I asked questions of certain

16   witnesses.  My rulings were no more than an application of law,

17   and my questions were only intended for clarification or to

18   expedite matters.  You are expressly to understand that I have

19   no opinion as to the verdict you should render in this case.

20          With regard to impartiality, you are to perform your

21   duty of finding the facts without bias or prejudice as to any

22   party.  You are to perform your duty with an attitude of

23   complete fairness and impartiality.  This case is important to

24   both parties.  Ms. Chai and Mr. Lee are charged with serious

25   crimes.  They have pleaded not guilty.  It is important for the

1    government, too.  Enforcement of criminal laws is a prime

2    concern of the government.

3           The fact that the prosecution is brought in the name

4    of the United States of America entitles the government to no

5    greater consideration than that accorded to any other party.

6    By the same token, it is entitled to no less consideration.

7    All parties, whether the government or individuals, stand as

8    equals before this Court.

9           It would be improper for you to consider, in reaching

10   your decision to whether the government sustained its burden of

11   proof, any personal feelings you have about Ms. Chai or

12   Mr. Lee's race, religion, national origin, wealth, gender, or

13   age.  Similarly, it would be improper for you to consider any

14   personal feelings that you may have about the race, religion,

15   national origin, wealth, gender, or age of any other witness or

16   anyone else involved in this case.  Every defendant is entitled

17   to the presumption of innocence, and the government has the

18   burden of proof, as I will discuss in detail in a moment.  It

19   would be equally improper for you to allow any feelings you

20   might have about the nature or the crime charged to interfere

21   with your decision-making process.

22          You are not to be swayed in any way by sympathy.

23   Rather, the crucial question that you have to ask yourselves as

24   you review the evidence is has the government proved the guilt

25   of Ms. Chai, Mr. Lee, or both, beyond a reasonable doubt?

1         It must be clear to you if you let bias, prejudice,

2    fear, disgust, sympathy or any other irrelevant consideration

3    interfere with your thinking, there would be a risk that you

4    would not arrive at a true and just verdict.  So do not be

5    guided by anything except clear thinking and calm analysis of

6    the evidence.  Sympathy can play no role in your deliberations.

7         You should also not consider any personal feelings you

8    may have about the attorneys who represent the parties in this

9    matter.  As I indicated at the beginning of this trial, the

10   lawyers and other participants at the counsel table have been

11   instructed not to have any communication with you as jurors.

12   If, due to the congestion in the courthouse, you ran into

13   counsel and they ignored you, they did so because they were

14   supposed to ignore you.  That's the rule.  This should not

15   influence your decision in any way regarding Ms. Chai or

16   Mr. Lee's guilt or innocence.

17        With respect to punishment, the question of Ms. Chai

18   and Mr. Lee's possible punishment is of no concern to the jury

19   and should not in any sense enter into or influence your

20   deliberations.  The duty of imposing a sentence rests

21   exclusively with the Court.  Your function is to weigh the

22   evidence or lack of evidence in the case and determine whether

23   or not Ms. Chai, Mr. Lee, or both, are guilty beyond a

24   reasonable doubt solely on the basis of the evidence.

25        Now the defendants, Ms. Chai and Mr. Lee, were

E9JTCHA6                          Charge

1    formally charged in an indictment.  They are entitled to know

2    the charges against them.  But as I instructed you when the

3    trial started, the indictment is not evidence.  It merely

4    describes the charges against Ms. Chai and Mr. Lee and may not

5    be considered by you as evidence of guilt.  You are to give no

6    weight to the fact that a grand jury returned an indictment

7    against Ms. Chai and Mr. Lee.

8            I'm not going to read the entire indictment to you,

9    but I will summarize the offenses charged.  I will then explain

10   in detail the elements of the charged offense.  Before you

11   begin your deliberations, you will be provided with copies of

12   the indictment.

13           Now as we've already heard, the law presumes Ms. Chai

14   and Mr. Lee innocent until proven guilty beyond a reasonable

15   doubt.  Ms. Chai and Mr. Lee have entered a plea of not guilty

16   to the charges alleged in the indictment.  As a result, the

17   government has the burden to prove each defendant's guilt

18   beyond a reasonable doubt.  That burden never shifts to

19   Ms. Chai or Mr. Lee for the simple reason that the law presumes

20   them innocent and never imposes upon any defendant in a

21   criminal case the burden or the duty of calling any witnesses

22   or producing any evidence.

23           In other words, Ms. Chai and Mr. Lee start with a

24   clean slate.  They are presumed innocent until such time that

25   you, the jury, are unanimously satisfied that the government

1     has proved Ms. Chai, Mr. Lee, or both guilty beyond a

2     reasonable doubt.  If the government fails to sustain this

3     burden with respect to either Ms. Chai or Mr. Lee or both, you

4     must find either of them or both of them not guilty.

5           Let's talk about reasonable doubt.  As I said, the

6     government must prove Ms. Chai and Mr. Lee are guilty beyond a

7     reasonable doubt.  The burden never shifts to Ms. Chai or

8     Mr. Lee; instead, it is always the government's burden to prove

9     beyond a reasonable doubt each of the elements for the crime

10    charged for each defendant.  Ms. Chai and Mr. Lee have no

11    burden to prove themselves innocent.

12          The question then is:  What is a reasonable doubt?

13    Well, the words almost define themselves.  It's a doubt based

14    upon reason.  It is a doubt that a reasonable person has after

15    carefully weighing all the evidence.  Proof beyond a reasonable

16    doubt must therefore be proof of such a convincing character

17    that a reasonable person would not hesitate to rely and act

18    upon it in the most important of his or her own affairs.

19          A reasonable doubt is not a guess, it's not a whim,

20    it's not speculation, it's not suspicion.  It is not an excuse

21    to avoid the performance of an unpleasant duty, and it is

22    certainly not sympathy.  The law does not require that the

23    government prove guilty beyond all possible doubt, proof beyond

24    a reasonable doubt is sufficient to convict.

25          After, after a fair and impartial consideration of all

E9JTCHA6                        Charge

1   the evidence, you have a reasonable doubt as to the guilt of

2   Ms. Chai, Mr. Lee, or both, it is your duty to acquit that

3   defendant, or both defendants.  On the other hand, if, after a

4   fair and impartial consideration of all the evidence, you are

5   satisfied that the government has met its burden of proving

6   Ms. Chai's, Mr. Lee's, or both defendants' guilt beyond a

7   reasonable doubt, it is your duty to convict that defendant or

8   both defendants.

9           Let me give you some instructions about evidence.

10  First of all, direct and circumstantial evidence.  In deciding

11  whether Ms. Chai and Mr. Lee are guilty or not guilty, you may

12  consider both direct evidence and circumstantial evidence.

13          Direct evidence is evidence that proves a disputed

14  fact directly.  For example, where I witness is testifying to

15  what he or she saw, heard or observed, that's called direct

16  evidence.

17          Circumstantial evidence is evidence that tends to

18  prove a disputed fact by proof of other facts.  I'll give you a

19  simple example.  Suppose when you came into the courthouse

20  today the sun was shining, as it was, and it was a nice day,

21  and now the courtroom blinds are drawn and you cannot look

22  outside.  As you are sitting here, someone walks in with a

23  dripping wet umbrella, and soon after someone walks in with a

24  dripping wet raincoat.  And on these assumed facts, you cannot

25  look outside the courtroom and see whether it is raining, so

E9JTCHA6                    Charge

 1   you have no direct evidence of that fact.  But on the

 2   combination of the facts about the umbrella and the raincoat,

 3   it would be reasonable for you to conclude that it had started

 4   to rain outside.  Well, that's all there is to circumstantial

 5   evidence.  Using your reason and experience, you will infer

 6   from established facts the existence or non-existence of some

 7   other facts.

 8          An inference is the deduction or conclusion that

 9   reason and common sense prompt a reasonable mind to draw from

10   facts that have been proven by the evidence.  Not all logically

11   possible conclusions are legitimate or fair inferences.  Only

12   those inferences to which the mind is reasonably led or

13   directed are fair inferences from direct or circumstantial

14   evidence in this case.  Whether or not to draw a particular

15   inference is, of course, a matter of exclusively for you to

16   decide, as are all determinations of fact.

17          Many material facts, such as state of mind, are rarely

18   susceptible of proof by direct evidence.  You cannot look into

19   one another's minds.  Generally such facts are established by

20   circumstantial evidence and the inferences that the jury draws

21   them.  The law makes no distinction between direct and

22   circumstantial evidence.  Circumstantial evidence is of no less

23   value than direct evidence, and you can consider either or both

24   and give them such weight as you conclude is warranted.

25          Now you have heard references to the fact that certain

1    investigative techniques were not used by the government.  You

2    should look to all the evidence or lack of evidence in deciding

3    whether either or both defendants are guilty.  However, there

4    is no legal requirement that the government prove its case

5    through any particular means.  The government is not on trial.

6    Law enforcement techniques are not your concern.  Your concern

7    is to determine whether or not, on the evidence or lack of

8    evidence presented here in this courtroom, Ms. Chai and

9    Mr. Lee's guilt have been proven beyond a reasonable doubt.

10          You have heard testimony about the evidence seized in

11   connection with certain searches conducted by law enforcement

12   officers.  Evidence obtained from these searches was properly

13   admitted in this case and may be properly considered by you.

14   Whether you approve or disapprove how the evidence was obtained

15   should not enter into your deliberations, because I now

16   instruct you that the government's use of this evidence is

17   entirely lawful.

18          You must, therefore, regardless of your personal

19   opinions, give this evidence full consideration along with all

20   the other evidence in this case in determining whether the

21   government has proved the guilt of Ms. Chai and Mr. Lee beyond

22   a reasonable doubt.

23          Now there has been evidence that Ms. Chai and Mr. Lee

24   made statements to law enforcement authorities.  Evidence of

25   these statements was properly admitted in this case and can be

1    considered by you.  You are to give the evidence of such

2    statements such weight as you feel it deserves in light of all

3    the evidence.  Whether you approve or disapprove of the use of

4    these statements may not enter into your deliberations.  I

5    instruct you now that no one's rights were violated and

6    government's use of this evidence is entirely lawful.

7            I want to let you know, however, that the evidence of

8    one defendant's statement to the authorities about his or her

9    own conduct cannot be considered or discussed by you in any way

10   with respect to the other defendant on trial.  Ms. Chai's

11   statements can only be considered against Ms. Chai, and

12   Mr. Lee's statements can only be considered against Mr. Lee.

13           During the course of this trial, you heard testimony

14   that Mr. Lee has a reputation of honesty and integrity in his

15   community.  That testimony bears on Mr. Lee's character.

16   Character testimony should be considered together with all the

17   other evidence in this case in determining the guilt or

18   innocence of Mr. Lee.  Evidence of good character may in itself

19   create reasonable doubt, where without such evidence no

20   reasonable doubt would have existed.  But if on all the

21   evidence, including the character evidence, you are satisfied

22   beyond a reasonable doubt that Mr. Lee is guilty, the showing

23   that he previously enjoyed a reputation of good character does

24   not justify or excuse the offense, and you should not acquit

25   Mr. Lee merely because you believe he's a person of good

E9JTCHA6                        Charge

1    repute.

2            The testimony of a character witness is not to be

3    taken by you as an opinion by the witness as to the guilt or

4    innocence of the defendant.  The guilt or innocence of a

5    defendant is for you alone to determine, and that should be

6    based on all the evidence which you have heard in this case.

7            You have also heard evidence during the course of this

8    trial that law enforcement officers and certain individuals

9    working at the direction of law enforcement officers acted in

10   undercover capacities to purchase oxycodone from Stanley

11   Pharmacy.  There is nothing improper about such undercover

12   operations so long as the defendants' rights were not violated,

13   and the defendants here have not claimed that their rights were

14   violated in any way.  The government is permitted to rely on

15   such techniques in order to catch people that are engaged in

16   criminal enterprises.

17           Because this law enforcement technique is entirely

18   lawful, your personal view is not to enter into your

19   deliberations in any way.

20           Both sides have prepared charts and summaries.

21   Several charts that summarize voluminous records have been

22   received in evidence, in addition to the underlying records.

23   The charts and summaries were admitted in order to save time

24   and avoid unnecessary inconvenience.  It's up to you to decide

25   whether these charts fully, fairly, and correctly present the

E9JTCHA6                          Charge

1    information in the testimony and the documents on which they

2    are based.  You may consider charts and summaries as you would

3    any other evidence.

4              In this case, you heard evidence in the form of

5    several stipulations.  A stipulation of testimony is an

6    agreement among the parties that, if called, the witness would

7    have given certain testimony.  You must accept as true the fact

8    that the witness would have given the testimony.  However, it

9    is for you to determine the effect that would be given to the

10   testimony.

11             You have also heard evidence in the form of

12   stipulations that contain facts which the parties have agreed

13   were true.  In such cases, you should accept the facts as true

14   and you should not question those facts.

15             Variance in dates and amounts.  It does not matter if

16   a specific transaction is alleged to have occurred on or about

17   a certain date or that it involved a specific amount of money

18   but the testimony indicates that in fact it was a different

19   date or amount.  The law only requires any substantial

20   similarity between the dates and amounts alleged in the

21   indictment and the dates and the amounts established by the

22   testimony or other evidence.

23             Let me say some words about credibility and the

24   application of those standards to the witnesses who testified.

25   It must be clear to you now that counsel for the parties are

E9JTCHA6                    Charge

asking you to draw very different conclusions about significant
factual issues in this case.  An important part of your
decision will involve making judgments about the testimony of
the witnesses you have listened to and observed.  In making
these judgments, you should carefully scrutinize all of the
testimony of each witness, the circumstances under which each
witness testified, and any other matter in evidence that may
help you to decide the truth and the importance of each
witness's testimony.

         Your decision whether or not to believe a witness may
depend on how the witness impressed you.  Was the witness
candid, frank, forthright, or did the witness seem to be
evasive or suspect in some way?  How did the way the witness
testified on direct examination compare with how the witness
testified on cross-examination?  Was the witness consistent or
contradictory?  Did the witness appear to know what he or she
was talking about?  Did the witness strike you as someone who
was trying to report his knowledge or her knowledge accurately?
What was the witness's demeanor like?  These are examples of
the kind of common sense question that you should ask
yourselves in deciding whether a witness is or is not truthful.

         In addition, you may consider whether the witness had
any possible bias or relationship with a party or any possible
interest in the outcome of the case.  Such a bias,
relationship, or interest does not necessarily make the witness

1   unworthy of belief.  These are simply factors that you may

2   consider in assessing the witness's credibility.

3           Similarly, if you determine that a witness made

4   statements in the past that are inconsistent with his testimony

5   or her testimony during the trial concerning the facts that are

6   at issue here, you may consider that fact in deciding how much

7   of the testimony, if any, to believe.  In making this

8   determination, you may consider whether or not the witness

9   purposely made a false statement or whether it was an innocent

10  mistake.  You may also consider whether the inconsistency

11  concerns an important fact or merely a small detail, as well as

12  whether the witness has an explanation for the inconsistency

13  that appeals to your common sense.

14          If you find that a witness has testified falsely as to

15  any material fact, or if you find that a witness has been

16  previously untruthful when testifying under oath, you may

17  reject that witness's testimony in its entirety or you may

18  accept those facts that you believe to be truthful or

19  corroborated by other independent evidence in this case.

20          You should also consider when the witness had an

21  opportunity to observe the facts that he or she testified

22  about, and whether the witness's recollection of the facts

23  stands out in light of other evidence in this case.

24          In other words, what you have to try to do in deciding

25  credibility is to size up a person just as you would in any

E9JTCHA6                          Charge

important matter where you're trying to decide if a person is

truthful, straightforward, and accurate in his or her

recollection.

          Now a witness may be discredited or impeached by

contradictory evidence or by evidence that at some other time

the witness has said or done something that is inconsistent

with the witness's present testimony.  The earlier inconsistent

or contradictory statements are admissible only to discredit or

impeach the credibility of witness, not to establish the truth

of the earlier statements made somewhere else other than here

in front of you during the trial.  It is the role of the jury

to determine the credibility of a witness who made a prior

inconsistent or contradictory statement.  If you believe that

any witness has been impeached and thus discredited, it is for

to you give the testimony of that witness as much or as little

weight, if any, as you think it deserves.

          It is for you, the jury, and for you alone, not the

lawyers, or the witnesses, or me as the judge, to decide the

credibility of witnesses who appeared here and the weight that

their testimony deserves.  After making your own judgment or

assessment concerning the credibility a witness, you can then

attach such importance or weight to their testimony, if any,

that you feel it deserves.  You will then be in a position to

decide whether the government has proven the charges beyond a

reasonable doubt.

E9JTCHA6                        Charge

1          Now have you heard evidence during the trial that

2     witnesses have discussed the facts of the case and their

3     testimony with the lawyers before the witnesses appeared.

4     Although you may consider that fact in evaluating the witness's

5     credibility, it's not unusual nor is it inappropriate for a

6     witness to meet with lawyers before testifying so that the

7     witness can be aware of the subjects he or she will be

8     questioned about, focus on those subjects, and have the

9     opportunity to review the relevant exhibits and prior testimony

10    before being questioned about them.  It is your decision what

11    inferences to draw from the witness's preparation for his or

12    her testimony.

13         Now let me say a few things that you will want to

14    consider during your deliberations on the subject of what we

15    call cooperating witnesses.

16         You have heard testimony from certain witnesses who

17    I'll identify as the Girdauskas' brothers, Edward and Michael,

18    and Michael Penzo.  They pled guilty to charges arising in part

19    out of the facts relating to this case.  You are to draw no

20    conclusion or inferences of any kind about the guilt of the

21    defendants on trial and the fact that these government

22    witnesses pled guilty to criminal charges.  The decisions of

23    those individuals to plead guilty were personal decisions they

24    made about their own guilt and may not be used by you in any

25    way as evidence against or unfavorable to the defendants on

E9JTCHA6                         Charge

1    trial here.

2          You have also heard the testimony from certain

3    witnesses, Miriam Padilla and Ixchel Campos, who agreed to

4    testify in this proceeding in exchange for the government's

5    promise they will not be prosecuted for any crimes relating to

6    the alleged unlawful distribution of oxycodone out of Stanley

7    Pharmacy.  I caution you that it is no concern of yours whether

8    the government made agreements with these witnesses.  Your sole

9    concern is to decide whether the witnesses have given truthful

10   testimony in this case.

11         Cooperating witness testimony should be given such

12   weight as it deserves in light of facts and circumstances

13   before you, taking into account the witness's demeanor, the

14   witness's demeanor, candor, the strength and accuracy of the

15   witness's recollection, the witness's background, and the

16   extent to which the testimony is or is not collaborated by

17   other evidence in the case.

18         Because of the possible interest a cooperating witness

19   may have in testifying, let my say a few things that you may

20   want to consider during your deliberations on the subject of

21   cooperating witnesses.  Cooperating witness testimony must be

22   scrutinized with special care and caution.  Certain of the

23   cooperating witnesses are facing fairly long maximum prison

24   sentences and are hoping for a reduced sentence.  For those

25   witnesses, the government decides whether or not to file a

E9JTCHA6                    Charge

1    motion for reduced sentence, and there was the reference to 5K.

2    The sentencing court, according to its own determination, then

3    decides what sentence to ultimately impose.  It does not

4    follow, however, that simply because a person has admitted to

5    participation in one or more crimes he is incapable of giving a

6    truthful version to what happened.

7          The fact that a witness is testifying pursuant to a

8    cooperation agreement can be considered by you in bearing on

9    his or her credibility.  You should, of course, consider

10   whether the testimony was motivated by reward or self-interest.

11   You should ask yourself whether the cooperating witness would

12   benefit more by lying or by telling the truth in the course of

13   their meetings with government and their testimony here at

14   trial.  If you believe that the witness was motivated by

15   personal gain, consider if the motivation was one that would

16   cause him or her to lie, or was it one that would cause him or

17   her to tell the truth, and if this motivation colored his or

18   her testimony.

19         Obviously, you should reject the testimony if you find

20   that it is false.  If you are satisfied that the testimony is

21   true, you should accept it.  You may also accept parts and

22   reject parts of the cooperating witness's or any witness's

23   testimony.

24         In sum, you should look to all of the evidence in

25   deciding what credence and what weight, if any, you give to the

E9JTCHA6                    Charge

1   witness's testimony.

2          Let me talk about the law enforcement witnesses.  You

3   heard the testimony of law enforcement witnesses.  The fact

4   that a witness may be law enforcement official or employee does

5   not mean that his or her testimony deserves more or less

6   consideration or greater or lesser weight than any other

7   witness.

8          In this context, defense counsel is allowed to try to

9   attack the credibility of such witness on the ground that his

10  or her testimony may be affected by personal or professional

11  interest in the outcome of a case.

12         It is your decision, after reviewing all the evidence,

13  whether to accept the testimony of a law enforcement witness

14  and to give that testimony whatever weight, if any, you find

15  that it deserves.

16         Now we also heard the testimony from what we call

17  expert witnesses.  An expert is a witness who, by education or

18  experience, has required learning or experience in a personal

19  area of knowledge.  Such witnesses are permitted to give their

20  opinions as to relevant matters in which they profess to be an

21  expert and give their reasons for their opinions.  Expert

22  testimony is presented to you on the theory that someone who is

23  experienced in the field can assist you in particular in

24  understanding the evidence or in reaching an independent

25  decision on the facts.

E9JTCHA6                          Charge

1          Now your role in judging credibility applies to

2    experts as well as to other witnesses.  You should consider the

3    expert and opinions which were received in evidence in this

4    case and give them as much or as little weight as you think

5    they deserve.  If you should decide the opinion of the expert

6    was not based on sufficient education or experience or on

7    sufficient data, or if you should conclude that the

8    trustworthiness or credibility of an expert is questioned for

9    any reason, or if the opinion of the expert was outweighed in

10   your judgment by the other evidence in this case, then you

11   might disregard the opinion of the expert entirely or in part.

12         On the other hand, if you find that the opinion of the

13   expert is based on sufficient data, education and experience,

14   and the other evidence does not give you reason to doubt the

15   expert's conclusions, you would be justified in placing

16   reliance on the expert's testimony.

17         Now one of the government's witnesses, Mr. Catizone,

18   testified regarding various regulatory standards that apply to

19   licensed pharmacists in New York, as well as his opinion as to

20   whether Stanley Pharmacy violated those regulatory standards.

21   I want to remind you this is a criminal case, not a regulatory

22   case.  As I already told you, the failure to comply with

23   regulations does not alone provide the basis for concluding

24   that either of the defendants is guilty of the crimes charged

25   in Count One of the indictment.  Rather, Count One of the

E9JTCHA6                          Charge

1    indictment has very specific elements that I will explain to

2    you shortly.  The government must prove each of those elements

3    beyond a reasonable doubt, separate and apart from whatever

4    regulations govern the pharmacy's operations.

5           That said, the failure to comply with regulations is

6    the factor that you may consider in determining whether

7    Ms. Chai or Mr. Lee or both knowingly participated in unlawful

8    distribution of oxycodone.  But you are judges of the facts,

9    and you must decide for yourselves whether Ms. Chai and Mr. Lee

10   or both knowingly participated in the unlawful distribution of

11   oxycodone.

12          You cannot draw any inferences favorable or

13   unfavorable to the government, Ms. Chai or Mr. Lee, from the

14   fact that any person or persons other than Ms. Chai and Mr. Lee

15   are not on trial here.  You may also not speculate as to the

16   reason why other persons are not on trial.  Those matters are

17   wholly outside your concern and have no bearing on your

18   function as jurors.

19          Now the two defendants, Ms. Chai and Mr. Lee, have not

20   testified in this case.  Under our Constitution, a defendant

21   has no obligation to testify or present any evidence, because

22   it is the government's burden to prove guilt beyond a

23   reasonable doubt.  That burden remains with the government

24   throughout the entire trial and never shifts to a defendant.  A

25   defendant is never required to prove that he or she is

E9JTCHA6                      Charge

1    innocent.

2          You must not attach any significance to the fact that

3    Ms. Chai and Mr. Lee did not testify.  No adverse inference

4    against Mr. Chai or Mr. Lee May be drawn by you because they it

5    not take the witness stand.  You may not consider this against

6    Ms. Chai or Mr. Lee in any way in your deliberations in the

7    jury room.

8          Now with that out of the way, let's talk about the

9    substantive law.  First of all, let's start with a summary

10   again of the indictment.

11         As I explained to you before, the indictment is simply

12   a charge or an accusation.  It's not evidence.  I will first

13   summarize the counts that are charged in the indictment, then I

14   will explain in detail the elements of each charged crime.

15         The indictment here contains three counts.  Ms. Chai

16   and Mr. Lee are charged with Count One.  Mr. Lee is charged in

17   two additional counts, Counts Two and Three.  Count One charges

18   each defendant with the crime of conspiracy.  Although there

19   are common facts to both defendants, each defendant must be

20   considered separately.  You must return a separate verdict as

21   to each defendant on Count One.  The case against each

22   defendant stands or falls upon the proof or lack of proof

23   against that defendant alone, and your verdict as to one

24   defendant cannot control your decision as to the other

25   defendant.

1            In this regard, you may have noticed during the trial

2    the lawyers for the defendants have at times consulted with

3    each other and they shared some of the work of the trial in an

4    effort to avoid duplicating each other's work.  The fact that

5    lawyers consulted and cooperated with each other during the

6    course of the trial should not be considered by you as having

7    any significance to any issues in this case.  Especially in a

8    case of this length, it would be wasteful of time and effort if

9    counsel did not share burdens of the defense.

10           Count One is a conspiracy count that charges that from

11   at least in or about 2011 up to and including January 17, 2013,

12   Ms. Chai and Mr. Lee participated in a conspiracy to distribute

13   or possess with intent to distribute a controlled substance --

14   here, oxycodone -- from the Stanley Pharmacy in Yonkers, New

15   York.  Mr. Lee, a pharmacist, is the owner of Stanley Pharmacy.

16   Ms. Chai has worked at Stanley Pharmacy as a pharmacist since

17   March of 2010.

18           Count Two is a conspiracy count.  Count Two charges

19   that from at least in or about 2011 up to and including on or

20   about January 2013, Mr. Lee participated in a conspiracy to

21   launder the proceeds of the unlawful narcotics transaction.

22   According to the indictment, the conspiracy to launder the

23   proceeds had two purposes:  First, to promote the carrying on

24   an unlawful narcotics transaction; and second, to conceal the

25   nature, location, source, ownership, and control of the

E9JTCHA6                        Charge

1    proceeds.  Ms. Chai is not charged in Count Two.

2          Count Three charges Mr. Lee with structuring financial

3    transactions in order to avoid the required filing of Currency

4    Transaction Reports or CTRs.  In particular, Count Three

5    charges that Mr. Lee made multiple deposits of U.S. currency or

6    cash in the amounts of $10,000 or less so as to avoid causing

7    financial institutions to file the required CTRs, and that he

8    did so either as part of illegal deposits of more than $10,000

9    during a twelve-month period or in furtherance of the narcotics

10   conspiracy charged in Count One.  Ms. Chai is not charged in

11   Count Three.

12         As I told you, you must consider each count

13   separately, and your verdict as to one count must not affect

14   your verdict as to any other count.

15         Let's turn now to Count One.  Ms. Chai and Mr. Lee are

16   charged in Count One of the indictment with participating in a

17   conspiracy to violate the laws of the United States which

18   prohibit the illegal distribution of narcotics.  Count One

19   appears on pages 1 through 3 of the indictment.  As I said

20   before, I'm going to send copies of the indictment into the

21   jury room.

22         The indictment charges that the conspiracy in Count

23   One existed from at least in or about 2011 up to and including

24   on or about January 17, 2013.  The government does not have to

25   prove the conspiracy started and ended at these specific times.

E9JTCHA6                         Charge

1    It is sufficient if you find the charged conspiracy was formed

2    at some point and that it existed for some period within the

3    period set forth in the indictment, whether or not it continued

4    beyond that period.

5           To sustain its burden of proof with respect to the

6    charge of conspiracy contained in Count One, the government

7    must prove the following two elements beyond a reasonable

8    doubt:

9           First, the existence of the conspiracy charged in the

10   indictment, that is, an agreement or understanding between two

11   or more persons in or about 2011 through on or about

12   January 17, 2013, to intentionally and knowingly distribute or

13   possess with intent to distribute controlled substance, here

14   oxycodone.  So the first question is:  Did the conspiracy

15   exist?

16          Second, that Ms. Chai, Mr. Lee, or both, intentionally

17   and knowingly became a member of the conspiracy.  The second,

18   question then is:  Did Ms. Chai or Mr. Lee or both knowingly

19   and intentionally associate himself or herself with the

20   conspiracy and participate in the conspiracy to distribute or

21   and possess with intent to distribute narcotics?

22          So let's go back and take a look at the first element,

23   the existence of the conspiracy.

24          First, the government must establish the existence of

25   the conspiracy beyond a reasonable doubt.  What is a

E9JTCHA6                        Charge

1   conspiracy?  Well, it's kind of a criminal partnership, a

2   combination or agreement of two or more persons to join

3   together to accomplish some unlawful purpose.  The conspiracy

4   alleged in Count One is an agreement to commit the crime of

5   distribution of a controlled substance or possessing with

6   intent to distribute a controlled substance.  The crime of

7   conspiracy to violate a federal law is an independent offense.

8   It is separate and distinct from the actual violation of any

9   specific or federal law, which the law refers to as a

10  "substantive crime" as opposed to a conspiracy.

11        Given that a conspiracy and subsequent crimes are

12  distinct and independent offenses, you may find Ms. Chai and

13  Mr. Lee are both guilty of the crime of conspiracy even if you

14  find that he or she never actually committed the substantive

15  crime that was the object of the conspiracy.  It is the

16  agreement itself, the agreement with others to commit the crime

17  that the law forbids.

18        Now to establish a conspiracy, the government does not

19  have to show that individuals sat around a table and entered

20  into a solemn pact, orally or in writing, stating that they

21  formed a conspiracy to violate the law and setting forth the

22  details and plans and means by which the unlawful project is to

23  be carried out or the part to be played by each conspirator.

24  Indeed, it is rare that a conspiracy can be proven by direct

25  evidence of an explicit agreement.

1              Common sense tells that you when people in fact

2      undertake to enter into a criminal enterprise, much is left to

3      unexpressed understanding.  From its very nature, a conspiracy

4      almost invariably secret in its origin and execution.

5              To show that a conspiracy existed then, it is

6      sufficient if the evidence shows that two or her persons in

7      some way or manner explicitly or implicitly came to an

8      understanding to violate the law.  Express language or specific

9      words are not required to indicate assent or attachment to a

10     conspiracy.  Nor is it required that you find that any

11     particular number of alleged co-conspirators joined in the

12     conspiracy in order to find that a conspiracy existed.  You may

13     need only find that two or more persons entered into an

14     unlawful agreement alleged in the indictment in order to find

15     that a conspiracy existed.

16             In determining whether there's been unlawful

17     agreement, you may consider the facts and conduct of alleged

18     co-conspirators which were done to carry out the alleged

19     criminal purpose.  The adage "actions speak louder than words"

20     may be applicable here.  At times the only evidence available

21     with respect to the existence of the conspiracy is of

22     disconnected acts on the part of the alleged individual

23     co-conspirators.  When taken together or considered as a whole,

24     however, such acts may show a conspiracy or agreement just as

25     conclusively as would more direct proof.

E9JTCHA6                        Charge

1          So in considering the first element of the crime of

2     conspiracy as charged -- whether the conspiracy actually

3     existed -- you may consider all the evidence which has been

4     admitted with respect to the acts, conduct, and declarations of

5     the alleged conspirators and the reasonable inferences to be

6     drawn from such evidence.

7          It is sufficient to establish the existence of the

8     conspiracy if, after considering all the relevant evidence, you

9     find beyond a reasonable doubt that the minds of at least two

10    alleged co-conspirators came to a mutual understanding and they

11    agreed to work together in furtherance of the object of the

12    conspiracy which I will now describe.  You have to have an

13    agreement, the agreement has to have an object.

14          As I mentioned, the indictment charges the conspiracy

15    alleged in Count One charges that the object or goal of the

16    conspiracy was either to distribute or to possess with intent

17    to distribute the controlled substance.  Oxycodone, as we

18    learned, is a controlled substance.  So let's review the object

19    of the conspiracy.

20          Someone who is a "practitioner" is authorized to

21    prescribe or dispense drugs.  A "practitioner" is a physician,

22    pharmacist, or other person licensed, registered, or otherwise

23    permitted to distribute, dispense or administer drugs in the

24    course of professional practice or research.  Thus, a

25    pharmacist who in good faith dispenses drugs in the regular

E9JTCHA6                         Charge

1    course of a legitimate professional practice is protected from

2    prosecution.  But a pharmacist who acts outside the usual

3    course of professional practice and dispenses drugs for no

4    legitimate medical purpose may be guilty of violating the law.

5              In order to prove the defendant you are considering

6    conspired to commit this offense, the government must prove

7    beyond a reasonable doubt that the defendant conspired to

8    dispense or distribute oxycodone pursuant to a prescription

9    that he or she knew was not properly issued by a prescribing

10   physician.

11             The first thing you must determine is whether the

12   defendant you are considering conspired to dispense or

13   distribute a controlled substance.  The government must prove

14   this element by showing beyond a reasonable doubt that the

15   defendant delivered the controlled substance to the ultimate

16   user.

17             If you find that Ms. Chai, Mr. Lee or both conspired

18   to distribute a controlled substance, you must then determine

19   whether the government has proved beyond a reasonable doubt

20   that the defendant you are considering knew that the

21   prescription that was filled was not properly issued by a

22   prescribing doctor, that is, the government must prove the

23   defendant knew the prescribing doctor did not issue the

24   prescription in the usual course of medical practice and that

25   the prescription was not issued for a legitimate medical

E9JTCHA6                          Charge

1    purpose.

2              In determining whether the government has proved the

3    requisite element of knowledge, you may consider all the facts

4    and circumstances and the inferences that can be logically

5    drawn therefrom, provided that such evidence satisfies you

6    beyond a reasonable doubt that the defendant you are

7    considering acted knowingly.

8              The government must prove beyond a reasonable doubt

9    that the defendant you are considering conspired to dispense

10   drugs or cause them to be dispensed other than for a legitimate

11   medical purpose, other than in good faith, and not in the usual

12   course of medical practice.  Good faith in this context means

13   the honest exercise of best professional judgment.  It means

14   that the pharmacist acted in accord with what he or she should

15   have reasonably believed to be proper pharmaceutical practice.

16             A pharmacy assistant or pharmacy employee who is not a

17   licensed pharmacist is not a practitioner.  It is unlawful for

18   a person who is not a practitioner to distribute a controlled

19   substance without the supervision of a licenses pharmacist

20   regardless of whether a valid prescription exists for the

21   controlled substance.  It is unlawful for a practitioner to

22   conspire with the person who is not a practitioner to

23   distribute a controlled substance without the supervision of a

24   licensed pharmacist.

25             Now with regard to the second element, the membership

E9JTCHA6                     Charge

1    in a conspiracy, if you conclude that the government has proven

2    beyond a reasonable doubt the conspiracy charged in Count One

3    existed, you should proceed to the second element:  Did the

4    defendant you are considering participate in a conspiracy with

5    knowledge of its unlawful purpose or purposes and in

6    furtherance of its unlawful objective or objectives?

7           The government must prove by each defendant's own

8    actions that she or he intentionally and knowingly entered into

9    the conspiracy, the agreement, with the criminal intent, that

10   is, with the purpose to violate the law, and agreed to take

11   part in the conspiracy to further promote and cooperate in its

12   unlawful objectives.

13          As you can see, this element concerns a person's state

14   of mind.  Direct proof of a state of mind is not always

15   available.  Indeed, it would be a rare case where it could be

16   shown that a person wrote or stated that as of a given time in

17   the past he or she committed an act with a certain state of

18   mind.  Such direct proof is not required.

19          As to this element, the terms "intentionally" and

20   "knowingly" mean that you must be satisfied beyond a reasonable

21   doubt that in joining the conspiracy -- if you find one or both

22   of the defendants did join the conspiracy -- that the defendant

23   you are considering knew what he or she was doing, that he or

24   she took the actions in question deliberately and voluntarily.

25          An act is done knowingly and intentionally when it is

E9JTCHA6                    Charge

1   done deliberately and purposefully, that is, the defendant's

2   action must have been the product of his or her conscious

3   objective not the product of a mistake or an accident or

4   negligence or some other innocent reason.

5        While we cannot look into a person's mind and know

6   what someone is thinking, knowledge and intention are matters

7   of inference from proven facts.  The ultimate facts of

8   knowledge and criminal intent, though subjective, may be

9   established by circumstantial evidence based on a person's

10   outward manifestations, his or her words, his or her conduct,

11   his or her acts, and all the surroundings circumstances

12   disclosed by the evidence and the rational or logical

13   inferences that may be drawn therefrom.

14        By pleading not guilty, Ms. Chai and Mr. Lee deny they

15   were members of the conspiracy charged in Count One.  It is for

16   to you determine whether the government has established beyond

17   a reasonable doubt that in such knowledge and intent on the

18   part of either defendant or both defendants existed.

19        It is not necessary that Ms. Chai or Mr. Lee were

20   fully informed as to all the details of the conspiracy in order

21   to justify an inference of knowledge on his or her part.  To

22   have knowledge, Ms. Chai and Mr. Lee may not have known the

23   full extent of the conspiracy or all the activities or all of

24   the participants.  It is not even necessary that Ms. Chai and

25   Mr. Lee knew every member of the conspiracy.  In fact, the

E9JTCHA6                      Charge

1      defendant may know only one other member of the conspiracy and

2      still be a co-conspirator.  Nor is it necessary that the

3      defendant receive any monetary benefit from participating in

4      the conspiracy or have a financial stake in the outcome, so

5      long as he or she in fact participated in the conspiracy in the

6      manner that I have described.

7              On the other hand, the mere presence of a defendant at

8      the place where a crime was committed, or his or her mere

9      association with another person who committed a crime, is not

10     sufficient to support a conviction.  Mere knowledge or

11     acquiescence without participation in an unlawful plan is not

12     sufficient.  Moreover, the fact that the acts of a defendant

13     without knowledge merely happened to further the purpose or

14     objectives of the conspiracy does not make that defendant a

15     member.  What is necessary is the defendant must have

16     participated with the knowledge of at least some of the

17     purposes or objectives of the conspiracy and with the intention

18     of aiding in the accomplishment those unlawful ends.

19             The duration and extent of the defendant's

20     participation in the conspiracy has no bearing upon the issue

21     of defendant's guilt.  The defendant need not have joined the

22     conspiracy at the outset.  The defendant may have joined it for

23     any purpose at any time during its progress and that defendant

24     will still be held responsible for all that was done before he

25     or she joined and all that was done during the conspiracy's

E9JTCHA6                    Charge

1    existence while that defendant was a member.  Each member of a

2    conspiracy may perform separate and distinct acts and may

3    perform them at different times.  Some conspirators play major

4    roles while other play minor roles.  An equal role is not what

5    the law requires.  In fact, even a single act may be sufficient

6    to draw a defendant within the ambit of a conspiracy.

7         In sum, in order to be a knowing and intentional

8    participant in an unlawful agreement, that is to a say

9    conspirator, Ms. Chai and Mr. Lee, with an understanding of the

10   unlawful character of the conspiracy, must have intentionally

11   engaged, advised or assisted in the conspiracy for the purpose

12   of furthering the illegal undertaking.

13        A conspiracy, once formed, is presumed to continue

14   until either its objectives are accomplished or there is some

15   affirmative act of termination by its members.  So, too, once a

16   person is found to be a member of a conspiracy, he or she is

17   presumed to continue his or her membership in the venture until

18   its termination unless it is shown by some affirmative proof

19   that he or she withdrew and disassociated himself or herself

20   from it.

21        Now we have already heard some of this in summations.

22   Let me say one other thing about knowledge regarding the

23   knowledge element regarding the conspiracy.  In determining

24   whether Ms. Chai and Mr. Lee or both acted knowingly, you may

25   consider whether Ms. Chai and Mr. Lee or both deliberately

E9JTCHA6                    Charge

1   closed his or her eyes to what otherwise would have been

2   obvious.

3           As you know, if a person is actually aware of a fact,

4   then he or she knows the fact.  But the law also allows you to

5   find that a defendant had knowledge of a fact when the evidence

6   shows that he or she was aware of a high probability of that

7   fact but intentionally avoided confirming that fact.  The law

8   calls this conscious avoidance or willful blindness.  On the

9   other hand, if you find that the defendant actually believed

10  that the fact did not exist, then you may not find that he or

11  she had knowledge of the fact based on the defendant's

12  conscious avoidance or willful blindness.

13          In determining whether the government has proven

14  beyond a reasonable doubt that Ms. Chai and Mr. Lee or both

15  acted knowingly, you may consider whether either or both

16  defendants deliberately closed their eyes to what would

17  otherwise have been obvious to them.  One may not willfully and

18  intentionally remain ignorant of a fact important to his or her

19  conduct in order to escape the consequences of criminal law.

20          Let me explain further what the concept of willful

21  blindness or conscious avoidance means with respect to

22  conspiracy.

23          First, there's a difference between knowingly

24  participating in a joint undertaking and knowing the object of

25  an undertaking.  Conscious avoidance, as I have described it,

E9JTCHA6                        Charge

1    cannot be used as a substitute for finding Ms. Chai or Mr. Lee

2    or both knowingly agreed to a joint undertaking.

3           For example, it is logically impossible for a

4    defendant to join another person unless he knows that he or she

5    has made such an agreement.  However, if you find beyond a

6    reasonable doubt that Ms. Chai and Mr. Lee or both entered into

7    such an agreement, in considering whether Ms. Chai, Mr. Lee, or

8    both, knew that the object of the conspiracy was distribution

9    of oxycodone pursuant to prescriptions that were issued outside

10   the course of the professional practice and not for legitimate

11   medical purpose, you may then consider whether Ms. Chai,

12   Mr. Lee, or both deliberately avoided confirming obvious facts,

13   that is, whether either or both defendants closed their eyes to

14   what would have otherwise been obvious.

15          Remember that guilty knowledge may not be established

16   by demonstrating that a defendant was merely reckless,

17   negligent, foolish or mistaken.  It is entirely up to you

18   whether you find that Ms. Chai, Mr. Lee, or both, deliberately

19   closed his or her eyes, and any inferences to be drawn from the

20   evidence on this issue.

21          When people enter into a conspiracy to accomplish an

22   unlawful end, each and every member becomes an agent for the

23   other conspirators in carrying out the conspiracy.

24   Accordingly, the reasonably foreseeable acts, declarations,

25   statements, and admissions of any member of the conspiracy in

E9JTCHA6                          Charge

furtherance of the common purpose of the conspiracy are deemed

under the law to be the acts of all the members, and all the

members are responsible for such acts, declarations, statements

and omissions.

        If you find beyond a reasonable doubt Ms. Chai and

Mr. Lee or both were members of the conspiracy charged in Count

One of the indictment, then any acts done or statements made in

furtherance of the conspiracy by other persons you find to be

members of that same conspiracy may be considered against

Ms. Chai and Mr. Lee or both.  This is so even if such acts

were done and statements were made in Ms. Chai or Mr. Lee's

absence without his or her knowledge.

        (Continued on next page)

E9jzcha7                     Charge

1              THE COURT:  However, before you may consider the

2      statements or acts of a coconspirator in deciding the issue of

3      Ms. Chai and Mr. Lee's guilt, you must first determine that the

4      acts and statements were made during the existence and in

5      furtherance of the lawful scheme.  If the acts were done and

6      the statements were done and the statements made by someone you

7      do not find were a member of the conspiracy, or if they were

8      not done or said in furtherance of the conspiracy, you may

9      consider them as evidence only against the member who did or

10     said them.

11             Now, the indictment contains a section entitled overt

12     acts set forth in the indictment page two and three.  These

13     overt acts provide examples of conduct allegedly undertaken by

14     alleged members of the conspiracy to further or promote the

15     illegal objects of the conspiracy charged in count one.  It is

16     not necessary for the government to prove that the overt acts

17     alleged in count one took place, so long as the government

18     proves as I've explained the existence of the conspiracy

19     charged in count one, and that one or both defendants were

20     knowing and intentional members of the conspiracy.

21             If you find that the government has proven a

22     conspiracy to perform these essential elements as to Ms. Chai

23     and Mr. Lee or both beyond a reasonable doubt, then either or

24     defendants are guilty of count one.  If the government fails to

25     prove any one of these elements as to a particular defendant or

E9jzcha7                        Charge

1   both defendants, then the defendant or both defendants must be

2   found not guilty of count one.

3           That concludes the charge on count one.

4           Let me turn to count two, which is a charge against

5   Mr. Lee but not Ms. Chai.

6           Count two of the indictment charges Hi Jong Lee with

7   participating in the conspiracy with others to violate the laws

8   of the United States which prohibit money laundering.  Count

9   two appears on pages three through five of the indictment.

10          You should keep in mind my instruction on the

11  conspiracy, the object of the conspiracy and the difference

12  between a conspiracy and a substantive offense that I gave you

13  with respect to count one as you are considering count two.  I

14  won't repeat it for count two.

15          The time period of the conspiracy to launder funds is

16  alleged to be from in or about 2011, up to and including in or

17  about January 2013.  As I told you before, it's not essential

18  that the government prove the conspiracy started and ended at

19  these specific times.  It is sufficient that the charged

20  conspiracy was formed at some point, and it existed for some

21  period, sometime within the period set forth in the indictment,

22  whether or not it continued beyond that period.

23          In order to meet its burden of proving that Mr. Lee is

24  guilty of conspiring with others to launder money as charged in

25  count two, the government has to prove beyond a reasonable

E9jzcha7                    Charge

1   doubt the following two elements:  First, two or more persons

2   entered into an unlawful agreement to commit a money laundering

3   offense; and, two, that Mr. Lee knowingly, willfully and

4   intentionally entered into the agreement.

5           I gave you instructions on the elements of conspiracy

6   earlier in describing the elements of count one.  I also

7   defined for you the terms knowingly and intentionally.  You are

8   to apply those instructions and definitions to this count of

9   conspiracy as well.

10          With respect to willfully, I'll define that term now.

11  An act is done willfully if it is done with the knowledge that

12  one's conduct is unlawful, and with intent to do something that

13  the law forbids, that is to say, with bad purpose, to disobey

14  or disregard the law.

15          I'll now summarize the elements of the conspiracy.

16  First element is agreement.  As explained in count one, to show

17  a conspiracy existed it is sufficient if the evidence shows

18  that two or more persons in some way or manner explicitly or

19  implicitly came to an understanding to violate the law.

20  Violation of the law here is conspiring to accomplish two

21  legal, two different legal illegal objectives.  The first

22  object that Mr. Lee is alleged to have agreed to accomplish was

23  to commit money laundering by engaging in financial

24  transactions that involved the proceeds of illegal narcotic

25  transactions with intent to promote the carrying on of

E9jzcha7                         Charge

narcotics transaction.

The second object that Mr. Lee's alleged to have agreed to accomplish was to commit money laundering by engaging in financial transactions that involve the proceeds of illegal narcotic transactions with the intent to conceal the nature, location, source, ownership and control of the proceeds.  It is not necessary for you to find that the charged conspiracy embodied both of these unlawful objectives.  It is sufficient if you find unanimously that the government has proved beyond a reasonable doubt the conspirators agreed expressly or impliedly and any one of the two objectives.  An agreement to accomplish either one of these objectives is sufficient.  However, in order to find Mr. Lee guilty you must all agree on at least one specific unlawful objective charge, and you must be unanimous on that.

In order to prove Mr. Lee guilty of conspiring to commit money laundering, the government must prove beyond a reasonable doubt that Mr. Lee conspired first to conduct or attempt to conduct a financial transaction.  A financial transaction must, in some way affect interstate or foreign commerce; second, to conduct or attempt to conduct the financial transaction with property or funds that involve the proceeds of some form of specified unlawful activity; third, to engage in the transaction with knowledge that the transaction involved the proceeds or some form of unlawful activity;

E9jzcha7                         Charge

1    fourth, to engage in financial transactions with either, A, of

2    the intent to promote the carrying on of specified unlawful

3    activity or, B, knowledge that the transaction was designed in

4    whole or in part to conceal and disguise nature, location,

5    source, ownership or control of the proceeds of some specified

6    unlawful activity.

7         Now the first element the government must prove beyond

8    a reasonable doubt is that two or more persons knowingly agreed

9    to conduct or attempt to conduct a financial transaction

10   involving property constituting the proceeds of a specified

11   unlawful activity; here, namely narcotics trafficking.

12        The term conducts includes initiating, including

13   participating in initiating including a transaction.

14   Transaction means purchase, sale, loan, pledge, gift, transfer

15   delivery or other disposition of property.

16        The term financial transaction means a transaction

17   involving a financial institution which is engaged in, the

18   activities of which affect interstate or foreign commerce in

19   any way or degree or, two, the transaction which in any way or

20   degree affects interstate or foreign commerce that involves the

21   movement of funds by wire or other means, or involves one or

22   more monetary instruments or involves the transfer of title to

23   any real property, vehicle, vessel or aircraft.

24        There are several terms of this definition of

25   financial transaction that, themselves, require definition.

E9jzcha7                    Charge

1            A transaction involving a financial institution

2     includes deposit, withdrawal, transfer between accounts, loan

3     or any other payment, transfer, delivery by through or to a

4     financial institution by whatever means.

5            The term interstate commerce means any transmission,

6     transfer or transportation of goods and services, both tangible

7     and intangible, communications and/or persons, between persons,

8     places and entities from one state, and persons and places or

9     entities located in another state, regardless of whether

10    they're done for business purpose or otherwise.  Foreign

11    commerce means the same thing, except it's between a person,

12    place or entity in the United States or a person, place and

13    entity in a foreign country.

14           In determining whether someone's engaged in or whether

15    his activities affect interstate or foreign commerce, the

16    involvement in interstate or commerce foreign commerce can be

17    minimal.  Any involvement at all will satisfy this element.

18    You do not have to decide whether the effect on interstate or

19    foreign commerce was harmful or beneficial to a particular

20    business or commerce in general.  The government satisfies its

21    burden of proving an affect on interstate or foreign commerce

22    if it proves beyond a reasonable doubt any effect, whether it

23    was harmful or not.

24           In addition, it is not necessary for the government to

25    show that the defendants actually intended or anticipated

E9jzcha7                         Charge

affect on interstate or foreign commerce by his actions or that

commerce was actually affected.  All that is necessary is that

the natural and probable consequences of the actions the

defendant agreed to take affect interstate or foreign commerce.

The second element which the government must prove

beyond a reasonable doubt is that the property involved the

agreed upon financial transaction was the proceeds of some form

of specified unlawful activity.  The term "proceeds" means any

property or any interest in property that someone acquires or

retains as profits, resulting from the commission of the

specified unlawful activity.

It is the Government's contention here that the money

involved in the financial transactions in this case were

derived from or obtained as a result of unlawful distribution

of narcotics.  The term "unspecified unlawful activity" means

any one of a variety of offenses defined by the statute.  Here

in this case the government has alleged that the funds in

question were the proceeds of the unlawful distribution of

narcotics.  I instruct you that as a matter of law the unlawful

distribution of narcotics falls within the definition of

"unlawful activity."  However, it is for you to determine

whether the funds were the proceeds of that unlawful activity

charged in the indictment.

The third element which the government must prove

beyond a reasonable doubt is the defendant entered into an

E9jzcha7                    Charge

1    agreement to engage in the financial transactions, with

2    knowledge that the property involved in the the financial

3    transaction was the proceeds of unlawful activity.  To satisfy

4    this element, the government must prove two or more persons

5    agreed to conduct a transaction, knew that the property

6    involved in the transaction represented proceeds from some

7    form, though not necessarily specific form of activity, and

8    constitutes a federal, a felony under state or federal law.

9    Thus, the government does not have to prove that Mr. Lee

10   specifically knew the property involved in the transaction

11   represented the proceeds of unlawful distribution of narcotics

12   as opposed to any other specific offense.  The government only

13   has to prove that the individuals agreeing to conduct financial

14   transaction knew that the transaction represented the proceeds

15   of some illegal activity that was a felony.  It is not

16   necessary for all conspirators to believe the proceeds came

17   from the same unlawful activity.  It's sufficient that each is

18   potential conspirator believed the proceeds came from some

19   unlawful activity.

20        The fourth and final element the government must prove

21   beyond a reasonable doubt is that the defendant acted either,

22   one, with the intent to promote the carrying on of specified

23   unlawful activity, namely, the unlawful distribution of

24   narcotics or; two, with knowledge that the transaction was

25   designed to conceal or disguise the nature, location, source

E9jzcha7                    Charge

ownership or control of proceeds of the unlawful activity.

Either finding is sufficient to find guilt in this case.

To act intentionally means to act willfully, not by

mistake or accident, the deliberate purpose of promoting,

facilitating or assisting the carrying on the unlawful

distribution of narcotics.

If you find that the conspirators agreed to act with

the intention to deliberate -- the intention or deliberate

purpose of promoting, facilitating or assisting in the carrying

out the unlawful distribution of narcotics, then the fourth

element is satisfied.

Alternatively, the element is satisfied if you find

beyond a reasonable doubt that the conspirators acted with

knowledge that the agreed upon transaction was designed to

conceal or disguise the nature, location, source, ownership or

control of the proceeds specified illegal activity; namely,

unlawful narcotics distribution.

If you find that the evidence establishes beyond a

reasonable doubt that the defendant knew of the purpose of the

agreed upon transaction in issue, and he knew that the

transaction was either designed to conceal or disguise the true

origin of the property in question, then this element is

satisfied.  However, if you find that the defendant knew of the

agreed upon transaction but did not no it was either designed

to conceal or disguise the true origin of the property in

E9jzcha7                          Charge

1    question, you must find that the element has not been satisfied

2    and you should find the defendant not guilty.  Proof that the

3    conspirators knew the purpose of the agreed upon financial

4    transaction was to conceal or disguise the location or the

5    ownership of the proceeds of specified unlawful activity, may

6    be established by proof that the conspirators actually knew or

7    knew because of circumstantial evidence.  In other words, you

8    are entitled to find from circumstances surrounding financial

9    transactions what the purpose of the activity was in the and

10   the alleged conspirators knew of the purpose.

11        Now after that, the second element, is membership in

12   the conspiracy.  So if you conclude that the government has

13   proved beyond a reasonable doubt that a conspiracy charged in

14   count two of the indictment existed, you should proceed to

15   consider the second element; did Mr. Lee participate in the

16   conspiracy with knowledge of its unlawful purpose and in

17   furtherance of its unlawful objective or objectives.  The

18   government must prove beyond a reasonable doubt that Mr. Lee

19   intentionally, knowingly and willfully entered into that

20   conspiracy.  The agreement with the criminal intent, that is

21   with the purpose to violate law and agreed to take part in the

22   conspiracy to promote, cooperate in its unlawful objective.

23        I have previously defined intentionally, knowingly and

24   willfully for you and you should apply those definitions here.

25   I remind the defendant's mere association with other persons

E9jzcha7                         Charge

1    who commits a crime is not sufficient to support a conviction.

2            Now, with respect to overt acts for count two, the

3    indictment also contains the section entitled overt acts that's

4    at page five and six.  These overt acts provide examples of

5    conduct allegedly undertaken by alleged members of the

6    conspiracy to further promote the illegal objects of the

7    conspiracy charged in count two.

8            It is not necessary for the government to prove that

9    the overt acts alleged in count two took place, so long as the

10   government proves, as I've explained, the existence of the

11   conspiracy charged in count two, and that Mr. Lee was a knowing

12   intentional member of the conspiracy.

13           Count three deals with the structuring transactions to

14   evade currency reporting requirements.  Mr. Lee is charged in

15   count three of the indictment with the structuring financial

16   transactions for the purposes of evading reporting

17   requirements.  Counts three appears at page five and six of the

18   indictment.  In order to prove that, the crime of structuring

19   currency transaction, government must prove beyond a reasonable

20   doubt each of the following elements; first, the defendant knew

21   that a financial institution was legally obligated to report

22   currency transactions in excess of $10,000; second, the

23   defendant engaged in the structuring of the currency

24   transaction; third, the defendant acted with the intent to

25   evade the reporting requirement.  And the first element is

E9jzcha7                      Charge

1    knowledge of reporting requirement.

2              First element that the government must prove beyond a

3    reasonable doubt is that at the time the transaction described

4    in the indictment occurred, Mr. Lee knew that a financial

5    institution was legally obligated to report currency

6    transactions in excess of $10,000.  A financial institution is

7    defined in part as a bank, the deposits of which are insured by

8    the Federal Deposit Insurance Corporation.  Under federal law,

9    a financial institution is required to file a report with the

10   federal government at any time that it is involved in a

11   transaction involving more than $10,000 in U.S. currency.  This

12   is known as a currency transaction report or CTR.  There is

13   nothing unlawful about engaging in a transaction involving more

14   than $10,000.  However, financial institutions are required to

15   file a CTR for any such transaction.  In order to satisfy this

16   element, the government must prove that Mr. Lee knew the

17   financial institution involved would be required to file a CTR

18   for any currency transaction involving more than $10,000.  The

19   question of whether a person acted with knowledge is a question

20   of fact for you to determine like any other fact question.

21   Direct proof of knowledge is not always available and such

22   proof is not required.  The ultimate fact of whether someone

23   knew something at a particular time, though subjective, may be

24   established by circumstantial evidence based on a person's

25   outward manifestation, his words, his conduct, his acts and all

E9jzcha7                    Charge

1    the surrounding circumstances disclosed by the evidence, and

2    the rational and logical inferences that may be drawn

3    therefrom.

4           Now the second element in structuring transaction that

5    the government has to prove beyond a reasonable doubt is that

6    Mr. Lee engaged or assisted in the structuring with the

7    currency transaction.  The currency transaction is any

8    financial transaction which includes the physical transfer of

9    currency; for example, taking a check to a bank, cashing it is

10   a currency transaction, but depositing the check in a bank

11   account is not a currency transaction.  Depositing cash in a

12   bank account is a currency transaction.  Purchasing something

13   and paying for it in cash is a currency transaction.  Paying

14   for it by check or credit card is not.

15          As I instructed you before, engaging in a currency

16   transaction in an amount of more than $10,000 requires the

17   financial institution to file a CTR, Currency Transaction

18   Report.  The structuring of a transaction is when a person

19   acting alone or with others conducts or attempts to conduct one

20   or more currency transactions in any amount at one or more

21   financial institution on one or more days for the purposes of

22   evading reporting requirement I've just described.

23          Structuring includes, but is not limited to breaking

24   down some currency exceeding $10,000 into smaller amounts, each

25   less than $10,000, then conducting a series of separate

E9jzcha7                         Charge

1   currency transactions in those smaller amounts in order to

2   avoid the reporting requirement.  The transactions need not

3   exceed $10,000 in any single financial institution or in any

4   single day in order to constitute structuring.

5          The third element the government must prove beyond a

6   reasonable doubt is that Mr. Lee engaged in structuring with

7   intent to evade the reporting requirement.  A person acts

8   intentionally when he acts deliberately and purposefully.  Mr.

9   Lee's acts must have been the product of conscientious --

10  conscious objective, rather than the product of mistake or

11  accident.  As I've previously instructed you, proof of a

12  defendant's intent may be established by circumstantial

13  evidence based on the defendant's outward manifestations, his

14  words, conduct, acts and all the surrounding circumstances

15  disclosed by the evidence, the rational and logical inferences

16  that may be drawn from them.

17         If you conclude unanimously that the government has

18  proven the first three elements of this count, then Mr. Lee is

19  guilty of count three.

20         However, the indictment also charges Mr. Lee with

21  engaging in structuring transactions or violating another law

22  of the United States, and as part of a pattern of illegal

23  activity involving more than $100,000 in a 12 month period.

24  Therefore, if you find that the government has proven beyond a

25  reasonable doubt that Mr. Lee is guilty of engaging in

E9jzcha7                        Charge

1    structuring transactions as charged in count two, you must

2    determine whether the government has proven beyond a reasonable

3    doubt that Mr. Lee willfully engaged in the structuring

4    transactions as part of a pattern of illegal activity involving

5    more than $100,000 in a 12 month period or while violating

6    another law of the United States, including either the crimes

7    charged in counts one or two.

8           To prove this element, the government must prove that

9    Mr. Lee engaged in a series of transactions involving repeated

10   failures to file required reports of these transaction all

11   related to each other, and together involving more than

12   $100,000 over 12 month period.  No single transaction has to be

13   greater than $100,000, so long as the total of the transaction

14   in a 12 month period is greater than $100,000.  In the

15   alternative, the government must prove that Mr. Lee engaged in

16   structuring transactions while violating another law of the

17   United States.  If you find unanimously that the government has

18   proved beyond a reasonable doubt Mr. Lee engaged in structuring

19   activity either, A, as part of a pattern of illegal activity

20   involving more than $100,000 in a 12 month period or, B,

21   violating another law of the United States, then check yes in

22   response to that question on the verdict form that I'm going to

23   provide to you.

24          Now, with respect to count three, this count also

25   charges Mr. Lee with what is called aiding and abetting.

1   Aiding and abetting is an alternative theory on which the

2   defendant can be convicted of a substantive crime.  In other

3   words, you may also find Mr. Lee guilty of count three of the

4   indictment, count charging financial structuring if you find

5   that Mr. Lee aided and abetted commission of that crime.  The

6   aiding and abetting statute, Title 18, Section 2A United States

7   Code provides as follows:  Whoever commits an offense against

8   the United States or aids, abets counsels, commands induces or

9   procures its commission, is punishable as a principal.  Under

10  the aiding and abetting statute, it is not necessary for the

11  government to show that Mr. Lee himself physically committed

12  the crimes with which he is charged in order to find him

13  guilty.  A person who aids or abets another to commit an

14  offense is just as guilty of that offense as if he committed it

15  himself.  Accordingly, you may find Mr. Lee guilty of the

16  substantive crime if you find beyond a reasonable doubt that

17  another person actually committed the crime, and Mr. Lee aided

18  and abetted that person in the commission of the offense.

19          As you can see, the first requirement is that another

20  person committed the crime charged.  Obviously, no one can be

21  convicted of aiding and abetting criminal acts of another if no

22  crime was committed by the other person in the first instance.

23  But if you do find that a crime was committed, then you must

24  consider whether Mr. Lee aided or abetted in the commission of

25  the crime.  In order to aid or abet another to commit a crime

E9jzcha7                         Charge

1    it is necessary the defendant willfully and knowingly

2    associated himself in some way with the crime and that he

3    willfully and knowingly seeked by some act to help make that

4    crime succeed.

5            Participation in a crime is willful if action is taken

6    voluntarily and intentionally, or in the case of a failure to

7    act, with specific intent failed to do something the law

8    requires to be done, that is to say, with a bad purpose either

9    to disobey or disregard the law.

10           I remind you that the mere presence of a defendant

11   where a crime is being committed, even coupled with knowledge

12   by the defendant that a crime is being committed or the mere

13   acquiesence by a defendant in criminal conduct of others, even

14   with guilty knowledge, is not sufficient to establish aiding

15   and abetting.  An aidor or abettor must have some interest in a

16   criminal venture.  To determine whether a defendant aided or

17   abetted the commission of a crime with which he is charged, ask

18   yourself these questions.  Did he participate in the crime

19   charged as something he wished to bring about?  Did he

20   associate himself with a criminal venture knowingly and

21   willfully?  Did he seek by his actions to make criminal venture

22   succeed?  If he did, then the defendant is an aidor and

23   abettor, therefore guilty of the offense.  If he did not aid

24   the crime, he is not an aider abettor, the defendant is not an

25   aider and and abettor, he does not personally commit the crime,

E9jzcha7                    Charge

1   then he is not guilty of that offense.

2           With respect to motive, proof of motive is not

3   necessarily an element of the 11th crimes with which

4   Mr. Ms. Chai or Mr. Lee are charged.  Proof of motive does not

5   establish guilt, nor does lack of proof of motive establish the

6   defendant is not guilty.  If the guilt of a defendant is shown

7   beyond a reasonable doubt, it is immaterial what the

8   defendant's motive for the crime may be or whether his or her

9   motive was shown at all.  Presence or absence of motive is,

10  however, a circumstance which you may consider as bearing on

11  the intent of the defendant.

12          In addition to the elements I've just described for

13  you, you must also decide whether any act in furtherance of the

14  unlawful activity charged occurred within the Southern District

15  of New York.  The Southern District of New York includes

16  Manhattan, the Bronx and Westchester, which includes Yonkers.

17  It is sufficient to satisfy the venue requirement if any act by

18  anyone in furtherance of the crime charged occurred within the

19  Southern District of New York.  I should note on this issue and

20  this issue alone, the government need not prove venue beyond a

21  reasonable doubt, but only by a mere preponderance of evidence.

22  Preponderance of evidence means something that is more likely

23  than not.  Thus, the government has satisfied its venue

24  obligation if you conclude it is more likely than not that any

25  act in furtherance of the crime charged occurred within this

E9jzcha7                    Charge

1   district.  If you find that the government has failed to prove

2   venue, then you must find Ms. Chai and Mr. Lee are both not

3   guilty.  Defendant has the right only to be tried in the

4   district that is proper.

5          Final conclusion, instructions.  I'm just about at the

6   end.  You're about to go in the jury room to begin your

7   deliberation.  Your function now is to weigh the evidence in

8   this case and determine whether the government has proved

9   beyond a reasonable doubt that Ms. Chai Mr. Lee or both are

10  guilty of the offenses charged in counts one, two and three of

11  the indictment.  Remember you have to answer with respect to

12  each count separately.  You must base your verdict solely on

13  the evidence and these instruction as to the law.  You're

14  obliged under your oath as jurors to follow the law as I've

15  instructed you, whether you agree or disagree with the

16  particular law in question.

17         The verdict must represent the considered judgment of

18  each juror.  In order to return a verdict, it is necessary that

19  each juror agree to it.  Your verdict must be unanimous.  If

20  you're divided, do not report how the vote stands.  If you

21  reached a verdict, do not report on what it is until you're

22  asked in open court.  When you retire to the jury room, you

23  must have a foreman, foreperson, that will preside over the

24  deliberations and speak for you here in open court.  Other than

25  those functions, the foreperson will have no greater or lesser

E9jzcha7                    Charge

authority than any other juror.  It is my custom to select

juror number one in every case be the foreperson of the jury.

Accordingly, I'm now selecting juror number one, Laura

Hagerman, as your foreperson.

            Now, let me talk about your duty to deliberate.  It is

your duty as jurors to consult with one another, and to

deliberate with a view towards reaching an agreement.  You must

each decide the case for yourself, but you should do so only

after discussing the case with your fellow jurors.  And you

should not hesitate to change your opinion when you're

convinced it's erroneous, because it's essential that every

juror consider all the facts and arguments before reaching a

verdict.  All of you must be present in order to deliberate.

If any juror takes a break during the course of your

deliberation, you have to stop discussing the case until that

juror or juror returns.  Similarly, if any juror arrives late

in the morning, you may not commence your deliberations till

all 12 of you are present.  Your deliberations, for your

deliberations, you'll be provided with copies of the

instructions I'm currently giving to you as I've told you.

You'll be provided with copies of the indictment and I'll

provide one verdict sheet on which you will record your

verdict.  As they indicated in their summations, I'm going to

send exhibits received in evidence into the jury room.  If you

want any testimony read back, you want to see any videotapes,

you may also request that.  Please remember, though, when you

are requesting testimony it is not always easy to locate what

you might want, so try to be as specific as you possibly could

be when requesting testimony or portion of testimony.

         If you want further explanation of the law as I

explained it to you, you may request that as well.  If there's

any doubt or question about the meaning of any part of the

charge, you may ask for a clarification, further explanation.

Your requests or any other communication you wish to make with

the Court should be made in writing, signed by your foreperson,

given to one of the Marshals who will be watching over you.

Bear in mind that you're never to reveal to any person, not

even the Court, how you, the jury, stand numerically or

otherwise on the questions before you, until you've reached a

unanimous verdict.  Your decision has to be unanimous, but

you're not bound to surrender your honest beliefs concerning

the effect of the weight of the evidence for the mere purpose

of returning a verdict or solely because the opinion of other

jurors.  Discuss and weigh your respective opinions

dispassionately, without regard for sympathy, prejudice or

favor of either party, and adopt the conclusion that your good

conscience appears to in accordance with the truth.

         Some of you may have taken notes.  I think many of you

took notes.  I told you at the beginning of the trial this is

permitted because it helps some of us find, it helps focus on

E9jzcha7                      Charge

1    the testimony.  But your notes are for your private use only as

2    a way to help you recall the testimony as you begin your

3    deliberations.  Jurors notes are not entitled to any greater

4    weight than the recollection of the juror who does not take

5    notes.  Again, each of you must make your own decision about

6    the proper outcome of this case based on your consideration of

7    the evidence and your discussions with your fellow jurors.  No

8    juror should surrender his conscientious beliefs solely for the

9    purpose of every returning a unanimous verdict.  Your verdict

10   must be based solely upon the evidence introduced at trial or

11   the lack of evidence.  It is improper for you to consider any

12   personal feelings you have about the defendant's race,

13   religion, national origin, wealth, gender or age.  Parties in

14   this case are entitled to trial free from prejudice.  And our

15   judicial system may not work unless you reach a verdict through

16   a fair and impartial consideration of the evidence before you.

17   Your function now is to weigh the evidence in this case and to

18   determine whether the government has or has not established

19   Ms. Chai or Mr. Lee's guilt beyond a reasonable doubt with

20   respect to each count of the indictment.  You must base your

21   verdict solely on the evidence and these instruction as to the

22   law.  You're obliged by your oath as jurors to follow the law

23   as I instruct you, regardless of whether you agree or disagree

24   with the particular law in question.  Remember at all times you

25   are not partisans, you are judges, judges of the facts, and

E9jzcha7                    Charge

1    your sole interest is to seek the truth from the evidence in

2    this case.  It is your duty as jurors to consult with one

3    another and deliberate with a view toward reaching agreement.

4    Each of you must decide the case for himself or herself, but do

5    so only after an impartial discussion and consideration of all

6    of the evidence in the case with your fellow jurors.  In the

7    course of your deliberations, do not hesitate to re-examine

8    your own views and change your opinion if you're convinced it's

9    erroneous, but do not surrender your honest convictions as to

10   the weight or effect of evidence solely because the opinion of

11   your fellow jurors.

12         Now, as to the alternate jurors Ms. Schnuer, and

13   Ms. Baralta and Ms. Gibbons, only the 12 jurors, only 12 jurors

14   may deliberate on reaching a verdict.  So I'm going to excuse

15   you now three alternate jurors.  You'll notice I said excuse,

16   not dismiss.  You may, there may be circumstances where one or

17   more of you will have to be recalled, such as if one of the 12

18   jurors unexpectedly becomes unavailable.  In addition to

19   thanking you for your punctuality to your faithful attendance,

20   close attention you paid, I'm going to instruct the alternate

21   jurors not to discuss the case with anyone, not to read, listen

22   or watch any news reports and not to do any research until this

23   case is over and we have a jury verdict.

24         We have the alternate jurors contact information.

25   We'll contact you should the need arise.  If no needs arise,

E9jzcha7                    Charge

1    we'll contact you when the jury of 12 concludes its

2    deliberations.

3              Before I excuse the alternates, I'll see counsel at

4    sidebar.

5              (At the sidebar)

6              THE COURT:  Any further instructions?

7              MR. RIOPELLE:  Yeah, no objection to the -- there is

8    no objection to the instructions from my client, other than to

9    the extent the Court did not accept our submissions.

10             THE COURT:  Oh, those are preserved.

11             MR. RIOPELLE:  Yeah.

12             THE COURT:  I should have said that at the end of the

13   charge.

14             MR. RIOPELLE:  That's okay.

15             MR. AGNIFILO:  No objection.

16             MR. KOBRE:  No objection from the government.

17             MR. AGNIFILO:  Judge, one last thing.  When we send

18   the exhibits back, we're doing to take all the tabs and stuff

19   off, just pure exhibits go back?

20             THE COURT:  Clean copies, no highlighting.

21             MR. AGNIFILO:  Right.

22             THE COURT:  No tabs, no watch this, no watch this.

23             MR. AGNIFILO:  Right.

24             MR. RIOPELLE:  I have the best story ever about that.

25             THE COURT:  I'll tell you the story later on.  Okay

E9jzcha7                    Charge

1   anything else.

2              MR. RIOPELLE:  No, Judge thank you.

3              THE COURT:  Is the security guard here?

4              THE DEPUTY CLERK:  Yes.

5              (In open court)

6              THE COURT:  You're excused.  Thank you very much.

7              (Alternates excused)

8              THE COURT:  Marshal, tell the three alternates to

9    leaver their pads.  Thank you.

10             THE COURT:  Swear the Marshal, please.

11             THE DEPUTY CLERK:  Sir, can you please raise your

12   right hand.

13             (Marshal sworn)

14             THE COURT:  Thank you.  Now before I excuse you, let

15   me say we're going, as I said, you'll get the jury charge, the

16   indictment, and verdict sheet will go into the jury room.

17   You're free to deliberate as long as you want tonight.  We'd

18   appreciate it Ms. Hagerman, if you poll the jury, let us know

19   because we have to stay here so long as you deliberate.  You

20   won't to deliberate over the weekend.  If you need more time,

21   come back on Monday at nine or 9:30, but you might take -- talk

22   about it a little amongst yourselves and let us know what your

23   schedule is for deliberations tonight.  Okay.

24             THE DEPUTY CLERK:  All rise.

25             (Jury retires at 4:08 p.m.)

E9jzcha7                    Charge

1              (In open court, jury not present)

2              THE COURT:  Okay.  Do we have copies of the indictment

3     and jury charge?

4              THE DEPUTY CLERK:  One copy of the verdict sheet,

5     copies of notes, six copies of the indictment and 12 copies of

6     the charge.

7              THE COURT:  Give those to the court security officer,

8     I assume.

9              THE DEPUTY CLERK:  Yes, sir.

10             THE COURT:  And are we ready with the evidence?

11             MR. RIOPELLE:  Yes.  We have ours, your Honor.

12             MR. TEHRANI:  Your Honor, we if we're going to have to

13    take off all tabs, we need to do that.

14             THE COURT:  How long will that take, Mr. Tehrani?

15             MR. TEHRANI:  15 minutes, 10, 15 minutes.

16             MR. RIOPELLE:  We'll help.

17             THE COURT:  Okay.

18             (Recess pending verdict)

19             (In open court, jury not present)

20             4:27 p.m.

21             THE COURT:  Has everybody?  Seen the note.

22             MR. KOBRE:  Yes, Judge.

23             THE COURT:  Okay, you want to call them in or just let

24    them go?

25             MR. AGNIFILO:  I'm fine with letting them go unless

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E9jzcha7                    Charge

1   you have a different procedure.

2            THE COURT:  I don't.  I always ask -- procedure is to

3   follow your request.

4            MR. AGNIFILO:  I'm fine just to let them to go.

5            MR. KOBRE:  That's fine, Judge.

6            THE COURT:  Mr. Riopelle is not here?  Okay, just read

7   this into the record.

8            It's court Exhibit 1.  "We are leaving today at 4:30.

9   We agreed to start deliberations on Monday at 9:30 a.m.,"

10  signed by Ms. Hagerman.

11           Okay, see you on Monday.

12           (Adjourned to September 22, 2014 at 9:30 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25