UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

UNITED STATES OF AMERICA

    *-against-*

CHRISTINA CHAI and HI JONG LEE,

    *Defendants.*

------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  1 - 2 2 - 15
```

13 Cr. 290 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

On September 29, 2014, after a two-week trial, a jury convicted Defendant Christina Chai of conspiracy to illegally distribute oxycodone; and Defendant Hi Jong Lee of conspiracy to illegally distribute oxycodone, conspiracy to commit money laundering, and structuring transactions to evade currency reporting requirements.

Mr. Lee now moves for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure ("Fed. R. Crim. P.") 29(c) as to all three counts of conviction, arguing that there was insufficient evidence to support the verdicts. Alternatively, he moves for a new trial, pursuant to Fed. R. Crim. P. 33, on the grounds that certain of the Court's rulings effectively denied him a fair trial.

Ms. Chai moves for a new trial on the sole ground that the jury was exposed to extra-record information during its deliberation. For the reasons below, Mr. Lee's and Ms. Chai's motions are DENIED.

## BACKGROUND

Mr. Lee and Ms. Chai were indicted with a third individual, Ji Lee. During the time frame of the conspiracy (2011-2013), Mr. Lee was a pharmacist and the owner of Stanley Pharmacy, Ms. Chai was a pharmacist employed by the pharmacy, and Ji Lee was the pharmacy

1

manager. Prior to trial, Ji Lee pled guilty to conspiracy to illegally distribute oxycodone. At trial, neither Mr. Lee nor Ms. Chai disputed that oxycodone was illegally distributed at Stanley Pharmacy. Their defense was that they were not involved in the alleged illegal activity.

## DISCUSSION

### I.    Motion for Judgment of Acquittal

#### A.    Legal Standard

Under Fed. R. Crim. P. 29, a court must enter a judgment of acquittal if "the evidence is insufficient to sustain a conviction." Defendants seeking to overturn convictions on this basis bear a "heavy burden" because verdicts "must be affirmed if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Cote*, 544 F.3d 88, 98 (2d Cir. 2008) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In reviewing the sufficiency of the evidence, the Court "credit[s] every inference that could have been drawn in the government's favor, and defer[s] to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Chavez*, 549 F.3d 119, 125 (2d Cir. 2008) (citations omitted).

The Court reviews "pieces of evidence not in isolation but in conjunction," *United States v. Amato*, 15 F.3d 230, 236 (2d Cir. 1994) (citation omitted), and the evidence, taken together, "need not have excluded every possible hypothesis of innocence." *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992). This is particularly true for conspiracy convictions, "because a conspiracy by its very nature is a secretive operation, and it is a rare case 'where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *Id.* (quoting *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir. 1980)).

**B. Application**

    **1. There was sufficient evidence to support the verdicts against Mr. Lee**

        **a. Count One (Conspiracy to illegally distribute oxycodone) and Count Two (Conspiracy to commit money laundering)**

Mr. Lee argues that there was insufficient evidence to support a guilty verdict for Counts One and Two because the Government presented no direct proof of Mr. Lee's guilt, and because the circumstantial evidence was inadequate to support the verdicts.

The evidence showed that, during the time frame of the conspiracy, Mr. Lee was the president and owner of Stanley Pharmacy; he was responsible for banking, payroll, and bookkeeping; and he was physically present at the pharmacy several days each week. (Tr. 912-15). The evidence showed that Mr. Lee spent much of his time in the drugstore's office in the basement, including those days when he was the only pharmacist scheduled to work. (Tr. 305, 587-88). The only other individual who could have been filling prescriptions on those days was his son Ji Lee, who Mr. Lee knew was not a licensed pharmacist. (Tr. 588-89). Moreover, during their search of the basement office, federal agents found bank records for Stanley Pharmacy, as well as a detailed ledger showing the number of prescriptions filled per day and revenue derived from those prescriptions. (Tr. 814-22).

The evidence at trial also showed that Mr. Lee and his wife were the only authorized signers for the bank account for Stanley Pharmacy (the "Pharmacy Account"). (Tr. 781-82). The amount of money in the Pharmacy Account increased substantially during the conspiracy, from approximately $300,000 to $750,000. (*See* Tr. 811-14). The Government presented evidence from which the jury could determine that Mr. Lee knew of this substantial increase—not only because he and his wife were the authorized signers for the account, but also because Mr. Lee regularly deposited cash into the account. (Tr. 693-94; 713-14). The evidence showed

3

that when Mr. Lee made cash deposits, he often did so in amounts totaling just under $10,000, the threshold that would require the bank to file a currency transaction report. (Tr. 714).

Considering the evidence "not in isolation but in conjunction," *Amato*, 15 F.3d at 236, any rational jury could easily have found beyond a reasonable doubt that Mr. Lee participated in a conspiracy to illegally distribute oxycodone and to launder the proceeds. Mr. Lee's contention that the Government failed to present direct, as opposed to circumstantial, evidence of his participation is unavailing because a "jury's verdict may be based entirely on circumstantial evidence." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995).

### 2.   Count Three (Structuring transactions to evade currency reporting requirements)

Mr. Lee claims that the evidence was insufficient to prove his intent to evade currency reporting requirements. Mr. Lee further argues that the Government failed to prove that he structured transactions either: (a) while violating another law, or (b) in amounts of more than $100,000 during a single year.

The arguments are rejected. Bank tellers Kadene Gayle and Providence Maia testified that Mr. Lee personally made cash deposits into the Pharmacy Account multiple times per week. (Tr. 693-94; 713-14). Ms. Gayle, in particular, recalled that Mr. Lee's cash deposits would often total just under $10,000. (Tr. 714). Ms. Gayle also testified that on one occasion, Mr. Lee attempted to make two deposits totaling $11,000, but when she asked for his identification to prepare a currency transaction report, Mr. Lee "took back" $2,000 from her. (Tr. 714-16). While Mr. Lee argues that "[t]here could be all sorts of reasons why [he] decided not to make one of the two deposits," the evidence presented "need not have excluded every possible hypothesis of innocence," but merely be sufficient for a rational trier of fact to find guilt beyond a reasonable doubt. Lee Mtn., at 9; *see Pitre*, 960 F.2d at 1120. The evidence here was clearly

4

sufficient. Furthermore, a rational jury could find that Mr. Lee structured transactions while
violating another law because the jury was entitled to—and did—find Mr. Lee guilty of
conspiracy.[1]

Accordingly, Mr. Lee's motions for judgments of acquittal with respect to Counts One,
Two, and Three are DENIED.

## II.    Motions for a New Trial

### A.  Legal Standard

The Court may "vacate any judgment and grant a new trial if the interest of justice so
requires." Fed. R. Crim. P. 33. Motions for a new trial "are disfavored in this Circuit and the
standard for granting such a motion is strict." *United States v. Gambino*, 59 F.3d 353, 364 (2d
Cir. 1995). To prevail, a defendant must demonstrate that "letting a guilty verdict stand would
be a manifest injustice." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (quoting
*United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)). In considering the motion, the
Court "must examine the entire case, take into account all facts and circumstances, and make an
objective evaluation." *Id.*

### B.  Mr. Lee's Motions

#### 1. The Court's evidentiary rulings were not erroneous

##### i.  Preclusion of hearsay testimony

Mr. Lee asserts that the Court improperly precluded testimony by John Osborn, Mr. Lee's
handwriting expert, that a number of fraudulent prescriptions bearing Mr. Lee's initial "H" were

---

[1] The jury's verdict does not show whether it found that Mr. Lee structured financial transactions while
violating another law, or that he made structured deposits of more than $100,000 during a single year, but the distinction is
immaterial. There was sufficient evidence for the jury to make either determination. Mr. Lee concedes that the
Government proved that "more than $100,000 was deposited in the Stanley Pharmacy bank accounts during the year
2012" and that "many of those deposits were in amounts of a little less than $10,000," but argues that the
Government failed to prove that Mr. Lee himself made many of those deposits. Lee Mtn., at 10. The jury found to
the contrary; and the Court will not second guess the jury.

5

signed not by Mr. Lee, but by Ji Lee.² To support Mr. Osborn's testimony, Ji Lee submitted an affidavit identifying the handwriting on certain prescriptions bearing the initial "H" as his own; Mr. Osborne compared that handwriting to the handwriting on other prescriptions with the initial "H." The Court allowed Mr. Osborn to testify that the handwriting on a number of prescriptions bearing the initial "H" was not Mr. Lee's. The Court rejected Mr. Osborn's attempt to repeat Ji Lee's hearsay statement that he had signed certain prescriptions with the initial "H."

According to Mr. Lee, Ji Lee's affidavit falls within a hearsay exception because it is "a statement against penal interest, made by an unavailable witness, with a Fifth Amendment right to assert." Lee Reply Mtn., at 7. Yet the contention that Ji Lee "would have asserted his Fifth Amendment privilege if compelled to testify is too speculative" because "an affiant is only unavailable when he has actually invoked the Fifth Amendment privilege." *See Colucci v. Beth Israel Med. Ctr.*, 531 Fed. Appx. 118, 121 (2d Cir. 2013). The affidavit therefore constitutes inadmissible hearsay.

Federal Rule of Evidence 703 permits experts such as Mr. Osborn to rely upon inadmissible facts in forming an opinion. Those facts, however, may only be disclosed to the jury "if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703; *see Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) ("a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony") (citation omitted). Here, the probative value of admitting Ji Lee's statement was low. Mr. Osborn was permitted to testify as to his ultimate conclusion—that the handwriting on a number of fraudulent prescriptions bearing the initial "H" did not belong to Mr. Lee—without repeating Ji Lee's

---

² The Government suggested that the handwritten initials indicated the person who had filled a particular prescription. (*See* Tr. 29).

6

hearsay assertion that certain signatures were his own.

### ii. Cross-examination of Andrew Chong

Mr. Lee argues that the Government impermissibly asked Mr. Chong, a character witness, guilt-assuming questions based on allegations in the indictment. *See United States v. Oshatz*, 912 F.2d 534, 539 (2d Cir. 1990). This argument is misplaced, because Mr. Chong went beyond being a character witness, and also testified as a fact witness. *See United States v. Cuti*, 720 F.3d 453, 460 (2d Cir. 2013) (declining to apply *Oshatz* where, *inter alia*, "the challenged questions . . . were not directed at character witnesses"); *United States v. Hatfield*, 2010 U.S. Dist. LEXIS 57860, at *4 (E.D.N.Y. June 10, 2010) (explaining that "*Oshatz* repeatedly confines its analysis to guilt assuming hypotheticals posed to 'character witnesses'").

In addition to Mr. Chong's opinion regarding Mr. Lee's character, he also testified that Mr. Lee owned Photo Arts, a store located "near[] [Stanley] [P]harmacy"; that Mr. Lee owned the building in which Photo Arts was located and received rent from tenants; and that in recent years, Mr. Lee had reduced the amount of time that he spent at Stanley Pharmacy. (Tr. 1125-27). The testimony thus supported Mr. Lee's defense that he had made multiple cash deposits at the same time, not with the intention of evading reporting requirements, but because the cash was derived from two separate sources—Stanley Pharmacy and rent from the Photo Arts building. (*See* Tr. 852-55; 1381). The testimony also supported Mr. Lee's argument that he was not aware of the illegal distribution of oxycodone because he was not often present at Stanley Pharmacy.

The questions to which Mr. Lee objects also concerned facts that were not in dispute. *Cf. United States v. Damblu*, 134 F.3d 490, 495 (2d Cir. 1998) (questions that were "carefully limited to the uncontroverted fact" that defendant had sold drugs were permissible). The Government asked Mr. Chong whether he was aware that: (1) Stanley Pharmacy had dispensed

7

"much more oxycodone in 2011 and 2012"; (2) "a large amount of cash" had been "taken in by the pharmacy" during that time; and (3) Mr. Lee had made cash deposits in a bank.  Mr. Lee does not contest the truth of any of these allegations.  (Tr. 66-67; 1130-33).

### iii. Admission of evidence regarding Mr. Lee's wealth

Mr. Lee argues that admitting financial statements that contained his personal bank account balances was more prejudicial than probative because the statements invited "class resentment" against him.  Lee Reply Mtn., at 15.  To the contrary, however, the financial statements were relevant to show that Mr. Lee was attentive to his financial affairs, and to rebut arguments that Mr. Lee was duped into making illegal cash deposits into the Pharmacy Account. (Tr. 66-69).  To eliminate any prejudice that might accrue due to Mr. Lee's wealth, the Court permitted the Government to introduce only three out of the thirteen financial statements that it sought to offer.  (Tr. 748).

### iv. Testimony of Investigator Dewey

Mr. Lee also contends that the testimony of New York State Bureau of Narcotics Investigator Timothy Dewey was "cumulative and inflammatory," and that its only purpose was to prejudice the jury against Mr. Lee by "reminding [them] of the unsavory characters with whom Ji Lee dealt."  Lee Mtn., at 13-14.  The testimony, however, was more probative than prejudicial.  Investigator Dewey testified regarding the anti-tampering features incorporated into New York State prescription pads.  (Tr. 682-86).  This testimony was clearly relevant—the Government was entitled to offer evidence to show that an experienced pharmacist such as Mr. Lee could easily have detected fraudulent prescriptions.[3]  Moreover, Investigator Dewey's

---

[3] While Mr. Lee asserts that "there was no proof at the trial that Defendant Lee ever saw any of the prescriptions that were tampered with," the Government presented evidence from which the jury could conclude that Mr. Lee did see such prescriptions.  For example, Mr. Lee's handwritten initial appears on certain of the fraudulent prescriptions.

8

testimony was a straightforward recitation of the features of New York prescription pads; at no time did he allude to "unsavory characters" in general, or to Stanley Pharmacy in particular.

### v.  Preclusion of evidence regarding Mr. Lee's health

Finally, Mr. Lee asserts that the Court erred in precluding evidence regarding Mr. Lee's "illness and injury during the relevant period." Lee Mtn., at 14. That evidence would have shown why Mr. Lee was absent from the pharmacy "during much of the time period charged in the Indictment." *Id.* The probative value of that evidence, however, is quite low because the number of days that Mr. Lee was present at Stanley Pharmacy was not disputed. (Tr. 912-15). Mr. Lee never claimed he was unable to perform any of his duties at Stanley Pharmacy due to his illness. The potential prejudice, on the other hand, is high, because jurors may have been improperly swayed by sympathy for Mr. Lee's illness in their deliberations.

Accordingly, Mr. Lee's motion for a new trial on the grounds that the Court committed evidentiary errors is DENIED.

### 2. The conscious avoidance instruction was appropriate

A conscious avoidance instruction is "appropriate when (a) the element of knowledge is in dispute, and (b) the evidence would permit a rational juror to conclude beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *United States v. Cuti*, 720 F.3d 453, 463 (2d Cir. 2013) (quoting *United States v. Ebbers*, 458 F.3d 110, 124 (2d Cir. 2006)). Mr. Lee asserts that the Government presented no evidence that he was aware of a high probability of illegal distribution of oxycodone at Stanley Pharmacy, or that he "saw any warning signs" of a conspiracy to do so. Lee Mtn., at 15.

---

(Tr. 1175-76). Although Mr. Lee's handwriting expert testified that he did not believe that handwriting belonged to Mr. Lee, the jury was free to reject his opinion.

Contrary to Mr. Lee's statement that he was not "in the pharmacy often enough or long enough to observe [Ji Lee's] improper behavior," witnesses testified that Mr. Lee was present at Stanley Pharmacy multiple days per week. Lee Reply Mtn., at 17; (Tr. 912-15). Moreover, according to witnesses, Mr. Lee spent much of his time in the basement office of the pharmacy—even when he knew that he was the only licensed pharmacist working at the time. (Tr. 305, 587-89). The basement office was also where federal agents found the ledger detailing the day-to-day transactions of the pharmacy. (Tr. 814-22).

As an authorized signer on the Pharmacy Account, Mr. Lee was in a position to observe the marked increase in the account balance during the time of the conspiracy. (Tr. 781-82). Mr. Lee personally made cash deposits into the Pharmacy Account during this time, a number of which were in amounts of slightly less than $10,000. (Tr. 714). Based on this evidence, a rational jury could conclude that Mr. Lee was aware of a high probability of the illegal distribution of oxycodone, but deliberately avoided confirming that fact. *See Cuti*, 720 F.3d at 463. Accordingly, the conscious avoidance instruction was appropriate.

### 3. Submission of Counts One and Two to the jury was proper

Mr. Lee argues that he was prejudiced by the Court's error in submitting Counts One and Two to the jury "in the absence of proof to sustain them." Lee Mtn., at 16. This application must be denied since there was sufficient proof for the jury to find Mr. Lee guilty of Counts One and Two, (*see* Section I(B)(1)(a), *supra*).

### 4. The Government's rebuttal summation was not improper

Mr. Lee contends that the Government's rebuttal summation was improper because it: (a) contradicted its own witness' testimony regarding how cash deposits were made to the Pharmacy Account, and (b) shifted the burden of proof to Mr. Lee by arguing that Mr. Lee's handwriting

10

expert should have analyzed the handwriting on certain cash deposit slips.

In its rebuttal summation, the Government argued that "people generally don't deposit large amounts of cash bordering on $10,000 in an overnight drop box. You want to make the deposits personally." (Tr. 1402). Mr. Lee argues that Government witnesses actually testified that the deposits "appeared to have been made in the Bank of America's night depository.'" Lee Mtn., at 17. This is not an accurate recitation of the testimony. Ms. Maia merely testified that the appearance of certain deposit slips were "consistent with [use of] the night depository," but that there was "no way to distinguish" whether a deposit was made in person or via the night depository. (Tr. 707). Ms. Gayle, moreover, testified that Mr. Lee regularly made deposits in person. In fact, she specifically recalled that a number of Mr. Lee's transactions totaled slightly less than $10,000, stating that his deposits would "always be like [$]9,700 but they would never be over." (Tr. 714). This is consistent with Mr. Lee's own assertion during opening argument that "[h]e made the deposits in person." (Tr. 67). The Government's argument was therefore supported by evidence that Mr. Lee had personally made cash deposits of slightly less than $10,000.

The Government also stated:

> Hi Jong Lee wants you to believe that somebody else was making the deposits. Well, if that's the case—and again, the defendant doesn't have any burden, the defendant doesn't have to do anything, but the defendant put on a handwriting expert . . . . How come you didn't hear a word from the handwriting expert about the handwriting that was on the deposit slips? That's because it was the defendant who wrote those deposit slips and it was the defendant who brought those deposits personally into the bank.

(Tr. 1402-03). "A prosecutor is entitled to comment on . . . [the] defendant's failure to support his own factual theories with witnesses." *United States v. McDermott*, 918 F.2d 319, 327 (2d Cir. 1990). Indeed, such comments become improper "only when the evidence that the

11

defendant has not adduced is in the control of the defendant alone or where the jury would

naturally and necessarily interpret the Government's summation as a comment on the

defendant's failure to testify." *Id.* If a prosecutor's remarks cause "ambiguity" with respect to

the burden of proof, that ambiguity may be cured by a Court's instruction that the Government,

not the defendant, bears the burden of proof. *See United States v. Bautista*, 23 F.3d 726, 733 (2d

Cir. 1994).

The Government's argument falls well within permissible limits. The Government, after

reminding the jury that "the defendant doesn't have any burden," commented upon Mr. Lee's

failure to support his factual theory—that someone else had made the deposits—with testimony

from his own expert witness. *See McDermott*, 918 F.2d at 327. Furthermore, following the

Government's rebuttal summation, the Court instructed the jury that

> [T]he government has the burden to prove each defendant's guilt
> beyond a reasonable doubt. That burden never shifts to Ms. Chai
> or Mr. Lee for the simple reason that the law presumes them
> innocent and never imposes upon any defendant in a criminal case
> the burden or the duty of calling any witnesses or producing any
> evidence. . . . Ms. Chai and Mr. Lee have no burden to prove
> themselves innocent.

(Tr. 1412-13). The jury charge removed any doubt that the burden of proof beyond a reasonable

doubt always rested with the Government. *See Bautista*, 23 F.3d at 733; *United States v.*

*Williams*, 690 F.3d 70, 77 (2d Cir. 2012) (potentially erroneous statement not reversible error

where Court delivered "extensive discussion of the . . . requirement that the government prove

guilt beyond a reasonable doubt").

Accordingly, Mr. Lee's motions for a new trial pursuant to Fed. R. Crim. P. 33 are

DENIED.

12

### C. Ms. Chai's Motion

Ms. Chai moves for a new trial, pursuant to Fed. R. Crim. P. 33, on the sole ground that the jury was exposed to "prejudicial extra-record information" during its deliberation. Chai Mtn., at 1. Mr. Lee joins in the motion.

#### 1. Background

The jury began its deliberations on the morning of Monday, September 22. That morning, prior to sending the exhibits into the jury room, the Court conferred with the Government and defense counsel and was assured that both sides had reviewed the exhibits and that only the exhibits received in evidence would be sent into the jury room.[4] (Tr. 1473).

On the morning of Friday, September 26, the Court received notification that Juror #5 had a family medical emergency and could not return to deliberations; Juror #4 also indicated that she was unavailable beginning on Monday, September 29, due to a business obligation. (Tr. 1512-14). After conferring with counsel, the Court adjourned deliberations, dismissed Jurors #4 and #5, and notified two alternate jurors that they would begin deliberations on Monday, September 29. (Tr. 1530-31).

On the morning of September 29, the Government informed the Court that it had been unable to locate a folder containing certain trial materials (the "Government Folder"), and that the folder may have been inadvertently included with the exhibits sent into the jury room. The Court then empanelled the alternate jurors and instructed the jury:

> You're going to begin your deliberations. Your deliberations [t]hat you did before must be set aside, and you must disregard your earl[ier] deliberations and begin your deliberations anew.
>
> You should not discuss or mention any statements or comments

[4] The jury was charged on September 19, but left at the end of the charge. Jury deliberations began on Monday, September 22, but most of the day was taken up by a readback of testimony. The jury met on Tuesday, and for a half day on Wednesday. The jury did not deliberate on Thursday, September 25.

13

> made during the prior deliberations when you begin your new
> deliberations. This is because . . . your alternate jurors[] were not
> present to hear the earlier deliberations, and a jury verdict must be
> the product of the deliberations of all 12 people who reach that
> verdict.

(Tr. 1538-39). The Court further instructed the jury that the exhibits would be temporarily

removed from the jury room, and that they were to discard all notes and work product from their

previous deliberations. The Court reiterated:

> [S]tart your deliberations as though this were Monday, the 22nd
> when you began your deliberations. This is a new set of
> deliberations, though, because you have a new jury. . . . You have
> to start anew and fresh."

(Tr. 1539).

Before returning the exhibits to the jury room, counsel examined the exhibits and located

the Government Folder among them. The folder contained, *inter alia*, a typed copy of the

Government's opening statement, outlines of direct examinations and expected answers for

Government witnesses, and questions and expected answers of Special Agent Nicholas Silva, a

federal investigator who did not testify at trial. (Tr. 1547-48). Counsel for Ms. Chai and Mr.

Lee requested that the Court conduct an individualized voir dire to determine whether any juror

had reviewed the contents of the Government Folder. (Tr. 1555). The Court declined to do so,

and instead instructed the jury at 11:00 a.m. as follows:

> I want to call to your attention that certain documents which were
> not in evidence were sent into the jury room last week. It was a
> mistake to do so. I want you to disregard that evidence. If you've
> considered it, you must strike it from your mind and disregard it
> for all purposes in the future. The material consisted of
> government notes and preparation materials. It's contained in a
> redwell folder. . . .
>
> [Y]ou must disregard any evidence contained in that redwell. It
> was an accident and we don't know how it happened, but it's not
> received in evidence and so it must be disregarded by you.

14

> Now, this should not be any problem because, as I told you this
> morning, you're beginning your deliberations anew, and you're to
> consider only the materials that were received in evidence. That
> material is no longer before you. It's been removed.

(Tr. 1557-58). At approximately 4:30 p.m., the jury notified the Court that it had reached a
verdict.

## 2. Applicable law

The law presumes that a jury's exposure to extra-record evidence is prejudicial; such
prejudice however, may be rebutted "by a showing that the extra-record information was
harmless." *United States v. Farhane*, 634 F.3d 127, 168 (2d Cir. 2011) (citation omitted). To
determine whether the information was harmless, the Court considers: "(1) the nature of the
information . . . at issue, and (2) its probable effect on a hypothetical average jury." *Id* at 169.
The test "is an objective one," and courts should "assess the possibility of prejudice by reviewing
the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that
information of which the jurors were properly aware." *United States v. Weiss*, 752 F.2d 777, 783
(2d Cir. 1985). A "district court must be careful that it does not itself create prejudice by
exaggerating the importance and impact of extra-record information." *Farhane*, 634 F.3d at 169.

## 3. Analysis

The jury was not prejudiced because it was not exposed to extra-record information. The
Government Folder was removed from the jury room before the newly-constituted jury
containing the two alternate jurors commenced deliberations on Monday, September 29, 2014.
The jury that was exposed to the extra-record information, therefore, was a different jury than the

15

one that returned the verdicts against Defendants.[5]  Indeed, the Court specifically instructed that "[t]his is a new set of deliberations . . . because you have a new jury." (Tr. 1539).  The Court also instructed the jury to set aside its previous deliberations and to refrain from mentioning any statements or comments made during the prior deliberations.  *See United States v. Williams*, 690 F.3d 70, 77 (2d Cir. 2012) (juries are presumed to follow instructions from the Court).

In an abundance of caution, the Court issued a curative instruction to the newly-constituted jury directed specifically to the extra-record materials.[6]  The Court specifically directed the jury to disregard any extra-record information, and explained that to do so should not be problematic because the jury was beginning deliberations anew. (Tr. 1558).  *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (courts presume that a jury "will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant") (citations omitted).  Moreover, in issuing a general curative instruction rather than the individualized voir dire requested by defense counsel, the Court sought to avoid "creat[ing] prejudice by exaggerating the importance and impact of" the Government Folder.  *See Farhane*, 634 F.3d at 169.

Finally, Ms. Chai's assertion that the extra-record information was not discovered until "[a]fter the jury had been deliberating for over four days" is not accurate.  The original jury only deliberated for approximately a day and a half, starting on Monday and allowing for the readback

---

[5] This is particularly true given the 4½ day time lapse between the time when the original jury concluded deliberations—at 2:00 p.m. on Wednesday, September 24—and when the newly-constituted jury commenced deliberations on Monday, September 29.

[6] The Court modeled the curative instruction after the instruction in *United States v. Okehi*, 2003 U.S. Dist. LEXIS 11851, at *3-5 (S.D.N.Y. July 14, 2003), *aff'd*, 111 Fed. Appx. 41 (2d Cir. 2004).  In that case, the Government's notes from a proffer meeting with the defendant were inadvertently sent into the jury room.  Despite clear evidence that the jury had reviewed the notes during its deliberation, the Court held that the defendant was not entitled to a new trial because the Court had issued a curative instruction regarding the notes, and because the notes contained only information that had already been presented at trial.  *Id.*

16

of testimony that day.[7]  Chai Mtn., at 1.  The newly-constituted jury began its deliberations 4½

days later on Monday, September 29, 2014.

     The Defendants are not entitled to a new trial.

## CONCLUSION

     For the reasons discussed, Defendants' motions for judgment of acquittal and for a new

trial are DENIED in their entirety.  The Court will order the production of the pre-sentence

reports.  Ms. Chai's sentencing will proceed on May 21, 2015 at 2:00 p.m.; Mr. Lee's sentencing

will proceed on May 21, 2015 at 3:00 p.m.

Dated: New York, New York
      January 22, 2014

        SO ORDERED

        PAUL A. CROTTY
        United States District Judge

---

[7] The Court also notes that it gave both parties the opportunity to review the exhibits before providing them to the jury, and the Government and counsel for Ms. Chai both represented that they had done so.  (Tr. 1473).

17